**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE ) | |
| NEIL H. ELLIS IRREVOCABLE INSURANCE ) | |
| TRUST – 2005, NO. 2 ) | |
| ) | Case No. 08 C 3083 |
| Plaintiff, ) | |
| ) | Judge John W. Darrah |
| v. ) | Magistrate Judge Nolan |
| ) | |
| COVENTRY CAPITAL I LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND COMPEL
ARBITRATION**

Defendant COVENTRY CAPITAL I LLC, ("Coventry") states the following in support

of its motion to dismiss and compel arbitration:

**INTRODUCTION**

The transaction that gives rise to this dispute is a non-recourse premium finance loan.

Elizabeth Ellis, as Co-Trustee of the Neil H. Ellis Irrevocable Insurance Trust – 2005, No. 2 [*sic*]

(the "Plaintiff") is the settlor of a statutory trust that borrowed money in order to pay premiums

on a life insurance policy. The policy was pledged to the lender as collateral for the loan.

Defendant Coventry Capital I LLC ("Coventry") is the servicing agent and program

administrator for the lender. As a result of the Plaintiff's failure to repay the loan on or prior to

the maturity date, Coventry foreclosed on the insurance policy and liquidated the policy in an

effort to recoup the lender's losses. Now, even though the Plaintiff previously agreed to submit

and settle by arbitration any and all claims related to the transaction, the Plaintiff refuses to

arbitrate its claims against Coventry. Therefore, Coventry now moves for an order dismissing

this case under either Federal Rule of Civil Procedure 12(b)(1) or Rule 12(b)(6) and compelling

arbitration as required by the Federal Arbitration Act (the "FAA").

## BACKGROUND

On July 26, 2005, pursuant to the terms of a Note and Security Agreement (the "Note and Security Agreement"), LaSalle Bank National Association ("LaSalle") loaned money (the "Loan") to the Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust (the "Sub-Trust") to pay the premiums on a $30 million life insurance policy (the "Policy") issued to the Neil H. Ellis Insurance Trust – 2005 (the "Trust"). The Note and Security Agreement is attached as Exhibit 1 to the Plaintiff's Amended Complaint, a copy of which is attached hereto as Exhibit A. The Policy served as collateral for the Loan.

The Trust was formed pursuant to a trust agreement dated June 30, 2005 (the "Trust Agreement"), a copy of which is attached hereto as Exhibit B, among Wilmington Trust Company, as trustee, the Neil H. Ellis Irrevocable Insurance Trust–2005, No. 2 (the "Irrevocable Trust" or the "Plaintiff"), as settlor and beneficial owner, and Elizabeth Ellis, as co-trustee. The Sub-Trust was pursuant to a Supplement to Trust Agreement (the "Supplement") dated July 1, 2005, a copy of which is attached hereto as Exhibit C. The Sub-Trust also has Wilmington Trust Company, as trustee, the Plaintiff, as settlor and beneficial owner, and Elizabeth Ellis, as co-trustee.

Elizabeth Ellis had several roles in the loan transaction: In addition to being the co-trustee of the Trust and Sub-Trust, she is also the trustee of the Irrevocable Trust that is (i) the plaintiff in this action and (ii) the settlor and beneficial owner of the Trust and Sub-Trust. Ellis' signature appears on numerous documents that, among other things, (i) authorize the Trust to enter into the Note and Security Agreement, (ii) acknowledge Coventry's role as LaSalle's servicing agent and (iii) provide that any disputes relating to the transaction are subject to

arbitration.

These transaction documents disprove the allegations in the Plaintiff's amended complaint that she was unaware of the Loan transaction and of Coventry's role as servicer. *See* Exhibit A at ¶12. For example, the Supplement, which is signed by Elizabeth Ellis in three separate capacities (as settlor, co-trustee and beneficial owner of the Sub-Trust), states, in part, that:

> **The Settlor desires that the Trustee (i) cause the Sub-Trust to enter into the Note and Security Agreement** (the "Note and Security Agreement") dated as of the date hereof, between the Trust and LaSalle Bank, N.A. (the "Lender"), **pursuant to which the Sub-Trust will borrow money from the Lender in the amount specified therein (the "Loan"), the proceeds of which shall be used primarily to pay premiums on the Policy in accordance with the terms of the Note and Security Agreement**...

Ex. C, at Recital D (emphasis added). In addition, the Settlor and Co-Trustee Disclosure Statement and Acknowledgment (the "Disclosure Statement"), a copy of which is attached hereto as Exhibit D, provides that:

> **Settlor intends to cause the [Sub-Trust] to enter into that certain Note and Security Agreement** (the "Note") with the lender named therein (together, with its successors, assigns and agents, the "Lender"), **under which the Borrower shall be provided loans to procure certain life insurance policies which have been identified to the Lender (the "Policies")**.

Ex. D, at 1 (emphasis added). Elizabeth Ellis signed and initialed the Disclosure Statement in her capacities as settlor and co-trustee of the Sub-Trust.

The transaction documents also make it clear that Coventry is LaSalle's agent. Elizabeth Ellis, as trustee of the Plaintiff, consented to LaSalle's appointment of Coventry as its servicing agent in the Settlor Non-Recourse Security Agreement, a copy of which is attached hereto as Exhibit E:

## CONSENT TO APPOINTMENT OF AGENT

> You [Irrevocable Trust] acknowledge and agree that we [LaSalle] have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicer"). You agree to follow the instructions and directions of the Servicer under this Agreement until we notify you in writing to the contrary.

Ex. E, at 2. The Note and Security Agreement contains a nearly identical provision relating to Coventry's role as LaSalle's agent. *See* Ex. A, at 4. Coventry is also identified as LaSalle's "Program Administrator" in the Disclosure Statement. *See* Ex. D, at 2. Coventry's role as LaSalle's agent for the Loan includes, but is not limited to, originating the Loan, arranging for Loan documents to be signed, servicing the Loan and the Policy, monitoring the status of the insured under the Policy, sending out notices under the Loan documents and facilitating the satisfaction of the Loan at maturity.

Finally, the transaction documents contain arbitration provisions that require the Plaintiff to arbitrate her claims against Coventry. The Note and Security Agreement and the Settlor Non-Recourse Security Agreement contain identical arbitration provisions that provide:

> **Any claim or dispute**, whether in contract, tort, statute or otherwise (including interpretation and scope of this clause, and the arbitrability of the claim or dispute), **between you and us or our** employees, **agents**, successors or assigns, **which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (<u>including any such relationship with third parties who do not sign this Agreement</u>) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.**

Ex. A, at 5-6; Ex. E, at 4. The Disclosure Statement contains a separate arbitration provision which states, in part, that:

> Except to the extent that any party shall seek equitable relief, **all other disputes and controversies of every kind and nature between the Program Administrator [Coventry] and the Settlor [the Plaintiff], the Co-Trustee [Elizabeth Ellis] or the Borrower [the Sub-Trust] arising out of or in connection with**

4

> **any of the Transaction Documents,** including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof **shall be submitted and settled by arbitration in accordance with the rules of the American Arbitration Association.**

Ex. D, at ¶ 16.

The Loan matured on January 28, 2008 (the "Maturity Date"). As a result of the Sub-Trust's failure to repay the Loan on or prior to the Maturity Date, Coventry foreclosed on the Policy and liquidated the Policy in a commercially reasonable manner in an effort to satisfy the obligations of the Sub-Trust under the Note and Security Agreement. An accounting was sent to the Plaintiff on March 20, 2008.

The Plaintiff filed its initial complaint in state court on February 13, 2008 seeking to enjoin the foreclosure. Ellis alleged that LaSalle (then a named defendant) and Coventry breached contractual and fiduciary duties in exercising rights accorded them under the Note and Security Agreement. The trial court denied the motion for emergency injunctive relief.

LaSalle and Coventry then filed a motion to dismiss the complaint citing mootness and the arbitration clause. Ellis acknowledged the applicability of the arbitration clause as to LaSalle, but denied it applied to Coventry. On May 12, 2008, Ellis was granted leave to file an amended complaint in state court naming only Coventry. In the amended complaint removed to this Court, Ellis purports to assert claims she contends fall outside the arbitration clause. Coventry and LaSalle served a joint demand for arbitration on May 16, 2008. A copy of this demand is attached hereto as <u>Exhibit F</u>. Ellis did not respond to this demand. It is Coventry's understanding that Ellis refuses to arbitrate her claims against Coventry.

## <u>STANDARDS</u>

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter

jurisdiction.  Fed. R. Civ. P. 12(b)(1); *Rendina v. Falco/Rendina/Erickson*, 2006 WL 2578926, at *2 (N.D. Ill. Sept. 5, 2006).  District courts look beyond the pleadings and consider all competent evidence when considering a Rule 12(b)(1) motion challenging the factual basis for subject matter jurisdiction.  *New Medium Technologies LLC v. Barco N.V.*, 2007 WL 2020169 at *5 (N.D. Ill. July 5, 2007).  While this Court must accept all well pled facts as true and draw all reasonable inferences in the plaintiff's favor in ruling on the motion, Ellis nonetheless bears the burden of establishing that the necessary jurisdictional conditions precedent have been alleged. *Id*.  Ellis cannot meet her burden.

The purpose of a 12(b)(6) motion is to test the sufficiency of the complaint.  *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990).  A complaint must allege the operative facts on which each claim is based to withstand a motion to dismiss.  *Joyce v. Morgan Stanley & Co., Inc*., 2007 WL 967933 at *3 (N.D. Ill., Mar. 29, 2007).

Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2), the complaint "*must* contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). (emphasis added; internal citation omitted).  Plaintiff must provide *some* factual basis to show why she is entitled to relief—something "beyond the mere *possibility* of loss causation." *Twombly*, 127 S. Ct. at 1966 (emphasis added); *see also, E.E.O.C. v. Concentra Health Services, Inc*., 496 F.3d 773, 776, (7th Cir. 2007).  Ellis similarly cannot satisfy this standard in light of the binding arbitration clause that subjects any and all disputes relating to the Note and Security Agreement to arbitration.

Arbitration must be compelled when it is shown that there is (1) a written agreement to

arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc*., 417 F.3d 682, 687 (7th Cir. 2005), *citing* 9 USC §4; *Olson v. Jenkins & Gilchrist*, 461 F.Supp.2d 710, 726 (N.D. Ill. 2006). Each of these elements is present here.

## ARGUMENT

Congress enacted the Federal Arbitration Act (the "FAA") (9 U.S.C. § 1 et seq. (1994)) in 1925 "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts[ ] and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26, 36 (1991). The FAA reflects a "liberal federal policy favoring arbitration agreements" (*Moses H. Cone Memorial Hospital v. Mercury Construction Corp*., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983)) and provides for orders compelling arbitration when one party fails, neglects, or refuses to comply with an arbitration agreement. 9 U.S.C. §4. Any doubts concerning the scope of arbitrable issues are resolved in favor of arbitration. *Moses*, 460 US at 24-25.

## I. ELLIS EXPRESSLY AGREED TO ARBITRATE DISPUTES WITH COVENTRY AS LASALLE'S AGENT IN THE NOTE AND SECURITY AGREEMENT AND THE SETTLOR NON-RECOURSE SECURITY AGREEMENT

The arbitration clauses in the Note and Security Agreement and Settlor Non-Recourse Security Agreement could hardly be clearer: ***any claim or dispute*** shall be resolved by binding arbitration, including those claims directed against Coventry as LaSalle's agent.

As set forth above, the transaction documents make clear that LaSalle designated Coventry as its agent and that plaintiff consented to this appointment in the Note and Security Agreement (which the Sub-Trust entered into at the request of Elizabeth Ellis) and in the Settlor Non-Recourse Security Agreement (which is signed by Elizabeth Ellis). Pursuant to the terms of

those agreements, LaSalle's appointment of Coventry as its agent required the Plaintiff to "agree to follow the instructions and directions of the Servicer [Coventry] under this Agreement until we notify you in writing to the contrary."  Ex. C, at 4; Ex. D, at 2.

An "agent" is "[o]ne who is authorized to act for or in place of another; a representative." Black's Law Dictionary 68 (8th ed. 2004).  *See also* Webster's Third New International Dictionary 40 (1993) (defining an "agent" as "one that acts for or in the place of another by authority from him: as * * * a representative, emissary, or official of a government").  *Ultsch v. Illinois Mun. Retirement Fund,* 226 Ill. 2d 169, 197-98, 874 N.E.2d 1 (Ill. 2007).

Because Coventry is LaSalle's agent under Illinois law for the administration of the Note and Security Agreement and the Settlor Non-Recourse Security Agreement, Coventry can demand that this dispute be arbitrated under the terms of those agreements.  Those agreements contain identical arbitration clauses, the plain language of which expressly provide that "any claim or dispute  . . . . between you and us or our employees, agents, successor or assigns, which arises out of or relates to this Agreement or any related or resulting agreement . . . shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action."  The Plaintiff's dispute with Coventry "relates" to its execution of its duties as LaSalle's agent – plaintiff's admitted default prompted Coventry, *as LaSalle's agent*, to foreclose on the collateral for the Loan (the Policy) and dispose of such collateral consistent with the terms of the Note and Security Agreement.

## II.  PLAINTIFF SEPARATELY AGREED TO EXPRESSLY ARBITRATE DISPUTES BETWEEN HER AND COVENTRY

Even if this Court finds that Coventry is not entitled to arbitrate under the provisions contained in the Note and Security Agreement and the Settlor Non-Recourse Security Agreement (which it is), Coventry can arbitrate this dispute under the arbitration provision contained in the

Disclosure Statement, which provides that all "disputes and controversies of every kind and nature between the Program Administrator [Coventry] and the Settlor [the Plaintiff], the Co-Trustee [Elizabeth Ellis]or the Borrower [the Sub-Trust] arising out of or in connection with any of the Transaction Documents . . . shall be submitted and settled by arbitration." Ex. D, at ¶16. The Disclosure Statement is signed by Elizabeth Ellis, as co-trustee and settlor of the Trust.

## III.  PLAINTIFF'S CLAIMS FALL EXPRESSLY WITHIN THE ARBITRATION CLAUSE

The discussion above makes clear that there is a written agreement to arbitrate any claim or dispute between the parties, including claims or disputes related to the interpretation and scope of the arbitration clause and the arbitrability of the claim or dispute.  Coventry submits that the claims asserted in the amended complaint fall squarely within the scope of the arbitration agreement.  These claims include breach of fiduciary duty, violation of the Illinois Consumer Fraud Act, fraudulent concealment, unjust enrichment and a request for a constructive trust.  *See* Exhibit A.

The focus is on the factual allegations of the complaint in determining whether a claim comes within the scope of an arbitration agreement.  *Bayer Cropscience, Inc. v. Limagrain Genetics Corp., Inc.*, 2004 WL 2931284 *2 (N.D. Ill., Dec. 9, 2004) (Darrah, J).  An order to arbitrate a dispute should not be denied unless it can be said "with positive assurance" that the arbitration clause cannot be interpreted to cover the dispute.  *Id, quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 582-83 (1960).  Doubts relating to the scope of the arbitration clause are resolved in favor of arbitration once it is clear that the parties agreed to arbitrate disputes between them.  *Bayer,* 2004 WL 2931284 at *2; *Miller v. Flume*, 139 F.3d 1130, 1135 (7th Cir. 1998).

Importantly, each claim is based on, and arises out of, the Note and Security Agreement

to which the arbitration clause applies.  A contrary argument overlooks the indisputably plain language of the clause:

> "Any claim or dispute, whether in contract, tort, statute or otherwise (including the scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of *or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement)* shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action."

Ex. A, at 5-6.

The clause contains no temporal distinction.  The plain language instead unequivocally provides that *all* disputes "related to" the Note and Security Agreement would be subject to arbitration.  It cannot be reasonably disputed that alleged breach of fiduciary duty, fraudulent concealment by Coventry to plaintiff, and alleged resulting unjust enrichment relate to the Note and Security Agreement to which the arbitration clause was plainly intended to apply.

## IV.  ELLIS REFUSES TO ARBITRATE

Finally, Ellis refuses to arbitrate this dispute despite a formal arbitration demand served on her by Coventry on May 16, 2008.  *See* Exhibit F.  Inexplicably, Ellis agrees that she must arbitrate her claim against LaSalle but persists in pursuing litigation against Coventry *with respect to the same transaction*.  This approach defeats the purpose of the arbitration clause and is contrary to the public policy embodied in the FAA favoring alternative dispute resolution.  The FAA is "at bottom a policy guaranteeing enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chryslers-Plymouth, Inc.*, 473 US 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).  That policy should be given full effect here.

The arbitration clause in the Note and Security Agreement makes clear that Ellis may not resort to court action to resolve her dispute with Coventry regarding the administration of her

loan.  This Court lacks subject matter jurisdiction over this case as a result.  At the very least, the arbitration clause prevents Ellis from stating a legally viable claim on which relief may be granted.  This case should de dismissed and the parties allowed to arbitrate their dispute.

WHEREFORE, for the foregoing reasons, defendant COVENTRY CAPITAL I LLC respectfully requests that this Court grant its motion, dismiss plaintiff's complaint and order the parties to arbitrate their dispute under section 4 of the Federal Arbitration Act and for such other relief as this Court deems proper.

Respectfully submitted,

By:   */Rosa M. Tumialán*
    One of the Attorneys for Defendant

| | |
|---|---|
| Terrence E. Kiwala ARDC #1476548 | Brian P. Brooks |
| Michael C. Borders ARDC# 61800620 | Kyra A, Grundeman |
| Rosa M. Tumialán ARDC# 6226267 | O'MELVENY & MYERS LLP |
| Dykema Gossett PLLC | 1625 Eye Street, N.W. |
| 10 South Wacker Drive, Suite 2300 | Washington, D.C.  20006 |
| Chicago, IL  60606-7407 | (202) 383-5300 |
| (312) 876-1700 | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **June 18, 2008,** I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel set forth below:

James John Sanders     jjs@lefltd.com

A copy was also served on the below counsel by US mail:

Stephen B. Eisenberg
Mark L. LeFevour
Leahy, Eisenberg & Frankel, Ltd.
33 West Monroe Street
Suite 1100
Chicago, IL 60603

*s/ Rosa M. Tumialán*

# EXHIBIT A

## SETTLOR AND CO-TRUSTEE DISCLOSURE STATEMENT AND ACKNOWLEDGMENT

### IMPORTANT: PLEASE READ THIS DISCLOSURE STATEMENT BEFORE SIGNING THE TRANSACTION DOCUMENTS

| BORROWER: | The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust |
|---|---|

Settlor intends to cause The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust to enter into that certain Note and Security Agreement (the "Note") with the lender named therein (together, with its successors, assigns and agents, the "Lender"), under which Borrower shall be provided loans to procure certain life insurance policies which have been identified to the Lender (the "Policies"). The Note, the Trust Agreement, Supplement to Trust Agreement and each of the documents contemplated thereby or delivered in connection therewith are sometimes referred to collectively as the "Transaction Documents." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Transaction Documents.

Each of the undersigned, as Settlor and Co-Trustee of the Borrower, do hereby acknowledge that such Settlor or Co-Trustee has read each of the Transaction Documents and further acknowledges, represents and warrants the following:

1. Each undersigned understands that pursuant to the Note, Borrower has agreed to take out a loan (the "Loan") from the Lender for the sole purpose of allowing it to procure the Policies, which Loan shall be strictly non-recourse unless Borrower defaults under the Note.

2. Each undersigned understands that pursuant to the Transaction Documents, Borrower has granted to the Lender a security interest in all of the assets contained in The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust (the "Sub-Trust"), including the Policies and all proceeds from the Policies, and in the event of a default under the Note, the Lender shall have the right to (i) take the Sub-Trust assets, including the Policies, from Borrower by means of foreclosure and (ii) surrender, sell or otherwise exercise rights under the Policies. Settlor also understands that in the event the Insured dies prior to the maturity of the Loan, the death benefit proceeds paid pursuant to the Policies shall first be used to repay the obligations of the Borrower due under the Note with the remainder of such death benefit proceeds being paid to the Borrower.

3. Each undersigned understands that, upon the maturity of the Loan, Borrower may satisfy all of its payment and other obligations under the Note by either (i) paying the Lender the Scheduled Maturity Date Balance (as defined in the Note) or (ii) relinquishing to the Lender all of Borrower's right, title and interest in, to and under the Policies.

4. Each undersigned understands that in the event Borrower relinquishes its rights to any of the Policies in accordance with the terms and conditions of the Note, Settlor, Co-Trustee and Borrower will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

5. Each undersigned understands that there will be tax effects to Borrower in connection with the transactions contemplated by the Transaction Documents, and Borrower has not relied upon any advice from the Lender, Coventry Capital I LLC, the administrator for the Lender (together with any successor, the "Program Administrator"), any affiliate of the Program Administrator, or any insurance producer regarding any such tax effects. Settlor and Co-Trustee each hereby confirms that the Program Administrator has recommended that both the Settlor and Co-Trustee consult with such person's own legal, tax, accounting and financial advisors regarding such potential effects.

6. Settlor hereby acknowledges and understands that the Trust Agreement and the Supplement to Trust Agreement are not intended to satisfy Settlor's estate planning needs and have not been designed as an

Settlor Initials _____
Co-Trustee Initials _____

estate planning tool. Settlor hereby confirms that the Program Administrator has recommended to Settlor that Settlor consult with Settlor's own legal, tax, accounting and financial advisors regarding individual estate planning needs.

7. Settlor hereby confirms that each of the beneficial owners named in the Trust Agreement and in the Supplement to Trust Agreement is either related to or otherwise has an insurable interest in the insured.

8. Each undersigned hereby acknowledges and confirms that such undersigned has had an opportunity to review each of the Transaction Documents, including the Note, with his, her or its attorneys, accountants and/or advisors and has a complete understanding of each of the Transaction Documents. Each undersigned understands and agrees that any such attorneys, accountants and or advisors (including any insurance producer) who is advising, or assisting such undersigned in connection with the transactions contemplated by the Transaction Documents is not acting as an agent of either the Program Administrator or the Lender. Neither undersigned has relied upon any advice from the Lender, the Program Administrator, or any affiliate of the Program Administrator, regarding its involvement in this transaction, and has not received and is not relying on any oral or written representations from any person that are inconsistent with or contrary to the information contained in the Note or this Disclosure Statement and Acknowledgement or any other Transaction Documents. Each undersigned is signing, or causing the Borrower to sign, as appropriate, the Transaction Documents freely and voluntarily and is of sound mind and not subject to any constraint or undue influence, and has never been the subject of any mental health or mental competency proceeding or other proceeding or hearing with respect to which such undersigned's competency or capacity to contract is or was an issue.

9. The Loan and the issuance of the Policies are on terms that are fair and reasonable to the Borrower.

10. The Program Administrator has no obligation to cause any of the Policies to be issued and/or the Loan to be made.

11. Upon the reasonable request of the Program Administrator, Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, releases and authorizations from time to time, permitting or authorizing the Program Administrator to obtain current information regarding the Policies.

12. Settlor and Co-Trustee shall inform the Program Administrator within thirty (30) days of any and all changes in personal information of the Insured, including address, telephone number, or attending physician information. Settlor acknowledges that the Program Administrator may, from time to time and at its own discretion, contact Insured for confirmation of such information.

13. Each undersigned acknowledges that the Lender, the Program Administrator, and any insurance company providing insurance coverage relating to the value of the Policies, as well as third parties, will be acting in reliance upon the undertakings of such undersigned set forth in this document.

14. Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, all documents as may be required by the Lender, or any life insurer in connection with any of the Policies or the Loan and shall cooperate in any way reasonably requested (and at no cost to Settlor, Co-Trustee or Borrower) in connection with the transactions contemplated by the Transaction Documents, including, but not limited to, assisting in keeping any of the Policies in force or liquidating any of the Policies upon a default under the Note or at the request of the Borrower.

15. Each undersigned shall hold each of the Lender, the Program Administrator, any affiliate of the Program Administrator and any insurance company providing insurance coverage relating to the value of the Policies

Settlor Initials _____
Co-Trustee Initials _____

harmless, and indemnify each of them from and against any loss, liability, expense, claim, or demand arising out of or in connection with (i) the failure of the Settlor, the Co-Trustee, the Borrower or the Insured to perform any of their respective obligations contained herein (or in any Transaction Document), except for those Losses resulting directly from the gross negligence or willful misconduct of either the Lender or the Program Administrator and/or (ii) any representation, and/or information provided, by the Settlor, the Co-Trustee, the Borrower or the Insured, or any of their respective agents, to the Lender or the Program Administrator being found to be false or materially misleading (collectively, "Losses"). The foregoing indemnity shall survive the termination of the Transaction Documents.

16. Except to the extent that any party shall seek equitable relief, all other disputes and controversies of every kind and nature between the Program Administrator and the Settlor, the Co-Trustee or the Borrower arising out of or in connection with any of the Transaction Documents, including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof shall be submitted and settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall be held in Philadelphia, Pennsylvania before a panel of three (3) arbitrators, hereafter collectively referred to as "arbitrator", knowledgeable in the business of life insurance, one to be chosen by each party, and the third to be chosen by the two previously chosen arbitrators. The arbitrator's decision and award shall be final and binding and may be entered in any court having jurisdiction thereof. The arbitrator shall not have the power to award punitive, exemplary, or consequential damages.

**SETTLOR**

X _Elizabeth Ellis_

(Signature of Settlor)

The Neil H. Ellis Irrevocable Insurance
Trust - 2005 No. 2
Elizabeth Ellis, Trustee

(Printed name of Settlor)

**CO-TRUSTEE**

X _Elizabeth Ellis_

(Signature of Co-Trustee)

Elizabeth Ellis

(Printed name of Co-Trustee)

**NOTARY**

State of _Connecticut_ )
                                    ) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_ , _2005_

(Seal) _Mary C. Arnold_

(Signature of Notary Public)

My commission expires: _____

My Commission Exp. Sep. 30, 2007

**NOTARY**

State of _Connecticut_ )
                                    ) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_ , _2005_

(Seal) _Mary C. Arnold_

(Signature of Notary Public)

My commission My Commission Exp. Sep. 30, 2007

Settlor Initials _EE_
Co-Trustee Initials _EE_

3

FILED-CH

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

08 MAY 16 PM 4:13

| | |
|---|---|
| Elizabeth Ellis, as Co-Trustee of )<br>The Neil H. Ellis Irrevocable )<br>Insurance Trust – 2005, No. 2, )<br>Plaintiff, )<br>·vs. )<br>)<br>LaSalle Bank National Association and )<br>Coventry Capital I LLC., )<br>Defendants. ) | ——— ——————CLERK<br>DOROTHY BROWN<br><br>No.   08 CH 5368 |

## NOTICE OF FILING

Terrence E. Kiwala
Michael C. Borders
Rosa M. Tumialan
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606

Brian P. Brooks
Kyra A. Grundeman
O'Melveny & Meyers, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

**PLEASE TAKE NOTICE THAT** on *May 16, 2008,* we filed with the Clerk of the Circuit Court of Cook County, of *Plaintiff's Verified First Amended Complaint,* a copy of which is attached hereto.

### PROOF OF SERVICE

LaVerne M. Heiser, a non-attorney, on oath state that I served this notice by mailing a copy to the above named parties listed above on *May 16, 2008* and depositing same in the US mail at 33 W. Monroe Street, Chicago, Illinois 60603.

*LaVerne M. Heiser*
LaVerne M. Heiser

[X]   Under penalties as provided by law pursuant to
Ill. Stat. Chap. 110 Sec. 1-109, I certified that the
statements set forth herein are true and correct.

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street, Suite 1100
Chicago, Illinois  60603
Attorney No. 45875

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS,
COUNTY DEPARTMENT, CHANCERY DIVISION

Elizabeth Ellis, as Co-Trustee of )
The Neil H. Ellis Irrevocable )
Insurance Trust-2005, No. 2 )
                  )
          Plaintiff, )
                  )
    v. )      No. 2008 CH 05368
                  )
Coventry Capital I LLC )
         Defendant. )

### VERIFIED FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd.,

and for her Verified First Amended Complaint against Defendant, Coventry Capital I LLC, states

as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

1.     Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust-2005, No. 2, ("Trust"). The Wilmington Trust Company is a Co-Trustee of the

Trust. On information and belief, the Trust is the beneficiary of a $30,000,000.00 life insurance

policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2.     Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, in

the business of securing the purchase and financing of life insurance policies for its clients.

Coventry is, on information and belief, a foreign corporation with its principal place of business

in Fort Washington, Pennsylvania.

3.    LaSalle Bank National Association ("LaSalle") is, on information and belief, a bank chartered and licensed under the laws of the United States and the laws of the State of Illinois with its principal place of business in Chicago, Cook County, Illinois.

4.    At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high-benefit insurance policies with financing of the premiums provided by third parties.

5.    Prior to the transaction which is the subject matter of this case, Passananti solicited and arranged for the purchase of a $10,000,000.00 life insurance policy on Ellis' life. Coventry administered and acted as the servicing agent for the purchase of the $10,000,000.00 policy and the financing of its premium through LaSalle Bank.  Upon the recommendation of Passananti, Ellis sold the $10,000,000.00 policy to a bidder.  Ellis had little involvement with the purchase and sale of the Policy and the financing of its premium.  Due to Passananti and Coventry's experience in the industry, Ellis relied on Passananti and Coventry to handle the details and complete the purchase, finance, and sale of the policy.

6.    In 2005, Passananti solicited Ellis to purchase a $30,000,000.00 life insurance policy ("Policy") on Ellis' life and acted as Ellis' agent in said purchase.

7.    Passananti advised Ellis that he would arrange all of the legal work and the financing of the premium.  On information and belief, Coventry administered and acted as the servicing agent for purchase and financing of the Policy.

8.    Based on Passananti's representations, Ellis participated in the purchase of a $30,000,000.00 life insurance policy on his life and, as he had done with the $10,000,000.00 policy, relied on the expertise and experience of Passananti and Coventry in securing and financing the policy.

9.    On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was designated as the beneficiary of the Policy.

10.    The Policy premium was financed by LaSalle Bank. A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

11.    The Note and Security Agreement was signed only by the Corporate Co-Trustee.

12.    Neither Ellis nor Plaintiff, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis and Plaintiff did not know that the Policy had been purchased on July 26, 2005 and were otherwise of the belief that the Policy had been financed and purchased on or about August 18, 2005. As the Note provided that the Loan would become due 30 months from the Financing Date, Ellis and Plaintiff were of the belief that the Maturity Date was February 18, 2005.

13.    Upon information and belief, as a result of the financing provided by the Agreement, the premium for the Policy was paid through December 31, 2008.

14.    Ellis and the Trust first became aware of the Note's actual maturity date on or about January 29, 2008, when Coventry sent notification, via Federal Express, that the Agreement's maturity date was the previous day, January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to foreclosure of the Policy. At no time prior to that date did Plaintiff or Ellis receive a notice of premium due on the Policy. A copy of the January 29, 2008 correspondence is attached hereto as Exhibit 2.

15.    On or about February 1, 2008, via Federal Express, Coventry sent notification that the Trust had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on

Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of the February 1, 2008 correspondence is attached hereto as Exhibit 3.

16.    Due to Coventry's failure to provide proper notice of the Note's maturity date, Ellis was unable to appropriate the funds necessary to satisfy the balance prior to February 12, 2008.

17.    On information and belief, Coventry initiated foreclosure of the Policy on or about February 13, 2008.

18.    By correspondence dated March 20, 2008, Coventry notified Plaintiff that the Policy was foreclosed upon and subsequently liquidated in order to satisfy the Trust's obligations under the Note. A copy of the March 20, 2008 correspondence is attached hereto as Exhibit 4.

**COUNT I**
**(Breach of Fiduciary Duty)**

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count I, as if fully set forth herein.

19.    On information and belief, Coventry received fees and commissions from both LaSalle and Plaintiff, whereby Coventry received a portion or percentage of fees and commissions that Plaintiff paid to Passananti in connection with the initial purchase of the Policy.

20.    Additionally, due to Coventry's experience in securing and financing life insurance policies, Ellis, Plaintiff and the Trust relied on Coventry's skill and judgment in

securing the Policy and administering the Loan, which included providing the Trust with proper

notice of the loan's maturity date.

21.    Coventry owed Plaintiff a fiduciary duty to provide proper notice of the

impending maturity date.

22.    By failing to provide the Trust with proper notice of the loan's maturity date and

otherwise protect the Trust's beneficiary interest in the Policy proceeds, Coventry breached its

fiduciary duty to Plaintiff.

23.    As a proximate and direct result of said breach, Plaintiff has suffered and will

continue to suffer substantial damages in that Plaintiff has lost her $30,000,000.00 interest in the

Policy and/or the cash surrender value of the Policy in an amount in excess of $50,000.00.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust-2005, No. 2, prays that judgment be entered in her favor and against

Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, together with any

costs incurred, and for any other and further relief this Court deems just and proper.


## COUNT II
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count II,

as if fully set forth herein.

19.    On information and belief, Coventry secured the lender for the policy premium

and counsel to draft the Note.

20.    The Note's default provision provided as follows: "[u]pon your failure to make

any payment when due ... we may ... take any other action with respect to the Policies,

including foreclosure and sale or change of beneficiaries, to realize the value therefrom." (Ex. 1, p. 2).

21.    By allowing LaSalle to assume ownership of a policy on the life of an individual in which it had no insurable interest, the default provision created a "wager" policy on Ellis' life. Wager policies on the life of another violate Illinois law and are contrary to public policy.

22.    Despite its knowledge that the Note contained a provision which created an illegal wager policy on Ellis' life, Coventry secured the Note to finance the Policy's premium and intentionally deceived Ellis, Plaintiff and the Trust into believing that the Note was a legal instrument.

23.    Additionally, after Ellis rejected the initial offer to sell the Policy, Coventry, despite knowing that Ellis, Plaintiff and the Trust were relying on Coventry to provide proper notice of the Note's maturity date, intentionally and deceptively failed to provide the Trust with proper notice of the maturity date.

24.    In failing to provide proper notice to the Trust, Coventry knew and intended that the maturity date would pass without the Trust's knowledge, thereby causing the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy and disperse the proceeds of the liquidation between itself and Coventry.

25.    As Coventry is in the business of securing and financing life insurance policies and was receiving commissions to act as the servicing agent for the subject transaction, its deception of the Trust by intentionally securing a note with an illegal default provision and failing to provide proper notice of the maturity date was in the course of trade or commerce.

26.    As a result of the foregoing, Coventry violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*

27.    As a direct and proximate result of Coventry's violation of the Illinois Consumer Fraud and Deceptive Practices Act, Plaintiff has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00, plus statutory attorney's fees, penalties and costs.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in her favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, together with any costs incurred for statutory attorneys fees and penalties, and for any other and further relief this Court deems just and proper.

## COUNT III
### (Fraudulent Concealment)

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count III, as if fully set forth herein.

19.    By knowingly and intentionally failing to provide the Trust with proper notice of the impending maturity date pursuant to the terms of the Note, Coventry knowingly concealed a material fact – the Note's maturity date.

20.    In concealing the maturity date, Coventry knew that the Trust was relying on Coventry to provide proper notice of the maturity date and intended to induce the Trust into failing to pay the maturity date balance by the maturity date.

21.    Coventry's knowing concealment of the maturity date caused the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy.

22.    Upon information and belief, Coventry profited from said transaction by receiving commission and fees in connection with the foreclosure and liquidation of the Policy.

23.     Had Coventry provided the Trust with proper notice of the maturity date, Ellis would have paid the maturity date balance to ensure that the Note was not defaulted upon and that the Policy would not be foreclosed and liquidated.

24.     As a direct and proximate result of the Trust's reliance and Coventry's intentional concealment, which caused the subsequent default, foreclosure, and liquidation, Plaintiff has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in her favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, together with any costs incurred, and for any other and further relief this Court deems just and proper.  Plaintiff also seeks punitive damages to the fullest extent permitted by law.

## COUNT IV
### (Unjust Enrichment/Disgorgement)

1-18.   Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count IV, as if fully set forth herein.

19.     Upon information and belief, Coventry, at the direction of LaSalle, effectuated the foreclosure and liquidation of the Policy, and profited from said transaction in receiving commission and fees in connection with the foreclosure and sale of the Policy.

20.     As a consequence of the acts set forth above, and to the extent that the sale of the Policy caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy, Coventry was unjustly enriched at the expense and detriment of Plaintiff.

21.    The Plaintiff requests that Coventry be dispossessed of all funds received by Coventry related to the foreclosure and sale of the Policy.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in her favor and against Defendant, Coventry Capital I LLC, for an amount in excess $50,000.00, with any costs incurred, and for any other and further relief this Court deems just and proper.

## COUNT V
### (Constructive Trust)

1-23.   Plaintiff repeats and realleges paragraphs 1-23 of Count I as paragraphs 1-23 of Count V, as if fully set forth herein.

24.    Coventry breached its fiduciary duty to Plaintiff by failing to provide the Trust with advance notice of the Note's maturity date.

25.    As a proximate result of Coventry's breach of its fiduciary duty, in failing to protect the Trust's beneficiary interest in the Policy proceeds, Coventry has caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy.

26.    Coventry's abuse of confidence and/or violation of its fiduciary relationship allows for the imposition of a constructive trust.

27.    Plaintiff requests that this Court impose a constructive trust on the proceeds of the liquidated Policy, $3,993,000.00, against Coventry until the disposition of this case as the proper and necessary means to protect Plaintiff from suffering future undue harm and damages.

WHEREFORE, Plaintiff requests that this Court impose a constructive trust on said proceeds from the sale of the Policy, totaling $3,993,000.00, and for a declaration that

Defendant, COVENTRY CAPITAL, LLC, hold the proceeds of the sale of the Policy as a constructive trustee, and for such other relief as the Court deems just and equitable.

Respectfully Submitted,

Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2

By: _____

One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875
F:CASE\059808\12849\FIRST AMENDED COMPLAINT.doc

## VERIFICATION

I, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust 2005, No. 2, being first duly sworn under oath, deposes and states that she has read the above and foregoing Verified First Amended Complaint and under penalties of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge.

_____
Elizabeth Ellis

LEAHY, EISENBERG & FRAENKEL, LTD.
Attorneys for Plaintiff
33 West Monroe, Suite 1100
Chicago, Illinois 60603
(312) 346-4554
Firm I.D. 45875

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on 7/26/05, by and between THE NEIL H. ELLIS INSURANCE TRUST – 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.



*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

*Funding Date*. We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

– The Policies; and

– All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and' any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

## SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust - 2005,     LaSalle Bank National Association
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By: _____              By: _____
Name:   Janel R. Havrilla                   Name:   Krista Lake
Title:      Financial Services Officer      Title:   Attorney-in-fact

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

7



711 Valley Green Road    Fort Washington, PA 19034-2209    077-836-8700    coventry.com

January 29, 2008

Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    Default Notice of PFP Loan Maturity – Loan ID #12070

Dear Borrower:

This letter is in reference to your loan with LaSalle Bank National Association evidenced by the
Note and Security Agreement dated as of July 26, 2005 between Neil H. Ellis Insurance Trust –
2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Note").   The
outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity
Date").

As a result of your failure to pay the required amount prior to such time, your loan is now in
default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of
(i) the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law.  In
the event that you fail to pay the amounts due under the Note, you will be required to pay our
costs, including attorneys' fees, court costs and collection costs paid in connection with our
foreclosure on the collateral securing your loan.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding
obligations under the Note.

Sincerely,

Richard Cooper
Coventry Capital
Servicing Agent

EXHIBIT
2



COVENTRY
**CAPITAL**     7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    Notice of Foreclosure of Collateral of PFP Loan---Loan ID #12070

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July
26, 2005 between Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust and LaSalle
Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was
due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in
default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i)
the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the
Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate
the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof
(the "Collateral") and/or use other legal remedies in order to satisfy your payment
obligations under the Agreement, and you will be responsible for our costs, including
attorney's fees, court costs and collection costs paid in connection with our foreclosure on
the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding
obligations under the Note.

Sincerely,

Richard Cooper

Coventry Capital
Servicing Agent





7111 Valley Green Road    Fort Washington, PA 19034-2209    877-036-8300    coventry.com

March 20, 2008

VIA UPS

Elizabeth Ellis, Trustee
The Neil H. Ellis Irrevocable Insurance Trust – 2005 No.2
149 Colonial Road
P.O. Box 1270
Manchester, CT 06045

Re:    Accounting and Demand for Payment – PFP Loan ID No. 12070

Dear Trustee:

Reference is made to (i) the Note and Security Agreement, dated as of July 26, 2005 (the "Note and Security Agreement"), between The Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust (the "Borrower") and LaSalle Bank, N.A. and (ii) the Settlor Non-Recourse Security Agreement, dated as of July 1, 2005 (the "Settlor Security Agreement" and together with the Note and Security Agreement, the "Agreements"), between The Neil H. Ellis Irrevocable Insurance Trust – 2005, No.2 (the "Settlor") and LaSalle Bank, N.A. Pursuant to the terms of the Agreements, the Borrower promised to pay LaSalle Bank, N.A. $3,921,112.16 on or before January 28, 2008 (the "Maturity Date") and the Settlor promised to pay certain amounts in the event of a default and foreclosure. We previously sent you notices concerning your payment obligations under the Note and Security Agreement at the following intervals: (i) seventy-five (75) days prior to the Maturity Date, (ii) forty-five (45) days prior to the Maturity Date, (iii) the Maturity Date; (iv) five (5) days after the Maturity Date and (v) fifteen (15) days after the Maturity Date.

As a result of your failure to pay the amounts due under the Note and Security Agreement, we foreclosed upon and subsequently liquidated the life insurance policy set forth on Schedule A of the Note and Security Agreement (the "Collateral") in order to receive proceeds sufficient to satisfy your obligations under the Agreements. A partial accounting is provided below:

| | |
|---|---|
| Proceeds from Sale of Collateral | $3,993,000.00 |
| Less: Maturity Date Balance | $3,921,112.16 |
| Less: Accrued Default Interest | $63,681.04 |
| Less: Partial Foreclosure Costs (Including Attorneys' Fees) and Expenses[1] | $21,360.50 |
| Shortfall Amount: | $13,153.70 |

[1] We will send you an invoice containing the remaining foreclosure costs and expenses when those amounts become available.





We hereby demand payment in the amount of $13,153.70 by certified check or wire within five (5) days of the date of this letter.

LaSalle Bank, N.A. and Coventry Capital I LLC retain their respective rights to exercise further legal remedies available to them in connection with your deficiency, including the right to engage collection services to pursue such rights and remedies. To the extent required by law or consistent with our normal policies in connection with delinquencies and foreclosures, we will report or continue to report your default, such foreclosure and your continuing failure to perform your obligations under the Agreements to credit reporting services and appropriate regulatory authorities.

Sincerely,

Coventry Capital I LLC

Josh May
Senior Counsel

Cc:    Stephen P. Eisenberg (via FedEx)

2

# EXHIBIT B

## THE NEIL H. ELLIS INSURANCE TRUST - 2005

## TRUST AGREEMENT

This TRUST AGREEMENT (as may be amended or supplemented from time to time, this "Trust Agreement"), is made as of _June 30_, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as Settlor (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee (in such capacity, the "Trustee") and Elizabeth Ellis, as Co-Trustee (the "Co-Trustee"). The Settlor, the Beneficial Owner, the Trustee and the Co-Trustee hereby agree as follows:

1.  The trust created hereby shall be known as "The Neil H. Ellis Insurance Trust - 2005" (sometimes referred to herein simply as the "Trust"), in which name the Trustee may conduct the business of the Trust and make, execute and enforce contracts, and in which name the Trustee, the Settlor or the Co-Trustee may execute on behalf of the Trust one or more applications and contracts for life insurance, which policies are to become part of the trust estate of the Trust, and in so doing, has the power to bind the Trust to such contracts as obligations of the Trust. Such policies need not be separately executed by the Trustee. The Trustee shall execute on behalf of the Trust such agreements, certificates, instruments, or other documents, and shall manage, control, use, sell and dispose of the assets of the trust estate of the Trust in such manner as the Settlor may instruct, and the Co-Trustee shall execute on behalf of the Trust any such application or contract for insurance; provided that, except for the insurance application, all forms, instructions or other documents related to or in any way affecting any life insurance policy that is a part of the trust estate must be signed by the Trustee to be effective.

2.  The Settlor hereby assigns, transfers, conveys and sets over to the Trustee the sum of $1.00 (the "Initial Trust Estate"). The Trustee hereby acknowledges receipt of such amount in the Trust from the Settlor, which shall constitute the initial trust estate. The Trustee hereby declares that it will hold the trust estate in trust for the Beneficial Owner.

3.  It is the intention of the parties that the Trust constitute a statutory trust under Sections 3801 et seq. of Title 12 of the Delaware Code (the "Act"), and that this document constitute the governing instrument of the Trust. The Trustee is hereby authorized and directed to execute and file a certificate of trust with the Delaware Secretary of State.

4.  The Trustee and Co-Trustee accept the trusts hereby created and agree to perform their duties hereunder with respect to such trusts but only upon the terms of this Trust Agreement. The Trustee also agrees to disburse all moneys actually received by it constituting part of the trust estate of the Trust upon the terms of this Trust Agreement, and the Co-Trustee acknowledges and agrees that it is not expected or entitled to receive any such moneys or any other property or proceeds of the property of the Trust, but that if it does in fact receive any such moneys, property or proceeds, the Co-Trustee promptly shall notify the Trustee thereof and deliver the same to or at the direction of the Trustee. The Trustee and Co-Trustee shall not be answerable or accountable hereunder under any circumstances, except (i) for its own willful misconduct, bad faith or gross negligence, or (ii) for actual damages incurred by the Trust as a result of the inaccuracy of any representation or warranty herein expressly made by the Trustee

or Co-Trustee, as the case may be, in its individual capacity. In particular, but not by way of limitation (and subject to the exceptions set forth in the preceding sentence):

a.    in accordance with Section 3313(b) of the Act, the Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of this Trust Agreement, and the Co-Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or Trustee in accordance with the provisions of this Trust Agreement;

b.    no provision of this Trust Agreement or any document to which the Trust is a party shall require the Trustee or Co-Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder or thereunder, if the Trustee or Co-Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

c.    under no circumstances shall the Trustee or Co-Trustee be liable for any indebtedness of the Trust;

d.    the Trustee and Co-Trustee shall not be responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Settlor or for the form, character, genuineness, sufficiency, value or validity of any of the trust estate, and in no event shall the Trustee or Co-Trustee assume or incur any liability, duty or obligation other than as expressly provided for herein;

e.    the right of the Trustee to perform any discretionary act enumerated in this Trust Agreement or in any agreement to which the Trust is a party shall not be construed as a duty, and the Trustee shall not be answerable for other than its gross negligence, bad faith or willful misconduct in the performance of any such act;

f.    the Trustee and Co-Trustee undertake to perform such duties and only such duties as are specifically set forth in this Trust Agreement, in particular, but not by way of limitation, the Trustee and Co-Trustee shall have no duty or obligation to monitor any collateral securing any borrowing of the Trust or any sub-trust of the Trust nor any ratings or attributes of any insurance policy or the issuer of any insurance policy held in trust hereunder or in any sub-trust of the Trust, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee or Co-Trustee;

g.    the Trustee shall not be liable for any error of judgment made in good faith unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

h.    the Trustee may conclusively rely and shall fully be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or

2

document in good faith believed by it to be genuine and to have been signed or presented by the proper party or parties;

i.    the Trustee shall be under no obligation to appear in, prosecute or defend any legal action that is not incidental to its duties as the Trustee in accordance with this Trust Agreement or any agreement to which the Trust is a party and that in its reasonable judgment may involve it in any expense or liability (i) in excess of funds then available in the trust estate to defray such expenses or liability and (ii) for which the repayment of such expenses or adequate indemnity against such liability is not reasonably assured or provided to it;

j.    in no event shall the Trustee be liable for special, punitive, indirect or consequential losses or damages of any kind whatsoever (including but not limited to lost profit), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

k.    the Trustee shall not be charged with any duty to determine compliance by the Trust with the provisions of this Trust Agreement unless (i) a responsible officer of the Trustee shall have actual knowledge of non-compliance or (ii) the matter was submitted for the approval of the Trustee in accordance with the provisions hereof;

l.    in the exercise or administration of the trusts hereunder the Trustee (i) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Trustee with reasonable care and (ii) may consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by them, and the Trustee shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other skilled persons;

m.    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instruction, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit; and

n.    the Trustee shall not be liable for any actions taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights conferred upon the Trustee by this Trust Agreement, or that are taken by the Co-Trustee.

5.    Except as expressly provided in this Trust Agreement, in accepting the trusts hereby created, Wilmington Trust Company acts solely as the Trustee hereunder and thereunder and not in its individual capacity and all persons or entities having any claim against the Trustee shall look only to the trust estate for payment or satisfaction thereof

6.    The Trustee hereby represents and warrants that:

a.    it is a Delaware corporation, duly organized and validly existing in good standing under the laws of the State of Delaware and having an office and its principal place of business within the State of Delaware. It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Trust Agreement;

b.    it has taken all corporate action necessary to authorize the execution and delivery by it of this Trust Agreement, and this Trust Agreement will be executed and delivered by one of its officers who is duly authorized to execute and deliver this Trust Agreement on its behalf;

c.    this Trust Agreement constitutes a legal, valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms, subject, as to enforceability, to applicable bankruptcy, insolvency, reorganization, conservatorship, receivership, liquidation and other similar laws affecting enforcement of the rights of creditors of banks generally and to equitable limitations on the availability of specific remedies; and

d.    neither the execution nor the delivery by it of this Trust Agreement, nor the consummation by it of the transactions contemplated hereby nor compliance by it with any of the terms or provisions hereof will contravene any federal or applicable state law, governmental rule or regulation granting the banking or trust powers of the Trustee or any judgment or order binding on it, or constitute any default under its articles of association or by laws or any indenture, mortgage, contract, agreement or instrument to which it is a party or by which any of its properties may be bound.

7.    The Trustee may resign upon thirty days prior notice to the Settlor and the Beneficial Owner.

8.    Upon written instructions of the Settlor, the Trustee shall dissolve, wind-up and terminate the Trust and file a certificate of cancellation in accordance with Section 3810 of the Act. Unless earlier dissolved by the Settlor, the Trust shall dissolve upon the disposition of the entire trust estate of the Trust and the disposition to the Beneficial Owner of all net proceeds thereof.

9.    In connection with the dissolution and winding up of the Trust, the Trustee and Co-Trustee shall take such action as may be directed by the Settlor to transfer the related assets of the trust estate of the Trust to the Settlor or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets.

10.    The principal place of business of the Trust for purposes of Delaware law shall be in the care of the Trustee. The office of the Trust shall be in the care of the Trustee located at Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19890.

4

11.    At no time can more than 100 persons hold beneficial interests in the Trust or any sub-trust of the Trust, collectively.

12.    The Trustee is hereby authorized and directed to issue to the Beneficial Owner a certificate representing the non-assessable, fully paid, fractional undivided interest in the general assets of the Trust.

13.    The Settlor, the Beneficial Owner, Trustee and Co-Trustee agree, and any person accepting a beneficial interest in the Trust or any sub-trust of the Trust shall by accepting such beneficial interest be deemed to agree, not to elect to have any part of the Trust or any sub-trust of the Trust taxed as a corporation.

14.    This Trust Agreement may be amended or supplemented at any time as contemplated by Section 3806(b) of the Act by an instrument executed by the Trustee upon the instruction of the Settlor.

15.    THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS AGREEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS AGREEMENT. SECTIONS 3540 AND 3561 OF TITLE 12 OF THE ACT SHALL NOT APPLY TO THE TRUST.

16.    Notwithstanding any other provision of this Trust Agreement (other than any amendment hereto expressly to the contrary), the Trustee shall perform all of its duties

hereunder and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner) and the Trustee shall, in accordance with 12 Del. C. § 3313(b), have no liability hereunder for any action taken at direction or for failure to act in the absence of direction except for loss to the Trust resulting directly from the Trustee's own willful misconduct.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed as of the day and year first written above.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Settlor


Elizabeth Ellis, Trustee


WILMINGTON TRUST COMPANY,
as Trustee


By:
Name:    Janel R. Havrilla
Title:    Financial Services Officer

ELIZABETH ELLIS, as Co-Trustee


Elizabeth Ellis

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Beneficial Owner

Elizabeth Ellis, Trustee

# EXHIBIT C

## SUPPLEMENT TO TRUST AGREEMENT

This SUPPLEMENT TO TRUST AGREEMENT (this "Supplement") is made as of _July 1_, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Settlor of the Trust (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner of the Trust (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee of the Trust (the "Trustee") and Elizabeth Ellis, as Co-Trustee of the Trust (the "Co-Trustee").

### RECITALS

A.    The Settlor, Trustee and Co-Trustee have entered into a Trust Agreement (the "Trust Agreement"), dated as of _June 30_, 2005, pursuant to which the Settlor, Trustee and Co-Trustee formed The Neil H. Ellis Insurance Trust - 2005, a Delaware statutory trust.

B.    Pursuant to the authority granted to the Trustee, the Settlor and Co-Trustee under Section 1 of the Trust Agreement, the Trustee, Settlor and/or Co-Trustee executed on behalf of the Trust a life insurance policy (the "Policy") dated as of _July 20_, 2005, which Policy is part of the trust estate of the Trust.

C.    The Settlor desires to instruct the Trustee in accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act to establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust" (the "Sub-Trust").

D.    The Settlor desires that the Trustee (i) cause the Sub-Trust to enter into the Note and Security Agreement (the "Note and Security Agreement"), dated as of the date hereof, between the Trust and La Salle Bank, N.A. (the "Lender"), pursuant to which the Sub-Trust will borrow money from the Lender in the amount specified therein (the "Loan"), the proceeds of which shall be used primarily to pay premiums on the Policy in accordance with the terms of the Note and Security Agreement, (ii) for so long as the Loan is outstanding, allocate the Policy and the other assets of the Sub-Trust (as defined below) to the Sub-Trust and hold such assets as collateral for the Loan, and (iii) upon repayment of the Loan, terminate the Sub-Trust and allocate the Policy and the other assets of the Sub-Trust Estate to the general trust estate of the Trust or otherwise as directed by the Settlor, all as set forth in this Supplement.

E.    The Settlor desires and hereby directs the Sub-Trust not to engage in any activities other than those expressly required or permitted by the Trust Agreement and this Supplement, and the Settlor, Trustee and Co-Trustee acknowledge that the Sub-Trust is being established in connection with the Note and Security Agreement for the purpose of entering into the Note and Security Agreement and giving the Lender interests in the assets of the Sub-Trust as collateral security for the loan evidenced thereby.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Trust Agreement, the parties hereto agree to the following supplemental obligations and provisions with regard to the Sub-Trust created hereby:

## ARTICLE I.
## DEFINITIONS

Section 1.   Capitalized Terms.   Except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used and not otherwise defined in this Supplement shall have the meanings ascribed to them in the Trust Agreement.

Section 2.   Other Interpretive Provisions.   The words "hereof," "herein" and "hereunder" and words of similar import when used in this Supplement shall refer to this Supplement as a whole and not to any particular provision of this Supplement; section references contained in this Supplement are references to sections in or to this Supplement unless otherwise specified; with respect to all terms in this Supplement, the singular includes the plural and the plural the singular; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Supplement; references to persons include their permitted successors and assigns; references to laws include their amendments and supplements, the rules and regulations thereunder and any successors thereto; and the term "including" means "including without limitation."

## ARTICLE II.
## ORGANIZATION AND BENEFICIAL OWNERSHIP

Section 1.   Initial Creation of Sub-Trust.   In accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act, the Settlor hereby instructs the Trustee to, and the Trustee hereby does, establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust."

Section 2.   Execution of the Note and Security Agreement.   The Settlor hereby instructs the Trustee to execute on behalf of the Sub-Trust the Note and Security Agreement.

Section 3.   Declaration of Sub-Trust.   The Trustee hereby declares that it will hold all right, title and interest in and to the Policy, and all proceeds thereof, including, without limitation, the right to collect net death benefits thereon, the right to proceed against any state guarantee fund and other property and interests in property related thereto, including, without limitation, all monies due and to become due in respect to any of the foregoing (whether in respect of principal, interest, fees, expenses, indemnities, rescission payments or otherwise), and any proceeds of the foregoing (collectively, the "Sub-Trust Estate"), and does hereby accept and agree to hold in trust, for the benefit of the Lender as security for the Loan for so long as the Loan is outstanding, and thereafter for the benefit of the Beneficial Owner, all of the Sub-Trust Estate conveyed or to be conveyed to the Trustee and all monies and proceeds that may be received with respect thereto in accordance with the terms of this Supplement. The Sub-Trust Estate shall be segregated and held separately from the general trust estate of the Trust.

Section 4.   Purposes and Powers.   The purpose of the Sub-Trust is, and the Trust shall have the power and authority, to engage in the following activities:

(a)    to enter into the Note and Security Agreement;

(b)    to borrow money from the Lender and to pledge the Policy as collateral therefor pursuant to the Note and Security Agreement;

(c)    to hold the Policy and other assets of the Sub-Trust Estate in trust, for the benefit of the Lender as security for the Loan until such time as all obligations in respect of the Loan are fully satisfied or waived by the Lender;

(d)    to administer, service and collect the Policy, and to exercise other rights of ownership in connection with the Policy;

(e)    to enter into and perform its obligations under any agreements to which it is or may become a party; and

(f)    to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 5.    <u>Title to Trust Property; Sub-Trust Certificate</u>.  Legal title to all of the Sub-Trust Estate shall be vested at all times in the Sub-Trust.  The Trustee is hereby authorized and directed to issue a certificate in substantially the form attached hereto as <u>Exhibit A</u> representing the non-assessable, fully paid, undivided beneficial interest in the assets of the Sub-Trust Estate, which shall be issued in the name of the Beneficial Owner and delivered to the possession of the Lender or its designee as collateral security for the loan evidenced by the Note and Security Agreement.

Section 6.    <u>Limitations on Trust Property</u>.  The Trust shall not hold any property other than the Initial Trust Estate and the Sub-Trust shall not hold any property other than the Sub-Trust Estate; <u>provided</u>, that the Settlor, the Beneficial Owner, the Trustee and the Co-Trustee, if any, may enter into a supplement to the Trust Agreement or this Supplement that would permit the Trust or the Sub-Trust to hold only such additional assets as are necessary for the repayment or the refinancing of the Loan promptly after adding such assets.  The Settlor and the Beneficial Owner hereby agree (i) not to assign, transfer or convey any property to the Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Trust, other than the Initial Trust Estate, (ii) not to assign, transfer or convey any property to the Sub-Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Sub-Trust, other than the Sub-Trust Estate, and (iii) for so long as the Loan is outstanding, not to establish or instruct the Trustee or the Co-Trustee to establish, any additional series of the Trust other than the Sub-Trust.  The Settlor and the Co-Trustee hereby agree (i) not to instruct the insurance company, which insurance company is obligated to pay the death benefit in accordance with the terms of the Policy (the "Issuing Insurance Company"), to change the owner or beneficiary of the Policy without the consent of the Trustee acting at the direction of such person or entity then authorized to direct the Trustee in the performance of its duties hereunder, and (ii) to notify the Issuing Insurance Company that the Trustee's signature is required to change the owner or beneficiary of the Policy.

Section 7.    Additional Covenants of the Settlor and the Trustee.

(a)    The Settlor and the Trustee hereby agree (i) to maintain the Sub-Trust Estate as identifiable and not commingle the Sub-Trust Estate with the assets of any other entity, including the assets of the Settlor, the Trust or any other sub-trust of the Trust and (ii) to maintain bank accounts, if any, records and books of account of the Sub-Trust showing the Sub-Trust Estate as assets of the Sub-Trust and being separate assets from those of any other person or entity, including the Settlor, the Trust or any other sub-trust of the Trust, and (iii) that the affairs of the Sub-Trust shall be managed by or under the direction of the Trustee.

(b)    The Settlor and the Trustee hereby agree that they will not (i) indicate to any third party, including any creditors of the Trust, the Trustee or the Settlor, that the Sub-Trust Estate is available to satisfy any obligations other than the Loan and any other obligations under the Note and Security Agreement, (ii) indicate to any third party that the Sub-Trust Estate constitutes assets of the Settlor or that the Trust or the Sub-Trust is responsible for or guaranteeing any obligations of the Settlor, (iii) cause the Trust or the Sub-Trust to issue any securities or deposit assets into any entity that issues any securities, (iv) cause the Trust or the Sub-Trust to incur any indebtedness, or assume or guaranty any indebtedness of any other person or entity, other than the Loan, or (v) purport that the Trust or the Sub-Trust is a division or subsidiary of, or the same person as, the Settlor.

ARTICLE III.
AUTHORITY AND DUTIES OF THE TRUSTEE

Section 1.    General Authority of the Trustee.   It shall be the duty of the Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of the Trust Agreement, this Supplement, the Note and Security Agreement and any other agreements to which the Trust or Sub-Trust is a party, and to administer the Sub-Trust in the interest of the Lender and the Beneficial Owner in accordance with the provisions of this Supplement.  The Trustee is hereby expressly authorized to create security over the Sub-Trust Estate for the benefit of the Lender in accordance with the terms of the Note and Security Agreement.

Section 2.    Trustee to Act at Direction.  Notwithstanding any other provision of the Trust Agreement or this Supplement, the Trustee shall perform all of its duties under this Supplement and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner); provided, however, that, except as otherwise provided in Section 6 of this Article III, for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in a writing delivered to the Trustee, and the Trustee shall, in accordance with Section 3313(b) of the Act, have no liability hereunder for any action taken at the direction of such of the Settlor, the Beneficial Owner, Lender, or Lender's designee as is then authorized to direct the Trustee or for failure to act in the absence of direction except for loss to the Sub-Trust resulting directly from the Trustee's own willful misconduct.

Section 3.    Notice.  In the event that the Settlor or the Beneficial Owner takes or attempts to take any action, or instructs the Trustee or the Co-Trustee to take any action, that is

4

not required or permitted under the terms of the Trust Agreement, this Supplement or the Note and Security Agreement, and a responsible officer of the Trustee or the Co-Trustee, as the case may be, shall have actual knowledge thereof, the Trustee or the Co-Trustee, as the case may be, shall promptly inform the Lender or its agent of such actions or instructions. Any notice or other communication delivered to the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, by the Issuing Insurance Company shall be forwarded by the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, to Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, Attention: Alex Seldin, facsimile: 312-992-5111, electronic mail: aseldin@coventryfirst.com.

Section 4.    Direction of Trustee.  Whenever the Trustee is unable to decide between alternative courses of action permitted or required by the terms of the Trust Agreement, this Supplement, the Note and Security Agreement or any other agreement to which the Trust or the Sub-Trust is a party, or is unsure as to the application of any provision thereof or any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that any provision thereof permits any determination by the Trustee or is silent or is incomplete as to the course of action that the Trustee is required to take with respect to a particular set of facts, the Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the person or entity then authorized to direct the Trustee in the performance of the Trustee's duties hereunder, requesting direction as to the course of action to be adopted or application of such provision, and to the extent the Trustee acts or refrains from acting in good faith in accordance with any direction from the person or entity then authorized to direct the Trustee, the Trustee shall not be liable on account of such action or inaction to any person or entity.

Section 5.    Relinquishment.  Notwithstanding the provisions of Section 2 of this Article III, upon written instructions sent by the Settlor to the Trustee and Co-Trustee at any time on or before the maturity date of the Loan, the Trustee and Co-Trustee shall in accordance with the terms of the Note and Security Agreement fully relinquish to the Lender, or any other person or entity designated in writing by the Lender or its agent, all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise.

Section 6.    Liquidation of the Sub-Trust Estate; Foreclosure.  In the event that the Sub-Trust fails to satisfy in full all obligations in respect of the Loan at maturity or otherwise defaults on the Loan, and either (i) the Settlor, Co-Trustee and Trustee acting at direction pursuant to Section 5 of this Article III (on behalf of the Sub-Trust) agree to fully relinquish to the Lender all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise, or (ii) the Lender notifies the Trustee that it is foreclosing on the Policy and other assets of the Sub-Trust Estate in accordance with the terms of the Note and Security Agreement, the Trustee and Co-Trustee shall take such action as may be directed by the Lender to liquidate such assets and distribute the proceeds thereof, including, if necessary, the execution of all applicable assignment, transfer or sale forms and any other instruments of transfer, assignment or sale reasonably identified by the Lender as necessary to effect the valid transfer, assignment or sale of

5

such assets.  If such liquidation is made as a result of the Lender's foreclosure on the assets of the Sub-Trust Estate, proceeds of such liquidation that exceed the aggregate of the obligations due to the Lender in respect of the Loan through the completion of such liquidation shall be retained by the Trustee and deemed to be assets of the Trust, and not of the Sub-Trust Estate, and shall be maintained or distributed in accordance with the Trust Agreement.

Section 7.   Sale or Transfer.  In the event the Settlor elects to satisfy the Trust's obligations under the Note and Security Agreement in connection with a sale or transfer of the Policy (which sale or transfer shall be reasonably acceptable to the Lender or its designee), the Trustee, acting at the Settlor's direction, Co-Trustee and Lender shall enter into and reasonably act in accordance with any payoff instruction supplied by the Settlor, pursuant to which:

(a)      the Trustee and Co-Trustee shall promptly execute and deliver such documentation (the "Transfer Documents") prepared by and at the expense of the Settlor (or a third party on behalf of the Settlor) that is reasonably necessary to transfer the Policy to a third party (subject to paragraphs (b) through (e) set forth below), other than change of ownership or change of beneficiary forms (it being understood that (i) the Trustee shall have no responsibility for the preparation, accuracy or effectiveness of any such Transfer Documents and (i) the transfer contemplated by the Transfer Documents will not be effective until receipt by the Lender of the Payoff Funds (as defined below));

(b)      promptly upon receipt of the fully executed Transfer Documents from the Trustee, the Settlor will, on behalf of the Trust, cause immediately available funds to be deposited into an account (the "Escrow Account") maintained and controlled by the Lender or by a nationally recognized financial institution reasonably acceptable to the Lender (such financial institution or the Trustee in such capacity, as applicable, the "Escrow Agent") in an amount sufficient to satisfy all of the Trust's obligations to the Lender under the Note and Security Agreement (the "Payoff Funds") for release of all of Lender's interest in the Sub-Trust Estate;

(c)      the Escrow Account shall be established pursuant to an escrow agreement in form and substance (and on terms including fees payable to the Escrow Agent) reasonably acceptable to the Lender and the Escrow Agent;

(d)      the Trustee and Co-Trustee will, immediately upon receipt of written acknowledgment from the Escrow Agent that funds in the amount of the Payoff Funds have been placed in the Escrow Account, execute and deliver to the Settlor change of ownership and beneficiary forms prepared by or at the expense of the Settlor (or a third party on behalf of the Settlor) to be recorded with the issuer of the Policy (the "Change Forms"); and

(e)      upon confirmation that such Change Forms have been recorded by the issuer of the Policy (written notice of which is delivered to the Trustee and the Escrow Agent) as contemplated by the Transfer Documents, the Escrow Agent will release the Payoff Funds to the Lender.

Notwithstanding the foregoing to the contrary, in the event that the applicable Payoff Funds are not placed into such Escrow Account within 30 days of delivery of a related payoff instruction, neither the Lender nor the Trustee shall have any further obligation to execute and deliver any

6

ownership transfer documents or otherwise take any action as described in this Section, the Settlor shall be deemed to have revoked the applicable payoff instruction, the Settlor shall pay all costs, fees and expenses incurred by the Lender, the Trustee and the Escrow Agent in connection therewith, and the Transfer Documents shall be deemed void.

ARTICLE IV.
TERMINATION

Section 1.    Termination of the Sub-Trust.  Promptly upon satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement, the Lender shall give written notice to the Trustee that all obligations of the Sub-Trust under the Note and Security Agreement have been fully performed or satisfied (the "Satisfaction Notice").  The parties hereto acknowledge and agree that either the Settlor or the Trustee may, following the delivery of the Satisfaction Notice, deliver written notification to the other that it wishes to terminate the Sub-Trust (the "Termination Notice").  Following the receipt by the non-terminating party of the Termination Notice, each of the Settlor, the Trustee and the Co-Trustee shall take all commercially reasonable actions that are necessary to effectuate and evidence the termination of the Sub-Trust.  Prior to such satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement and the Lender's delivery of the Satisfaction Notice:

(a)    (i) the Trustee will not resign pursuant to Section 8 of the Trust Agreement except upon thirty days prior notice to the Lender and the appointment of a successor Trustee or, if no successor Trustee is appointed prior to the expiration of such thirty day notice period, upon the interpleader of the Sub-Trust Estate pursuant to an action filed by the Trustee, at the expense of the Sub-Trust Estate, in the Court of Chancery in and for New Castle County, Delaware, (ii) neither the Trustee nor the Co-Trustee will take any action to dissolve, wind-up or terminate the Trust or file a certificate of cancellation pursuant to Section 9 of the Trust Agreement, and (iii) none of the Trustee, the Co-Trustee, the Settlor or the Beneficial Owner will take any action to terminate the Sub-Trust, and

(b)    the assets of the Sub-Trust Estate will not be modified or reduced by the Settlor, the Trustee, the Co-Trustee or the Lender other than as expressly contemplated in this Supplement as this Supplement or the Trust Agreement may be supplemented as described in Article II, Section 6 or otherwise.

Section 2.    Trustee Actions Upon Termination.  In connection with the termination of the Sub-Trust, upon full performance or satisfaction of all obligations of the Sub-Trust under the Note and Security Agreement and following Lender's delivery of the Satisfaction Notice, any remaining assets of the Sub-Trust Estate shall be allocated to the general trust estate of the Trust, or the Trustee and Co-Trustee shall take such action as may be directed by the Settlor to transfer such assets to the Beneficial Owner or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets.  Upon completion of the transfer of the remaining assets of the Sub-Trust Estate pursuant to the first sentence hereof, the Settlor may designate another person or entity as the Trustee or Co-Trustee of the Trust.

7

ARTICLE V.
MISCELLANEOUS

Section 1.    Amendments.  This Supplement may be amended by a writing signed by the Settlor, Trustee and Co-Trustee; provided that this Supplement may not be amended without the prior written consent of the Lender during the term of the Loan or prior to the satisfaction of all obligations in connection with the Loan and the Lender's delivery of the Satisfaction Notice.

Section 2.    Governing Law.  THIS SUPPLEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS SUPPLEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS SUPPLEMENT.  SECTIONS 3540 AND 3561 OF TITLE 12 OF THE DELAWARE CODE SHALL NOT APPLY TO THE TRUST.

Section 3.    Indemnification.  The Trustee and Co-Trustee shall be liable hereunder and under the Trust Agreement only for gross negligence, willful misconduct, or actions taken in bad faith.  The Trustee and Co-Trustee shall not be liable in a fiduciary or personal capacity for making any delegation that is authorized hereunder or under the Trust Agreement, nor for any action taken at direction or without their consent, nor for any failure to act absent bad faith.  The Trustee shall be indemnified and held harmless by the Settlor and the Beneficial Owner (but only to the extent of such Beneficial Owner's interest hereunder or under the Trust Agreement), the Lender, and each assignee at any time holding an interest in the Loan

8

(but only to the extent of the value of such assignee's interest in the Loan) from and against any threatened, pending or completed action, claim, demand, suit or proceeding (whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section 3 or to which the Trustee is made a party, or threatened to be made a party, by reason of serving as Trustee, if the Trustee, as the case may be, acted in good faith) brought by any Person claiming through the Settlor, the Beneficial Owner, the Lender or such assignee, as the case may be. Such indemnification shall include reimbursements for expenses (including attorneys' fees, judgments, fines and amounts paid in settlement) actually incurred, together with advancements for such expenses reasonably expected by the Trustee to be incurred in connection with such action, claim, demand, suit, or proceeding. Each indemnitor hereunder shall be liable, jointly and severally, for the full amount of the indemnity payments due hereunder and for such portion thereof as any indemnified person shall demand of them, subject to the limitations described above with respect to Beneficial Owner and Loan assignees. The Trustee shall not have any recourse to, right of offset against, or other claim against the assets of the Trust Estate or of the Sub-Trust Estate for any expense or liability of any kind (whether falling within the exculpatory provisions of this Section 3 or otherwise) of the Trustee incurred in connection with its duties under the Trust Agreement or this Supplement or for fees, if any, payable to the Trustee by any Fund (as defined in Section 6 of this Article V) as a result of the Trustee's management activity in connection with such Fund. The provisions of this Section 3 shall survive termination of the Trust Agreement or this Supplement or, with respect to any Trustee, the resignation or removal of such Trustee.

Section 4.   Taxation of Sub-Trust. The Settlor is intended to be the owner of the Sub-Trust Estate for purpose of, and pursuant to, Sections 671 through 677 of the Internal Revenue Code of 1986 (the "Code") and, except as otherwise directed by the person or entity then authorized to direct the Trustee hereunder, the Trustee shall so treat the Sub-Trust and Sub-Trust Estate in connection with all federal, state and local income tax filings, reports, returns, records and other documents prepared or filed by the Trustee or any agent of the Trustee with any tax authority.

Section 5.   Reports to the Settlor, the Beneficial Owner, the Internal Revenue Service and Others. The Trustee shall, on behalf of the Trust, (a) only upon the direction of the Settlor, which direction shall be delivered to the Trustee within 30 days of the end of a fiscal year, cause to be prepared and delivered to the Settlor and the Beneficial Owner, within 90 days of the end of such fiscal year, or more often, as may be required by the Code and the regulations thereunder, a copy of an unaudited annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as is necessary and appropriate to enable the Settlor and the Beneficial Owner to prepare its federal and state income tax returns, (b) annually determine if criteria are met requiring the Trust to file an IRS Form 1041, (c) if required by law, annually cause to be prepared IRS Form 1041 on behalf of the Trust as a grantor trust, (d) if required by law, annually cause to be prepared grantor letters for the Beneficial Owner that (i) set forth income, deductions, and credits allocated to such Beneficial Owner, (ii) set forth suggested classification of such income, deductions, and credits on such Beneficial Owner's own tax return and (iii) inform such Beneficial Owner that income, deductions, and credits should be included on its tax return, (e) annually determine validity of income and expenses incurred by the Trust and (f) annually allocate income, deductions, and credits to each

9

of the Owners based on its percentage ownership interest in the Trust and the number of days it has held such percentage ownership interest. The Trustee shall sign on behalf of the Trust the tax filings of, or on behalf of, the Trust, unless the Beneficial Owner determines that applicable law requires the Beneficial Owner to sign such documents, in which case, the Beneficial Owner shall sign such documents.

      Section 6.    <u>Investment of the Trust Assets</u>. The Trustee shall not, and shall have no duty to, invest and reinvest the assets of the Trust unless the Trustee has received a written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement to invest such assets. Promptly following receipt of such direction, the Trustee shall invest the directed assets only in the following: (a) negotiable instruments or securities represented by instruments in bearer or registered or in book-entry form which evidence investments that are short-term debt obligations rated A-1 by S&P and P-1 by Moody's; (b) commercial paper having, at the time of investment or contractual commitment to invest therein, a credit rating from Moody's and S&P of at least P-1 and A-1, respectively; or (c) any other similar highly rated investment approved in writing by the Lender ("Permitted Investments"), until such directed assets are required (1) to satisfy other obligations of the Trust, if any, or (2) to be distributed pursuant to the written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement. The parties acknowledge that, subject to the foregoing limitations, the Trustee may make Permitted Investments in one or more mutual funds managed by affiliates of the Trustee (each, a "Fund"), and that (i) shares in a Fund are not obligations of the Trustee, are not deposits and are not insured by the FDIC, (ii) the Trustee or its affiliates may be compensated by a Fund for services rendered in its capacity as investment advisor, custodian and/or transfer agent; (iii) the Trustee, or its affiliates, also may be compensated by a Fund for providing shareholder services; and (iv) such compensation will be both described in detail in the prospectus for a Fund, and is in addition to the compensation, if any, paid to Trustee in its capacity as the Trustee hereunder.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be duly executed as of the date first written above.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Settlor

_____
Elizabeth Ellis, Trustee

WILMINGTON TRUST COMPANY,
as Trustee

Acknowledged and Agreed:

LA SALLE BANK, N.A.,
as Lender

By: _____
Name:
Title:     Janel R. Havrilla
           Financial Services Officer

By: _____
Name: Krista Lake
Title: Attorney-in-fact

ELIZABETH ELLIS , as Co-Trustee

_____
Elizabeth Ellis

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Beneficial Owner

_____
Elizabeth Ellis, Trustee

# EXHIBIT D

**SETTLOR AND CO-TRUSTEE DISCLOSURE STATEMENT AND ACKNOWLEDGMENT**

**IMPORTANT: PLEASE READ THIS DISCLOSURE STATEMENT BEFORE SIGNING THE
TRANSACTION DOCUMENTS**

| | |
|---|---|
| BORROWER: | The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust |

Settlor intends to cause The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust to enter into that certain Note and Security Agreement (the "Note") with the lender named therein (together, with its successors, assigns and agents, the "Lender"), under which Borrower shall be provided loans to procure certain life insurance policies which have been identified to the Lender (the "Policies"). The Note, the Trust Agreement, Supplement to Trust Agreement and each of the documents contemplated thereby or delivered in connection therewith are sometimes referred to collectively as the "Transaction Documents." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Transaction Documents.

Each of the undersigned, as Settlor and Co-Trustee of the Borrower, do hereby acknowledge that such Settlor or Co-Trustee has read each of the Transaction Documents and further acknowledges, represents and warrants the following:

1.  Each undersigned understands that pursuant to the Note, Borrower has agreed to take out a loan (the "Loan") from the Lender for the sole purpose of allowing it to procure the Policies, which Loan shall be strictly non-recourse unless Borrower defaults under the Note.

2.  Each undersigned understands that pursuant to the Transaction Documents, Borrower has granted to the Lender a security interest in all of the assets contained in The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust (the "Sub-Trust"), including the Policies and all proceeds from the Policies, and in the event of a default under the Note, the Lender shall have the right to (i) take the Sub-Trust assets, including the Policies, from Borrower by means of foreclosure and (ii) surrender, sell or otherwise exercise rights under the Policies. Settlor also understands that in the event the Insured dies prior to the maturity of the Loan, the death benefit proceeds paid pursuant to the Policies shall first be used to repay the obligations of the Borrower due under the Note with the remainder of such death benefit proceeds being paid to the Borrower.

3.  Each undersigned understands that, upon the maturity of the Loan, Borrower may satisfy all of its payment and other obligations under the Note by either (i) paying the Lender the Scheduled Maturity Date Balance (as defined in the Note) or (ii) relinquishing to the Lender all of Borrower's right, title and interest in, to and under the Policies.

4.  Each undersigned understands that in the event Borrower relinquishes its rights to any of the Policies in accordance with the terms and conditions of the Note, Settlor, Co-Trustee and Borrower will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

5.  Each undersigned understands that there will be tax effects to Borrower in connection with the transactions contemplated by the Transaction Documents, and Borrower has not relied upon any advice from the Lender, Coventry Capital I LLC, the administrator for the Lender (together with any successor, the "Program Administrator"), any affiliate of the Program Administrator, or any insurance producer regarding any such tax effects. Settlor and Co-Trustee each hereby confirms that the Program Administrator has recommended that both the Settlor and Co-Trustee consult with such person's own legal, tax, accounting and financial advisors regarding such potential effects.

6.  Settlor hereby acknowledges and understands that the Trust Agreement and the Supplement to Trust Agreement are not intended to satisfy Settlor's estate planning needs and have not been designed as an

Settlor Initials ___
Co-Trustee Initials ___

estate planning tool. Settlor hereby confirms that the Program Administrator has recommended to Settlor that Settlor consult with Settlor's own legal, tax, accounting and financial advisors regarding individual estate planning needs.

7. Settlor hereby confirms that each of the beneficial owners named in the Trust Agreement and in the Supplement to Trust Agreement is either related to or otherwise has an insurable interest in the insured.

8. Each undersigned hereby acknowledges and confirms that such undersigned has had an opportunity to review each of the Transaction Documents, including the Note, with his, her or its attorneys, accountants and/or advisors and has a complete understanding of each of the Transaction Documents. Each undersigned understands and agrees that any such attorneys, accountants and/or advisors (including any insurance producer) who is advising, or assisting such undersigned in connection with the transactions contemplated by the Transaction Documents is not acting as an agent of either the Program Administrator or the Lender. Neither undersigned has relied upon any advice from the Lender, the Program Administrator, or any affiliate of the Program Administrator, regarding its involvement in this transaction, and has not received and is not relying on any oral or written representations from any person that are inconsistent with or contrary to the information contained in the Note or this Disclosure Statement and Acknowledgement or any other Transaction Documents. Each undersigned is signing, or causing the Borrower to sign, as appropriate, the Transaction Documents freely and voluntarily and is of sound mind and not subject to any constraint or undue influence, and has never been the subject of any mental health or mental competency proceeding or other proceeding or hearing with respect to which such undersigned's competency or capacity to contract is or was an issue.

9. The Loan and the issuance of the Policies are on terms that are fair and reasonable to the Borrower.

10. The Program Administrator has no obligation to cause any of the Policies to be issued and/or the Loan to be made.

11. Upon the reasonable request of the Program Administrator, Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, releases and authorizations from time to time, permitting or authorizing the Program Administrator to obtain current information regarding the Policies.

12. Settlor and Co-Trustee shall inform the Program Administrator within thirty (30) days of any and all changes in personal information of the Insured, including address, telephone number, or attending physician information. Settlor acknowledges that the Program Administrator may, from time to time and at its own discretion, contact Insured for confirmation of such information.

13. Each undersigned acknowledges that the Lender, the Program Administrator, and any insurance company providing insurance coverage relating to the value of the Policies, as well as third parties, will be acting in reliance upon the undertakings of such undersigned set forth in this document.

14. Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, all documents as may be required by the Lender, or any life insurer in connection with any of the Policies or the Loan and shall cooperate in any way reasonably requested (and at no cost to Settlor, Co-Trustee or Borrower) in connection with the transactions contemplated by the Transaction Documents, including, but not limited to, assisting in keeping any of the Policies in force or liquidating any of the Policies upon a default under the Note or at the request of the Borrower.

15. Each undersigned shall hold each of the Lender, the Program Administrator, any affiliate of the Program Administrator and any insurance company providing insurance coverage relating to the value of the Policies,

Settlor Initials _____
Co-Trustee Initials _____

2

harmless, and indemnify each of them from and against any loss, liability, expense, claim, or demand arising out of or in connection with (i) the failure of the Settlor, the Co-Trustee, the Borrower or the Insured to perform any of their respective obligations contained herein (or in any Transaction Document), except for those Losses resulting directly from the gross negligence or willful misconduct of either the Lender or the Program Administrator and/or (ii) any representation, and/or information provided, by the Settlor, the Co-Trustee, the Borrower or the Insured, or any of their respective agents, to the Lender or the Program Administrator being found to be false or materially misleading (collectively, "Losses"). The foregoing indemnity shall survive the termination of the Transaction Documents.

16. Except to the extent that any party shall seek equitable relief, all other disputes and controversies of every kind and nature between the Program Administrator and the Settlor, the Co-Trustee or the Borrower arising out of or in connection with any of the Transaction Documents, including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof shall be submitted and settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall be held in Philadelphia, Pennsylvania before a panel of three (3) arbitrators, hereafter collectively referred to as "arbitrator", knowledgeable in the business of life insurance, one to be chosen by each party, and the third to be chosen by the two previously chosen arbitrators. The arbitrator's decision and award shall be final and binding and may be entered in any court having jurisdiction thereof. The arbitrator shall not have the power to award punitive, exemplary, or consequential damages.

**SETTLOR**

X _Elizabeth Ellis_____
(Signature of Settlor)

The Neil H. Ellis Irrevocable Insurance
Trust - 2005 No. 2
Elizabeth Ellis, Trustee
(Printed name of Settlor)

**CO-TRUSTEE**

X _Elizabeth Ellis_____
(Signature of Co-Trustee)

Elizabeth Ellis
(Printed name of Co-Trustee)

**NOTARY**

State of _Connecticut_ )
) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_, _2005_

(Seal) _Marily C. Arnold_____
(Signature of Notary Public)

My commission expires: _____

My Commission Exp. Sep. 30, 2007

**NOTARY**

State of _Connecticut_ )
) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_, _2005_

(Seal) _Marily C. Arnold_____
(Signature of Notary Public)

My commission ~~expires~~ My Commission Exp. Sep. 30, 2007

Settlor Initials _EE_
Co-Trustee Initials _EE_

3

# EXHIBIT E

## SETTLOR NON-RECOURSE SECURITY AGREEMENT

This **SETTLOR NON-RECOURSE SECURITY AGREEMENT** (this "Agreement") is entered into on ⎯July 1⎯, 20 05 by and between THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2 (sometimes "you" in this Agreement) and LA SALLE BANK, N.A. (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this grant of security from you to us of all of your right, title and interest in and to (i) any and all beneficial ownership interests in THE NEIL H. ELLIS INSURANCE TRUST - 2005 (the "Trust") and THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST(the "Sub-Trust") and (ii) all the assets held by the Trust and the Sub-Trust. Please read this Agreement together with the Note Agreement (as defined below) carefully and if you agree with the terms, please sign your name below.

*Background.* We and the Sub-Trust have entered into that certain Note and Security Agreement (the "Note Agreement"), dated ⎯July 20⎯, 20 05 , pursuant to which we have lent money to the Sub-Trust (the "Loan"). You acknowledge that it is a condition to our making the Loan to the Sub-Trust that you execute and deliver this Agreement to us and that you are entering into this Agreement in order to induce us to make the Loan to the Sub-Trust.

*Definitions.* Unless otherwise stated herein, capitalized terms used herein shall have the meanings ascribed thereto in the Note Agreement.

*Limited Non-Recourse Guaranty.* You hereby pledge and assign to us, and hereby grant to us a security interest in, all of your right, title and interest in and to all beneficial ownership interests in the Trust and the Sub-Trust and all assets now or hereafter held in the Trust or the Sub-Trust and all proceeds of the foregoing (collectively, the "Collateral"). The Collateral secures your guaranty below of the payment of the Loan. It also secures the Sub-Trusts' other obligations under the Note Agreement to the extent allowed by the law. You hereby, unconditionally and irrevocably, guarantee to us, for the benefit of the Sub-Trust and the Trust, and their respective successors and assigns, the prompt payment by the Sub-Trust of the Loan when due and all other obligations under the Note Agreement. This Agreement is non-recourse, meaning that nothing other than the Collateral secures your obligation to us and that we will not seek to collect the amounts due in respect of the Loan or pursuant to the Note Agreement other than from proceeds of the Collateral except as provided below in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date. In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request (the "Security Interest Perfection Documents"). You hereby authorize us, upon an Event of Default, to file one or more financing or continuation statements relative to all or any part of the Collateral without your signature. If the Sub-Trust does not satisfy all of its obligations to us under the Note Agreement on or before the Maturity Date and an Event of Default results, this Agreement, the Note Agreement and the documents pursuant to which the Trust and the Sub-Trust are formed give us the right and ability to foreclose upon the Collateral in an effort to receive proceeds sufficient to satisfy such obligations.

*Covenants.* You hereby agree that so long as the Note Agreement and this Agreement shall remain in effect, you will not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Collateral

*Events of Default.* Upon any Event of Default by the Sub-Trust, as described in the Note Agreement that is not remedied by the Sub-Trust within fifteen (15) days, we may take any and all lawful actions as described in paragraph "Events of Default" in the Note Agreement, including accelerating the Loan, and otherwise permitted by applicable law. In addition, upon any Event of Default, we may exercise any of the rights and remedies described below under the heading "If the Sub-Trust Fails to Perform Its Obligations."

*Default Interest.* You agree that if any amounts due under the Note Agreement are not paid on the Maturity Date and the Sub-Trust has not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Collateral).

## CONSENT TO APPOINTMENT OF AGENT

*Servicer.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicer"). You agree to follow the instructions and directions of the Servicer under this Agreement until we notify you in writing to the contrary.

You agree to send copies of all notices and correspondence hereunder to the Servicer at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless us and the Servicer and any of their respective affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF THE SUB-TRUST FAILS TO PERFORM ITS OBLIGATIONS

*We will take the Collateral from you.* If the Sub-Trust fails to pay the amounts due under the Note Agreement by the Scheduled Maturity Date (as defined in the Note Agreement), we may take the Collateral from you (i.e., foreclose) by whatever methods are contemplated by this Agreement or the Security Interest Perfection Documents and applicable law, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies and take any other actions that are legal and that we find appropriate with regard to the Collateral. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that the Sub-Trust fails to pay the amounts due under the Note Agreement on or before the Scheduled Maturity Date and fails to

relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Collateral.* We may surrender, sell or otherwise exercise rights under the Collateral as the owner thereof if the Sub-Trust defaults and we foreclose upon the Collateral as provided for in this Agreement. You hereby agree that we may exercise in respect of the Collateral, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Collateral) or other applicable law and also may, without notice except as specified below, sell or otherwise dispose of the Collateral or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You hereby confirm, acknowledge and agree that you have given to us, the Servicer and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge of any facts that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request. You further represent and warrant that your principal residence is located at 149 Colonial Road, PO Box 1270, Manchester, CT 06045 and that you will not change your principal residence without giving us at least 30 days prior written notice.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) the Sub-Trust defaults under the Note Agreement and we take the Collateral from you, or (ii) the Policies are relinquished to us in satisfaction of the Sub-Trust's obligations under the Note Agreement, we or certain third parties may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of the Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by us or such third party and its agents and employees, and you agree to reasonably cooperate with us or such third person in this matter.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under the Note Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

3

*Counterparts.* This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

*Delay in Enforcement.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US RELATING TO THIS AGREEMENT DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

### HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the Note Agreement and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

4

## SIGNATURES

- Do not sign this Agreement before you have read both this Agreement and the Note Agreement.

- This is a binding legal document and you should seek legal, financial and tax advice before signing it.

- If the Sub-Trust defaults in the performance of its obligations under the Note Agreement, we may foreclose on the Collateral.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THE NOTE AGREEMENT IN ITS ENTIRETY AND THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2

LASALLE BANK NATIONAL
ASSOCIATION

Elizabeth Ellis, Trustee

By: _____
Name: Krista Lake
Title: Attorney-in-fact

Address:
149 Colonial Road
PO Box 1270
Manchester, CT 06045

S-1

# EXHIBIT F



Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606

WWW.DYKEMA.COM

Tel: (312) 876-1700
Fax: (866) 244-1596

**Michael C. Borders**
Direct Dial: (312) 627-2154
Email: MBORDERS@DYKEMA.COM
**Via Facsimile and First-Class Mail**

May 16, 2008

Stephen P. Eisenberg, Esq.
Leahy, Eisenberg & Frankel, Ltd.
33 W. Monroe Street, Suite 1100
Chicago, Illinois 60603

**Re:**   *Ellis v. LaSalle Bank National Association and Coventry Capital I LLC, Court No. 08 CH 5368*

Dear Mr. Eisenberg:

On May 12, 2008, Judge Maki dismissed your client's complaint with leave to amend. Please be advised that Coventry Capital I LLC, both on its own behalf and, in its capacity as servicing agent, on behalf of LaSalle Bank National Association, hereby demands that any claims of any kind or nature that your client may assert arising out of or relating in any way to the loan evidenced by the Note and Security Agreement (the "Note and Security Agreement") dated 7/26/2005, by and between The Neil H. Ellis Insurance Trust — 2005, Premium Finance Sub-Trust and LaSalle Bank National Association, and each of the documents contemplated thereby or delivered in connection therewith (including, but not limited to, any dispute related to any insurance policy pledged as security for such loan), be submitted to binding arbitration as provided in the Note and Security Agreement, the Settlor Non-Recourse Security Agreement and the Settlor and Co-Trustee Disclosure Statement and Acknowledgment.

Very truly yours,

DYKEMA GOSSETT PLLC

Michael C. Borders

MCB:izd

CHICAGO\2450679.1
ID\MCB