## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Elizabeth Ellis, as Co-Trustee of | ) | |
| The Neil H. Ellis Irrevocable | ) | |
| Insurance Trust-2005, No. 2 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 3083 |
| | ) | |
| | ) | |
| Coventry Capital I LLC | ) | Judge John W. Darrah |
| | ) | |
| | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) | |

### PLAINTIFF'S MOTION FOR REMAND

NOW COMES Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and for her Motion for Remand pursuant to 28 USCA § 1447, states as follows:

### I.  INTRODUCTION

This claim arises out of the wrongful foreclosure of a $30,000,000.00 life insurance policy ("policy") on the life of Mr. Neil Ellis. It is undisputed that the federal courts do not have original subject matter jurisdiction over the claims in the Plaintiff's lawsuit. Defendant Coventry Capital I LLC ("Coventry") removed this case from the Chancery Division of the Circuit Court of Cook County. Coventry asserts that subject matter jurisdiction allegedly exists pursuant to diversity of citizenship with the amount in controversy exceeding $75,000.00 and

that it has satisfied all of the necessary prerequisites and jurisdictional requirements for removal to federal court.

Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 ("Ellis"), hereby challenges Coventry's removal of this case from state court because Coventry has admitted in its Motion to Dismiss that this Court lacks subject matter jurisdiction. Moreover, Coventry's removal was untimely, defective (in that Coventry did not strictly comply with 28 USCA § 1441), and that as a result of Coventry's participation in the merits of the state court action prior to removal, Coventry has waived its right of removal to federal court. Ellis maintains that, for any of the foregoing reasons, or collectively, the instant case should be remanded back to the Circuit Court of Cook County, Illinois and that Coventry's Motion to Dismiss is moot. If the Court chooses not to remand this case to the Circuit Court of Cook County, then Ellis would request that this Court deny Coventry's Motion to Dismiss and Compel Arbitration.

Procedurally, since February 12, 2008, the underlying action has been litigated as follows:

On February 12, 2008, while the courts were closed, the Plaintiff appeared on an emergency basis in the Circuit Court of Cook County and received a one-day temporary restraining order which enjoined LaSalle Bank National Association ("LaSalle") and Coventry from foreclosing on and liquidating the policy. On February 13, 2008, Plaintiff filed a verified complaint for certain injunctive relief in the Chancery Division of the Circuit Court of Cook County, Illinois. On February 27, 2008, LaSalle and Coventry filed a motion to dismiss, contesting the Plaintiff's request for injunctive relief and seeking a dismissal of the Plaintiff's Complaint pursuant to an arbitration clause contained in a Note and Security Agreement

executed between Plaintiff and LaSalle. On April 18, 2008, while Coventry's Motion to

Dismiss was pending, Plaintiff sought leave to file an Amended Complaint as her response to

Coventry's Motion to Dismiss. Coventry objected and the Court denied Plaintiff's Motion for

Leave to File an Amended Complaint, indicating that the state court wanted to proceed on the

Defendant's Motion to Dismiss the Plaintiff's original Complaint. On April 21, 2008, Plaintiff

filed a response brief to the motion to dismiss in which she contested the motion with respect

to Coventry, as a non-signatory to the Agreement. Additionally, Plaintiff stated her agreement

to arbitrate all claims with LaSalle and intent to voluntarily dismiss LaSalle from the case.

Coventry filed its reply brief on May 2, 2008.

On May 12, 2008, the state court conducted a hearing on Coventry's Motion to

Dismiss. A copy of the Transcript of proceedings of that hearing is attached hereto as Exhibit

1. The issues at that hearing were whether the causes of action in the Amended Complaint

against Coventry were even covered by the arbitration clause, whether Coventry, as a non-

signatory to the Note and Security Agreement which contained the discretionary arbitration

clause, could assert any rights against the Plaintiff to have the case dismissed pursuant to the

arbitration clause in the Agreement. The state court inquired whether a request for arbitration

had been filed by either party. The state court was informed that the Plaintiff had originally

demanded arbitration, but that Coventry rejected that arbitration demand. The Plaintiff

informed the state court that the Plaintiff filed suit in Cook County after Coventry had rejected

Plaintiff's arbitration demand. The Court then inquired as to whether the parties had actually

filed for arbitration. Coventry indicated that it had not. The Plaintiff indicated that it had

elected, pursuant to the discretionary arbitration clause, to seek relief in the courts rather than

arbitration. The state court then ruled that since no arbitration had been filed, he did not see a

sufficient demand for arbitration to establish that the court did not have subject matter jurisdiction over the lawsuit. (Exhibit 1, p. 36). Therefore, the state court denied Coventry's Section 2-619 Motion to Dismiss (735 ILCS 5/2-619), granted Coventry's 2-615 Motion to Dismiss, (735 ILCS 5/2-615) and allowed the Plaintiff leave to file her Amended Complaint.

The Plaintiff filed her Amended Complaint in state court on May 16, 2008.[1] In this Court, Coventry has filed a Motion to Dismiss Ellis' Amended Complaint and to Compel Arbitration. For the reasons stated below, this case should be remanded to the state court, or alternatively, this Court should deny Coventry's Motion to Dismiss and Compel Arbitration.

## II. THIS CASE SHOULD BE REMANDED PURSUANT TO 28 U.S.C. § 1447(c) AS A RESULT OF COVENTRY'S JUDICIAL ADMISSIONS IN ITS MOTION TO DISMISS THAT THE COURT LACKS SUBJECT MATTER JURISDICTION

28 U.S.C. § 1447 (c) states as follows:

> **(c)** A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). *If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.* [Emphasis added] An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

Coventry, within days of filing its "Corrected and Amended" Notice of Removal, filed a Motion to Dismiss and Compel Arbitration. One of the arguments that Coventry has asserted in its Motion to Dismiss is that the Court lacks subject matter jurisdiction and pursuant to FRCP 12 (b) (1), the Plaintiff's Amended Complaint should be dismissed. (Document 15 pp. 10-11). Based on Coventry's judicial admissions in its 12 (b) (1) arguments in its Motion to

---

[1] The Amended Complaint contained the same allegations as the Amended Complaint that Plaintiff sought leave to file in state court on April 18, 2008 and which the state court originally denied Plaintiff leave to file.

Dismiss that this Court lacks subject matter jurisdiction, Ellis would therefore request pursuant to 28 U.S.C. § 1447 (c) that this Court find that it lacks subject matter jurisdiction over this case and to remand this case to the Circuit Court of Cook County, Illinois for further proceedings in state court.

Wherefore, Ellis hereby requests that the Court find that pursuant to 28 U.S.C. § 1447 (c) it lacks subject matter jurisdiction over this case and that the case be remanded to the Circuit Court of Cook County. Ellis also requests that pursuant to 28 U.S.C. § 1447 (c) that Coventry be ordered to pay just costs and any actual expenses, including attorney fees, as a result of Coventry's removal of this case to federal court.

## III. THE DEFENDANT'S REMOVAL WAS PROCEDURALLY DEFECTIVE REQUIRING REMAND

Alternatively, if the Court does not remand this case pursuant to 28 U.S.C. § 1447 (c), then the following additional bases exist for remand:

### A. The 30-day Requirement

Coventry failed to file its Notice of Removal in a timely manner. The federal removal statute, 28 U.S.C. §1446 (b), requires that if the case stated in the initial pleading is not removable, as Coventry has alleged in its Corrected Notice of Removal, "a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, *motion*, order or other paper *from which it may first be ascertained that the case is one which is or has become removable.*" 28 U.S.C. § 1446 (b) (Emphasis supplied). Coventry has alleged that this matter became removable pursuant to 28 U.S.C. § 1441 (b) when Plaintiff filed the First Amended Complaint on May 16, 2008, which removed LaSalle, an Illinois Corporation. However, Coventry was first made aware of

Plaintiff's intent to remove LaSalle on April 21, 2008 when Plaintiff filed a response brief to Coventry and LaSalle's Motion to Dismiss in the state court action. A copy of Plaintiff's Response brief is attached as <u>Exhibit 2</u>.

The second subheading of Plaintiff's response Brief, entitled **"PRELIMINARY STATEMENT"** states as follows:

> Plaintiff agrees that arbitration is the appropriate forum for resolving all disputes between Plaintiff and Defendant, LaSalle Bank National Association ("LaSalle"), and requests leave to file an amended complaint which dismisses LaSalle from this case. Accordingly, this Response is limited in scope to the Motion to Dismiss by Coventry Capital I LLC ("Coventry"). (Exhibit 2, p. 1).

Plaintiff clearly and unambiguously expressed an intent to dismiss LaSalle from the state court action. Pursuant to 28 U.S.C. § 1446 (b), Coventry could have easily ascertained from Plaintiff's response brief that this matter had become removable and Coventry's receipt of the response brief triggered the thirty-day limitations period. Coventry, upon receiving notice of the Plaintiff's intent to dismiss LaSalle should have requested that the state court stay any consideration of the state court motions while it filed its notice of removal to federal court. Instead, Coventry chose to have the state court rule on its dispositive motions. Accordingly, Coventry was required to file its Notice of Removal by May 21, 2008. Coventry did not file its original, defective Notice of Removal until May 28, 2008, seven days after the limitation period had expired.

The thirty-day limitation period imposed by 28 USC §1446 (b) "is a strictly applied rule of procedure and untimeliness is a ground for remand so long as the timeliness defect has not been waived." *Northern Illinois Gas Co. v. Airco Indus. Gases, A Division Of Airco, Inc.,* 676 F.2d 270, 273 (7th Cir. 1982). Because Coventry failed to comply with the thirty-day

6

requirement of 28 USC § 1446 (b), this case must be remanded to the Circuit Court of Cook County, Illinois.

### B. Other Procedural Defects

Additionally, Coventry's Corrected Notice of Removal has several other procedural defects. Initially, Coventry failed to properly alleged the citizenship of the parties to this action. Coventry's Corrected Notice states that "this Court has jurisdiction of the state action under the provisions of § 1332. The plaintiff is a Connecticut resident. Coventry is a Delaware Corporation with its principal place of business in Pennsylvania." (Document 10, Coventry's Corrected Notice of Removal, ¶ 6). When the basis for removal is diversity of citizenship, the party seeking removal must allege the citizenship, rather than the residency, of each party. "When the parties allege residence but not citizenship, the court must dismiss the suit." *Guaranty National Title Co. v. J.E.G. Associates*, 101 F.3d 57, 58 (7th Cir. 1996) (citing *Steigleder v. McQuesten,* 198 U.S. 141, 25 S.Ct. 616, 49 L.Ed. 986 (1905)). Therefore, as a result of this defect in the Corrected Notice of Removal, this case should be remanded to the Circuit Court of Cook County, Illinois.

Assuming, *arguendo*, that Coventry's allegations of residency are effectively allegations of citizenship, it has nonetheless failed to properly allege its own citizenship. For purposes of diversity jurisdiction, "the citizenship of an LLC is the citizenship of each of its members." *Camico Mut. Ins. Co. v. Citizens Bank,* 474 F.3d 989, 992 (7th Cir. 2007). Coventry has merely alleged that it is Delaware corporation with its principal place of business in Pennsylvania. [2] Coventry's "failure to properly plead the citizenship of each individual member of the LLC places into question whether the citizenship between the parties is

---

[2] Coventry's statement that it is a Delaware Corporation is also incorrect. In fact, as noted, Coventry is a Delaware Limited Liability Company and not a corporation.

completely diverse" and "[t]he Court must approach this case as if jurisdiction does not exist."
*Maschhoff West, L.L.C. v. Berry Nursery*, 2008 WL 111297, *1 (S.D.Ill. 2008).

Lastly, Coventry has failed to comply with the removal statute's requirement that it
must attach to the Notice of Removal "a copy of all process, pleadings, and orders served upon
such defendant or defendants in such action." 28 USC § 1446 (a). The only document
attached to Coventry's Notice of Removal is Plaintiff's First Amended Complaint. Coventry
failed to attach any of the following pleadings or orders:

- Plaintiff's Verified Complaint for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (Exhibit 3)

- Plaintiff's Emergency Motion for a Temporary Restraining Order Injunction (Exhibit 4)

- Defendants' Memorandum in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order Injunction (Exhibit 5)

- Defendants' (State Court) Motion to Dismiss (Exhibit 6)

- Plaintiff's Emergency Motion for Leave to File an Amended Complaint in Lieu of a Response to Defendants' Motion to Dismiss (Exhibit 7)

- Plaintiff's Response Brief to Defendants' Motion to Dismiss (Exhibit 2)

- Defendants' Reply Brief in Support of their Motion to Dismiss Injunction (Exhibit 8)

- Court orders of February 14, 2008, February 28, 2008, April 7, 2008, April 18, 2008, and May 12, 2008 Injunction (Group Exhibit 9)

- Transcript of the Proceedings and the Court's Order of May 12, 2008 Injunction (Exhibit 1)

Since Coventry's original Notice of Removal and Corrected Notice of Removal fail to
comply with numerous procedural requirements, this matter should be remanded to the Circuit
Court of Cook County. See *Rothner v. City of Chicago,* 879 F.2d 1402 (7th Cir. 1989). These

documents are not only required by 28 USC § 1446 (a), but are indicative of the extensive litigation that has proceeded since this matter was initially filed in early February, 2008. (*See* Waiver Argument, below)

Wherefore, for all of the foregoing reasons, Plaintiff respectfully requests that the Court remand this case to the Circuit Court of Cook County, Illinois, *instanter*.

## IV. COVENTRY HAS WAIVED ITS RIGHT TO REMOVE THIS LAWSUIT TO FEDERAL COURT

### A. Coventry's Extensive Participation in the State Court Action Waived Coventry's Right to Remove This Lawsuit to Federal Court

As discussed at length in Section I above, Coventry extensively litigated issues in the state court as detailed in the referenced pleadings and Orders that Coventry failed to file with this Court as required by 28 USCA § 1446 (a). Plaintiff maintains that Coventry's actions in state court of filing of a motion to dismiss, arguing that motion to dismiss and receiving a partially adverse ruling and partially favorable ruling on that motion to dismiss manifested Coventry's intent to litigate on the merits in state court. Then, upon receiving an adverse ruling on the merits of one portion of its motion to dismiss and filing for removal to Federal Court, Coventry now seeks to use the removal process as an appeal of the adverse state court ruling and as a means of re-litigating an issue that was fully briefed, argued, and rule upon by the judge presiding over the state court action. Coventry's actions in the state court should be deemed a waiver of its right of removal to federal court.

A defendant may remove a state court proceeding to federal court pursuant to 28 U.S.C. § 1441 (a) if the federal court could have entertained the suit originally. However, the

right to remove a case to federal court may be waived by acts taken in the state court that indicate the defendant has invoked the jurisdiction of the state court. Also, a defendant will be deemed to have waived the right of removal where the removal is, in essence, an appeal from an adverse ruling of the state court. *See, e.g., Bolivar Sand Co. v. Allied Equipment, Inc.,* 631 F.Supp. 171, 173 (W.D.Tenn.1986); *McKinnon v. Doctor's Associates, Inc.,* 769 F.Supp. 216 (E.D.Mich.1991).

    In order to find that the defendants waived their right to remove, this Court must find that the Defendant clearly and unequivocally intended to waive the right to remove and to submit to the state's jurisdiction. A defendant waives its right to remove by proceeding to defend the action in state court or otherwise invoking the process of the state court. The relevant case law reveals two factors that guide a court's analysis in determining whether the right to remove a case to federal court has been waived: 1) whether the actions taken by the Defendants in the state court were for the purpose of preserving the status quo, or did they manifest an intent to litigate on the merits in state court and 2) whether the removal can be characterized as an appeal from an adverse judgment of the state court. *Kiddie Rides USA, Inc. v. Elektro-Mobiltechnik GmbH,* 579 F.Supp. 1476 (C.D.Ill.1984); *Bolivar Sand Co.,* 631 F.Supp. at 173; *Scholz v. RDV Sports, Inc.,* 821 F.Supp. 1469 (M.D.Fla.1993); *Grubb v. Donegal Mut. Ins. Co.,* 935 F.2d 57 (4th Cir.1991).

    Here, both factors supporting Coventry's waiver of its right to remove are present. First, Coventry extensively litigated on the merits in state court, attempting to secure a dismissal with prejudice pursuant to 735 ILCS 5/2-619 and actually securing a dismissal without prejudice of Plaintiff's Complaint pursuant to 735 ILCS 5/2-615. Second, Coventry's removal can be characterized as merely an appeal of the state court's adverse ruling on its

motion to dismiss. The incontrovertible proof of Coventry's use of the federal removal statute as an appeal of the adverse state court ruling is that the motion to dismiss filed in this Court presents the same arguments that the state court rejected in its May 12, 2008 Order. Coventry's removal of this action to federal court is merely an effort to circumvent the state court's appellate process and re-litigate an issue that has already been ruled upon.

Based on the foregoing, this Court should find that Coventry has waived its right to remove this case to federal court because Coventry clearly and unequivocally intended to waive its right to removal and submitted to the jurisdiction of the state court by filing a Section 2-619.1 dispositive combined 2-615 and 2-619 motion to dismiss, arguing those motions and receiving an adverse ruling on the 2-619 motion and a favorable ruling on the 2-615 motion. As a result of Coventry's extensive participation in the state court litigation, this Court should find that Coventry waived its right to remove this lawsuit from state court and that this matter should be remanded to the Circuit Court of Cook County, Illinois, *instanter*.

## B. Coventry Has Waived Its Right To Removal By Asserting in Pleadings That This Court Lacks Subject Matter Jurisdiction

Additionally, Coventry has waived its right of removal by making judicial admissions that this Court lacks subject matter jurisdiction over this claim. Since Coventry judicially admits that this Court lacks subject matter jurisdiction, it cannot ask this Court to affirmatively order Ellis to arbitrate. Coventry's assertions that the Court does not have subject matter jurisdiction, but nevertheless should compel arbitration, demonstrates the lack of basis for which this removal has been undertaken and further supports the waiver arguments stated above. If, according to Coventry, the only proper forum for resolution of this lawsuit is

arbitration, an argument upon which Coventry received an adverse decision from the state court, then this Court should find that Coventry has waived its right of removal.

Coventry, by failing to file all of the state court pleadings and orders has purposefully provided this Court with an incomplete record to attempt to circumvent the state court's order and in effect have an appeal of the state court's order denying Coventry's motion to dismiss and denying Coventry's arguments regarding arbitration. Further, these efforts are indicative of Coventry's true intent, which is use the removal process and this Court as means to re-litigate an issue on which it received an unfavorable ruling. It is clear from Coventry's actions that Coventry has sought removal *only* to request that this Court send this matter to arbitration. The state court refused to adopt Coventry's argument on the arbitration issue. Coventry has no basis to file for arbitration and the only way to compel the Plaintiff to proceed in arbitration was to remove the case to federal court and to request this Court to "compel" Ellis to proceed to arbitration, after Ellis had already elected to proceed in state court after Coventry's denial of Ellis' original demand for arbitration. It was only after Ellis filed her lawsuit that Coventry started to seek arbitration.

On basic, fundamental, equitable principles alone, Coventry's tactics should be rejected. However, based on the waiver standards set forth above, such removal practice is not allowed by law, should not be sanctioned and should be rejected as waived. The Plaintiff would respectfully request that, in addition to all of the procedural defects noted above, the Court find that Coventry has waived its right of removal . Ellis would hereby request that this Court remand this case to the Circuit Court of Cook County, Illinois, *instanter*.

12

## CONCLUSION

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005 No 2., respectfully requests that this Honorable Court grant Plaintiff's Motion for Remand to the Circuit Court of Cook County, Illinois, and for such further relief as this Court deems just and appropriate.

Respectfully Submitted,

Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2

By: _/s /Mark L. LeFevour_
One of its attorneys

Stephen P. Eisenberg (ARDC #0725358)
Mark L. LeFevour (ARDC #6204957)
James J. Sanders (ARDC #6204957)
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street  Suite 1100
Chicago, Illinois 60603
(312) 368-4554

F:CASE\059808\12849\Mtn to Remand – Final.doc

## CERTIFICATE OF SERVICE

     I hereby certify that on **July 16, 2008**, I caused to be filed, electronically, the foregoing document with the Clerk of the United States District Court, Northern District of Illinois for the Eastern Division, using the CM/ECF system, which sent a Notice of Electronic Filing to all CM/ECF Registered Participants on **July 16, 2008**.

| | |
|---|---|
| Terrence E. Kiwala<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 1476548<br>Email: tikiwala@dykema.com<br>*Attorney for Coventry Capital I LLC*<br><br>Michael Borders<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 61800620<br>Email: mborders@dykema.com<br>*Attorney for Coventry Capital I LLC*<br><br>Rosa M. Tumialan<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 6226267<br>Email: rtumialan@dykema.com<br>*Attorney for Coventry Capital I LLC* | **A copy was also served on the below counsel by U.S. mail:**<br><br>Brian P. Brooks<br>Kyra A. Grundeman<br>O'Melveny & Myers LLP<br>1625 Eye Street, N.W.<br>Washington, D.C. 20006 |

 

*/s/ Mark L. LeFevour*
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 West Monroe Street, Suite 1100
Chicago, IL 60603
Phone: (312) 368-4554
Fax: (312) 368-4562
E-mail: mll@lefltd.com
IL ARDC # 6204957

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )
IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION
ELIZABETH ELLIS, as the )
Co-Trustee of the Neil )
H. Ellis Insurance Trust )
- 2005 )
            Plaintiff, )
vs.                      ) Case No. 08 CH 5368
LaSALLE NATIONAL BANK    )
ASSOCIATION and COVENTRY )
CAPITAL LLC,             )
            Defendants.  )

REPORT OF PROCEEDINGS at the hearing of
the above-entitled cause before the Honorable
WILLIAM O. MAKI, Judge of said Court, on the 12th
day of May, 2008, at the hour of 1:45 o'clock p.m.

Reported by: Deborah E. DeSanto, CSR
License No. 084-1384

**1**

1    APPEARANCES:
2    LEAHY, EISENBERG & FRAENKEL, LTD.
3    BY:  MR. STEPHEN P. EISENBERG
4         and
5         MR. MARK L. LeFEVOUR
6    33 West Monroe Street
7    Suite 1100
8    Chicago, Illinois  60603
9    (312) 368-4554
10        Representing the Plaintiff;
11
12   DYKEMA GOSSETT LLC, by
13   BY:  MR. MICHAEL C. BORDERS
14   10 South Wacker Drive
15   Suite 2300
16   Chicago, Illinois  60606
17   (312) 876-1700
18        Representing the Defendants.
19
20
21
22
23
24

**2**

1    MR. LeFEVOUR:  Good afternoon, your Honor.
2    Mark LeFevour and Stephen Eisenberg on behalf of
3    the plaintiff, Elizabeth Ellis as Co-Trustee of the
4    the Neil H. Ellis Insurance Trust - 2005.
5    THE COURT:  Okay.
6    MR. BORDERS:  Michael Borders on behalf of
7    the defendants, LaSalle National Bank Association
8    and Coventry Capital LLC.
9    THE COURT:  I think this comes to be heard
10   on your 619/615 motion to dismiss.
11   MR. BORDERS:  Yes, your Honor, it does.
12   THE COURT:  You wish to be heard?
13   MR. BORDERS:  Briefly, because I think the
14   parties' positions are fairly well stated in the
15   briefs submitted to your Honor.
16   I think the critical issue is, for the
17   purposes of enforcement of the arbitration clauses
18   in the various agreements that have been made part
19   of this record, is Coventry Capital an "agent" of
20   LaSalle as contemplated by the arbitration clauses.
21   And there's simply no question about that fact.  In
22   the -- we have, well, three trusts.  We have the
23   irrevocable trust, which is the beneficiary of the
24   insurance policies.  We have the -- what we

**3**

1    generally refer to as the trust, and then the
2    sub-trust.  And the sub-trust is the trust that
3    actually took out the note and security agreement
4    from LaSalle.
5    In the insurance trust, the irrevocable
6    trust, which is the named plaintiff in this action,
7    it, the plaintiff consents to Coventry being named
8    as servicing agent of LaSalle.  There's
9    unquestionably an arbitration clause in the
10   agreement that encompasses the types of claims
11   attempted to be asserted here.  And, in fact, the
12   document itself, which is attached to the motion,
13   as the document says consent to agent, which
14   clearly makes -- consent to appointment of agent,
15   it's part of the Tab A to the note and security
16   agreement, lists Coventry as the servicing agent
17   for LaSalle.
18   So there can be no ambiguity, there is no
19   ambiguity as to whether or not for purposes of the
20   matters that are asserted here, that Coventry
21   Capital is an agent of LaSalle subject to the
22   arbitration provision.  The plaintiffs have
23   conceded that any disputes they have with LaSalle
24   are subject to the arbitration provision.


EXHIBIT
1

1     In addition, under the sub-trust's note
2 and security agreement, there is also a consent to
3 Coventry as being a sub-agent, and that provision
4 includes the same essential arbitration clauses as
5 included in the non-recourse security agreement
6 with LaSalle.
7     And then if that weren't enough as it
8 were, there is the separate disclosure statement
9 wherein Coventry is designated as the program
10 administrator. And there is a specific provision
11 in the disclosure statement that all these
12 agreements involving the program administrator are
13 also subject to arbitration under the same basic
14 terms. And that relates to any disputes relative
15 to the transaction documents. And the transaction
16 documents are defined to include the various trusts
17 that are the subject matter of this controversy.
18     So, there's essentially no dispute that
19 there's an arbitration provision here that under
20 the provisions of the Federal statute and the
21 public policy, that this Court essentially is
22 divested of subject matter jurisdiction for the
23 claims that plaintiff wishes to plead in what
24 essentially amounts to a motion to reconsider this

5

1 case should be dismissed with prejudice, and any
2 claims that the plaintiff has against either
3 LaSalle or Coventry will have to be submitted by
4 the arbitration.
5     THE COURT: Okay.
6     MR. LeFEVOUR: Your Honor, primarily, you
7 know, there's two different provisions that are
8 seeking dismissal, 2 619 and 2 615.
9     Under 2 619, their theory is that the
10 Court does not have subject matter jurisdiction
11 because of this arbitration clause.
12     As to Coventry, in the case law that we've
13 cited in our brief, more particularly, Urban vs.
14 Nokia, 349 Ill. App. 3d 508, and then the -- I
15 don't want to mispronounce it, the, Caligiure case,
16 is C-a-l-i-g-i-u-r-e, vs. First Colony Life
17 Insurance Company, 318 Ill. App. 3d 793, it really
18 goes to the heart of the issue here. And the issue
19 is not whether or not Coventry is designated an
20 agent in the documents, but as a non-signatory to
21 the agreements, whether Coventry can be deemed a
22 legal agent under Illinois law.
23     A mere servicing agent does not bring them
24 within the arbitration clause. They would have to

7

1 Court's denial of their prior motion to file an
2 amended complaint. They have essentially conceded
3 that the complaint currently on file is subject to
4 dismissal, and since the amended complaint does not
5 cure the defect, that the Court should deny what
6 needs to be filed.
7     The second argument raised is that the
8 plaintiffs are essentially estopped from contending
9 that this dispute's not subject to arbitration
10 since their Connecticut counsel has demanded
11 arbitration and in their demand letters asserted
12 essentially the same claims, breach of fiduciary
13 duty and -- that are encompassed within both
14 amendments.
15     And their final argument is, issue is
16 whether or not the arbitration clauses themselves
17 encompass what's alleged in the amended complaint.
18 And they clearly do in that the arbitration
19 provisions are quite broad, including the disputes
20 that arise out of or are related to the documents
21 which are the subject of this dispute, and that is
22 the essence of the plaintiff's claims of breach of
23 fiduciary duty.
24     So it's the defendants' position that this

6

1 have the right to conduct legal transactions on
2 behalf of LaSalle.
3     And even in the arguments today, that
4 position has not been taken here. Basically what
5 they're saying is, well, they have the right to be
6 the agent to do what's under the documents, which
7 is basically a servicing agent, which is basically
8 send out notices, send out other things that we're
9 claiming they did wrong.
10     And so, therefore, under the case law, as
11 we have read it, and that's one of the reasons we
12 sought to amend the complaint before the Court a
13 few weeks ago, was we did not believe that they
14 were covered by the agreement, because they're a
15 non-signatory, and there's been no showing in
16 either the documents or anywhere that they're
17 anything but a servicing agent and not a legal
18 agent of LaSalle Bank.
19     And I certainly would suggest to the Court
20 that I don't think LaSalle Bank would have made
21 them a legal agent for all purposes in case
22 Coventry is doing something wrong, as we have
23 alleged here.
24     The other issue is, there's a relationship

8

1  that exists prior to the secured -- I'm sorry, the
2  note and security agreement.
3      If I'm listening to LaSalle at this point,
4  they're saying, "Okay. Well, those transactions
5  would come within this because they're our agent."
6  And if that's their position, that's fine. But our
7  position is, those are things that took place even
8  before the financing here, the note and security
9  agreement was signed.
10      The critical issue is whether or not
11  they're a signatory to the agreement, and they are
12  not. And that's, that is where we divide here.
13      And LaSalle, there's no question, if
14  they're a signatory to the agreement, they can go
15  to arbitration.
16      Coventry's not a signatory to the
17  agreement and not right at this point, as far as I
18  know, designated as a legal agent under Illinois
19  law to act on behalf of LaSalle for all purposes in
20  this transaction. And that goes to -- you know, to
21  act as an agent for all purposes goes to signing
22  legal documents and things like that. And they
23  certainly did not do that in this case.
24      As to --

9

1  relevant, of course, to this transaction? And if
2  so, then their principal is responsible for what
3  they do if they can't hold for the indemnity, and
4  they acted with that full force of agency power for
5  its principal.
6      And I can't get an answer to that
7  question. I see the distinctions between servicing
8  agent and program administrator. But when I look
9  at the case law and I look at the language of the
10  arbitration provision, it says, "My agent,"
11      LaSalle's agents are subject to
12  arbitration, I can understand that. And I think if
13  we ask the question are they willing to stand,
14  LaSalle and Coventry, with actually the same
15  counsel today, for all the actions that Coventry
16  did relative to this transaction -- we're not
17  looking to make them into an agent for things that
18  are not relevant -- and if they answer yes, then
19  they are an unnamed and they might be there by
20  admitting to being an Illinois authorized legal
21  agent.
22      But if they corner and equivocate with the
23  word servicing agent and program administrator,
24  what is to say that later, during an arbitration,

11

1      THE COURT: What is the distinction in
2  terms of the facts here of Coventry Capital's role?
3  I mean, they are designated in the security
4  agreement, the note and security agreement as being
5  the servicing agent. And it's acknowledged by the
6  parties that they are the servicing agent. I mean,
7  what distinction is there in terms of any other
8  activities that may or may not have been alleged
9  here?
10      MR. LeFEVOUR: Well, in a case by case --
11      MR. EISENBERG: Well, if Coventry -- if I
12  may, as to the facts, your Honor, which you've
13  asked, we look at the fact that it is alleged that
14  the notices sent by Coventry were sent to the wrong
15  address.
16      Now, in the documents, we look at the
17  distinction because the documents say the
18  arbitration clause applies to us and our agents.
19      The documents also refer to Coventry as a
20  servicing agent and as a program administrator.
21      The question is a simple one, and I think
22  it can be answered, and, that is, do they stand
23  before the Court today and say that they are the
24  Illinois legal agent for LaSalle to do things only

10

1  they will say, not say, "Wait a minute. We're not
2  the agent for LaSalle on that. We're agent --" or
3  LaSalle might say, "No, they're not our agent on
4  that, that bad address thing. They're on their own
5  for that."
6      And then we would find ourself wondering
7  why we didn't litigate with them here, because now
8  it's not the arbitration provision against
9  Coventry, for Coventry, it's LaSalle saying, "Wait
10  a minute. They're not."
11      So will LaSalle say "Illinois law, our
12  agent, they bind us. All that they did is all that
13  we do." Or if they're going to hedge behind
14  language of servicing and program administrator,
15  then they're not under the arbitration benefit.
16      So I say to them, well, I wish they could
17  answer that question, and I asked it before court.
18  I don't have an answer yet. It might resolve the
19  whole matter.
20      The fact is that they sent it to the wrong
21  address. So the question is -- that and other
22  facts -- do they apply as the agent acting for the
23  principal?
24      THE COURT: So for the point of argument

12

1 if Coventry Capital performed a misdeed, whatever
2 it is, sent it to the wrong address, the issue in
3 your mind is were they acting as an agent of
4 LaSalle or are they acting independently?
5      MR. EISENBERG: I'm sure that they might,
6 that LaSalle might later say that they were acting
7 as an independent.
8      Now, they might correct that here by
9 saying for LaSalle, because LaSalle is here, too.
10 I don't -- that seems to have an inherent conflict
11 for me, but given this context, we can -- it's not
12 my job. I've got to go right by that.
13      But will LaSalle say, "They were acting
14 for us in all that they did"?
15      MR. LeFEVOUR: And that's what the Nokia
16 case basically says, Judge, is that -- they
17 attempted that in that case, when they got to
18 arbitration and they were going to switch their
19 position that they weren't an agent. And that's
20 the concern.
21      The only other points to touch on is the
22 estoppel argument on these letters. Judge, they
23 were letters asking to arbitrate about the
24 foreclosures and said that, "If we get to

13

1 arbitration, we'll raise these other issues." That
2 was early on in this, before anyone had really
3 looked at the documents.
4      Our position is, as Mr. Eisenberg stated,
5 Judge, is that if they're willing to take that
6 position, that for all purposes that they're the
7 legal agent, well, then that would control.
8      But if not, then we have to look at the
9 Nokia case and say that doesn't control and they're
10 not entitled to -- they're not entitled to
11 arbitration.
12      MR. EISENBERG: And counsel for both is
13 here. He could speak to that. That way we don't
14 have to be haunted by it later.
15      THE COURT: Can you speak to that?
16      MR. BORDERS: I can speak to it to this
17 extent. LaSalle and Coventry have no conflict as I
18 stand here representing both of them in this matter
19 in that they have the joint position that both
20 Coventry and LaSalle and any dispute they have with
21 the plaintiff relative to these documents and
22 transactions are subject to the arbitration
23 agreement. It will be up to the arbitrator to
24 decide and resolve if there is any claim against,

14

1 for purposes of example, Coventry that may or may
2 not go beyond the scope of the agency delegated to
3 them by LaSalle. That's arbitrable. This doesn't
4 divest the arbitrator of jurisdiction over that
5 dispute.
6      They need not have identical interest in
7 all matters, just as in any principal/agency
8 dispute. The agent, the principal could argue that
9 the agent acted outside the scope of their
10 delegated agency.
11      The question here before this Court is
12 what is contemplated by these documents and is
13 Coventry as well as LaSalle, if you will,
14 beneficiary of the arbitration clause. And I think
15 it's -- it can be -- there really is no legitimate
16 dispute that -- in my view, there is no legitimate
17 dispute that the agreements executed by the parties
18 contemplate that any and all controversies arising
19 out of these various documents are subject to
20 arbitration. And it can be no clearer than in the
21 disclosure statement, which is attached to our
22 motion as Exhibit D that specifically references
23 Coventry as well as LaSalle. In that document they
24 use the term program administrator.

15

1      THE COURT: Okay.
2      MR. BORDERS: So I think that, you know,
3 what plaintiffs are trying to do is, you know,
4 manipulate the issue as it were to try to create a
5 controversy between LaSalle and Coventry when in
6 fact there is no dispute over the -- between the
7 two parties as it relates to the ability in
8 assessing these claims be subject to arbitration.
9      MR. EISENBERG: Judge, what I just heard
10 is what I heard earlier, and that is that Coventry
11 and LaSalle agree with what this Court is charged
12 to order, the question, but Coventry and LaSalle
13 agree this is arbitrable. I heard him say that.
14 And then he said that which would be the context of
15 a third-party arbitration complaint, whether you
16 did act inside or outside the scope of authority.
17      It is not -- it is for me to deal with the
18 question about Coventry's actions with respect to
19 the plaintiff. Not to simply leave it later for an
20 arbitration of third-party liability between
21 principal and agent and actions inside or outside
22 of the scope of the authority.
23      A signatory to arbitration is LaSalle, and
24 it's clear that everything about their case with

16

4 (Pages 13 to 16)

1    the plaintiff goes to arbitration.
2        But when we have this hedging about
3    whether or not it's a third-party matter or
4    servicing agent or plan administrator, it's not
5    clear, and it shouldn't be left for it later to be
6    decided in arbitration that wrongs committed
7    against the plaintiff disavowed by LaSalle are the
8    duty of Coventry in arbitration for a decision
9    rather than this Court. It should be this Court,
10   because they're not named, they're not signed. And
11   I just heard third-party arbitration complaint, and
12   I can't believe that that would be the subject
13   matter, let alone they're arguing before the Court
14   by the same lawyer. So, they would have to do
15   that, they would have to get different lawyers in
16   arbitration.
17       THE COURT: All right. But the issue here
18   in their motion is whether or not they can choose
19   to void this Court of any jurisdiction and settle
20   these issues in arbitration. I mean, isn't that
21   the question? And it seems by the very nature of a
22   619 motion, they're saying, they're opting for
23   arbitration.
24       MR. EISENBERG: Absolutely, Judge. This

17

1    so.
2        THE COURT: Do you have to establish that
3    distinction in order to see whether Coventry is
4    entitled to arbitration? I mean, just because
5    they're not a signatory to this agreement doesn't
6    mean that it's -- that they don't have rights under
7    the agreement where all parties acknowledge that
8    they are a servicing agent.
9        MR. LeFEVOUR: Right. And that's -- I
10   think the case law in this area is very specific on
11   those issues, that non-signatories to agreements,
12   you have to establish, it's actually their burden
13   to establish that they are an agent before they'll
14   be able to enforce any arbitration provisions.
15       Because we have -- under the agreement,
16   either party has the right to arbitrate, okay, to
17   choose arbitration. We have the right to choose
18   arbitration against LaSalle. We have the right to
19   choose arbitration -- to not arbitrate against
20   Coventry because we don't believe that they're
21   covered by the agreement. They don't have the
22   right to choose arbitration against Coventry
23   because they're saying they don't have any claims
24   against them. So we --

19

1    is a question that on behalf of LaSalle is by the
2    documents and by the clear language arbitrable. We
3    have said that in our papers.
4        THE COURT: Okay.
5        MR. EISENBERG: The next step is, is it
6    the arbitration form for Coventry and plaintiff?
7    And we look at the documents, and the first
8    arguments that have been made -- well, I won't
9    repeat them -- are that they are non-signatories.
10       The second is that the defendant,
11   Coventry, says, "We're a servicing agent, so we're
12   the agent." "We're the program administer, so
13   we're the agent." And I say to them, "Are you,
14   therefore, the agent for LaSalle in all matters of
15   this transaction?" And he says, "That will be the
16   subject of a dispute, if at all, between my
17   principal and my agent," between the principal and
18   the agent.
19       And you can't read that into this
20   arbitration clause. If I've got a dispute with
21   Coventry, it should be brought to this Court. And
22   these documents and the references to a servicing
23   agent and a program administrator don't make them
24   the legal agent, and if they do, they should say

18

1        THE COURT: Now, wait a minute. I believe
2    he's representing them, he's saying on, "behalf of
3    Coventry I'm electing to arbitrate."
4        MR. LeFEVOUR: Of course. But that puts
5    the answer before the question, because to get to
6    where he wants, to be saying, "I want to arbitrate
7    on behalf Coventry," you'd have to establish that
8    they have rights under the agreement and the rights
9    under the agreement --
10       THE COURT: Correct.
11       MR. LeFEVOUR: Yes. And the rights under
12   the agreement, the case law says that when they're
13   non-signatory, the only way that they can get that
14   bundle of rights under the agreement is if they say
15   that they're their agent, they're legal agent for
16   all purposes.
17       And what we're trying to say here is, if
18   that's their position here, then your decision's
19   easy. But they're not stating that that's their
20   position.
21       And I hate to keep referring to the Nokia
22   case, but that's exactly what they said. They
23   didn't want gamesmanship, where they come in here
24   and say, "Judge, they're the agent." Then they go

20

1  over there and say, "Well, they're really not the
2  agent." So then we have to come all the way back
3  -- and then what do we have to do? We have to come
4  back here, because now they're not subject to the
5  arbitration.
6        And that's the issue that we're dealing
7  with. If they want to admit that these are -- that
8  it was our legal agent for purposes of this
9  transaction, and, you know, we accept his
10  representation, obviously then the Court's decision
11  is easy.
12        But here it's not that simple, because
13  they're not signatories to this agreement. And
14  that does make a difference, because they don't get
15  the rights that he's trying to assert as a
16  non-signatory. You only get them, those rights, if
17  they're agent, a legal agent of LaSalle.
18        And that's really -- I think we've been
19  trying to show the Court that, you know, here and
20  earlier in our -- when we sought to amend the
21  pleading, because we didn't think -- we don't
22  believe that under the current state of pleadings,
23  that Coventry is, you know, subject to the
24  arbitration clause or can invoke any rights under

21

1  the arbitration clause unless LaSalle says,
2  "They're our agent."
3        MR. EISENBERG: That could be an easy
4  answer. If under Illinois law, Coventry is the
5  agent of LaSalle, it seems that that's what limited
6  discovery, if we were allowed, would show here.
7  But they could solve it by that admission, and you
8  could order us to arbitration, and we would go do
9  so.
10        But I loathe the thought of getting to
11  arbitration when two parties against us are
12  starting to say, "Well, no, no, no, that's not me.
13  No, no, no, that's not me," when the burden of the
14  benefit of the arbitration opportunity is on
15  Coventry to show that they're the agent, not the
16  servicing agent, not the program administrator.
17        MR. BORDERS: Whenever it's my turn, you
18  know --
19        MR. EISENBERG: It's easier to just
20  interrupt. Then you'll get a turn for sure.
21        THE COURT: Here's what I'm doing, is I'm
22  reviewing his brief in reference to this Urban vs.
23  Nokia. I'm just looking at it, his arguments here
24  in reference to this case.

22

1        Go ahead. What did you want to add?
2        MR. BORDERS: I think the non-signatory,
3  Urban, if I remember, was expressly excluded from
4  the arbitration clause.
5        I mean, I think that it's not uncommon at
6  all for various parties who potentially may not
7  have completely uniform positions to agree to
8  submit disputes to arbitration.
9        So the issue before this Court is not
10  whether or not there could be a claim asserted in
11  arbitration against Coventry where they would not
12  be deemed to be the agent of LaSalle since LaSalle
13  was responsible financially for that breach, as
14  opposed to did the parties agree that any
15  controversies between the plaintiff or the other
16  trust and LaSalle and Coventry arising out of these
17  transactions and execution of these documents would
18  be submitted for resolution to arbitration.
19        And on that issue, I do not think there is
20  any dispute. Plaintiffs are trying to essentially
21  get, if you will, the cart before the horse. To
22  argue, you know, what if, what if, what if, those
23  what if claims could be submitted to arbitration.
24        If the arbitrator determines that Coventry

23

1  has liability to the plaintiff for some reason or
2  LaSalle does not, so be it, that would be the
3  result of the arbitration. If they deem that both
4  Coventry and LaSalle jointly have liability or
5  LaSalle as the principal for Coventry, so be it.
6        But the question before the Court is, do
7  these agreements give Coventry, since it's not a
8  dispute as to LaSalle, the right to assert the
9  arbitration clause.
10        THE COURT: That is the question.
11        MR. BORDERS: That is the question.
12        THE COURT: Right.
13        MR. BORDERS: And we say, and I say the
14  answer is undisputedly yes. If one goes no further
15  than looking at the disclosure statement, which is
16  at our Tab D, it talks about "arising out of or in
17  connection with any of the transaction documents,
18  including but not limited to its existence,
19  instruction, validity, interpretation or meaning,
20  performance, nonperformance, enforcement,
21  operation, breach, continuous, or termination
22  thereof shall be submitted and settled by
23  arbitration," et cetera.
24        So their arguments that Coventry breached

24

1  and their purported complaint that Coventry
2  breached a fiduciary duty to provide proper notice
3  of the maturity date clearly is a claim which falls
4  within the scope of responsibilities delegated to
5  Coventry as a servicing agent for LaSalle, for
6  example.
7      MR. LeFEVOUR: May I just make one brief
8  point on it, your Honor?
9      THE COURT: Sure.
10     MR. LeFEVOUR: The agreements they're
11 referring to, none of them are signed by Coventry.
12 That's No. 1.
13     And No. 2 is that Mr. Borders focuses on,
14 "Well, we can just go arbitrate this with
15 Coventry." But, you know, our client, the
16 plaintiff, has the right to choose where the trust
17 wants to litigate these issues. And what we lose
18 in arbitration is the potential of going before a
19 jury on these claims in the Law Division, which are
20 the legal claims.
21     And that's what the dispute is here, is
22 that, you know, we believe that based on the
23 amended complaint, that there is some significant
24 issues against Coventry that we want to litigate,

25

1  and we don't want to forego that right to litigate
2  it before a jury when we don't have to.
3      And quite frankly, again, under the case
4  law as we see it and without some establishment of
5  legal agency under Illinois law, we don't have to
6  under the agreement take Coventry to arbitration.
7  And that's our position. And --
8      THE COURT: And your position is that
9  Coventry doesn't have the right to take you to
10 arbitration?
11     MR. LeFEVOUR: Correct, correct, under the
12 agreement because they're non-signatory.
13     MR. BORDERS: But then what the plaintiff
14 would purport to put this Court in a predicament to
15 do, assuming hypothetically their argument would be
16 accepted, is then this Court would be left to slice
17 and dice, "Well, what relates to these agreements
18 and transactions and what's separate? So what's
19 before the arbitrator and what's before me?"
20     All right. So, you know, this is exactly
21 why arbitration clauses are enforced. I mean, I
22 don't even know what would be left before this
23 Court and would be left before the arbitrator,
24 because they're -- unless you just buy that as a

26

1  non-signatory, they cannot enforce the arbitration
2  clause, which I think that argument just has no
3  basis in law. Then you are to, well, what, you
4  know, what claims did they have that could possibly
5  -- legal claims that could fall outside of the
6  arbitration agreement? And the answer is that they
7  don't have any if they don't -- if their
8  independent claim's unrelated or arising out of the
9  execution of these documents, and that's not what
10 they've pled. Every claim they've pled arises out
11 of this transaction, the execution of these
12 documents and the legal relationship between the
13 parties as a result of the execution of these
14 documents.
15     THE COURT: But does it really matter,
16 because once LaSalle exercises their right to take
17 it to arbitration, then the issues are taken to
18 arbitration. Whether it's LaSalle, whether it's
19 Elizabeth Ellis, what difference does it make?
20 Whoever elects to take it to arbitration, the
21 issues go to arbitration.
22     MR. LeFEVOUR: As between LaSalle and the
23 trust.
24     THE COURT: If there's any disputes.

27

1      MR. LeFEVOUR: Between LaSalle and the
2  trust I would agree with you. I don't know -- I'm
3  not sure I agree with Mr. Borders that the -- our
4  claims against Coventry necessarily go to
5  arbitration. It wouldn't necessarily have to go to
6  arbitration even if they chose --
7      THE COURT: I believe, and, you know, I'm
8  going to have to go and read it, but I believe that
9  in the case that you're citing, the Nokia case, I
10 mean, Nokia was attempting to take it to
11 arbitration, and the issue became whether they had
12 that right or not, they were a non-signatory.
13     But whoever had the right in the agreement
14 if they chose to take arbitration, well, you
15 wouldn't have that same issue.
16     MR. LeFEVOUR: Well, you know, I --
17     MR. EISENBERG: I think you're looking at
18 the invocation, the right to elect that as a venue.
19     THE COURT: I'm saying the plain reading
20 of the agreement is that there's no ambiguity that
21 one or two parties could take this dispute to
22 arbitration.
23     MR. EISENBERG: I agree, Coventry or
24 plaintiff Ellis or LaSalle.

28

1    THE COURT: Correct.
2    MR. EISENBERG: Now, I ask you to
3 fast-forward, Judge.
4    If in fact all of this were handled in
5 arbitration, and at that point the Coventry party
6 attempts to -- is found responsible for failing to
7 send proper notices of a default --
8    THE COURT: But they don't have to waive
9 their defenses just because they're taking it to
10 arbitration.
11    MR. EISENBERG: No, sir. But if they
12 didn't -- if LaSalle disavows its agency, the
13 agents, that Coventry was its agent, it's not
14 collectible against LaSalle. And if Coventry's not
15 there, then we win nothing. And that's the reason
16 we know who's going do be arbitrating the case, and
17 that's the signatories.
18    Now, as to the non-signatories, the
19 question is, is there full-pledged agency, because
20 when we go now to arbitration, if Ellis wins and
21 there's this conflict between Coventry and LaSalle
22 and Coventry's committed all -- a bunch of wrongs
23 in mailing notices and default action on faulty
24 mailings, and LaSalle says, "Wait a minute. They

29

1 weren't our agents for that. It's not collectible
2 against us," and then all of a sudden we've got
3 this dispute between Coventry and LaSalle.
4    And all I'm suggesting is --
5    THE COURT: That would be the argument
6 whether they're in this forum or --
7    MR. BORDERS: Right.
8    THE COURT: -- in arbitration. I mean,
9 it's --
10    MR. EISENBERG: But under Illinois law, to
11 get to arbitration, they have to be the agent of
12 LaSalle. That's our position.
13    THE COURT: If they're insisting on the
14 arbitration, basically what it is is they're
15 acquiescing to arbitration. I.e., they're
16 submitting themselves to the jurisdiction of the
17 arbitrator or the arbitration.
18    MR. LeFEVOUR: But when you say them,
19 Judge, who are you saying specifically?
20    THE COURT: Coventry by the appearance of
21 their counsel. Their counsel is saying, "We're
22 willing to submit to arbitration."
23    MR. LeFEVOUR: And I don't think there's
24 -- there's no dispute as to that.

30

1    What I'm saying is, what the dispute is is
2 whether or not he has the right without declaring
3 them to be an agent.
4    THE COURT: But even assuming that
5 Coventry doesn't have the right, he has the right
6 to bring it to arbitration as the attorney for
7 LaSalle. And Coventry is submitting themselves to
8 the jurisdiction of that arbitration. So it's --
9    MR. EISENBERG: But isn't it the
10 plaintiffs may? The plaintiff Ellis may take this
11 case to arbitration against LaSalle. How does --
12    THE COURT: No. I believe the way it
13 reads is either party.
14    MR. EISENBERG: Either party may.
15    MR. BORDERS: The defense, some of them --
16 the disclosure statement actually uses the word
17 shall, but I think the note/security agreement may
18 use the language may.
19    THE COURT: Let's see.
20    MR. EISENBERG: "Either you or we may."
21 It's on Page 3 of defendants' brief, your Honor.
22    MR. BORDERS: This says LaSalle, but it's
23 LaSalle on behalf of LaSalle and all of their
24 "agents."

31

1    THE COURT: But we have Page 5 here,
2 arbitration clause, "Either you or we may choose to
3 have any dispute between us decided by an
4 arbitration and not in court or by a jury trial.
5 Discovery and rights to appeal in arbitration are
6 generally noted under the intended lawsuit and
7 other rights that you and we would have in court
8 may not be available in arbitration." This is --
9    MR. EISENBERG: That's the contract
10 between LaSalle and plaintiff.
11    THE COURT: Correct. Any -- and then it
12 goes on to the next paragraph, "Any claim or
13 dispute, whether in contract, tort, statute, or
14 otherwise, including the interpretation and the
15 scope of this clause and the arbitrability
16 (phonetic) of the claim or dispute between you and
17 us or our employees, agents, successors, or assigns
18 which arise out of the -- out of or relates to this
19 agreement or any related or resulting agreement,
20 transaction, or relationship, including any such
21 relationship of third parties who did not sign this
22 agreement, shall and at your own election be
23 resolved by a neutral binding arbitration and not
24 by court action."

32

8 (Pages 29 to 32)

1    It seems unambiguous to me.
2        MR. EISENBERG: Well, your Honor, I guess
3    I want to say that LaSalle has not elected
4    arbitration. LaSalle doesn't even acknowledge
5    there's a dispute. So I don't think we're talking
6    about LaSalle's election. Ellis has elected --
7        THE COURT: Well, wait a minute. My
8    understanding is that this is --
9        MR. BORDERS: We are counsel for LaSalle.
10   We moved --
11       THE COURT: No, no, no. Beyond that.
12   There is an arbitration pending, is there not?
13       MR. LeFEVOUR: No.
14       MR. EISENBERG: No, sir.
15       THE COURT: No, there is not?
16       MR. BORDERS: They made the demand, and
17   then they filed this lawsuit. And so until this
18   lawsuit is dismissed and we go through the process,
19   the arbitration is --
20       THE COURT: I'm sorry. They made a demand
21   for arbitration?
22       MR. BORDERS: Under the sub-trust
23   initially. That's all the letters --
24       MR. EISENBERG: And there was no response.

33

1        MR. LeFEVOUR: No, no, there was a
2    response.
3        MR. EISENBERG: There was?
4        MR. LeFEVOUR: They rejected it. They
5    rejected it. They said, "You can't ask for
6    arbitration." That's in the letter we attached
7    from Coventry. They said, "You can't demand
8    arbitration because we represent you. You can't
9    have an outside lawyer representing the trust. We
10   represent you. Therefore, you cannot go to
11   arbitration." That's what they said. And that's
12   one of the reasons we filed here, because they
13   said, "No, we're not going to arbitrate with you"
14   even though we demanded it. I mean, that's in the
15   letter. That's in the letter we attached to our
16   pleading.
17       You know, Judge, I agree with you, the
18   clause is not ambiguous, but you have to read it in
19   the context of who are you and us. You is LaSalle
20   or --
21       THE COURT: All right.
22       MR. LeFEVOUR: -- you is us.
23       And the other thing was is that --
24       THE COURT: Wait a minute.

34

1        MR. LeFEVOUR: Oh, sorry.
2        THE COURT: No, no. Really, what I think
3    I have to do is, I have to review it in the factual
4    context, and the factual context is that their
5    argument is I don't have jurisdiction because it's
6    subject to arbitration. But yet they haven't
7    elected to arbitrate. So how have I lost
8    jurisdiction?
9        MR. BORDERS: Well, we demand that it be
10   submitted to arbitration.
11       THE COURT: And how have you done that?
12       MR. BORDERS: By filing our pleadings
13   here.
14       MR. EISENBERG: Where is the letter?
15       MR. BORDERS: And, you know, what they're
16   asking you to do is, you know, decide, as you say,
17   the arbitrability of the claim here when LaSalle
18   and Ellis have undisputedly, you know, in this
19   court acknowledged that they agreed to be bound by
20   this clause. And asking this Court to leave
21   pending before it a claim against Coventry as a
22   servicing agent for LaSalle albeit while the
23   parties move on to arbitrate all other disputes I
24   guess between the two of them, which leaves --

35

1    which, you know, his comments are just forget the
2    arbitration clause, its purpose and intent.
3    Because you'd have pending before you claims
4    against Coventry as agent for LaSalle while that's
5    the very same issues being arbitrated, even if they
6    attempted to append claims in arbitration that
7    somehow said Coventry went beyond, above and beyond
8    the scope of their agency.
9        THE COURT: All right. I believe that
10   it's proper for me to deny your 619 motion as being
11   premature. I just don't see a sufficient demand
12   for arbitration to establish that this Court
13   doesn't have jurisdiction over this claim. So I'm
14   going to deny the 619 without prejudice. I'm going
15   to -- you're asking leave to file an amended
16   complaint?
17       MR. LeFEVOUR: Correct.
18       THE COURT: I suppose I could grant his
19   615, strike your complaint, and give you leave to
20   file an amended complaint, and then we'll go from
21   there.
22       MR. BORDERS: Here's the point of our
23   argument, your Honor. We have not -- they made a
24   claim against LaSalle and Coventry, and they made

36

1 it by filing this action. We responded by
2 demanding that that be dismissed pursuant to the
3 arbitration clause and submitted to arbitration.
4 To me that is a demand for arbitration. So I just
5 don't see how -- I mean, we could write the letter,
6 but, I mean, essentially we have demanded that
7 their dispute with us, that they have pled in this
8 action, be submitted to arbitration, and upon
9 dismissal --
10     THE COURT: But whose --
11     MR. BORDERS: But it's their claim to
12 pursue.
13     THE COURT: All right. Hold on. I mean,
14 are you shifting the burden on them? Are you
15 saying to them, "We're filing responsive pleadings
16 here saying we want to arbitrate," and then you're
17 going to sit back and wait for them to initiate
18 arbitration? I mean --
19     MR. BORDERS: Well, they're the ones
20 making the claim. It's their burden to submit the
21 claim to arbitration. They're the ones that have
22 the claim. We're defending the claim. We demand
23 -- when they say, "We're coming to the Law Division
24 of the Circuit Court of Cook County to make this

37

1 Honor. I think your position on this is obviously
2 correct. We have the right to either go to
3 arbitration or not go to arbitration. We chose not
4 to. We chose to file this claim here. They have
5 the right then to file for arbitration if they
6 want. They haven't done it.
7     So I believe actually you're right on
8 point, is that they're -- we're in -- we're doing
9 what we're allowed to do under the agreement.
10     THE COURT: That's going to be my ruling.
11 I'm going to deny the motion.
12     MR. LeFEVOUR: Thank you, Judge.
13     THE COURT: I should say I'm going to deny
14 his 619 without prejudice.
15     MR. LeFEVOUR: Correct.
16     THE COURT: I'm going to grant his 615,
17 give you leave to file an amended complaint. Now,
18 you had an amended complaint ready?
19     MR. LeFEVOUR: Right.
20     THE COURT: So, should I say give you
21 leave to file an amended complaint instanter, or
22 how do you --
23     MR. EISENBERG: Seven days, five days,
24 Judge.

39

1 claim --"
2     THE COURT: So you're saying, "If you want
3 to address this dispute, we're electing that we do
4 it in arbitration. You've got to take it to
5 arbitration"?
6     MR. BORDERS: Absolutely.
7     THE COURT: Okay. And their dilemma is
8 exactly what they said before, is that this
9 contradicts previous correspondence or --
10     MR. BORDERS: Now, that was just a
11 question of their ability to -- when they said they
12 represented the sub-trust and were seeking to stop
13 execution of the collateral under the terms -- it's
14 referenced in the responses under the terms of the
15 sub-trust, the trustee, all those rights when
16 delegated to Coventry at that point in time.
17     But that doesn't encompass the legal
18 claims that they made here. There's never been a
19 dispute that if they have these legal claims, that
20 those would be subject to arbitration.
21     I mean, you know, procedurally we're just
22 coming back here, you know, in two weeks arguing
23 the same motion again.
24     MR. LeFEVOUR: I don't think so, your

38

1     THE COURT: And we'll handle it that way.
2     MR. LeFEVOUR: Okay. Off the record for
3 one second.
4         (Whereupon, a discussion was had
5         off the record.)
6         (Whereupon, those were all the
7         proceedings had in the
8         above-entitled case on the
9         aforesaid date.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

40

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Elizabeth Ellis, as Co-Trustee of | ) | |
| The Neil H. Ellis Irrevocable | ) | |
| Insurance Trust – 2005, No. 2, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.    08 CH 5368 |
| | ) | |
| LaSalle Bank National Association and | ) | |
| Coventry Capital I LLC., | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

NOW COMES Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis
Irrevocable Insurance Trust-2005 No 2. ("Plaintiff"), by and through her attorneys, Leahy,
Eisenberg & Fraenkel, Ltd., and for her Response to Defendants' Motion to Dismiss, states as
follows:

### PRELIMINARY STATEMENT

Plaintiff agrees that arbitration is the appropriate forum for resolving all disputes
between Plaintiff and Defendant, LaSalle Bank National Association ("LaSalle"), and requests
leave to file an amended complaint which dismisses LaSalle from this case.  Accordingly, this
Response is limited in scope to the Motion to Dismiss by Coventry Capital I LLC
("Coventry").

### BACKGROUND

In summary, this case arises out of LaSalle and Coventry's foreclosure on and
liquidation of a life insurance policy ("Policy") issued on the life of Plaintiff's husband, Neal
Ellis.   The policy premiums were financed by LaSalle pursuant to a Note and Security
Agreement ("Note") executed on July 26, 2005.  A copy of the Note is attached hereto as

EXHIBIT
2

Exhibit A. The Note appointed Coventry as the "Servicing Agent" for the Note. On January 29, 2008, Ellis received notice from Coventry that the Note was in default and that Coventry would be foreclosing on and liquidating the Policy. By correspondence to Coventry dated February 5, 2008, (Exhibit B), Ellis demanded arbitration with Coventry and LaSalle to resolve the claim of default and any claim for foreclosure, sale or any other liquidation of the Policy. By correspondence to Ellis dated February 6, 2008, (Exhibit C), Coventry refused Ellis' demand for arbitration. By correspondence to Coventry dated February 6, 2008, (Exhibit D), Ellis again demanded arbitration. Coventry did not respond to the subsequent demand for arbitration and, on February 13, 2008, notified Ellis that it had foreclosed on and would be liquidating the Policy.

On February 13, 2008, Plaintiff filed a Complaint against LaSalle and Coventry. A copy of the Complaint is attached hereto as Exhibit E. The Complaint sought a temporary restraining order and preliminary and permanent injunctive relief to protect Plaintiff from the harm resulting from LaSalle and Coventry's potential liquidation of the Policy. Despite Coventry's prior refusal to arbitrate, on February 27, 2008, LaSalle and Coventry filed their motion to dismiss the Complaint on the basis that all disputes between Plaintiff and LaSalle and Coventry arising from the purchasing and financing of the Policy must be resolved through arbitration and, alternatively, on the basis that the Complaint does not allege sufficient facts on which relief can be granted.

On February 28, 2008, this Court entered an order setting the briefing schedule for the motion to dismiss. On March 19, 2008, Plaintiff filed a motion to extend the time for filing a response to the motion to dismiss or an amended complaint in lieu of a response. On April 7, 2008, Plaintiff's motion was granted. On April 16, 2008, Plaintiff filed an emergency motion

to file an amended complaint in lieu of its response to the motion to dismiss. The proposed amended complaint, as drafted, excludes LaSalle from this case and includes substantive theories of liability against Coventry to reflect recently discovered facts regarding Coventry's involvement in the purchasing and financing of the Policy. A copy of the proposed amended complaint is attached hereto as Exhibit F. On April 18, 2008, Plaintiff's motion to file an amended complaint was denied.

## ARGUMENT

**A.**    **The claims against Coventry are not subject to the Note's arbitration provision because Coventry has not alleged that it was LaSalle's agent under Illinois law**

Coventry's primary argument for dismissal is that an arbitration clause contained in the Note and Security Agreement divests this Court of subject matter jurisdiction over Coventry. The Note contained the following clause:

> *Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.
>
> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. (Ex. A, p. 5).

The signatories to the note were Janet Havrilla of Wilimington Trust Company and Kristin Lake as attorney-in-fact for LaSalle. (Ex. A, p. 7). Pursuant to the Note's arbitration clause,

Coventry, as a non-signatory, may only compel arbitration if it qualifies as LaSalle's "agent, employee, successor, or assign."

Illinois courts have held that "an arbitration clause cannot generally be invoked by a non signatory to the contract." *Peach v. CIM Ins. Corp.*, 352 Ill.App.3d 691, 696, 816 N.E.2d 668 (5th Dist. 2004). Neither Coventry nor LaSalle alleged in the Motion to Dismiss that Coventry was LaSalle's agent, employee, successor, or assign. Upon information and belief, there is no factual issue as to whether Coventry may have been LaSalle's employee, successor, or assign. Thus, Coventry may only successfully invoke the Note's arbitration clause to support dismissal of Plaintiff's claims against it if it proves that it was acting as LaSalle's legal agent in its administration of the Note.

Although Coventry was designated in the Note as LaSalle's "Servicing Agent," to invoke the arbitration clause, Coventry must prove that it was LaSalle's agent as that term is defined by Illinois law. In *Caligiuri v. First Colony Life Ins. Co.*, 318 Ill.App.3d 793, 801, 742 N.E.2d 750 (1st Dist. 2000), an Illinois appellate court considered the applicability of an arbitration clause to claims against a non-signatory. In *Caligiuri*, the subsidiary of a signatory to a contract containing an arbitration clause attempted to compel arbitration on the basis that it was an agent of the signatory. *Id.* at 800. After the trial court denied the motion on the grounds that the subsidiary was not an agent of the signatory, the subsidiary appealed. *Id.* The Appellate Court initially commented that to invoke the arbitration clause, the subsidiary must prove that it was the signatory's agent as that term is defined under Illinois law: "Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal." *Id.* at 801 (citing *Illinois State Toll*

*Highway Authority v. DiBenedetto*, 275 Ill.App.3d 400, 410, 655 N.E. 2d 1085 (1st Dist. 1995)). Although the subsidiary pointed to some evidence that it was controlled by the signatory, the Appellate Court upheld the trial court's ruling on the grounds that the subsidiary failed to introduce evidence that it had the ability to conduct legal transactions in the name of the signatory. *Id.* at 803. In this case, Coventry has not alleged that it was LaSalle's agent as that term has been defined by Illinois Courts.

Under the reasoning of *Caliguiri*, Coventry was not LaSalle's agent in its administration of the Note because it did not have the power to conduct legal transactions on LaSalle's behalf. Coventry's duties as the Servicing Agent were defined by the Note's "Consent to Appointment of Agent" provision. (Ex. A., p 4). That provision states that Coventry, as the servicing agent, was to handle certain paperwork and notices on LaSalle's behalf. The Consent to Appointment provision indicates that Coventry's involvement was of a clerical nature and does not suggest that Coventry was vested with the authority to conduct legal transactions on LaSalle's behalf. Coventry has failed to allege or provide any proof to the contrary.

Additionally, Coventry cannot compel arbitration by declining to take a position with respect to whether it was LaSalle's legal agent under Illinois Law. In *Ervin v. Nokia, Inc.*, 349 Ill.App.3d 508, 812 N.E.2d 534 (5th Dist. 2004), Nokia, a non-signatory to a phone service contract between the plaintiff and a service provider, sought to compel arbitration based on an arbitration clause contained in the contract. *Id.* at 509. Nokia refused to take any position on whether it was the service provider's agent and argued that it could invoke the arbitration clause because the plaintiff's complaint implied an agency theory of liability. *Id.* at 513. The Court rejected Nokia's argument and held that, based on its denial and failure to

allege or request a judicial determination that it was the service provider's agent, it could not invoke the arbitration clause. *Id.*

Similarly, in *Peach*, cited above, the appellant, a non-signatory to the contract containing the subject arbitration clause, attempted to compel arbitration while refusing to take a position regarding its relationship with the signatory or request a judicial ruling that it was the signatory's agent. 352 Ill.App.3d at 696. The *Peach* court's reasoning for upholding the trial court's denial of the non-signatory's motion to compel is instructive:

> In this case, [the defendant] did not request the trial court to find that Enterprise was its agent. CIM has actually refused to take any position in the trial court or in this court regarding its relationship to Enterprise. We can only assume that this is a tactical decision that will allow CIM, once it reaches arbitration, to deny that Enterprise was its agent, thereby refuting the exact allegation that allowed it to go to arbitration in the first place. Considering that an arbitration clause cannot generally be invoked by a nonsignatory to the contract, we see no reason to extend this option to CIM when it refuses to take a position on whether it has any legal relationship with enterprise.

*Id.*

Coventry's motion to dismiss is notably brief and vague when referring to the arbitration clause, stating only that "[d]ismissal under 2-619(a)(1) is proper because the parties' dispute, if any, would be subject to arbitration pursuant to an arbitration in the Security Agreement." (Defendants' motion to dismiss, ¶ 3). No legal or factual analysis is offered to support the contention that Coventry, as a non-signatory, may invoke the Note's arbitration clause. Coventry cannot, for the purposes of protecting LaSalle or for any other reason, refuse to take a position on whether it was LaSalle's legal agent and still successfully invoke the arbitration clause as grounds for its dismissal. Since Coventry failed to allege that it was LaSalle's agent as the term is defined by Illinois Courts, its motion to dismiss should be denied.

**B.     Plaintiff's claims against Coventry fall outside the substantive scope of the Note's arbitration clause**

Assuming *arguendo* that Coventry can prove that it was acting as LaSalle's legal agent in its capacity as Servicing Agent for the Note, the arbitration clause does not apply to those claims against Coventry which fall outside the scope of the arbitration clause. Plaintiff and Coventry are bound to submit to arbitration "only those issues that they have agreed clearly to resolve through the arbitration mechanism, and a court should not extend to an agreement by construction or implication." *Travis v. American Mfrs. Mut. Ins. Co.*, 335 Ill.App.3d 1171, 1176, 782 N.E.2d 322 (5th Dist. 2002).

Coventry's involvement in the transaction that is the subject matter of this case extends beyond its administration of the Note as the appointed Servicing Agent. As evidenced by correspondence dated June 21, 2005 from Coventry to Neal Ellis, Coventry's involvement pre-dates the Note's execution on July 26, 2005. A copy of the June 21, 2005 correspondence is attached hereto as Exhibit G. The attached correspondence evidences that Coventry procured the financing for the Policy's premium. As alleged in the proposed amended complaint, this and other pre-Note conduct by Coventry resulted in a fiduciary relationship between Coventry and the Trust. Plaintiff's claims against Coventry for breach of a duty which arose prior to the execution of the Note which contained the subject arbitration clause are beyond the scope of the arbitration clause.

To the extent that Coventry may have acted as LaSalle's agent in the administration of the Note, the parties to the Note agreed only to arbitrate those claims related to the Note itself or any resulting or related agreement. The parties did not agree to arbitrate those claims, such as those enumerated in Plaintiff's proposed amended complaint, arising from Coventry's

actions that pre-date the Note or were outside the scope of its capacity as LaSalle's agent.

**C.    Plaintiff's Complaint alleges facts which establish that Coventry breached legal or contractual duties owed to her**

Coventry has alternatively argued that the Complaint should be dismissed pursuant to 735 ILCS 2-615 for failure to state a claim on which relief can be granted. Coventry's motion only generally states that "Plaintiff's complaint alleges no facts that, if true, establish Defendants breached any legal or contractual duty owed to her." (Defendants' motion to dismiss, ¶ 6). Plaintiff, in her complaint, has alleged numerous facts upon which relief can be granted, including, but not limited to, those facts which concern Coventry's failure to provide the Trust with notice of the loan's maturity date.

Additionally, Plaintiff's proposed amended complaint includes additional factual allegations and substantive theories of liability against Coventry. The proposed amended complaint alleges that Coventry breached its fiduciary duty to Plaintiff and engaged in fraudulent and deceptive acts giving rise to certain common law and statutory causes of action. Thus, in the event that this Court finds that Plaintiff's Complaint does not allege facts giving rise to a cause of action against Coventry, Plaintiff requests that the Court reconsider its April 18, 2008 order denying Plaintiff leave to file an amended complaint against Coventry.

**CONCLUSION**

Since Coventry was a non-signatory to the Note and has not alleged that it was LaSalle's agent under Illinois Law, the Note's arbitration clause does not divest this Court of subject matter jurisdiction with respect to Plaintiff's claims against Coventry. Many of Coventry's actions giving rise to potential liability occurred prior to the Note's execution and were, to the extent that Coventry may have acted as LaSalle's agent, outside the scope of its

capacity as LaSalle's agent. Additionally, Plaintiff's Complaint alleges facts that, if true, establish that Coventry breached a legal or contractual duty owed to her. Thus, Coventry's motion to dismiss should be denied. Plaintiff requests this Court to reconsider its April 18, 2008 order denying Plaintiff leave to file an amended complaint and grant Plaintiff leave to file an amended complaint against Coventry, *instanter*.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005 No 2., respectfully requests that this Honorable Court deny Defendant, Coventry Capital I LLC's Motion to Dismiss under 735 ILCS 5/2-619.1 and 2-615, grant Plaintiff leave to file an amended complaint, *instanter*, and for such further relief as this Court deems just and appropriate.

Respectfully Submitted,

LEAHY, EISENBERG & FRAENKEL, LTD.

By: _____
One of Its Attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
LEAHY, EISENBERG & FRAENKEL, LTD.
33 W. Monroe Street, Suite 1100
Chicago, Illinois 60603-5317
(312) 368-4554
Firm I.D. 45875
F:\Case\059808\12849\RESPONSE BRIEF.doc

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on __7/26/05__, by and between THE NEIL H. ELLIS INSURANCE TRUST – 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits under the Policies sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.



*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital 1 LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

&mdash; The Policies; and

&mdash; All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

### IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

# SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,          LaSalle Bank National Association
Premium Finance Sub-Trust

By:  Wilmington Trust Company, Trustee

By: _____                         By: _____
Name:    Janel R. Havrilla                          Name:  Krista Lake
Title:   Financial Services Officer                 Title:  Attorney-in-fact

Address:
1100 North Market Street
Wilmington, DE 19890

Dated:  7/22/05

LAW OFFICES

# WEINSTEIN & WISSER, P.C.

A PROFESSIONAL CORPORATION

29 SOUTH MAIN STREET

SUITE 207

WEST HARTFORD, CONNECTICUT 06107

(860) 561-2628

RICHARD P. WEINSTEIN
KERRY MARC WISSER*†
NATHAN A. SCHATZ

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
†ALSO ADMITTED IN PA

TELECOPIER
(860) 521-6150

February 5, 2008

***SENT VIA FACSIMILE: (215) 402-8369***
***AND BY WAY OF FIRST CLASS MAIL***

Richard Cooper
Coventry Capital
7111 Valley Green Road
Fort Washington, PA 19034-2209

**Re:** ***The Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust***
***PFP Loan – ID # 12070***

## DEMAND FOR ARBITRATION

Dear Mr. Cooper:

The undersigned represents the two trusts referenced above, as well as Neil Ellis as the Settlor of said trusts and Elizabeth Ellis as the Co-Trustee. On behalf of my clients, a demand is hereby made for arbitration pursuant to the "Arbitration Clause" set forth in the Note and Security Agreement dated both July 22, 2005 and July 26, 2005, between the Trusts and LaSalle Bank National Association ("Lender"). Pursuant to the Note and Security Agreement, Coventry Capital I ("Coventry") is the "Servicing Agent" for the Lender and the entity that is to receive all notices and correspondence relating to the Note and Security Agreement. For protection, however, a notice of this Demand for Arbitration has also been sent to the Lender directly, as well as the Wilmington Trust Company ("Wilmington") as the other Co-Trustee of the Trusts.

I have reviewed a variety of documents surrounding this transaction and it appears that on or about June 21, 2005, Coventry solicited Mr. Ellis to participate in the PFP Program offered by Coventry to obtain non-recourse financing in order to procure certain life insurance policies. In furtherance of this solicitation, Coventry procured and/or provided Mr. and Mrs. Ellis with the following documents:

1.    PFP Summary of Terms and Conditions.    That document indicated that Coventry would attempt to procure a life insurance policy in the amount of $30,000,000



Page Two
Richard Cooper
February 5, 2008

on the life of Mr. Ellis from Security Life of Denver. The premium for said policy for the term of the loan that was to be secured to pay for the same was $2,195,700. The Lender for said loan was represented to be LaSalle Bank, N.A., as referenced above.

     2.     Proposed Note and Security Agreement.

     3.     Consent to Appointment of Agent. This document appointed Coventry as the Lender's servicing agent.

     4.     Settlor and Co-Trustee Disclosure Statement and Acknowledgement.

     5.     Insured's Disclosure Statement, Acknowledgement and Consent and Agreement. This document also provides an arbitration provision, but said provision specifically excludes arbitration for claims seeking equitable relief.

     6.     Borrower's Special Irrevocable Durable Power of Attorney. (This document provides a choice of law provision for Pennsylvania.)

     7.     Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney. (This document also has a choice of law provision for Pennsylvania.)

     8.     PFP Loan Application.

     9.     Settlor's Acknowledgement.

     10.     Settlor Non-Recourse Security Agreement. (This document has a choice of law provision applying Illinois law.) This document also contains an "Arbitration Clause" that mirrors said clause in the Note and Security Agreement referenced in the first paragraph of this letter. However, there is no exclusion for equitable claims in said clause.

     11.     Trust Agreement, executed between Wilmington and the Trust. (This document has a choice of law provision for Delaware.)

     12.     Supplement to Trust Agreement. This document supplements the above-referenced Trust with Wilmington.

The Note and Security Agreement that was either drafted by the Lender or drafted

Page Three
Richard Cooper
February 5, 2008

by Coventry, as servicer for the Lender, clearly identifies that my clients have the unfettered right to choose to have *any dispute* decided by arbitration and not in a court of law. The document specifically states that: "Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement, or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who did not sign this Agreement) *shall*, at your or our election, be resolved by neutral, binding arbitration and not by a court action." While the arbitration clause in document number 5 listed above had an arbitration provision that excludes equitable claims, the arbitration clause in the Note and Security Agreement has no such exclusion.

My clients have received notice that Coventry, as servicer for the Lender, and/or the Lender directly, intends to foreclose on the insurance policies to satisfy the purported obligation of my clients to make payment under the Note and Security Agreement. Said notice indicates that said foreclosure and/or sale or other liquidation of the life insurance policies will occur sometime after February 12, 2008, if my clients don't satisfy the purported default. Since it is clear and unequivocal that my clients have the unfettered right to elect arbitration for any and all claims asserted under the terms of the Note and Security Agreement, whether asserted by them or asserted against them, they hereby elect the arbitration process to resolve the claim of purported default and any claim for foreclosure, sale or any other liquidation of the policies. Now that Coventry and the Lender are on notice of this election and demand for arbitration, no court action shall properly be initiated by the Lender for foreclosure and no sale or other liquidation of the policies shall occur prior to any decision rendered by the arbitrator(s). Any such attempt to commence a foreclosure action in court, or to otherwise sell or liquidate the policies will represent a breach of the contract and my clients will seek a stay of any court action as well as all consequential damages relating to said breach.

During the arbitration proceeding, my clients intend to raise claims of conflict of interest, constructive trust, and breach of fiduciary duty against Coventry. It is clear that Coventry initially solicited my clients as set forth above. Additionally, the appointment of Coventry as an agent for the Lender, while also acting as attorney-in-fact for the borrower, creates a clear conflict that cannot be waived, nor otherwise reconciled. Other claims may be developed during the arbitration proceeding, but I wanted to make clear that the demand for arbitration goes beyond the claim of the alleged default and notice of foreclosure.

Page Four
Richard Cooper
February 5, 2008

Pursuant to the Arbitration Clause contained in the Note and Security Agreement, my clients choose the American Arbitration Association ("AAA") for arbitration of this matter. While AAA maintains its main business office in New York, it also has offices in Connecticut and my clients intend to arbitrate this claim in Hartford County, which is where the Ellises reside and the insurance Trusts maintain business offices.

I look forward to your immediate response.

Very truly yours,

Kerry M. Wisser

KMW/cmg
Enclosure
cc:     Coventry Capital I, LLC
        LaSalle Bank National Association
        Wilmington Trust Company
        Neil H. Ellis
        Elizabeth Ellis



7111 Valley Green Road     Fort Washington, PA 19034-2209     877-836-8300     coventry.com

February 6, 2008

SENT VIA FACSIMILE (860) 521-6150 AND FEDERAL EXPRESS

Weinstein & Wisser
29 South Main Street
Suite 207
West Hartford, CT 06107
Attn: Kerry Wisser

Re:     The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
         and PFP Loan ID #12070

Dear Mr. Wisser:

I am in receipt of your letter dated February 5, 2008 wherein you purport to make a demand for arbitration on behalf of the Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust (the "Sub Trust"), pursuant to the terms of the Note and Security Agreement (the "Note and Security Agreement") dated July 26, 2005 between the Sub-Trust and LaSalle Bank, N.A. Coventry Capital I LLC is the Servicing Agent for LaSalle Bank under the Note and Security Agreement.[1]

The assertion in your letter that you represent the Sub-Trust is incorrect. Article II, Section 3 of the Sub-Trust Agreement (the "Sub-Trust Agreement") dated July 1, 2005 states that Wilmington Trust Company, as Trustee, holds the property of the Sub-Trust "for the benefit of the Lender as security for the Loan for so long as the Loan is outstanding." Article II, Section 2 of the Sub-Trust Agreement further provides that *"for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in writing delivered to the Trustee."* Given that the Loan is currently outstanding and the Lender has not directed Wilmington Trust Company, as Trustee of the Sub-Trust, to retain you as its counsel, you do not represent the Sub-Trust.

As a result, your purported demand for arbitration on behalf of the Sub-Trust is invalid.

I would also like to point out that the Sub-Trust has already received the full benefit of the PFP transaction. Pursuant to instructions provided by The Neil H. Ellis Irrevocable Insurance Trust – 2005 No. 2, as settlor of the Sub-Trust, the Sub-Trust entered into the Note and Security Agreement to borrow money primarily to pay premiums on the life insurance policy (the "Policy") identified in Schedule A of the Note and Security

---

[1] Capitalized terms not herein defined shall have the meanings given to them in the Note and Security Agreement.

EXHIBIT
C

02/06/2008 04:08 FAX

2002



Agreement. For the duration of the Loan term, The Neil H. Ellis Irrevocable Insurance Trust – 2005 No. 2, as beneficial owner of the Sub-Trust, stood to receive the proceeds of the Policy that was financed by the amounts borrowed under the Note and Security Agreement (net of any amounts due to LaSalle Bank under the Note and Security Agreement).

As a result of the Sub-Trust's failure to pay the amounts due under the Note and Security Agreement or relinquish the Policy to LaSalle Bank, N.A. in satisfaction of the Loan by the Maturity Date, the Loan is currently in default. In the event that the Sub-Trust fails to satisfy in full all of its obligations in respect of the Loan by February 12, which date is fifteen (15) days after the Maturity Date, the Lender will foreclose on the Policy.

Coventry Capital I LLC reserves all of its rights to respond more fully to your letter if and when it becomes appropriate.


Sincerely,

Coventry Capital I LLC

Cc:    Wilmington Trust Company (via electronic mail)

LAW OFFICES

WEINSTEIN & WISSER, P.C.

A PROFESSIONAL CORPORATION

29 SOUTH MAIN STREET

SUITE 207

WEST HARTFORD, CONNECTICUT 06107

(860) 561-2628

RICHARD P. WEINSTEIN
KERRY MARC WISSER*†
NATHAN A. SCHATZ

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
†ALSO ADMITTED IN PA

TELECOPIER
(860) 521-6150

February 6, 2008

*SENT VIA FACSIMILE:  (215) 402-8369*
*AND BY WAY OF FIRST CLASS MAIL*

Josh May
Coventry Capital
7111 Valley Green Road
Fort Washington, PA 19034-2209

**Re:**  *The Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust*
*PFP Loan – ID # 12070*

Dear Mr. May:

This letter is in response to your letter dated February 6, 2008.   The contents of the letter are inaccurate and the fallacy of the arguments set forth therein is self-evident. First of all, Coventry is breaching its fiduciary duty to my clients, created by the execution of the Power of Attorney, by continuing to prosecute this claim on behalf of the Lender. Further, the claim that the undersigned does not represent the sub-trust lacks merit.  Most importantly, however, the determination that the demand for arbitration on behalf of the sub-trust is "invalid" is not one that can be determined by Coventry, the Lender, or anyone else, other than the arbitrator.   I will direct your attention, once again, to the plain language of the Note and Security Agreement, which was drafted by the Lender or one of its agents, which undisputedly states as follows:   "Any claim or dispute, whether in contract, tort, statute or otherwise (***including the interpretation and scope of this clause and the arbitrability of the claim or dispute***)...shall at [ ] our election, be resolved by neutral, binding arbitration, and not by a court action."

Any literate individual, even if untrained in the law, must understand that the issue as to whether or not a matter is subject to arbitration can **only** be decided by an arbitrator once we elect arbitration.   Therefore, notwithstanding your interpretation otherwise, which can certainly be preserved and argued in front of the arbitrator, arbitration **must** occur.


EXHIBIT
D

Page Two
Josh May
Coventry Capital
February 6, 2008

Once again, a copy of this document is being sent to Wilmington Trust. Your company, the Lender and Wilmington are all on notice of the fact that arbitration must occur and all three companies will be held fully financially responsible if there is a breach of that arbitration provision. More importantly, any action brought in court to foreclose on the policies will be met with a Motion to Stay, which under all circumstances will be granted by the court. If your company or the Lender seeks to avoid a court action and tries to liquidate the policies in any other fashion, with full notice that this demand for arbitration has been made, that will represent an intentional tort which will expose Coventry and anyone else who aids and abets Coventry, to claims of conversion, civil theft and unfair trade practices. Under such claims, the entities involved will be responsible for punitive damages and potentially, treble damages for civil theft, as well as attorney's fees. Your company is treading on very thin ice, and since there is absolutely no prejudice to your company, the Lender or Wilmington in fulfilling the terms that are clear and unequivocal in the Agreement, I strongly suggest that you put the arbitration process in place forthwith. By virtue of receipt of this document, Wilmington is on full notice that it shall not release those policies to Coventry or the Lender unless and until ordered by a court, enforcing the decision of the arbitrator.

I do not intend to exchange any further letters with you, as the obligations of your company, the Lender and Wilmington are clear. You act at your own peril.

Very truly yours,

Kerry M. Wisser

KMW/cmg
Enclosure
cc:    Richard Cooper, Coventry Capital
        Coventry Capital I, LLC
        LaSalle Bank National Association
        Wilmington Trust Company
        Neil H. Ellis
        Elizabeth Ellis

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

Elizabeth Ellis, as Co-Trustee of )
The Neil H. Ellis Irrevocable )
Insurance Trust-2005, No. 2 )
 )
   Plaintiff, )
 ) No. **08CH05368**
 v. )
 )
 )
LaSalle Bank National Association and )
Coventry Capital I LLC )
   Defendants. )

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., pursuant to 735 ILCS 5/11-101 and 102 and for her Complaint for the entry of a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction, states as follows:

### COUNT I

### Temporary Restraining Order

1. Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, ("Trust"). The Trust is the beneficiary of a $30,000,000.00 life insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2. Defendant, LaSalle Bank National Association ("LaSalle") is, on information and belief, a bank chartered and licensed under the laws of the United States and the laws of the State of Illinois with its principal place of business in Chicago, Cook County, Illinois.



3.     Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, the Servicing Agent for LaSalle in the subject Note and Security Agreement ("Agreement") and is in the business of being a servicing agent and agent-in-fact for financing and purchasing life insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.

4.     At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high benefit insurance policies with financing provided by third parties.

5.     In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy on Ellis' life and acted as Ellis' agent in said purchase.

6.     Passananti advised Ellis that he would arrange all of the legal work to be done and the financing for the payment of premium.

7.     Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life.

8.     On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was the beneficiary of the Policy.

9.     The Policy premium was financed by LaSalle Bank.  A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

10.     The Note and Security Agreement was signed only by the Corporate Co-Trustee.

11.     Neither Ellis nor Elizabeth Ellis, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis did not even know that Coventry was involved as the Servicing Agent in the transaction until 2008.

2

12.    Upon information and belief, as a result of the financing provided by the Agreement, the premium on the Policy has been paid through December 31, 2008.

13.    On or about January 29, 2008, Coventry first notified Plaintiff that the Agreement's maturity date was the previous day on January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy. At no time did Plaintiff or Ellis receive a Notice of Premium Due on the policy.

14.    On February 1, 2008, Coventry notified the Plaintiff that Plaintiff had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/ or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of Coventry's February 1, 2008 letter is attached as Exhibit 2.

15.    The Agreement contains an Arbitration clause for all disputes arising under the Agreement. See Exhibit 1 attached hereto.

16.    The Plaintiff has disputed the default that was declared by Coventry on behalf of itself and LaSalle and, on February 5, 2008, pursuant to the Agreement, Plaintiff has demanded arbitration to resolve all disputes.

17.    Coventry's late notice of a purported default, and issues of conflict of interest, constructive trust and breach of fiduciary duty are issues for which the Plaintiff has demanded arbitration pursuant to the Agreement.

18.    Pursuant to the Agreement, Coventry has asserted that it has the right to liquidate the assets and to affect Plaintiff's interests in the assets prior to any foreclosure or other legal proceedings.

19.    If Coventry and LaSalle are allowed to change or otherwise alter the beneficiary of the Policy or to liquidate the Policy before the proper parties arbitrate their disputes, the Plaintiff will sustain irreparable injury in that the Plaintiff will lose its interest in the $30,000,000.00 policy of life insurance and the beneficiaries of the Trust will lose their rights and interest in the Policy.

20.    Plaintiff does not have an adequate remedy at law since the transfer or liquidation of the Policy will destroy Plaintiff's right and interest in the Policy. In contrast, the Defendants have adequate remedies at law.

21.    Plaintiff has filed this motion on an emergency basis because Coventry and LaSalle take the position that if the purported default is not cured by February 12, 2008, it will take action that will detrimentally affect Plaintiff's rights and interest in the Policy.

22.    With regard to the merits of the request for a restraining order, the issue is one of the arbitribility of "ANY DISPUTE" under the Agreement. As there is no issue that the Agreement requires that ANY DISPUTE be arbitrated, and further that the issues of arbitribility are arbitrable, there is clearly the highest likelihood of success on the merits. The issue for purposes of this temporary restraining order is *not* the propriety of the purported default. That issue, and others, will be the subjects of the arbitration.

23.    Since the premium on the Policy, the collateral for the Note and Security Agreement, upon information and belief, are paid through December 31, 2008. and since the Plaintiff is potentially liable for "Default Interest", the absence of a narrowly drawn temporary

4

restraining order will cause more harm to the Plaintiff than if it is entered against LaSalle and Coventry.

24.     There will be no prejudice to either party if the status quo is maintained until the arbitrator has had an opportunity to rule on the Arbitration Complaint. See *All Seasons Excavating Company v. Bluthardt*, 229 Ill App 3d 22, 593 N. E. 2d 679 (1st Dist. 1992)

WHEREFORE, Plaintiff requests that this Court issue a Temporary Restraining Order that prohibits Defendants, LaSalle and Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction at the earliest opportunity.

### COUNT II

#### Preliminary and Permanent Injunction

1-24    Plaintiff hereby restates and realleges paragraphs 1 through 24 of Count I as and for Paragraphs 1 through 24 of Count II as though fully set forth herein.

25.     Plaintiff has demanded arbitration pursuant to the Agreement to resolve the propriety of the alleged default, the conflict of interest between the Defendants and the Plaintiff and the issues of constructive trust and breach of fiduciary duty.

26.     The Plaintiff's remedy, upon arbitration of these issues will be prejudiced if the Court does not enter a preliminary and/or permanent injunction prohibiting the Defendants from taking any action that would impair or affect the Plaintiff's right and title to the Policy.

WHEREFORE, Plaintiff requests that this Court order a hearing on the Plaintiff's request for  a Preliminary Injunction and to issue an Order that prohibits Defendants, LaSalle and

Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction.

By: _____

One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on __7/26/05__, by and between THE NEIL H. ELLIS INSURANCE TRUST – 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

EXHIBIT
1

*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA. 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

—   The Policies; and

—   All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402–8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

# SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By: _____
Name:    Janel R. Havrilla
Title:    Financial Services Officer

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

LaSalle Bank National Association

By: _____
Name:    Krista Lake
Title:    Attorney-in-fact

7



COVENTRY
CAPITAL
7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    <u>Notice of Foreclosure of Collateral of PFP Loan—Loan ID #12070</u>

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July 26, 2005 between Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note <u>plus</u> 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

Richard Cooper

Coventry Capital
Servicing Agent

EXHIBIT
2

## VERIFICATION

I, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, being first duly sworn on oath, deposes and states that she has read the above and foregoing Verified Complaint and under penalties of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge.

_Elizabeth Ellis_
Elizabeth Ellis

LEAHY, EISENBERG & FRAENKEL, LTD.
Attorneys for Plaintiff
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 346-4554
Firm I.D. 45875

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

Elizabeth Ellis, as Co-Trustee of )
The Neil H. Ellis Irrevocable )
Insurance Trust-2005, No. 2 )
  )
        Plaintiff, )
  )
   v. )   No. 2008 CH 05368
  )
LaSalle Bank National Association and )
Coventry Capital I LLC )
        Defendants. )

### FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and for her First Amended Complaint against the Defendants, LaSalle Bank National Association and Coventry Capital I LLC, states as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

1.    Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, ("Trust"). The Wilmington Trust Company as Settlor, Trustee, and, on information and belief, Beneficial Owner of the Trust, is the beneficiary of a $30,000,000.00 life insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2.    Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, in the business of being a servicing agent and agent-in-fact for financing and purchasing life insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.



EXHIBIT
F

3.     Defendant, LaSalle Bank National Association ("LaSalle") is, on information and belief, a bank chartered and licensed under the laws of the United States and the laws of the State of Illinois with its principal place of business in Chicago, Cook County, Illinois.

4.     At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high-benefit insurance policies with financing of the premiums provided by third parties.

5.     Prior to the transaction which is the subject matter of this case, Passananti solicited Ellis to arrange for the purchase of a $10,000,000.00 life insurance policy on Ellis's life.     Coventry administered and acted as the servicing agent for the purchase of the $10,000,000.00 policy and the financing of its premium through LaSalle Bank.    Upon the recommendation of Passananti, Ellis elected to sell the $10,000,000.00 policy to a third-party. Ellis had little involvement with the purchasing and selling of the Policy and the financing of its premium.    Due to Passananti and Coventry's experience in the industry, Ellis relied on Passananti and Coventry to handle the details and complete the purchasing, financing, and selling of the policy.

6.     In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy ("Policy") on Ellis' life and acted as Ellis' agent in said purchase.

7.     Passananti advised Ellis that he would arrange all of the legal work and the financing of the premium.    On information and belief, Coventry administered and acted as the servicing agent for purchase and financing of the Policy.

8.     Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life and, as he had done with the

$10,000,000.00 policy, relied on the expertise and experience of Passananti and Coventry in securing and financing the policy.

9.     On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was designated as the beneficiary of the Policy.

10.     The Policy premium was financed by LaSalle Bank.  A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

11.     The Note and Security Agreement was signed only by the Corporate Co-Trustee.

12.     Neither Ellis nor Plaintiff, as Co-Trustee, agreed to or executed the financing agreement.  In fact, Ellis and Plaintiff did not know that the Policy had been purchased on July 26, 2005 and were otherwise of the belief that the Policy had been financed and purchased on or about August 18, 2005.  As the Note provided that the Loan would become due 30 months from the Financing Date, Ellis and Plaintiff were of the belief that the Maturity Date was February 18, 2005.

13.     Upon information and belief, as a result of the financing provided by the Agreement, the premium for the Policy has been paid through December 31, 2008.

14.     Ellis and the Trust first became aware of the Note's actual maturity on or about January 29, 2008, when Coventry sent notification via Federal Express that the Agreement's maturity date was the previous day, January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy.  At no time prior to that date did Plaintiff or Ellis receive a notice of premium due on the Policy.  A copy of the January 29, 2008 correspondence is attached hereto as Exhibit 2.

15.    On or about February 1, 2008, via Federal Express, Coventry sent notification that the Trust had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of the February 1, 2008 correspondence is attached as Exhibit 3.

16.    Due to Coventry's failure to provide proper notice of the Loan's Maturity Date, Ellis was unable to appropriate the funds necessary to satisfy the maturity date balance prior to February 12, 2008.

17.    On information and believe, Coventry initiated foreclosure of the Policy on or about February 13, 2008.

18.    By correspondence dated March 20, 2008, Coventry notified Plaintiff that the Policy was foreclosed upon and subsequently liquidated in order to satisfy the Trust's obligations under the Note. A copy of the March 20, 2008 correspondence is attached hereto as Exhibit 4.

## COUNT I
### (Breach of Fiduciary Duty)

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count I, as if fully set forth herein.

19.    Upon information and belief, Coventry received fees and commissions from both LaSalle, and Plaintiff, whereby Coventry received a portion or percentage of fees and

commissions that Plaintiff paid to Passananti in connection with the initial purchase of the Policy.

20.      Additionally, due to Coventry's experience in securing and financing life insurance policies, Ellis and the Trust relied on Coventry's skill and judgment in securing the Policy and administering the Loan, which included providing the Trust with proper notice of the loan's maturity date.

21.      Coventry owed Plaintiff a fiduciary duty to provide proper notice of the impending maturity date.

22.      By failing to provide the Trust with proper notice of the loan's maturity date, Coventry breached its fiduciary duty to Plaintiff.

23.      As a proximate and direct result of said breach, Plaintiff has suffered and will continue to suffer substantial damages in that Plaintiff has lost her $30,000,000.00 interest in the Policy and/or the cash surrender value of the Policy in an amount in excess of $50,000.00

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.

## COUNT II
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count II, as if fully set forth herein.

19.     On information and belief, Coventry secured the lender for the policy premium and counsel to draft the Note.

20.     The Note's default provision provided that in the event the Trust failed to pay the loan's balance by the scheduled maturity date, LaSalle would have the right to foreclose, surrender, sell, or otherwise exercise rights under the Policy as the owner thereof.

21.     By allowing LaSalle to assume ownership of a policy on the life of an individual in which it had no insurable interest, the default provision created a "wager" policy on Ellis's life.  Wager policies on the life of another are forbidden by Illinois law as contrary to public policy.

22.     Despite its knowledge that the Note contained a provision which created an illegal wager policy on Ellis's life, Coventry secured the Note to finance the Policy's premiums and intentionally deceived Ellis and the Trust into believing that the Note was a legal instrument.

23.     Additionally, after Ellis rejected the initial offer to sell the Policy, Coventry, despite knowing that Ellis and the Trust were relying on Coventry to provide proper notice of the Note's maturity date, intentionally and deceptively failed to provide the Trust with proper notice of the maturity date.

24.     In failing to provide proper notice to the Trust, Coventry knew and intended that the maturity date would pass without the Trust's knowledge, thereby causing the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy and disperse the proceeds of the liquidation between itself and Coventry.

25.     As Coventry is in the business of securing and financing life insurance policies and was receiving commissions to act as the servicing agent for the subject transaction, its

deception of the Trust by intentionally securing a note with an illegal default provision and failing to provide proper notice of the maturity date was in the course of trade or commerce.

26.     As a result of the foregoing, Coventry violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*

27.     As a direct and proximate result of Coventry's violation of the Illinois Consumer Fraud and Deceptive Practices Act, Plaintiff has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00, plus statutory attorney's fees, penalties and costs.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred for statutory attorneys fees and penalties, and for any other and further relief this Court deems just and proper.

## COUNT III
### (Fraudulent Concealment)

1-18.     Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count III, as if fully set forth herein.

19.     By knowingly and intentionally failing to provide the Trust with proper notice of the impending maturity date pursuant to the terms of the Note, Coventry knowingly concealed a material fact – the Note's maturity date.

20.     In concealing the maturity date, Coventry knew that the Trust was relying on Coventry to provide proper notice of the maturity date and intended to induce the Trust into failing to pay the maturity date balance by the maturity date.

21.   Coventry's knowing concealment of the maturity date caused the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy.

22.   Upon information and belief, Coventry profited from said transaction by receiving commission and fees in connection with the foreclosure and liquidation of the Policy.

23.   Had Coventry provided the Trust with proper notice of the maturity date, Ellis would have paid the maturity date balance to ensure that the Note was not defaulted upon and that the Policy would not be foreclosed and liquidated.

24.   As a direct and proximate result of the Trust's reliance and Coventry's intentional concealment, which caused the subsequent default, foreclosure, and liquidation, the Trust has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.  Plaintiff also seeks punitive damages to the fullest extent permitted by law.

## COUNT IV
### (Unjust Enrichment/Disgorgement)

1-18.   Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count IV, as if fully set forth herein.

19.   Upon information and belief, Coventry, at the direction of LaSalle, effectuated the foreclosure and liquidation of the Policy, and profited from said transaction in receiving commission and fees in connection with the foreclosure and sale of the Policy.

20.    As a consequence of the acts set forth above, and to the extent that the sale of the Policy caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy, Coventry was unjustly enriched at the expense and detriment of Plaintiff.

21.    The Plaintiff requests that Coventry be dispossessed of all funds received by Coventry related to the foreclosure and sale of the Policy.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.

## COUNT V
### (Constructive Trust)

1-23.    Plaintiff repeats and realleges paragraphs 1-18 and paragraphs 19-23 of Count I as paragraphs 1-26 of Count V, as if fully set forth herein.

24.    Coventry breached its fiduciary duty to Plaintiff by failing to provide the Trust with advance notice of the Note's maturity date.

25.    As a proximate result of Coventry's breach of its fiduciary duty, in acting as a dual agent and failing to act on Plaintiff's behalf, Coventry has caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy.

26.     Coventry's abuse of confidence and/or violation of its fiduciary relationship allows for the imposition of a constructive trust.

27.     Plaintiff requests that this Court impose a constructive trust on the proceeds of the liquidated Policy, $3,993,000.00, against Coventry as LaSalle's agent until the disposition of this case as the proper and necessary means to protect Plaintiff from suffering future undue harm and damages.

WHEREFORE, Plaintiff requests that this Court enter an order imposing a constructive trust on said proceeds from the sale of the Policy, totaling $3,993,000.00, and for a declaration that Defendant, COVENTRY CAPITAL, LLC, hold the proceeds of the sale of the Policy as a constructive trustee, and for such other relief as the Court deems just and equitable.

Respectfully Submitted,

Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2

By:_____
                        One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875
F:CASE\059808\12849\FIRST AMENDED COMPLAINT.doc

# COVENTRY
## CAPITAL

21 June 2005

Neil Ellis
149 Colonial Road
Manchester, CT 06045

Dear Mr. Ellis:

We have been advised that you are interested in participating in the PFP Program offered by Coventry Capital and obtaining non-recourse financing in order to procure certain life insurance policies. The attached Summary of Principal Terms and Conditions (the *"Loan Proposal"*) contains the indicative terms and conditions upon which we may be able to arrange such financing for you. Please note that the Loan Proposal is merely an indication of the terms and conditions of such a financing, and remains subject to final underwriting approval.

The Loan Proposal is delivered to you on the understanding that none of its terms or substance shall be disclosed, directly or indirectly, to any other person except to (a) your advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly).

If the Loan Proposal correctly sets forth our agreement, please indicate your acceptance of its terms by executing, and returning it to us by no later than 07/04/2005. The Loan Proposal will expire at such time in the event that we have not received a fully executed Loan Proposal from you.

In order to be able to issue the financing documents to you, we will need you to furnish us with each of the respective items identified in the Checklist of Required Documents attached to the Loan Proposal.

If you have any questions please feel free to contact our Contract Services Department at (877) 836-8300. Coventry Capital is pleased to have the opportunity to assist you in connection with this important transaction.

Very truly yours,

Krista Lake / KR

Krista Lake



# COVENTRY
## CAPITAL

## PFP℠ Summary of Terms and Conditions

### Borrower(s)

| Neil Ellis | | | 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 | |
|---|---|---|---|---|
| Borrower | | | Social Security Number or Tax ID Number | |

| | | | | |
|---|---|---|---|---|
| Borrower | | | Social Security Number or Tax ID Number | |

| 149 Colonial Rd | | Manchester | CT | 06045 |
|---|---|---|---|---|
| Address | | City | State | Zip |

### Insured(s)

| Neil Ellis | | | 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 | |
|---|---|---|---|---|
| First Insured's Name | | | Social Security Number | |

| 149 Colonial Rd | | Manchester | CT | 06045 |
|---|---|---|---|---|
| Address | | City | State | Zip |

| ☒ Male ☐ Female | 2/10/1928 | 77 | 77 |
|---|---|---|---|
| Insured's Sex | Insured's DOB | Proposed Issue Age | Actual Age |

| | | | |
|---|---|---|---|
| Second Insured's Name | | Social Security Number | |

| | | | |
|---|---|---|---|
| Address | City | State | Zip |

| ☐ Male ☐ Female | | | |
|---|---|---|---|
| Insured's Sex | Insured's DOB | Proposed Issue Age | Actual Age |

### The Policy(ies)

| 1. Security Life of Denver | | AA | S&P | $30,000,000 |
|---|---|---|---|---|
| Insurance Carrier | | Insurance Carrier Rating | Rating Agency | Net Death Benefit |

| LifeDesign Guarantee UL | | Standard Non Smoker | | UL |
|---|---|---|---|---|
| Life Insurance Product | | Rating Class Offered | | Policy Type |

| None | $2,195,700 | | | 4.50% |
|---|---|---|---|---|
| Rider | Premium For Loan Term | | | Current Crediting Rate |

| Return of Premium with No Contractual Cap on the Death Benefit | |
|---|---|
| Death Benefit Option | |

# COVENTRY
## CAPITAL

## The Loan

| | |
|---|---|
| Lender: | LaSalle Bank N.A. |
| Program Administrator: | Coventry Capital I LLC |
| Total Loan Amount: | (x) + (y) + (z) |
| Life Insurance Premium(x): | $2,195,700 |
| Expenses related to Lender insurance coverage (y): | Not to exceed 10% of the Total Loan Amount |
| Interest (z): | The Loans shall bear simple interest at an approximate rate per annum equal to no less than 14.43%. |
| Term: | 30 Months |
| Purpose: | The proceeds of the Loans shall be used solely to finance the acquisition and maintenance of the Policies |
| Origination Fee: | A one-time origination fee which is an amount equal to the greater of: (i) $5,000 and (ii) 1% of the Total Loan Amount, payable by the Borrower(s) in cash upon issuance of the Loans. |
| Prepayments: | The Loans may be prepaid by the Borrower(s) at any time prior to maturity subject to the terms of the loan documents. |
| Collateral: | The obligations of the Borrower(s) in respect of the Loans shall be secured by a perfected first priority security interest in (i) each of the Policies and (ii) insurance coverage maintained by the Lender. |
| Default: | The failure of the Borrower(s) to pay when due the outstanding principal and interest of the Loans. |
| 30 Day Rate Commitment: | Upon receiving your executed acceptance of this proposal, we will compute each of the amounts above, (x), (y), and (z). These amounts will be communicated to you as part of your loan closing package and will not change provided that your loan is financed within 30 days from the issuance of the loan closing package. After 30 days from the issuance of the loan package, the terms of the loan will be reevaluated and are subject to change. |

## Example

If the proposed transaction was completed today, the following represents the loan information:

| | | |
|---|---|---|
| $3,265,079 | $2,195,700 | |
| Total Loan Amount | Life Insurance Premium (x) | |
| | | |
| $203,770 | $865,609 | 14.43% |
| Expenses related to Lender insurance coverage (y) | Interest (z) | Interest Rate |

# COVENTRY
## CAPITAL

### Approval

This proposal, and the availability of the Loans, shall be conditioned upon receipt by the Program Administrator of each of the following items, each in form and substance satisfactory to the Program Administrator:

1. Final underwriting approvals.
2. Execution and delivery of definitive financing documentation with respect to the Loans.
3. Each of the respective items in the Checklist of Required Documents attached hereto as Exhibit A.

### Modifications of this Proposal

This is only a non-binding proposal and is not a firm agreement or commitment by the Lender to enter into a transaction or provide the Loans. The Program Administrator may withdraw this proposal at any time prior to a definitive written commitment to enter into the transaction.

### Proposal Accepted and Agreed

By: _____    /    /
Neil Ellis                                                                           Date

By: _____    /    /
Neil Ellis                                                                           Date

Closing Documents should be sent to:

_____
Name

_____
Address                                        City              State          Zip

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| Elizabeth Ellis, as Co-Trustee of<br>The Neil H. Ellis Irrevocable<br>Insurance Trust-2005, No. 2<br><br>        Plaintiff,<br><br>    v.<br><br><br>LaSalle Bank National Association and<br>Coventry Capital I LLC<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. **08CH05368**

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., pursuant to 735 ILCS 5/11-101 and 102 and for her Complaint for the entry of a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction, states as follows:

## COUNT I

### Temporary Restraining Order

1.    Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, ("Trust"). The Trust is the beneficiary of a $30,000,000.00 life insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2.    Defendant, LaSalle Bank National Association ("LaSalle") is, on information and belief, a bank chartered and licensed under the laws of the United States and the laws of the State of Illinois with its principal place of business in Chicago, Cook County, Illinois.

EXHIBIT
3
tabbies

3.     Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, the Servicing Agent for LaSalle in the subject Note and Security Agreement ("Agreement") and is in the business of being a servicing agent and agent-in-fact for financing and purchasing life insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.

4.     At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high benefit insurance policies with financing provided by third parties.

5.     In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy on Ellis' life and acted as Ellis' agent in said purchase.

6.     Passananti advised Ellis that he would arrange all of the legal work to be done and the financing for the payment of premium.

7.     Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life.

8.     On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was the beneficiary of the Policy.

9.     The Policy premium was financed by LaSalle Bank.  A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

10.    The Note and Security Agreement was signed only by the Corporate Co-Trustee.

11.    Neither Ellis nor Elizabeth Ellis, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis did not even know that Coventry was involved as the Servicing Agent in the transaction until 2008.

2

12.    Upon information and belief, as a result of the financing provided by the Agreement, the premium on the Policy has been paid through December 31, 2008.

13.    On or about January 29, 2008, Coventry first notified Plaintiff that the Agreement's maturity date was the previous day on January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy. At no time did Plaintiff or Ellis receive a Notice of Premium Due on the policy.

14.    On February 1, 2008, Coventry notified the Plaintiff that Plaintiff had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/ or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of Coventry's February 1, 2008 letter is attached as Exhibit 2.

15.    The Agreement contains an Arbitration clause for all disputes arising under the Agreement. See Exhibit 1 attached hereto.

16.    The Plaintiff has disputed the default that was declared by Coventry on behalf of itself and LaSalle and, on February 5, 2008, pursuant to the Agreement, Plaintiff has demanded arbitration to resolve all disputes.

17.    Coventry's late notice of a purported default, and issues of conflict of interest, constructive trust and breach of fiduciary duty are issues for which the Plaintiff has demanded arbitration pursuant to the Agreement.

18.     Pursuant to the Agreement, Coventry has asserted that it has the right to liquidate the assets and to affect Plaintiff's interests in the assets prior to any foreclosure or other legal proceedings.

19.     If Coventry and LaSalle are allowed to change or otherwise alter the beneficiary of the Policy or to liquidate the Policy before the proper parties arbitrate their disputes, the Plaintiff will sustain irreparable injury in that the Plaintiff will lose its interest in the $30,000,000.00 policy of life insurance and the beneficiaries of the Trust will lose their rights and interest in the Policy.

20.     Plaintiff does not have an adequate remedy at law since the transfer or liquidation of the Policy will destroy Plaintiff's right and interest in the Policy. In contrast, the Defendants have adequate remedies at law.

21.     Plaintiff has filed this motion on an emergency basis because Coventry and LaSalle take the position that if the purported default is not cured by February 12, 2008, it will take action that will detrimentally affect Plaintiff's rights and interest in the Policy.

22.     With regard to the merits of the request for a restraining order, the issue is one of the arbitribility of "ANY DISPUTE" under the Agreement. As there is no issue that the Agreement requires that ANY DISPUTE be arbitrated, and further that the issues of arbitribility are arbitrable, there is clearly the highest likelihood of success on the merits. The issue for purposes of this temporary restraining order is *not* the propriety of the purported default. That issue, and others, will be the subjects of the arbitration.

23.     Since the premium on the Policy, the collateral for the Note and Security Agreement, upon information and belief, are paid through December 31, 2008 and since the Plaintiff is potentially liable for "Default Interest", the absence of a narrowly drawn temporary

4

restraining order will cause more harm to the Plaintiff than if it is entered against LaSalle and Coventry.

24.     There will be no prejudice to either party if the status quo is maintained until the arbitrator has had an opportunity to rule on the Arbitration Complaint. See *All Seasons Excavating Company v. Bluthardt*, 229 Ill App 3d 22, 593 N. E. 2d 679 (1st Dist. 1992)

WHEREFORE, Plaintiff requests that this Court issue a Temporary Restraining Order that prohibits Defendants, LaSalle and Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction at the earliest opportunity.

## COUNT II

### Preliminary and Permanent Injunction

1-24    Plaintiff hereby restates and realleges paragraphs 1 through 24 of Count I as and for Paragraphs 1 through 24 of Count II as though fully set forth herein.

25.     Plaintiff has demanded arbitration pursuant to the Agreement to resolve the propriety of the alleged default, the conflict of interest between the Defendants and the Plaintiff and the issues of constructive trust and breach of fiduciary duty.

26.     The Plaintiff's remedy, upon arbitration of these issues will be prejudiced if the Court does not enter a preliminary and/or permanent injunction prohibiting the Defendants from taking any action that would impair or affect the Plaintiff's right and title to the Policy.

WHEREFORE, Plaintiff requests that this Court order a hearing on the Plaintiff's request for  a Preliminary Injunction and to issue an Order that prohibits Defendants, LaSalle and

Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction.

By: _____
One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on 7/26/05, by and between THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth below, or as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A, from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

EXHIBIT
1

*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with any conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default, at our option to the maximum extent within fifteen (15) days after the occurrence of such Event of Default has not been remedied by you permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

— The Policies; and

— All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

5

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

# SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By: _____
Name:    Janel R. Havrilla
Title:    Financial Services Officer

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

LaSalle Bank National Association

By: _____
Name: Krista Lake
Title: Attorney-in-fact

7


COVENTRY
CAPITAL

7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    <u>Notice of Foreclosure of Collateral of PFP Loan—Loan ID #12070</u>

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July 26, 2005 between Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note <u>plus</u> 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

Richard Cooper

Coventry Capital
Servicing Agent

EXHIBIT
2

## VERIFICATION

I, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, being first duly sworn on oath, deposes and states that she has read the above and foregoing Verified Complaint and under penalties of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge.

_Elizabeth Ellis_
Elizabeth Ellis

LEAHY, EISENBERG & FRAENKEL, LTD.
Attorneys for Plaintiff
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 346-4554
Firm I.D. 45875

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

Elizabeth Ellis, as Co-Trustee of )
The Neil H. Ellis Irrevocable Insurance )
Trust-2005, No 2, )
)
    Plaintiff, )
) No.   08CH05368
 v. ) No.
)
)
LaSalle Bank National Association and )
Coventry Capital I LLC )
    Defendants. )

<u>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis

Irrevocable Insurance Trust-2005 No 2. by and through her attorneys, Eisenberg & Fraenkel,

Ltd., pursuant to 735 ILCS 5/11-101 and moves this Court for the entry of a Temporary

Restraining Order, and in support thereof, states as follows:

  1. Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust-2005, No. 2, ("Trust"). The Trust is the beneficiary of a $30,000,000.00 life

insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

  2. Defendant, LaSalle Bank National Association ("LaSalle") is, on information and

belief, a bank chartered and licensed under the laws of the United States and the laws of the State

of Illinois with its principal place of business in Chicago, Cook County, Illinois.

  3. Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief,

the Servicing Agent for LaSalle in the subject Note and Security Agreement ("Agreement") and

is in the business of being a servicing agent and agent-in-fact for financing and purchasing life



EXHIBIT
4

insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.

4.     At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high benefit insurance policies with financing provided by third parties.

5.     In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy on Ellis' life and acted as Ellis' agent in said purchase.

6.     Passananti advised Ellis that he would arrange all of the legal work to be done and the financing for the payment of premium.

7.     Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life.

8.     On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was the beneficiary of the Policy.

9.     The Policy premium was financed by LaSalle Bank.  A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

10.     The Note and Security Agreement was signed only by the Corporate Co-Trustee.

11.     Neither Ellis nor Elizabeth Ellis, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis did not even know that Coventry was involved as the Servicing Agent in the transaction until 2008.

12.     Upon information and belief, as a result of the financing provided by the Agreement, the premium on the Policy has been paid through December 31, 2008.

13.     On or about January 29, 2008, Coventry first notified Plaintiff that the Agreement's maturity date was the previous day on January 28, 2008, that the loan was in

default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy. At no time did Plaintiff or Ellis receive a Notice of Premium Due on the policy.

14.     On February 1, 2008, Coventry notified the Plaintiff that Plaintiff had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/ or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of Coventry's February 1, 2008 letter is attached as Exhibit 2.

15.     The Agreement contains an Arbitration clause for all disputes arising under the Agreement. See Exhibit 1 attached hereto.

16.     The Plaintiff has disputed the default that was declared by Coventry on behalf of itself and LaSalle and, on February 5, 2008, pursuant to the Agreement, Plaintiff has demanded arbitration to resolve all disputes.

17.     Coventry's late notice of a purported default, and issues of conflict of interest, constructive trust and breach of fiduciary duty are issues for which the Plaintiff has demanded arbitration pursuant to the Agreement.

18.     Pursuant to the Agreement, Coventry has asserted that it has the right to liquidate the assets and to affect Plaintiff's interests in the assets prior to any foreclosure or other legal proceedings.

19.     If Coventry and LaSalle are allowed to change or otherwise alter the beneficiary of the Policy or to liquidate the Policy before the proper parties arbitrate their disputes, the

Plaintiff will sustain irreparable injury in that the Plaintiff will lose its interest in the $30,000,000.00 policy of life insurance and the beneficiaries of the Trust will lose their rights and interest in the Policy.

20.    Plaintiff does not have an adequate remedy at law since the transfer or liquidation of the Policy will destroy Plaintiff's right and interest in the Policy. In contrast, the Defendants have adequate remedies at law.

21.    Plaintiff has filed this motion on an emergency basis because Coventry and LaSalle take the position that if the purported default is not cured by February 12, 2008, it will take action that will detrimentally affect Plaintiff's rights and interest in the Policy.

22.    With regard to the merits of the request for a restraining order, the issue is one of the arbitribility of "ANY DISPUTE" under the Agreement. As there is no issue that the Agreement requires that ANY DISPUTE be arbitrated, and further that the issues of arbitribility are arbitrable, there is clearly the highest likelihood of success on the merits. The issue for purposes of this temporary restraining order is *not* the propriety of the purported default. That issue, and others, will be the subjects of the arbitration.

23.    Since the premium on the Policy, the collateral for the Note and Security Agreement, upon information and belief, are paid through December 31, 2008 and since the Plaintiff is potentially liable for "Default Interest", the absence of a narrowly drawn temporary restraining order will cause more harm to the Plaintiff than if it is entered against LaSalle and Coventry.

24.    There will be no prejudice to either party if the status quo is maintained until the arbitrator has had an opportunity to rule on the Arbitration Complaint. See *All Seasons Excavating Company v. Bluthardt*, 229 Ill App 3d 22, 593 N. E. 2d 679 (1st Dist. 1992)

WHEREFORE, Plaintiff requests that this Court issue a Temporary Restraining Order that prohibits Defendants, LaSalle and Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction at the earliest opportunity.

By: _____
    One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875
F:Case\059808\12849\EMERG-MOT-TRO

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on 7/26/05, by and between THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

EXHIBIT
I

*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

### SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

— The Policies; and

— All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

# SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,          LaSalle Bank National Association
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By:_____              By:_____
Name:    Janel R. Havrilla                 Name:  Krista Lake
Title:    Financial Services Officer       Title: Attorney-in-fact

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

7



7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    Notice of Foreclosure of Collateral of PFP Loan—Loan ID #12070

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July 26, 2005 between Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

Richard Cooper

Coventry Capital
Servicing Agent

EXHIBIT
2

## VERIFICATION

I, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, being first duly sworn on oath, deposes and states that she has read the above and foregoing Verified Complaint and under penalties of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge.

_Elizabeth Ellis_
Elizabeth Ellis

LEAHY, EISENBERG & FRAENKEL, LTD.
Attorneys for Plaintiff
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 346-4554
Firm I.D. 45875

Firm I.D. # 42297

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| ELIZABETH ELLIS, AS THE CO-TRUSTEE OF T )<br>NEIL H. ELLIS INSURANCE TRUST-2005,    )<br>              )<br>      Plaintiff,          )<br>              )<br>v.                   )<br>              )<br>LASALLE BANK NATIONAL ASSOCIATION an )<br>COVENTRY CAPITAL I LLC,       )<br>              )<br>      Defendants.       )<br>              ) | Case No. 08 CH 5368 |

**MEMORANDUM OF LASALLE BANK NATIONAL ASSOCIATION AND**
**COVENTRY CAPITAL I LLC IN OPPOSITION TO PLAINTIFF'S**
**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

NOW COME Defendants, LASALLE BANK NATIONAL ASSOCIATION ("LaSalle")

and COVENTRY FIRST, LLC ("Coventry"), by and through its attorneys O'MELVENY &

MYERS LLP and DYKEMA GOSSETT, LLC, and respectfully submit this memorandum of law

in opposition to plaintiff's "Emergency Motion for Temporary Restraining Order."

**INTRODUCTION**

In July 2005, plaintiff participated in a loan transaction whereby LaSalle loaned $2.4

million to be used to finance the premiums of a life insurance policy which, in turn, served as

collateral for the loan. The note provided that the loan was due to be paid in full 30 months after

the origination date, January 28, 2008. In the event the loan was not paid off, a related security

agreement provided that LaSalle, through its servicing agent Coventry, had the power to transfer

or otherwise dispose of the collateral to satisfy the unpaid loan balance. Plaintiff's complaint

does not dispute that the full benefit of the loan was received. Plaintiff does not deny that 30

months have passed since the loan was originated. Plaintiff does not deny that the loan was not



repaid and is in default. Nor can she deny that the agreements she signed authorize Coventry to dispose of the collateral in these circumstances.

Plaintiff has manufactured a supposed "emergency" in an attempt to justify the extraordinary remedy of a temporary restraining order ("TRO") by waiting until the day before the collateral was to be disposed of to seek judicial intervention. In fact, there is no emergency that would justify a TRO, and on the merits there is no basis for injunctive relief of any sort since, at most, this is a dispute about money for which plaintiff has an adequate remedy at law. Indeed, as plaintiff herself acknowledges in the complaint, the transaction at issue is subject to an arbitration agreement pursuant to which any dispute must be decided in an arbitral forum rather than in this or any other Court.

For these and other reasons discussed more fully below, defendants respectfully request that plaintiff's motion for a temporary restraining order be denied and the complaint dismissed

## BACKGROUND

On July 26, 2005, the Neil H. Ellis Insurance Trust-2005 ("Ellis Trust"), obtained a $30,000,000 life insurance policy (the "Policy") on the life of Neil H. Ellis which Policy was placed in the Ellis Trust, the beneficiary of which is the Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 ("Beneficiary"). *See* Compl. ¶¶ 1-8; Trust Agreements attached at Tab 1 of Affidavit of Richard Cooper ("Cooper Aff."), copy of which is attached hereto as Exhibit A. On July 21, 2005, the Neil H. Ellis Insurance Trust--2005, Premium Finance Sub-Trust ("Ellis Sub-Trust") entered into a Note and Security Agreement with LaSalle under which LaSalle loaned the Ellis Sub-Trust $2,405,182.20 to be used to pay the premiums on the Policy. *See* Note and Security Agreement attached at Tab 2 of Cooper Aff. The Note provides that the principal amount of the loan, plus accrued interest, must be paid on the maturity date, which is defined to

2

include the earliest of a scheduled maturity date, the date on which the loan is prepaid in full, or

the date on which death benefits under the Policy are paid in an amount sufficient to repay the

loan. *See Id.* at 1. Schedule A to the Note provides that the scheduled maturity date would be no

later than 30 months from July 21, 2005 or January 21, 2008. *See Id.* at Schedule A. Under the

Note, LaSalle also appointed Coventry Capital I LLC ("Coventry") as servicing agent of the

loan. *See Id.* at 4. The Note expressly provides that if the Ellis Sub-Trust "fail[s] to pay the

amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e.,

foreclose)." *See Id.* at 4. The Trust Agreement describes the foreclosure process:

> In the event the Sub-Trust fails to satisfy in full all obligation in
> respect of the Loan at maturity or otherwise defaults on the Loan,
> and either (i) the Settlor, Co-Trustee and Trustee … agree to fully
> relinquish to the Lender all right, title and interest in, to and under
> the Policy … or (ii) the Lender notifies the Trustee that it is
> foreclosing on the Policy in satisfaction of the Loan and other
> assets of the Sub-Trust Estate in accordance with the terms of the
> Note and Security Agreement, ***the Trustee and Co-Trustee shall
> take such action as may be directed by the Lender to liquidate
> such assets and distribute the proceeds thereof,*** including, if
> necessary, the execution of all applicable assignment, transfer or
> sale forms and any other instruments of transfer, assignment or
> sale reasonably identified by the Lender as necessary to effect the
> valid transfer, assignment or sale of such assets. If such
> liquidation is made as a result of the Lender's foreclosure on the
> assets of the Sub-Trust Estate, proceeds of such liquidation that
> exceed the aggregate of the obligations due to the Lender in
> respect of the Loan through the completion of such liquidation
> shall be retained by the Trustee and deemed to be the assets of the
> Trustee, and not of the Sub-Trust Estate, and shall be maintained
> or distributed in accordance with the Trust Agreement.

*See* Supplement to Trust Agreement at 5 (emphasis added), attached at Tab 1 to Cooper Aff.

On November 19, 2007, Coventry sent to plaintiff a letter indicating that the outstanding

balance of the loan was due on or before January 28, 2008 and pursuant to the terms of the Note,

plaintiff could repay the outstanding balance or relinquish all of its right, title and interest in the

Policy in full satisfaction of the loan. *See* Tab 3 to Cooper Aff. Coventry sent a similar notice

on December 17, 2007. *See* Tab 4 to Cooper Aff. Coventry never received a response to these

letters. *See* Cooper Aff. On January 29, 2008, after the expiration of the scheduled maturity

date, Coventry sent another letter to plaintiff indicating that the loan was now in default and

requesting that plaintiff contact Coventry immediately. *See* Tab 5 to Cooper Aff. On February

1, 2008, Coventry sent a letter to plaintiff indicating that if the outstanding balance was not paid

by February 12, 2008, Coventry would foreclose upon and sell the Policy. *See* Tab 6 to Cooper

Aff. Coventry and LaSalle were served with plaintiff's motion for temporary restraining order

on February 12, 2008. On the afternoon of February 13, 2003, after having checked this Court's

docket to ensure there was no order barring such action, Coventry proceeded to foreclose on the

policy securing the defaulted loan as provided under the applicable contract.

## I.    NONE OF THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION ARE SATISFIED.

### A.    NO EXIGENT CIRCUMSTANCES EXIST WHICH WOULD ENTITLE PLAINTIFF TO A TEMPORARY RESTRAINING ORDER.

The Illinois Supreme Court has explained that "[a] temporary restraining order is an

*emergency remedy*." *Delgado v. Bd. of Election Comm'rs*, 224 Ill. 2d 481, 483 (Ill. 2007)

(emphasis added); *Heerey v. Berke*, 179 Ill. App. 3d 927, 943 (Ill. App. Ct. 1989) (affirming

dismissal where "trial court had dismissed plaintiff's petition for a temporary restraining order,

stating that there was *no emergency* and no irreparable harm"). Here, plaintiff has manufactured

an emergency for tactical purposes to prevent Coventry and LaSalle from liquidating the Policy

in satisfaction of the defaulted loan. When the loan secured by the Policy was originated in July

2005, it was clear that the scheduled maturity date of the loan was January 2008. *See* Note and

Security Agreement attached at Tab 2 to Cooper Aff. Apart from the loan documents

themselves, and as explained above, Coventry also sent numerous notices to plaintiff several

4

months prior to the scheduled maturity date informing plaintiff of her options regarding the loan.

Because plaintiff was aware of the scheduled maturity date for over *2 years* and was reminded of

that date several months ago, plaintiff's failure to act does not constitute an emergency.

Accordingly, plaintiff is not entitled to a temporary restraining order.[1]

### B.    PLAINTIFF CANNOT DEMONSTRATE THAT SHE WILL SUFFER IRREPARABLE HARM.

In *In re Marriage of Schmidt*, Illinois' First District Court of Appeal set forth the test for

award of a preliminary injunction:

> In order to obtain a preliminary injunction, a party must establish: (1) that he possesses a clearly ascertainable right which needs protection; (2) that he will suffer ***irreparable harm*** without the injunction; (3) that there is no adequate remedy at law for the injury; and (4) that he is likely to be successful on the merits of his action.

118 Ill. App. 3d 467 (Ill. App. Ct. 1983); *see also City of Waukegan v. Ill. EPA*, 339 Ill. App. 3d

963, 977 (Ill. App. Ct. 2003) (same test for award of temporary restraining order). In addition,

"[a]n application for a preliminary injunction must specify all facts necessary to justify the

unusual relief sought and that [t]hese facts must be alleged with certainty and precision." *In re*

*Marriage of Schmidt*, 118 Ill. App. at 471 (citations omitted). In this case, it is clear that plaintiff

cannot demonstrate that she will suffer irreparable harm.

Plaintiff alleges she will "sustain irreparable injury in that the Plaintiff will lose its

interest in the $30,000,000 policy of life insurance." Compl. ¶ 19. ""[I]rreparable harm occurs

only where the remedy at law is inadequate; that is, ***where monetary damages cannot***

***adequately compensate the injury***, or the injury cannot be measured by pecuniary standards."

*Orr v. Department of Revenue*, 217 Ill. App. 3d 672, 674 (Ill. App. Ct. 1991). Despite plaintiff's

self-serving irreparable harm assertion, her complaint makes clear that she is disputing the

---

[1]    As noted above, Coventry foreclosed on the policy securing the defaulted loan on the afternoon of February 13, 2008, thus eliminating any suggestion of an emergency.

financial transaction and foreclosure of the collateral – both of which can be compensated by monetary damages.

In *Hagen v. Bank of Piedmont*, a case closely analogous to this matter, the court rejected a plaintiff's request for a temporary restraining order enjoining the defendant bank from foreclosing on the insurance policy held in an insurance trust.  763 S.W.2d 384 (Mo. App. 1989). A copy of the *Hagen* opinion is attached hereto as Exhibit B.  The court explained that "appellants have not shown that the bank is exercising a right that it does not have nor that irreparable harm may occur to appellants, and that they have no adequate remedy at law." So too here.  While Coventry and LaSalle emphatically deny that plaintiff is entitled to any recovery, there can be no question that the alleged damages can be measured by pecuniary standards because plaintiff herself specifically alleges that damages relate to her interest in the *$30,000,000* policy.  Plaintiff has failed to demonstrate why she would not have an adequate remedy at law for money damages assuming she could allege any unlawful conduct in connection with the loan, and she thus is not entitled to a temporary restraining order or preliminary injunction.

### C.    PLAINTIFF HAS FAILED TO SATISFY THE REMAINING ELEMENTS NECESSARY FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER.

Plaintiff seeks to prevent Coventry from foreclosing on the Policy.  In her complaint, plaintiff alleges that with respect to the loan secured by the Policy, she "dispute[s] the default that was declared by Coventry on behalf of itself and LaSalle." *See* Compl. ¶ 16.  Plaintiff further alleges that "[n]either Ellis nor Elizabeth Ellis, as Co-Trustee, agreed to or executed the financing agreement." Compl. ¶ 11.  Despite plaintiff's conclusory allegations, she fails to set forth a single fact establishing why Coventry is not entitled to foreclose on the Policy.  To the contrary: Plaintiff executed documents specifically acknowledging Coventry's right to foreclose on the Policy.  In an agreement titled "Settlor Non-Recourse Security Agreement" dated July 1,

6

2005 which was signed by Elizabeth Ellis, co-trustee of the Neil H. Ellis Irrevocable Insurance Trust – 2005 No. 2 specifically agreed to the appointment of Coventry as agent for LaSalle and further agreed that LaSalle "may surrender, sell or otherwise exercise rights under the Collateral as the owner thereof if the Sub-Trust defaults and we foreclose upon the Collateral as provided for in this Agreement." *See* Settlor Non-Recourse Security Agreement at 3 attached at Tab 7 to Cooper Aff. Because plaintiff undeniably failed to repay the loan as agreed, she has no basis to challenge Coventry's disposition of the policy securing the loan, is not entitled to protection from foreclosure, and will not likely be successful on the merits of her claims. She has failed to demonstrate that she is entitled to a temporary restraining order or preliminary injunction.

## II.    TO THE EXTENT PLAINTIFF HAS ACTUALLY ALLEGED A DISPUTE CONCERNING THE LOAN AND RELATED TRANSACTIONS, THAT DISPUTE IS SUBJECT TO ARBITRATION.

Apart from the unavailability of emergency or preliminary injunctive relief as a general matter, it is clear – both from plaintiff's own complaint and from the agreement between the parties – that this dispute, to the extent there is one, must be decided by arbitration and not by a judicial tribunal. Plaintiff herself acknowledges that "the Agreement requires that any dispute be arbitrated, and further that issues of arbitrability are arbitrable . . . ." Compl. ¶ 22. That is plainly correct: the security agreement relating to the note provides that "[a]ny claim or dispute, whether in contract, tort, statute or otherwise . . . between you or us and our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship . . . shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action." *See* Note and Security Agreement at 5. The courts of Illinois have a strong policy favoring the enforcement of arbitration agreements. *See Acme-Wiley Holdings, Inc. v. Buck*, 343 Ill. App. 3d 1098, 1103, 799 N.E.2d 337, 341, 278 Ill. Dec. 619 (2003). As a general matter, that pro-arbitration policy dictates that "ambiguities as to

the scope of the arbitration clause must be resolved in favor of arbitration[.]" *Roubik v. Merrill Lynch, Pierce, Fenner & Smith*, 181 Ill. 2d 373, 384 (Ill. 1998).

As courts in Illinois have recognized, where (as here) a party to an arbitration agreement has notice of his or her contractual obligations and delays commencing an action for relief, that party's request for preliminary injunctive relief should be denied and the matter should be referred to arbitration. *See Tenneco Automotive Operating Co. v. Hydrad Corp.*, 2002 WL 1632499 (N.D. Ill. July 23, 2002). A copy of the Tenneco opinion is attached hereto as Exhibit C. Like the plaintiff in *Tenneco Automotive*, plaintiff here "is not without an adequate remedy. An arbitrator, under the AAA rules, may grant injunctive relief." *Id.* at *3. For this independent reason, plaintiff's request for a temporary restraining order and preliminary injunction should be denied.

## III.  THE EQUITIES WEIGH IN FAVOR OF COVENTRY AND LASALLE BECAUSE COVENTRY AND LASALLE WILL LOSE THEIR INSURANCE COVERAGE IF NOT PERMITTED TO FORECLOSE.

Illinois courts recognize that in addition to the necessary elements for a temporary restraining order or preliminary injunction, plaintiff "generally must establish that the need for temporary relief outweighs any possible injury that the party to be enjoined might suffer by its issuance." *In re Marriage of Schmidt*, 118 Ill. App. 3d 467 (Ill. App. Ct. 1983). Loans under the premium finance program for which Coventry serves as Servicing Agent are insured against default by a premium finance insurance coverage provider ("PFIC Provider"). *See* Affidavit of Josh May ¶ 2, attached hereto as Exhibit D. The terms of the coverage require that, within 20 days after a loss (i.e., a loan default), Coventry must be able to deliver the collateral free of any liens or impairments of title. *Id.* If Coventry is unable to deliver the Policy to the PFIC Provider within such time, Coventry could be liable for the amount covered under the premium finance insurance coverage. *Id.* ¶ 3. This action is just that – an attempt to impose a title impairment on

8

the policy, which has the potential to cause Coventry and LaSalle to lose their insurance coverage. Because Coventry and LaSalle will suffer loss of their coverage, the equities weigh in favor of Coventry and LaSalle and against plaintiff. Accordingly, plaintiff's request for temporary restraining order, preliminary injunction and permanent injunction should be denied.

## **CONCLUSION**

LaSalle and Coventry respectfully request that the Court deny plaintiff's emergency motion for temporary restraining order in its entirety and the complaint be dismissed with prejudice.

Dated: February 14, 2008

Respectfully submitted,

LASALLE BANK NATIONAL ASSOCIATION AND COVENTRY CAPITAL, LLC

By: _____
One of the Attorneys for Defendants

Terrence E. Kiwala
Michael C. Borders
Rosa M. Tumialán
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700
Firm I.D. #42297

Brian P. Brooks
Kyra A, Grundeman
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

ELIZABETH ELLIS, AS THE CO-TRUSTEE
OF THE NEIL H. ELLIS INSURANCE TRUST-
2005,

             Plaintiff,

v.

LASALLE BANK NATIONAL ASSOCIATION
and COVENTRY CAPITAL I LLC,

             Defendants.

Case No. 08 CH 5368

**AFFIDAVIT OF RICHARD COOPER IN SUPPORT OF MEMORANDUM OF
LASALLE BANK NATIONAL ASSOCIATION AND COVENTRY CAPITAL I LLC
IN OPPOSITION TO PLAINTIFF'S VERIFIED COMPLAINT FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION
AND PERMANENT INJUNCTION**

State of Pennsylvania    )
County of Montgomery    )

     I, Richard Cooper, being duly sworn, do hereby swear under penalty of perjury that the

following is true and correct:

     1.     I am currently employed by Coventry Capital I LLC ("Coventry") as Senior Loan

Coordinator since approximately February 2007.   I have reviewed the complaint in the above-

entitled action.  As a result of my employment with Coventry, and my review of the loan file, I

have personal knowledge of the facts set forth in this affidavit.

2.     My review of Coventry's business records shows that the loan file contains, among other things, the Trust Agreements relating to the loan, the Note and Security Agreement, and the Settlor Non-Recourse Security Agreement. These documents are kept in the regular course of the business and collected at or within a reasonable time after the loan transaction is closed. A true and correct copy of the Trust Agreements are appended hereto at Tab 1. A true and correct copy of the Note and Security Agreement is appended hereto at Tab 2. A true and correct copy of the Settlor Non-Recourse Security Agreement is appended hereto at Tab 7.

3.     My review of Coventry's business records also shows that on November 19, 2007, Coventry sent a letter to the trust indicating that the outstanding balance of the loan was due on or before January 28, 2008 and pursuant to the terms of the Note, the trust could repay the outstanding balance or relinquish all of its right, title and interest in the Policy. (*See* Tab 3 to Cooper Aff.). A true and correct copy of the Coventry's letter dated November 19, 2007 is appended hereto at Tab 3. Coventry did not receive a response to this letter.

4.     My review of Coventry's business records also shows that on December 17, 2007, Coventry sent another letter to the trust indicating that the outstanding balance of the loan was due on or before January 28, 2008. A true and correct copy of the Coventry's letter dated December 17, 2007 is appended hereto at Tab 4. Coventry did not receive a response to the December 17, 2007 letter.

5.     On January 29, 2008, Coventry sent another letter to the trust indicating that the loan was now in default and requesting that plaintiff contact Coventry immediately. A true and correct copy of the Coventry's letter dated January 29, 2008 and the Federal Express receipt of delivery is appended hereto at Tab 5.

2

6.    On February 1, 2008, Coventry sent a letter to the trust indicating that if the outstanding balance was not paid by February 12, 2008, Coventry would foreclose upon and sell the Policy.  A true and correct copy of the Coventry's letter dated February 1, 2008 and the Federal Express receipt of delivery is appended hereto at Tab 6.

7.    As of the date hereof, the loan remains outstanding.

Dated: February 13, 2008

_Richard W. Cooper III_
RICHARD COOPER

2/13/08

NOTARIAL SEAL
ELIZABETH R HAUSER
Notary Public
FORT WASHINGTON, MONTGOMERY COUNTY
My Commission Expires Apr 23, 2011

3

## THE NEIL H. ELLIS INSURANCE TRUST - 2005

### TRUST AGREEMENT

This TRUST AGREEMENT (as may be amended or supplemented from time to time, this "Trust Agreement"), is made as of ___June___ _30_, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as Settlor (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee (in such capacity, the "Trustee") and Elizabeth Ellis, as Co-Trustee (the "Co-Trustee"). The Settlor, the Beneficial Owner, the Trustee and the Co-Trustee hereby agree as follows:

1.     The trust created hereby shall be known as "The Neil H. Ellis Insurance Trust - 2005" (sometimes referred to herein simply as the "Trust"), in which name the Trustee may conduct the business of the Trust and make, execute and enforce contracts, and in which name the Trustee, the Settlor or the Co-Trustee may execute on behalf of the Trust one or more applications and contracts for life insurance, which policies are to become part of the trust estate of the Trust, and in so doing, has the power to bind the Trust to such contracts as obligations of the Trust. Such policies need not be separately executed by the Trustee. The Trustee shall execute on behalf of the Trust such agreements, certificates, instruments, or other documents, and shall manage, control, use, sell and dispose of the assets of the trust estate of the Trust in such manner as the Settlor may instruct, and the Co-Trustee shall execute on behalf of the Trust any such application or contract for insurance; provided that, except for the insurance application, all forms, instructions or other documents related to or in any way affecting any life insurance policy that is a part of the trust estate must be signed by the Trustee to be effective.

2.     The Settlor hereby assigns, transfers, conveys and sets over to the Trustee the sum of $1.00 (the "Initial Trust Estate"). The Trustee hereby acknowledges receipt of such amount in the Trust from the Settlor, which shall constitute the initial trust estate. The Trustee hereby declares that it will hold the trust estate in trust for the Beneficial Owner.

3.     It is the intention of the parties that the Trust constitute a statutory trust under Sections 3801 et seq. of Title 12 of the Delaware Code (the "Act"), and that this document constitute the governing instrument of the Trust. The Trustee is hereby authorized and directed to execute and file a certificate of trust with the Delaware Secretary of State.

4.     The Trustee and Co-Trustee accept the trusts hereby created and agree to perform their duties hereunder with respect to such trusts but only upon the terms of this Trust Agreement. The Trustee also agrees to disburse all moneys actually received by it constituting part of the trust estate of the Trust upon the terms of this Trust Agreement, and the Co-Trustee acknowledges and agrees that it is not expected or entitled to receive any such moneys or any other property or proceeds of the property of the Trust, but that if it does in fact receive any such moneys, property or proceeds, the Co-Trustee promptly shall notify the Trustee thereof and deliver the same to or at the direction of the Trustee. The Trustee and Co-Trustee shall not be answerable or accountable hereunder under any circumstances, except (i) for its own willful misconduct, bad faith or gross negligence, or (ii) for actual damages incurred by the Trust as a result of the inaccuracy of any representation or warranty herein expressly made by the Trustee

or Co-Trustee, as the case may be, in its individual capacity. In particular, but not by way of limitation (and subject to the exceptions set forth in the preceding sentence):

   a. in accordance with Section 3313(b) of the Act, the Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of this Trust Agreement, and the Co-Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or Trustee in accordance with the provisions of this Trust Agreement;

   b. no provision of this Trust Agreement or any document to which the Trust is a party shall require the Trustee or Co-Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder or thereunder, if the Trustee or Co-Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

   c. under no circumstances shall the Trustee or Co-Trustee be liable for any indebtedness of the Trust;

   d. the Trustee and Co-Trustee shall not be responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Settlor or for the form, character, genuineness, sufficiency, value or validity of any of the trust estate, and in no event shall the Trustee or Co-Trustee assume or incur any liability, duty or obligation other than as expressly provided for herein;

   e. the right of the Trustee to perform any discretionary act enumerated in this Trust Agreement or in any agreement to which the Trust is a party shall not be construed as a duty, and the Trustee shall not be answerable for other than its gross negligence, bad faith or willful misconduct in the performance of any such act;

   f. the Trustee and Co-Trustee undertake to perform such duties and only such duties as are specifically set forth in this Trust Agreement, in particular, but not by way of limitation, the Trustee and Co-Trustee shall have no duty or obligation to monitor any collateral securing any borrowing of the Trust or any sub-trust of the Trust nor any ratings or attributes of any insurance policy or the issuer of any insurance policy held in trust hereunder or in any sub-trust of the Trust, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee or Co-Trustee;

   g. the Trustee shall not be liable for any error of judgment made in good faith unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

   h. the Trustee may conclusively rely and shall fully be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or

document in good faith believed by it to be genuine and to have been signed or presented by the proper party or parties;

        i.    the Trustee shall be under no obligation to appear in, prosecute or defend any legal action that is not incidental to its duties as the Trustee in accordance with this Trust Agreement or any agreement to which the Trust is a party and that in its reasonable judgment may involve it in any expense or liability (i) in excess of funds then available in the trust estate to defray such expenses or liability and (ii) for which the repayment of such expenses or adequate indemnity against such liability is not reasonably assured or provided to it;

        j.    in no event shall the Trustee be liable for special, punitive, indirect or consequential losses or damages of any kind whatsoever (including but not limited to lost profit), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

        k.    the Trustee shall not be charged with any duty to determine compliance by the Trust with the provisions of this Trust Agreement unless (i) a responsible officer of the Trustee shall have actual knowledge of non-compliance or (ii) the matter was submitted for the approval of the Trustee in accordance with the provisions hereof;

        l.    in the exercise or administration of the trusts hereunder the Trustee (i) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Trustee with reasonable care and (ii) may consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by them, and the Trustee shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other skilled persons;

        m.    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instruction, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit; and

        n.    the Trustee shall not be liable for any actions taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights conferred upon the Trustee by this Trust Agreement, or that are taken by the Co-Trustee.

        5.    Except as expressly provided in this Trust Agreement, in accepting the trusts hereby created, Wilmington Trust Company acts solely as the Trustee hereunder and thereunder and not in its individual capacity and all persons or entities having any claim against the Trustee shall look only to the trust estate for payment or satisfaction thereof.

6.    The Trustee hereby represents and warrants that:

a.    it is a Delaware corporation, duly organized and validly existing in good standing under the laws of the State of Delaware and having an office and its principal place of business within the State of Delaware. It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Trust Agreement;

b.    it has taken all corporate action necessary to authorize the execution and delivery by it of this Trust Agreement, and this Trust Agreement will be executed and delivered by one of its officers who is duly authorized to execute and deliver this Trust Agreement on its behalf;

c.    this Trust Agreement constitutes a legal, valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms, subject, as to enforceability, to applicable bankruptcy, insolvency, reorganization, conservatorship, receivership, liquidation and other similar laws affecting enforcement of the rights of creditors of banks generally and to equitable limitations on the availability of specific remedies; and

d.    neither the execution nor the delivery by it of this Trust Agreement, nor the consummation by it of the transactions contemplated hereby nor compliance by it with any of the terms or provisions hereof will contravene any federal or applicable state law, governmental rule or regulation granting the banking or trust powers of the Trustee or any judgment or order binding on it, or constitute any default under its articles of association or by laws or any indenture, mortgage, contract, agreement or instrument to which it is a party or by which any of its properties may be bound.

7.    The Trustee may resign upon thirty days prior notice to the Settlor and the Beneficial Owner.

8.    Upon written instructions of the Settlor, the Trustee shall dissolve, wind-up and terminate the Trust and file a certificate of cancellation in accordance with Section 3810 of the Act. Unless earlier dissolved by the Settlor, the Trust shall dissolve upon the disposition of the entire trust estate of the Trust and the disposition to the Beneficial Owner of all net proceeds thereof.

9.    In connection with the dissolution and winding up of the Trust, the Trustee and Co-Trustee shall take such action as may be directed by the Settlor to transfer the related assets of the trust estate of the Trust to the Settlor or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets.

10.    The principal place of business of the Trust for purposes of Delaware law shall be in the care of the Trustee. The office of the Trust shall be in the care of the Trustee located at Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19890.

11.    At no time can more than 100 persons hold beneficial interests in the Trust or any sub-trust of the Trust, collectively.

12.    The Trustee is hereby authorized and directed to issue to the Beneficial Owner a certificate representing the non-assessable, fully paid, fractional undivided interest in the general assets of the Trust.

13.    The Settlor, the Beneficial Owner, Trustee and Co-Trustee agree, and any person accepting a beneficial interest in the Trust or any sub-trust of the Trust shall by accepting such beneficial interest be deemed to agree, not to elect to have any part of the Trust or any sub-trust of the Trust taxed as a corporation.

14.    This Trust Agreement may be amended or supplemented at any time as contemplated by Section 3806(b) of the Act by an instrument executed by the Trustee upon the instruction of the Settlor.

15.    THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS AGREEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS AGREEMENT. SECTIONS 3540 AND 3561 OF TITLE 12 OF THE ACT SHALL NOT APPLY TO THE TRUST.

16.    Notwithstanding any other provision of this Trust Agreement (other than any amendment hereto expressly to the contrary), the Trustee shall perform all of its duties

5

hereunder and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner) and the Trustee shall, in accordance with 12 Del. C. § 3313(b), have no liability hereunder for any action taken at direction or for failure to act in the absence of direction except for loss to the Trust resulting directly from the Trustee's own willful misconduct.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed as of the day and year first written above.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Settlor

_____
Elizabeth Ellis, Trustee

WILMINGTON TRUST COMPANY,
as Trustee

By:     _____
Name:     Janel R. Havrilla
Title:     Financial Services Officer

ELIZABETH ELLIS, as Co-Trustee

_____
Elizabeth Ellis

6

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Beneficial Owner

Elizabeth Ellis, Trustee

## SUPPLEMENT TO TRUST AGREEMENT

This SUPPLEMENT TO TRUST AGREEMENT (this "Supplement") is made as of ___July___ __1__, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Settlor of the Trust (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner of the Trust (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee of the Trust (the "Trustee") and Elizabeth Ellis, as Co-Trustee of the Trust (the "Co-Trustee").

### RECITALS

A.      The Settlor, Trustee and Co-Trustee have entered into a Trust Agreement (the "Trust Agreement"), dated as of ___June___ __30__, 2005, pursuant to which the Settlor, Trustee and Co-Trustee formed The Neil H. Ellis Insurance Trust - 2005, a Delaware statutory trust.

B.      Pursuant to the authority granted to the Trustee, the Settlor and Co-Trustee under Section 1 of the Trust Agreement, the Trustee, Settlor and/or Co-Trustee executed on behalf of the Trust a life insurance policy (the "Policy") dated as of ___July___ __20__, 2005, which Policy is part of the trust estate of the Trust.

C.      The Settlor desires to instruct the Trustee in accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act to establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust" (the "Sub-Trust").

D.      The Settlor desires that the Trustee (i) cause the Sub-Trust to enter into the Note and Security Agreement (the "Note and Security Agreement"), dated as of the date hereof, between the Trust and La Salle Bank, N.A. (the "Lender"), pursuant to which the Sub-Trust will borrow money from the Lender in the amount specified therein (the "Loan"), the proceeds of which shall be used primarily to pay premiums on the Policy in accordance with the terms of the Note and Security Agreement, (ii) for so long as the Loan is outstanding, allocate the Policy and the other assets of the Sub-Trust Estate (as defined below) to the Sub-Trust and hold such assets as collateral for the Loan, and (iii) upon repayment of the Loan, terminate the Sub-Trust and allocate the Policy and the other assets of the Sub-Trust Estate to the general trust estate of the Trust or otherwise as directed by the Settlor, all as set forth in this Supplement.

E.      The Settlor desires and hereby directs the Sub-Trust not to engage in any activities other than those expressly required or permitted by the Trust Agreement and this Supplement, and the Settlor, Trustee and Co-Trustee acknowledge that the Sub-Trust is being established in connection with the Note and Security Agreement for the purpose of entering into the Note and Security Agreement and giving the Lender interests in the assets of the Sub-Trust as collateral security for the loan evidenced thereby.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Trust Agreement, the parties hereto agree to the following supplemental obligations and provisions with regard to the Sub-Trust created hereby:

## ARTICLE I.
## DEFINITIONS

Section 1.    Capitalized Terms.  Except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used and not otherwise defined in this Supplement shall have the meanings ascribed to them in the Trust Agreement.

Section 2.    Other Interpretive Provisions.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Supplement shall refer to this Supplement as a whole and not to any particular provision of this Supplement; section references contained in this Supplement are references to sections in or to this Supplement unless otherwise specified; with respect to all terms in this Supplement, the singular includes the plural and the plural the singular; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Supplement; references to persons include their permitted successors and assigns; references to laws include their amendments and supplements, the rules and regulations thereunder and any successors thereto; and the term "including" means "including without limitation."

## ARTICLE II.
## ORGANIZATION AND BENEFICIAL OWNERSHIP

Section 1.    Initial Creation of Sub-Trust.  In accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act, the Settlor hereby instructs the Trustee to, and the Trustee hereby does, establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust."

Section 2.    Execution of the Note and Security Agreement.  The Settlor hereby instructs the Trustee to execute on behalf of the Sub-Trust the Note and Security Agreement.

Section 3.    Declaration of Sub-Trust.  The Trustee hereby declares that it will hold all right, title and interest in and to the Policy, and all proceeds thereof, including, without limitation, the right to collect net death benefits thereon, the right to proceed against any state guarantee fund and other property and interests in property related thereto, including, without limitation, all monies due and to become due in respect to any of the foregoing (whether in respect of principal, interest, fees, expenses, indemnities, rescission payments or otherwise), and any proceeds of the foregoing (collectively, the "Sub-Trust Estate"), and does hereby accept and agree to hold in trust, for the benefit of the Lender as security for the Loan for so long as the Loan is outstanding, and thereafter for the benefit of the Beneficial Owner, all of the Sub-Trust Estate conveyed or to be conveyed to the Trustee and all monies and proceeds that may be received with respect thereto in accordance with the terms of this Supplement. The Sub-Trust Estate shall be segregated and held separately from the general trust estate of the Trust.

Section 4.    Purposes and Powers.  The purpose of the Sub-Trust is, and the Trust shall have the power and authority, to engage in the following activities:

2

    (a)     to enter into the Note and Security Agreement;

    (b)     to borrow money from the Lender and to pledge the Policy as collateral therefor pursuant to the Note and Security Agreement;

    (c)     to hold the Policy and other assets of the Sub-Trust Estate in trust, for the benefit of the Lender as security for the Loan until such time as all obligations in respect of the Loan are fully satisfied or waived by the Lender;

    (d)     to administer, service and collect the Policy, and to exercise other rights of ownership in connection with the Policy;

    (e)     to enter into and perform its obligations under any agreements to which it is or may become a party; and

    (f)     to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 5.    <u>Title to Trust Property; Sub-Trust Certificate</u>. Legal title to all of the Sub-Trust Estate shall be vested at all times in the Sub-Trust. The Trustee is hereby authorized and directed to issue a certificate in substantially the form attached hereto as <u>Exhibit A</u> representing the non-assessable, fully paid, undivided beneficial interest in the assets of the Sub-Trust Estate, which shall be issued in the name of the Beneficial Owner and delivered to the possession of the Lender or its designee as collateral security for the loan evidenced by the Note and Security Agreement.

Section 6.    <u>Limitations on Trust Property</u>. The Trust shall not hold any property other than the Initial Trust Estate and the Sub-Trust shall not hold any property other than the Sub-Trust Estate; <u>provided</u>, that the Settlor, the Beneficial Owner, the Trustee and the Co-Trustee, if any, may enter into a supplement to the Trust Agreement or this Supplement that would permit the Trust or the Sub-Trust to hold only such additional assets as are necessary for the repayment or the refinancing of the Loan promptly after adding such assets. The Settlor and the Beneficial Owner hereby agree (i) not to assign, transfer or convey any property to the Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Trust, other than the Initial Trust Estate, (ii) not to assign, transfer or convey any property to the Sub-Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Sub-Trust, other than the Sub-Trust Estate, and (iii) for so long as the Loan is outstanding, not to establish or instruct the Trustee or the Co-Trustee to establish, any additional series of the Trust other than the Sub-Trust. The Settlor and the Co-Trustee hereby agree (i) not to instruct the insurance company, which insurance company is obligated to pay the death benefit in accordance with the terms of the Policy (the "Issuing Insurance Company"), to change the owner or beneficiary of the Policy without the consent of the Trustee acting at the direction of such person or entity then authorized to direct the Trustee in the performance of its duties hereunder, and (ii) to notify the Issuing Insurance Company that the Trustee's signature is required to change the owner or beneficiary of the Policy.

3

Section 7.    Additional Covenants of the Settlor and the Trustee.

(a)    The Settlor and the Trustee hereby agree (i) to maintain the Sub-Trust Estate as identifiable and not commingle the Sub-Trust Estate with the assets of any other entity, including the assets of the Settlor, the Trust or any other sub-trust of the Trust and (ii) to maintain bank accounts, if any, records and books of account of the Sub-Trust showing the Sub-Trust Estate as assets of the Sub-Trust and being separate assets from those of any other person or entity, including the Settlor, the Trust or any other sub-trust of the Trust, and (iii) that the affairs of the Sub-Trust shall be managed by or under the direction of the Trustee.

(b)    The Settlor and the Trustee hereby agree that they will not (i) indicate to any third party, including any creditors of the Trust, the Trustee or the Settlor, that the Sub-Trust Estate is available to satisfy any obligations other than the Loan and any other obligations under the Note and Security Agreement, (ii) indicate to any third party that the Sub-Trust Estate constitutes assets of the Settlor or that the Trust or the Sub-Trust is responsible for or guaranteeing any obligations of the Settlor, (iii) cause the Trust or the Sub-Trust to issue any securities or deposit assets into any entity that issues any securities, (iv) cause the Trust or the Sub-Trust to incur any indebtedness, or assume or guaranty any indebtedness of any other person or entity, other than the Loan, or (v) purport that the Trust or the Sub-Trust is a division or subsidiary of, or the same person as, the Settlor.

ARTICLE III.
AUTHORITY AND DUTIES OF THE TRUSTEE

Section 1.    General Authority of the Trustee.  It shall be the duty of the Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of the Trust Agreement, this Supplement, the Note and Security Agreement and any other agreements to which the Trust or Sub-Trust is a party, and to administer the Sub-Trust in the interest of the Lender and the Beneficial Owner in accordance with the provisions of this Supplement.  The Trustee is hereby expressly authorized to create security over the Sub-Trust Estate for the benefit of the Lender in accordance with the terms of the Note and Security Agreement.

Section 2.    Trustee to Act at Direction.  Notwithstanding any other provision of the Trust Agreement or this Supplement, the Trustee shall perform all of its duties under this Supplement and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner); provided, however, that, except as otherwise provided in Section 6 of this Article III, for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in a writing delivered to the Trustee, and the Trustee shall, in accordance with Section 3313(b) of the Act, have no liability hereunder for any action taken at the direction of such of the Settlor, the Beneficial Owner, Lender, or Lender's designee as is then authorized to direct the Trustee or for failure to act in the absence of direction except for loss to the Sub-Trust resulting directly from the Trustee's own willful misconduct.

Section 3.    Notice.  In the event that the Settlor or the Beneficial Owner takes or attempts to take any action, or instructs the Trustee or the Co-Trustee to take any action, that is

4

not required or permitted under the terms of the Trust Agreement, this Supplement or the Note and Security Agreement, and a responsible officer of the Trustee or the Co-Trustee, as the case may be, shall have actual knowledge thereof, the Trustee or the Co-Trustee, as the case may be, shall promptly inform the Lender or its agent of such actions or instructions. Any notice or other communication delivered to the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, by the Issuing Insurance Company shall be forwarded by the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, to Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, Attention: Alex Seldin, facsimile: 312-992-5111, electronic mail: aseldin@coventryfirst.com.

Section 4.    Direction of Trustee.  Whenever the Trustee is unable to decide between alternative courses of action permitted or required by the terms of the Trust Agreement, this Supplement, the Note and Security Agreement or any other agreement to which the Trust or the Sub-Trust is a party, or is unsure as to the application of any provision thereof or any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that any provision thereof permits any determination by the Trustee or is silent or is incomplete as to the course of action that the Trustee is required to take with respect to a particular set of facts, the Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the person or entity then authorized to direct the Trustee in the performance of the Trustee's duties hereunder, requesting direction as to the course of action to be adopted or application of such provision, and to the extent the Trustee acts or refrains from acting in good faith in accordance with any direction from the person or entity then authorized to direct the Trustee, the Trustee shall not be liable on account of such action or inaction to any person or entity.

Section 5.    Relinquishment.  Notwithstanding the provisions of Section 2 of this Article III, upon written instructions sent by the Settlor to the Trustee and Co-Trustee at any time on or before the maturity date of the Loan, the Trustee and Co-Trustee shall in accordance with the terms of the Note and Security Agreement fully relinquish to the Lender, or any other person or entity designated in writing by the Lender or its agent, all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise.

Section 6.    Liquidation of the Sub-Trust Estate; Foreclosure.  In the event that the Sub-Trust fails to satisfy in full all obligations in respect of the Loan at maturity or otherwise defaults on the Loan, and either (i) the Settlor, Co-Trustee and Trustee acting at direction pursuant to Section 5 of this Article III (on behalf of the Sub-Trust) agree to fully relinquish to the Lender all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise, or (ii) the Lender notifies the Trustee that it is foreclosing on the Policy and other assets of the Sub-Trust Estate in accordance with the terms of the Note and Security Agreement, the Trustee and Co-Trustee shall take such action as may be directed by the Lender to liquidate such assets and distribute the proceeds thereof, including, if necessary, the execution of all applicable assignment, transfer or sale forms and any other instruments of transfer, assignment or sale reasonably identified by the Lender as necessary to effect the valid transfer, assignment or sale of

such assets. If such liquidation is made as a result of the Lender's foreclosure on the assets of the Sub-Trust Estate, proceeds of such liquidation that exceed the aggregate of the obligations due to the Lender in respect of the Loan through the completion of such liquidation shall be retained by the Trustee and deemed to be assets of the Trust, and not of the Sub-Trust Estate, and shall be maintained or distributed in accordance with the Trust Agreement.

Section 7.    Sale or Transfer. In the event the Settlor elects to satisfy the Trust's obligations under the Note and Security Agreement in connection with a sale or transfer of the Policy (which sale or transfer shall be reasonably acceptable to the Lender or its designee), the Trustee, acting at the Settlor's direction, Co-Trustee and Lender shall enter into and reasonably act in accordance with any payoff instruction supplied by the Settlor, pursuant to which:

(a)    the Trustee and Co-Trustee shall promptly execute and deliver such documentation (the "Transfer Documents") prepared by and at the expense of the Settlor (or a third party on behalf of the Settlor) that is reasonably necessary to transfer the Policy to a third party (subject to paragraphs (b) through (e) set forth below), other than change of ownership or change of beneficiary forms (it being understood that (i) the Trustee shall have no responsibility for the preparation, accuracy or effectiveness of any such Transfer Documents and (i) the transfer contemplated by the Transfer Documents will not be effective until receipt by the Lender of the Payoff Funds (as defined below));

(b)    promptly upon receipt of the fully executed Transfer Documents from the Trustee, the Settlor will, on behalf of the Trust, cause immediately available funds to be deposited into an account (the "Escrow Account") maintained and controlled by the Lender or by a nationally recognized financial institution reasonably acceptable to the Lender (such financial institution or the Trustee in such capacity, as applicable, the "Escrow Agent") in an amount sufficient to satisfy all of the Trust's obligations to the Lender under the Note and Security Agreement (the "Payoff Funds") for release of all of Lender's interest in the Sub-Trust Estate;

(c)    the Escrow Account shall be established pursuant to an escrow agreement in form and substance (and on terms including fees payable to the Escrow Agent) reasonably acceptable to the Lender and the Escrow Agent;

(d)    the Trustee and Co-Trustee will, immediately upon receipt of written acknowledgment from the Escrow Agent that funds in the amount of the Payoff Funds have been placed in the Escrow Account, execute and deliver to the Settlor change of ownership and beneficiary forms prepared by or at the expense of the Settlor (or a third party on behalf of the Settlor) to be recorded with the issuer of the Policy (the "Change Forms"); and

(e)    upon confirmation that such Change Forms have been recorded by the issuer of the Policy (written notice of which is delivered to the Trustee and the Escrow Agent) as contemplated by the Transfer Documents, the Escrow Agent will release the Payoff Funds to the Lender.

Notwithstanding the foregoing to the contrary, in the event that the applicable Payoff Funds are not placed into such Escrow Account within 30 days of delivery of a related payoff instruction, neither the Lender nor the Trustee shall have any further obligation to execute and deliver any

6

ownership transfer documents or otherwise take any action as described in this Section, the Settlor shall be deemed to have revoked the applicable payoff instruction, the Settlor shall pay all costs, fees and expenses incurred by the Lender, the Trustee and the Escrow Agent in connection therewith, and the Transfer Documents shall be deemed void.

ARTICLE IV.
TERMINATION

Section 1.   Termination of the Sub-Trust.  Promptly upon satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement, the Lender shall give written notice to the Trustee that all obligations of the Sub-Trust under the Note and Security Agreement have been fully performed or satisfied (the "Satisfaction Notice").  The parties hereto acknowledge and agree that either the Settlor or the Trustee may, following the delivery of the Satisfaction Notice, deliver written notification to the other that it wishes to terminate the Sub-Trust (the "Termination Notice").  Following the receipt by the non-terminating party of the Termination Notice, each of the Settlor, the Trustee and the Co-Trustee shall take all commercially reasonable actions that are necessary to effectuate and evidence the termination of the Sub-Trust.  Prior to such satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement and the Lender's delivery of the Satisfaction Notice:

(a)   (i) the Trustee will not resign pursuant to Section 8 of the Trust Agreement except upon thirty days prior notice to the Lender and the appointment of a successor Trustee or, if no successor Trustee is appointed prior to the expiration of such thirty day notice period, upon the interpleader of the Sub-Trust Estate pursuant to an action filed by the Trustee, at the expense of the Sub-Trust Estate, in the Court of Chancery in and for New Castle County, Delaware, (ii) neither the Trustee nor the Co-Trustee will take any action to dissolve, wind-up or terminate the Trust or file a certificate of cancellation pursuant to Section 9 of the Trust Agreement, and (iii) none of the Trustee, the Co-Trustee, the Settlor or the Beneficial Owner will take any action to terminate the Sub-Trust, and

(b)   the assets of the Sub-Trust Estate will not be modified or reduced by the Settlor, the Trustee, the Co-Trustee or the Lender other than as expressly contemplated in this Supplement as this Supplement or the Trust Agreement may be supplemented as described in Article II, Section 6 or otherwise.

Section 2.   Trustee Actions Upon Termination.  In connection with the termination of the Sub-Trust, upon full performance or satisfaction of all obligations of the Sub-Trust under the Note and Security Agreement and following Lender's delivery of the Satisfaction Notice, any remaining assets of the Sub-Trust Estate shall be allocated to the general trust estate of the Trust, or the Trustee and Co-Trustee shall take such action as may be directed by the Settlor to transfer such assets to the Beneficial Owner or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets.  Upon completion of the transfer of the remaining assets of the Sub-Trust Estate pursuant to the first sentence hereof, the Settlor may designate another person or entity as the Trustee or Co-Trustee of the Trust.

7

## ARTICLE V.
## MISCELLANEOUS

Section 1. <u>Amendments</u>. This Supplement may be amended by a writing signed by the Settlor, Trustee and Co-Trustee; provided that this Supplement may not be amended without the prior written consent of the Lender during the term of the Loan or prior to the satisfaction of all obligations in connection with the Loan and the Lender's delivery of the Satisfaction Notice.

Section 2. <u>Governing Law</u>. THIS SUPPLEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS SUPPLEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS SUPPLEMENT. SECTIONS 3540 AND 3561 OF TITLE 12 OF THE DELAWARE CODE SHALL NOT APPLY TO THE TRUST.

Section 3. <u>Indemnification</u>. The Trustee and Co-Trustee shall be liable hereunder and under the Trust Agreement only for gross negligence, willful misconduct, or actions taken in bad faith. The Trustee and Co-Trustee shall not be liable in a fiduciary or personal capacity for making any delegation that is authorized hereunder or under the Trust Agreement, nor for any action taken at direction or without their consent, nor for any failure to act absent bad faith. The Trustee shall be indemnified and held harmless by the Settlor and the Beneficial Owner (but only to the extent of such Beneficial Owner's interest hereunder or under the Trust Agreement), the Lender, and each assignee at any time holding an interest in the Loan

8

(but only to the extent of the value of such assignee's interest in the Loan) from and against any threatened, pending or completed action, claim, demand, suit or proceeding (whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section 3 or to which the Trustee is made a party, or threatened to be made a party, by reason of serving as Trustee, if the Trustee, as the case may be, acted in good faith) brought by any Person claiming through the Settlor, the Beneficial Owner, the Lender or such assignee, as the case may be. Such indemnification shall include reimbursements for expenses (including attorneys' fees, judgments, fines and amounts paid in settlement) actually incurred, together with advancements for such expenses reasonably expected by the Trustee to be incurred in connection with such action, claim, demand, suit, or proceeding. Each indemnitor hereunder shall be liable, jointly and severally, for the full amount of the indemnity payments due hereunder and for such portion thereof as any indemnified person shall demand of them, subject to the limitations described above with respect to Beneficial Owner and Loan assignees. The Trustee shall not have any recourse to, right of offset against, or other claim against the assets of the Trust Estate or of the Sub-Trust Estate for any expense or liability of any kind (whether falling within the exculpatory provisions of this Section 3 or otherwise) of the Trustee incurred in connection with its duties under the Trust Agreement or this Supplement or for fees, if any, payable to the Trustee by any Fund (as defined in Section 6 of this Article V) as a result of the Trustee's management activity in connection with such Fund. The provisions of this Section 3 shall survive termination of the Trust Agreement or this Supplement or, with respect to any Trustee, the resignation or removal of such Trustee.

Section 4.    Taxation of Sub-Trust.  The Settlor is intended to be the owner of the Sub-Trust Estate for purpose of, and pursuant to, Sections 671 through 677 of the Internal Revenue Code of 1986 (the "Code") and, except as otherwise directed by the person or entity then authorized to direct the Trustee hereunder, the Trustee shall so treat the Sub-Trust and Sub-Trust Estate in connection with all federal, state and local income tax filings, reports, returns, records and other documents prepared or filed by the Trustee or any agent of the Trustee with any tax authority.

Section 5.    Reports to the Settlor, the Beneficial Owner, the Internal Revenue Service and Others.  The Trustee shall, on behalf of the Trust, (a) only upon the direction of the Settlor, which direction shall be delivered to the Trustee within 30 days of the end of a fiscal year, cause to be prepared and delivered to the Settlor and the Beneficial Owner, within 90 days of the end of such fiscal year, or more often, as may be required by the Code and the regulations thereunder, a copy of an unaudited annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as is necessary and appropriate to enable the Settlor and the Beneficial Owner to prepare its federal and state income tax returns, (b) annually determine if criteria are met requiring the Trust to file an IRS Form 1041, (c) if required by law, annually cause to be prepared IRS Form 1041 on behalf of the Trust as a grantor trust, (d) if required by law, annually cause to be prepared grantor letters for the Beneficial Owner that (i) set forth income, deductions, and credits allocated to such Beneficial Owner, (ii) set forth suggested classification of such income, deductions, and credits on such Beneficial Owner's own tax return and (iii) inform such Beneficial Owner that income, deductions, and credits should be included on its tax return, (e) annually determine validity of income and expenses incurred by the Trust and (f) annually allocate income, deductions, and credits to each

9

of the Owners based on its percentage ownership interest in the Trust and the number of days it has held such percentage ownership interest. The Trustee shall sign on behalf of the Trust the tax filings of, or on behalf of, the Trust, unless the Beneficial Owner determines that applicable law requires the Beneficial Owner to sign such documents, in which case, the Beneficial Owner shall sign such documents.

Section 6.  <u>Investment of the Trust Assets</u>.  The Trustee shall not, and shall have no duty to, invest and reinvest the assets of the Trust unless the Trustee has received a written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement to invest such assets. Promptly following receipt of such direction, the Trustee shall invest the directed assets only in the following: (a) negotiable instruments or securities represented by instruments in bearer or registered or in book-entry form which evidence investments that are short-term debt obligations rated A-1 by S&P and P-1 by Moody's; (b) commercial paper having, at the time of investment or contractual commitment to invest therein, a credit rating from Moody's and S&P of at least P-1 and A-1, respectively; or (c) any other similar highly rated investment approved in writing by the Lender ("Permitted Investments"), until such directed assets are required (1) to satisfy other obligations of the Trust, if any, or (2) to be distributed pursuant to the written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement. The parties acknowledge that, subject to the foregoing limitations, the Trustee may make Permitted Investments in one or more mutual funds managed by affiliates of the Trustee (each, a "Fund"), and that (i) shares in a Fund are not obligations of the Trustee, are not deposits and are not insured by the FDIC, (ii) the Trustee or its affiliates may be compensated by a Fund for services rendered in its capacity as investment advisor, custodian and/or transfer agent; (iii) the Trustee, or its affiliates, also may be compensated by a Fund for providing shareholder services; and (iv) such compensation will be both described in detail in the prospectus for a Fund, and is in addition to the compensation, if any, paid to Trustee in its capacity as the Trustee hereunder.

*[Remainder of page intentionally left blank.]*

10

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be duly executed as of the date first written above.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Settlor

_(signature)_
Elizabeth Ellis, Trustee

WILMINGTON TRUST COMPANY,
as Trustee

Acknowledged and Agreed:

LA SALLE BANK, N.A.,
as Lender

By:    _(signature)_
Name:  Krista Lake
Title: Attorney-in-fact

By:    _(signature)_
Name:
Title:  Janel R. Havrilla
        Financial Services Officer

ELIZABETH ELLIS , as Co-Trustee

_(signature)_
Elizabeth Ellis

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Beneficial Owner

_(signature)_
Elizabeth Ellis, Trustee

# NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on 7/26/05, by and between THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). **All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies)**.

2

*Funding Date*. We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

– The Policies; and

– All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

## SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust - 2005,
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By: _____
Name:      Janel R. Havrilla
Title:      Financial Services Officer

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

LaSalle Bank National Association

By: _____
Name:   Krista Lake
Title:   Attorney-in-fact

7

# SCHEDULE   A

| | | |
|---|---|---|
| Origination Fee: | $ | 32,752.57 |
| Amount Financed: | $ | 2,405,182.20 |
| Interest Rate: | | 14.47% |

*Stated Rate of Interest:  The Stated Rate of Interest, meaning an amount calculated and disclosed solely for purposes of compliance with Chapter 815 of the Illinois Compiled Statutes, subsection 205/4.1a(f),  is 18.40%, which rate is calculated by including the Origination Fee and expenses incurred relating to the procurement of PFIC Coverage. You should refer to the Interest Rate shown above for the annual rate that will be applied to the Amount Financed.

| | | |
|---|---|---|
| *Scheduled Maturity Date Balance: | $ | 3,275,256.86 |
| Funding Date | No later than 07/21/2005 | |
| *Scheduled Maturity Date: | 30 months after the funding date | |
| Expenses Related to PFIC Coverage: | $ | 203,770.20 |
| Trust Administration Fees: | $ | 5,712.00 |
| *Total of Payments (Including Origination Fee): | $ | 3,308,009.43 |

Borrower Name:      The Neil H. Ellis Insurance Trust - 2005
Borrower Address:     149 Colonial Road
PO Box 1270
Manchester, CT 06045

**Life Insurance Policy Information**

Unique Identifier                31830
Life Insurance Company     Security Life of Denver
Policy Number              TBD
Face Amount                30,000,000.00
Premiums Financed By Us    2,195,700.00
Premiums Financed By Client   0.00

Insured Name:         Ellis, Neil
Insured Address:      149 Colonial Road, PO Box 1270, Manchester, CT 06045

Insurance Carrier Rating:       AA
Rating Agency:            S&P
Life Insurance Product:      LifeDesign Guarantee UL
Rating Class:             Male 77 Standard NonTobacco
Riders:                  None
Death Benefit Option:       Return of Premium with No Contractual Cap on the Death Benefit
Policy Type:               UL
Current Crediting Rate:      4.50%

Settlor Initials _____
Co-Trustee Initials _____

* Subject to adjustment where term of loan causes loan to mature on a Saturday, Sunday, or holiday and the Maturity Date is established as the next business day.



7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

November 19, 2007

Neil H. Ellis Insurance Trust – 2005
149 Colonial Road
Manchester CT 06045

Re:    Notice of PFP Loan Maturity – Loan ID: 12070

Dear Borrower:

This letter is in reference to your loan with LaSalle Bank National Association evidenced by the
Note and Security Agreement dated as of July 26, 2005 between Neil H. Ellis Insurance Trust -
2005 and LaSalle Bank (the "Note"). The outstanding balance of $3,921,112.16 is due on or
before January 28, 2008.

Pursuant to the terms of the Note, you have two options by which to satisfy your outstanding
obligations:

Option 1:    Repay the amount indicated above in immediately available funds.

Option 2:    Relinquish all of your right, title and interest in, to and under each life
Insurance policy set forth on Schedule A to the Note.

If you elect Option 1, please complete and return the enclosed Election Notice and provide
payment on or before January 28, 2008 in accordance with the enclosed payment instructions. If
you elect Option 2, please complete and return the enclosed Election Notice and
Relinquishment Instruction at your earliest convenience. A return envelope has been included
for your convenience.

Failure to pay the amount indicated above on or before January 28, 2008 may result in additional
interest, costs and expenses as set forth in the Note.

If you have any questions or need additional information regarding the loan satisfaction process,
please feel free to contact us at (877) 296-1700.

Sincerely,

*Richard M. Cooper*

Coventry Capital,
Servicing Agent

COVENTRY
**CAPITAL**

# Premium Finance Plus

# Election Notice

This Election Notice is in reference to the loan from LaSalle Bank National Association to Neil H. Ellis Insurance Trust - 2005 (the "Borrower") pursuant to a Note and Security Agreement dated as of July 26, 2005 secured by life insurance policy number(s) 1604188 (the "Policy/Policies"). Please select one of the following two options indicating the method by which the Borrower intends to satisfy the outstanding balance of $3,921,112.16 on or before the January 28, 2008 (the "Scheduled Maturity Date").

☐ Option 1:  Pay the loan in full on or before the Scheduled Maturity Date in immediately available funds.

☐ Option 2:  Relinquish all right, title an interest in and to the Policies effective as of _____ ____, 2007*. Relinquishment Instructions must be completed and returned with this Election Notice.

_____

Neil H. Ellis Insurance Trust - 2005

_____

\*   The relinquishment effective date may not exceed the Scheduled Maturity Date and will be deemed to be the Scheduled Maturity Date if a date is not indicated or the date indicated is later than the Scheduled Maturity Date.



# Premium Finance Plus

## Payment Instructions

Payment obligations under the Note and Security Agreement may be satisfied by wiring funds to LaSalle Bank, N.A. to the following account:

- Must be received on or before the Maturity Date
- Directed to:

| | |
|---|---|
| Account Name: | PFP Funding I LLC PFP Collection Account |
| Account #: | 5800398991 |
| Bank Name: | LaSalle Bank |
| ABA: | 071000505 |
| Reference #: | Loan ID: 12070 |



7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

December 17, 2007

Neil H. Ellis Insurance Trust - 2005
149 Colonial Road
Manchester CT 06045

Re:     Second Notice of PFP Loan Maturity — Loan ID: 12070

Dear Borrower:

This letter is the second notice that we have sent in reference to your loan with LaSalle Bank
National Association evidenced by the Note and Security Agreement dated as of July 26, 2005
between Neil H. Ellis Insurance Trust - 2005  and LaSalle Bank (the "Note").  The outstanding
balance of $3,921,112.16  is due on or before January 28, 2008.

Pursuant to the terms of the Note, you have two options by which to satisfy your outstanding
obligations:

Option 1:     Repay the amount indicated above in immediately available funds.

Option 2:     Relinquish all of your right, title and interest in, to and under each life
insurance policy set forth on Schedule A to the Note.

If you elect Option 1, please complete and return the enclosed Election Notice and provide
payment on or before January 28, 2008 in accordance with the enclosed payment instructions.  If
you elect Option 2, please complete and return the enclosed Election Notice and
Relinquishment Instruction at your earliest convenience.  A return envelope has been included
for your convenience.

Failure to pay the amount indicated above on or before January 28, 2008 may result in additional
interest, costs and expenses as set forth in the Note.

If you have any questions or need additional information regarding the loan satisfaction process,
please feel free to contact us at (877) 296-1700.

Sincerely,

Richard M. Cooper

Coventry Capital,
Servicing Agent



# Premium Finance Plus

# Election Notice

This Election Notice is in reference to the loan from LaSalle Bank National Association to Neil H. Ellis Insurance Trust - 2005 (the "Borrower") pursuant to a Note and Security Agreement dated as of July 26, 2005 secured by life insurance policy number(s) 1604188 (the "Policy"/"Policies"). Please select one of the following two options indicating the method by which the Borrower intends to satisfy the outstanding balance of $3,921,112.16 on or before the January 28, 2008 (the "Scheduled Maturity Date").

☐  Option 1:  Pay the loan in full on or before the Scheduled Maturity Date in immediately available funds.

☐  Option 2:  Relinquish all right, title an interest in and to the Policies effective as of _____ ___, 2007*. Relinquishment Instructions must be completed and returned with this Election Notice.

---

Neil H. Ellis Insurance Trust - 2005

---

\*  The relinquishment effective date may not exceed the Scheduled Maturity Date and will be deemed to be the Scheduled Maturity Date if a date is not indicated or the date indicated is later than the Scheduled Maturity Date.



# Premium Finance Plus

## Payment Instructions

Payment obligations under the Note and Security Agreement may be satisfied by wiring funds to LaSalle Bank, N.A. to the following account:

- Must be received on or before the Maturity Date
- Directed to:

| | |
|---|---|
| Account Name: | PFP Funding I LLC PFP Collection Account |
| Account #: | 5800398991 |
| Bank Name: | LaSalle Bank |
| ABA: | 071000505 |
| Reference #: | Loan ID: 12070 |



COVENTRY
**CAPITAL**          7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

January 29, 2008

Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    Default Notice of PFP Loan Maturity – Loan ID #12070

Dear Borrower:

This letter is in reference to your loan with LaSalle Bank National Association evidenced by the Note and Security Agreement dated as of July 26, 2005 between Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Note"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to such time, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law. In the event that you fail to pay the amounts due under the Note, you will be required to pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the collateral securing your loan.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

*Richard Cooper*

Coventry Capital
Servicing Agent

## Tumialan, Rosa M.

**From:**   TrackingUpdates@fedex.com
**Sent:**   Wednesday, January 30, 2008 8:51 AM
**To:**   Rich Cooper
**Subject:** FedEx Shipment 790435518616 Delivered

This tracking update has been requested by:

Company Name:          The Coventry Group
Name:                  Richard Cooper
E-mail:                rcooper@coventryfirst.com

Our records indicate that the following shipment has been delivered:

Reference:             Ellis_Default Notice
Ship (P/U) date:       Jan 29, 2008
Delivery date:         Jan 30, 2008 9:43 AM
Sign for by:           P.DELORME
Delivered to:          Receptionist/Front Desk
Service type:          FedEx Priority Overnight
Packaging type:        FedEx Envelope
Number of pieces:      1
Weight:                0.50 lb.
Special handling/Services:   Deliver Weekday

Tracking number:       790435518616

Shipper Information              Recipient Information
Richard Cooper                   Neil H. Ellis Insurance Trust -
The Coventry Group               200
7111 Valley Green Road           149 COLONIAL RD
Fort Washington                  MANCHESTER
PA                               CT
US                               US
19034                            060422307

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 8:50 AM CST
on 01/30/2008.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above,
or visit us at fedex.com.

This tracking update has been sent to you by FedEx on the behalf of the
Requestor noted above. FedEx does not validate the authenticity of the

requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.



7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    Notice of Foreclosure of Collateral of PFP Loan--Loan ID #12070

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July 26, 2005 between Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

Coventry Capital
Servicing Agent

## Tumialan, Rosa M.

**From:** TrackingUpdates@fedex.com
**Sent:** Monday, February 04, 2008 8:34 AM
**To:** Rich Cooper
**Subject:** FedEx Shipment 798865481550 Delivered

This tracking update has been requested by:

Company Name:        The Coventry Group
Name:                Richard Cooper
E-mail:              rcooper@coventryfirst.com

Our records indicate that the following shipment has been delivered:

Reference:                Ellis Foreclose Notice
Ship (P/U) date:          Feb 1, 2008
Delivery date:            Feb 4, 2008 9:30 AM
Sign for by:              P.DELORMIE
Delivered to:             Receptionist/Front Desk
Service type:             FedEx Priority Overnight
Packaging type:           FedEx Envelope
Number of pieces:         1
Weight:                   0.50 lb.
Special handling/Services:  Deliver Weekday

Tracking number:          798865481550

Shipper Information            Recipient Information
Richard Cooper                 Neil H. Ellis Insurance Trust -
The Coventry Group             200
7111 Valley Green Road         149 COLONIAL RD
Fort Washington                MANCHESTER
PA                             CT
US                             US
19034                          060422307

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 8:34 AM CST
on 02/04/2008.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above,
or visit us at fedex.com.

This tracking update has been sent to you by FedEx on the behalf of the
Requestor noted above. FedEx does not validate the authenticity of the

requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to <u>fedex.com</u>.

Thank you for your business.

## SETTLOR NON-RECOURSE SECURITY AGREEMENT

This **SETTLOR NON-RECOURSE SECURITY AGREEMENT** (this "Agreement") is entered into on ___July 1___, 20_05_ by and between THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2 (sometimes "you" in this Agreement) and LA SALLE BANK, N.A. (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this grant of security from you to us of all of your right, title and interest in and to (i) any and all beneficial ownership interests in THE NEIL H. ELLIS INSURANCE TRUST - 2005 (the "Trust") and THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST (the "Sub-Trust") and (ii) all the assets held by the Trust and the Sub-Trust. Please read this Agreement together with the Note Agreement (as defined below) carefully and if you agree with the terms, please sign your name below.

*Background.* We and the Sub-Trust have entered into that certain Note and Security Agreement (the "Note Agreement"), dated ___July 20___, 20_05_, pursuant to which we have lent money to the Sub-Trust (the "Loan"). You acknowledge that it is a condition to our making the Loan to the Sub-Trust that you execute and deliver this Agreement to us and that you are entering into this Agreement in order to induce us to make the Loan to the Sub-Trust.

*Definitions.* Unless otherwise stated herein, capitalized terms used herein shall have the meanings ascribed thereto in the Note Agreement.

*Limited Non-Recourse Guaranty.* You hereby pledge and assign to us, and hereby grant to us a security interest in, all of your right, title and interest in and to all beneficial ownership interests in the Trust and the Sub-Trust and all assets now or hereafter held in the Trust or the Sub-Trust and all proceeds of the foregoing (collectively, the "Collateral"). The Collateral secures your guaranty below of the payment of the Loan. It also secures the Sub-Trusts' other obligations under the Note Agreement to the extent allowed by the law. You hereby, unconditionally and irrevocably, guarantee to us, for the benefit of the Sub-Trust and the Trust, and their respective successors and assigns, the prompt payment by the Sub-Trust of the Loan when due and all other obligations under the Note Agreement. This Agreement is non-recourse, meaning that nothing other than the Collateral secures your obligation to us and that we will not seek to collect the amounts due in respect of the Loan or pursuant to the Note Agreement other than from proceeds of the Collateral except as provided below in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date. In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request (the "Security Interest Perfection Documents"). You hereby authorize us, upon an Event of Default, to file one or more financing or continuation statements relative to all or any part of the Collateral without your signature. If the Sub-Trust does not satisfy all of its obligations to us under the Note Agreement on or before the Maturity Date and an Event of Default results, this Agreement, the Note Agreement and the documents pursuant to which the Trust and the Sub-Trust are formed give us the right and ability to foreclose upon the Collateral in an effort to receive proceeds sufficient to satisfy such obligations.

*Covenants.* You hereby agree that so long as the Note Agreement and this Agreement shall remain in effect, you will not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Collateral

***Events of Default.*** Upon any Event of Default by the Sub-Trust, as described in the Note Agreement that is not remedied by the Sub-Trust within fifteen (15) days, we may take any and all lawful actions as described in paragraph "Events of Default" in the Note Agreement, including accelerating the Loan, and otherwise permitted by applicable law. In addition, upon any Event of Default, we may exercise any of the rights and remedies described below under the heading "If the Sub-Trust Fails to Perform Its Obligations."

***Default Interest.*** You agree that if any amounts due under the Note Agreement are not paid on the Maturity Date and the Sub-Trust has not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Collateral).

## CONSENT TO APPOINTMENT OF AGENT

***Servicer.*** You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicer"). You agree to follow the instructions and directions of the Servicer under this Agreement until we notify you in writing to the contrary.

You agree to send copies of all notices and correspondence hereunder to the Servicer at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

***Hold Harmless.*** To the fullest extent permitted by law, you agree to hold harmless us and the Servicer and any of their respective affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF THE SUB-TRUST FAILS TO PERFORM ITS OBLIGATIONS

***We will take the Collateral from you.*** If the Sub-Trust fails to pay the amounts due under the Note Agreement by the Scheduled Maturity Date (as defined in the Note Agreement), we may take the Collateral from you (i.e., foreclose) by whatever methods are contemplated by this Agreement or the Security Interest Perfection Documents and applicable law, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies and take any other actions that are legal and that we find appropriate with regard to the Collateral. We will send you a written notice of our activities in this regard.

***You will have to pay foreclosure and collection costs.*** In the event that the Sub-Trust fails to pay the amounts due under the Note Agreement on or before the Scheduled Maturity Date and fails to

2

relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Collateral.* We may surrender, sell or otherwise exercise rights under the Collateral as the owner thereof if the Sub-Trust defaults and we foreclose upon the Collateral as provided for in this Agreement. You hereby agree that we may exercise in respect of the Collateral, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Collateral) or other applicable law and also may, without notice except as specified below, sell or otherwise dispose of the Collateral or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You hereby confirm, acknowledge and agree that you have given to us, the Servicer and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge of any facts that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request. You further represent and warrant that your principal residence is located at 149 Colonial Road, PO Box 1270, Manchester, CT 06045 and that you will not change your principal residence without giving us at least 30 days prior written notice.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) the Sub-Trust defaults under the Note Agreement and we take the Collateral from you, or (ii) the Policies are relinquished to us in satisfaction of the Sub-Trust's obligations under the Note Agreement, we or certain third parties may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of the Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by us or such third party and its agents and employees, and you agree to reasonably cooperate with us or such third person in this matter.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under the Note Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

3

*Counterparts.* This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

*Delay in Enforcement.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US RELATING TO THIS AGREEMENT DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the Note Agreement and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

## SIGNATURES

- **Do not sign this Agreement before you have read both this Agreement and the Note Agreement.**

- **This is a binding legal document and you should seek legal, financial and tax advice before signing it.**

- **If the Sub-Trust defaults in the performance of its obligations under the Note Agreement, we may foreclose on the Collateral.**

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THE NOTE AGREEMENT IN ITS ENTIRETY AND THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION.

**THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2**

Elizabeth Ellis, Trustee

Address:
149 Colonial Road
PO Box 1270
Manchester, CT 06045

**LASALLE BANK NATIONAL ASSOCIATION**

By: _____

Name: Krista Lake
Title: Attorney-in-fact

S-1

Westlaw.

763 S.W.2d 384

Page 1

763 S.W.2d 384
**(Cite as: 763 S.W.2d 384)**

▷
Hagen v. Bank of Piedmont
Mo.App. S.D. 1989.

Missouri Court of Appeals,Southern
District,Division Two.
James O. HAGEN, Special Deputy to the
Liquidator of American Trustee Life Company of
Minnesota, and American Trustee Life Company of
Nebraska in Conservatorship, Plaintiffs-Appellants,
v.
BANK OF PIEDMONT, a Missouri Banking
Corporation, and Robert M. Ramshur, Trustee,
Defendants-Respondents.
**No. 15898.**

Jan. 12, 1989.

Mortgagors appealed from an order of the Circuit
Court, Wayne County, William E. Seay, J.,
dissolving a temporary restraining order and
refusing to issue a preliminary injunction to enjoin
foreclosure of the deed of trust. The Court of
Appeals, Prewitt, J., held that: (1) order dissolving
temporary restraining order was appealable,
although mortgagors also purported to appeal from
order refusing to issue a preliminary injunction, and
(2) mortgagors did not establish that bank did not
have a right to request foreclosure under
participation agreement.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ☞78(1)**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(D) Finality of Determination
　　　30k75 Final Judgments or Decrees
　　　　30k78 Nature and Scope of Decision
　　　　　30k78(1) k. In General. Most Cited
Cases

Generally orders entered during the temporary
injunction stage are not final orders, and thus no
appeal lies from the denial of a preliminary
injunction.

**[2] Appeal and Error 30 ☞100(2)**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(E) Nature, Scope, and Effect of
Decision
　　　30k96 Relating to Provisional Remedies
　　　　30k100 Injunction
　　　　　30k100(2) k. Continuing,
Modifying, Vacating, or Dissolving. Most Cited
Cases
Where a temporary restraining order has been
issued and dissolved, the order dissolving the
temporary restraining order is appealable.
V.A.M.S. § 512.020.

**[3] Appeal and Error 30 ☞100(2)**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(E) Nature, Scope, and Effect of
Decision
　　　30k96 Relating to Provisional Remedies
　　　　30k100 Injunction
　　　　　30k100(2) k. Continuing,
Modifying, Vacating, or Dissolving. Most Cited
Cases
Order dissolving temporary restraining order was
appealable, even though appellants also purported
to appeal from order refusing to issue a preliminary
injunction. V.A.M.S. § 512.020.

**[4] Mortgages 266 ☞338**

266 Mortgages
　266IX Foreclosure by Exercise of Power of Sale
　　266k338 k. Restraining Exercise of Power.
Most Cited Cases
Mortgagors were not entitled to temporary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

763 S.W.2d 384

763 S.W.2d 384
**(Cite as: 763 S.W.2d 384)**

Page 2

restraining order enjoining bank from foreclosing deed of trust, based on claim that the bank did not have the right to request foreclosure under agreement with two other lenders who participated in making the loan secured by the deed of trust; mortgagors did not show that bank was exercising a right it did not have nor that irreparable harm would occur to them, or that they did not have an adequate remedy at law.

*384 Randy P. Schuller, Hackworth and Schuller Law Offices, Piedmont, for plaintiffs-appellants.
Jerry M. Merrell, John R. Hopkins, Jr., Hyde, Purcell, Wilhoit, Spain, Edmundson and Merrell, Poplar Bluff, for defendants-respondents, Bank of Piedmont.
PREWITT, Judge.

Appellants appeal from an order dissolving a temporary restraining order and refusing to issue a preliminary injunction to enjoin the foreclosure of a deed of trust. The temporary restraining order was apparently*385 granted with notice to respondents so it was not limited to a time "not to exceed ten days". See Rule 92.02(b).

[1] We first consider whether an appeal lies. Generally orders entered during the temporary injunction stage are not final orders, thus no appeal lies from the denial of a preliminary injunction. *Eickelmann v. Eickelmann,* 724 S.W.2d 261, 262 (Mo.App.1986); *C.M. Brown & Associates, Inc. v. King,* 662 S.W.2d 572, 573 (Mo.App.1983); *Simms v. Ford Motor Credit Co.,* 605 S.W.2d 212, 214 (Mo.App.1980); *Frimel v. Humphrey,* 555 S.W.2d 350, 352 (Mo.App.1977); *Bayer v. Associated Underwriters, Inc.,* 402 S.W.2d 11, 13 (Mo.App.1966).

[2] However, where a temporary restraining order has been issued and dissolved, the order dissolving the temporary restraining order is appealable. Section 512.020, RSMo 1986, provides that there may be an appeal from any order "dissolving an injunction". A temporary restraining order is an injunction and thus an appeal lies from an order dissolving it. *Perseverance Common School District No. 90 v. Honey,* 367 S.W.2d 243, 246-247 (Mo.App.1963). See also *Wilson v. City of St. Robert,* 714 S.W.2d 738, 739 (Mo.App.1986)

; *Niemann v. Carps, Inc.,* 541 S.W.2d 712, 714 (Mo.App.1976); *J and P Trust v. Continental Plants Corp.,* 541 S.W.2d 22, 25 n. 1 (Mo.App.1976).

[3] Some cases have denied appeals where a temporary restraining order was dissolved, perhaps because the error claimed was the denial of a preliminary injunction and not the dissolving of the temporary restraining order. See for example *Eickelmann,* 724 S.W.2d at 262. Here, appellants specifically appealed from, and claimed error in the court's order dissolving the temporary restraining order, and, although they also purported to appeal from the order refusing to issue a preliminary injunction, we consider the latter as surplusage not affecting the appeal.

There are certain general principles applicable here in considering appellants' claim of error. Generally, injunctive relief is discretionary and does not issue as a matter of right. *Community Title Co. v. Roosevelt Federal Savings & Loan Assoc.,* 670 S.W.2d 895, 900 (Mo.App.1984); *Hudson v. School District of Kansas City,* 578 S.W.2d 301, 311 (Mo.App.1979). Injunctive relief is a harsh remedy, to be used sparingly and only in clear cases. Id. at 312; *Neaf v. Mallory,* 622 S.W.2d 372, 373 (Mo.App.1981).

Injunctive relief should only be granted if irreparable harm is otherwise likely to result. *Smith v. Western Electric Co.,* 643 S.W.2d 10, 13 (Mo.App.1982). Injunctive relief is not available if plaintiff has an adequate remedy at law. Id.

[4] American Trustee Life Company of Minnesota, American Trustee Life Company of Nebraska, and respondent bank participated in making a loan secured by a deed of trust. Respondent bank directed respondent trustee to start foreclosure for default in a note evidencing the loan and the trustee did so. Appellants contend that the bank had no authority to unilaterally request foreclosure, contending that a "Participation Agreement" between the parties making the loan "plainly contemplates that it is [American] Trustee Life [Company of] Minnesota, not the Bank, which has the power to make decisions regarding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

763 S.W.2d 384
**(Cite as: 763 S.W.2d 384)**

foreclosure". Appellants quote from and rely on paragraph 4 of the agreement. It states:

*Management of the Credit.* Without each Participant's prior written consent, Lender [American Trustee Life Company of Minnesota] will not exercise any right or take any action pursuant to the Agreement or the Note which would increase the amount Lender is required to lend pursuant to the Agreement, reduce principal or interest, or postpone any date fixed for any payment of principal or interest provided for in the Agreement and the Note.

Subject to the foregoing, Lender may, in the exercise of its business judgment, consent to any action or failure to act by Borrower and exercise or refrain from exercising any powers or rights Lender may have under the Agreement or the *386 Note and vote the full amount of the Note (including the Participation) with respect to any waiver, modification, amendment or alteration of the Agreement and the Note.

Lender shall handle all transactions relating to the Loan in accordance with its usual practices in the ordinary course of business.

We have considered that paragraph and examined the remainder of the agreement and find no plain language giving American Trustee Life Company of Minnesota the sole power to decide when foreclosure should be initiated. As appellants acknowledge in their reply brief, the deed of trust is not in the record. Nor is there a transcript of the hearings in the trial court.

The trial court's order is presumed valid and appellant in contesting that order has the burden to overcome that presumption. *In re Estate of Erwin,* 611 S.W.2d 564, 568 (Mo.App.1981). It was the duty of appellants to furnish a transcript containing information sufficient for this court to determine the questions on appeal. *Empire Gas Corp. v. Randolph,* 552 S.W.2d 82, 84 (Mo.App.1977).

As we do not find in the participation agreement the "clear language" to which appellants allude preventing the bank from requesting foreclosure, we cannot say that the trial court abused its discretion in dissolving the temporary restraining order. Appellants have not shown that the bank is exercising a right that it does not have nor that irreparable harm may occur to appellants, and that they have no adequate remedy at law.

The order dissolving the temporary restraining order is affirmed.

FLANIGAN, P.J., and MAUS, J., concur.
Mo.App. S.D. 1989.
Hagen v. Bank of Piedmont
763 S.W.2d 384

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Tenneco Automotive Operating Co. Inc. v. Hyrad Corp.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
**TENNECO** AUTOMOTIVE OPERATING COMPANY INCORPORATED f/k/a Monroe Auto Equipment Company, Plaintiff,
v.
HYRAD CORPORATION, Defendant.
**No. 02 C 0728.**

July 23, 2002.

Licensee of patented technology sued licensor, seeking a preliminary injunction to preserve the contractual status quo pending arbitration of a dispute between the parties. On the licensor's motion to dismiss, the District Court, Guzman, J., held that licensee failed to prove irreparable harm.

Ordered accordingly.

West Headnotes

T ⟸196

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk190 Stay of Proceedings Pending Arbitration
                25Tk196 k. Particular Cases. Most Cited Cases
    (Formerly 33k23.9 Arbitration)
Licensee of patented technology failed to prove irreparable harm requirement for a preliminary injunction to preserve the contractual status quo pending arbitration of a dispute with the licensor, in light of its inconsistent representations to different courts, and its unreasonable delay of at least 15

months in seeking injunctive relief.

*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.
    *1 Tenneco Automotive Operating Company Inc. ("Tenneco") has brought this action seeking a preliminary injunction to preserve the contractual status quo in its relationship with Hyrad Corporation ("Hyrad") while the parties arbitrate their dispute. Hyrad has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the action. Because the parties are now in arbitration, Tenneco's complaint for injunctive relief is dismissed without prejudice, with leave to reinstate after the arbitrator issues his/her final award.

*Factual Background*

    On May 16, 1991, Monroe Auto Equipment, now Tenneco, entered into a Licensing Agreement with Hyrad. (Pl.'s Mem. in Opp'n Mot. Dismiss at 2.) The agreement granted Tenneco the exclusive license to use Hyrad's technology and patents owned to manufacture and sell adjustable shock absorbers for certain types of vehicles. (*Id.*) The agreement contains an arbitration provision. (*Id.* at 3.)

    Over the years, contractual disputes arose between the parties. (*Id.* at 3.) These contractual disputes prompted Hyrad to file a declaratory judgment action on July 5, 2000 in the United States District Court for the Western District of Wisconsin ("the Wisconsin Court"). (Def.'s Mem. in Supp. Mot. Dismiss at 2.) Hyrad asked the Wisconsin Court to find that Tenneco had breached the Licensing Agreement. (*Id.*) On October, 30, 2000, the Wisconsin Court ordered the parties to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arbitrate their dispute, and dismissed Hyrad's action. (Pl.'s Mem. in Opp'n Mot. Dismiss at 4.)

On January 29, 2002, Tenneco filed this action for preliminary injunction. At the time Tenneco filed its complaint, no arbitration proceedings had begun. (Def.'s Mem. in Supp. Mot. Dismiss at 4.) On February 11, 2002, Hyrad filed a motion to reopen the judgment in the Wisconsin court pursuant to Federal Rule of Civil Procedure 60(b) (" Rule 60(b)"). (Def.'s Ex. A at 7, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss.) Hyrad's Rule 60(b) motion was denied. (*Id.* at 11.)Tenneco then filed a demand for arbitration against Hyrad with the American Arbitration Association (AAA). (Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 2.)

*Jurisdiction*

Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. (Compl.¶ 2.) Tenneco is a corporation organized under the laws of the State of Delaware, with its principal place of business in Lake Forest, Illinois. (*Id.* at ¶ 4.) Hyrad is a corporation organized under the laws of the State of Arizona, with its principal place of business in Wisconsin Dells, Wisconsin. (*Id.* at ¶ 5.)

*Discussion*

Because the parties are now before the arbitrator, we find that the arguments raised in Hyrad's motion to dismiss are moot. In determining whether to a grant a preliminary injunction, four factors must be established. *Ty, Inc. v. The Jones Group,* 237 F.3d 891, 895 (7th Cir.2001); *see also Meridian Mutual Ins. Co. v. Meridan Ins. Group,* 128 F.3d 1111, 1114 (7th Cir.1997). First, the moving party must establish two factors: 1) that the case has a likelihood of success on the merits; and 2) that the party will suffer irreparable harm if the

injunction is not granted, that no adequate remedy at law exists. *Id.* Third, if the party establishes these first two criteria, the court must conduct a balancing test. *Id.* The court must balance the harm that the non-moving party will suffer if the injunction is granted against the harm the moving party will suffer if the injunction is denied. *Id.* Finally, the court must balance the effect of the injunction on non-parties, the public interest factor. *Id.* These factors exist on a sliding scale, the more likely the moving party's likelihood of success, "the less the balance of irreparable harms need favor the plaintiff's position."*Id.*

*2 Because of the unique facts of this case, we address the alleged irreparable harm element being suffered by Tenneco. Because of it's repeated, inconsistent representations to different district courts, and because of its unreasonable delay in seeking injunctive relief, Tenneco fails to set forth sufficient facts to support its alleged irreparable harm requirement.

Tenneco has stated to this court that it had " never represented to the Wisconsin Court that it had already filed for arbitration" and that "Tenneco did not represent that it had filed a formal demand with AAA, nor did the Wisconsin Court's Order assume a demand had been filed."(Pl.'s Mem. in Opp'n Mot. Dismiss at 7.) On October 30, 2000, the Wisconsin Court dismissed Hyrad's declaratory judgment action. (Def.'s Ex. A at 11, Attached to Def.'s Reply to Pl .'s Mem. in Opp'n Mot. Dismiss.) Judge Crab, in her opinion dismissing Hyrad's Rule 60(b) motion stated that she dismissed Hyrad's original declaratory judgment action "*on the mistaken belief that defendants'* [Tenneco] *actually had filed a formal demand for arbitration,*" and that " Defendants' current protestations to the contrary are cynical and disingenuous."(*Id.* (emphasis added.) Judge Crab went on to add that

Defendants [Tenneco] never had any intention of seeking arbitration and they deduced early on that plaintiff was equally averse to arbitration. It is now quite clear that defendants have engaged in a game of intentional delay and avoidance, hoping to keep their business relationship with plaintiff in limbo as long as possible. (*Id.*)... [D]efendants had no intention of actually invoking the arbitration

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

clause.

(*Id.* at 12.)

Tenneco waited fifteen months after the Wisconsin court's dismissal of Hyrad's decision before filing this action on January 29, 2002. If Tenneco had an immediate concern for the irreparable harm it would suffer, it would not have waited a year and a half to ask for relief. Similarly, Tenneco represented to this court that the day it filed this action for a preliminary injunction, it also filed a Demand for Arbitration with the AAA. (Pl.'s Mem. in Opp'n to Mot. Dismiss at 4.) However, the Demand for Arbitration was not actually filed until February 11, 2002. (Def.'s Ex. A at 12, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 4.) However, the Demand for Arbitration was not actually filed until February 11, 2002. (Def.'s Ex. A at 12, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss.) Judge Crab noted that "what finally forced defendants' [Tenneco's] hand was plaintiff's motion to this court for relief from judgment: *on the same day that they filed their response,* defendants filed a formal demand for arbitration, apparently to hedge their bets. (*Id.* (emphasis added).)

The case of *Sauer-Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983) is distinguishable from the instant case. In *Sauer-Getriebe,* White Hydraulics ("White") granted Sauer-Getriebe ("Sauer") the exclusive license to sell motors manufactured by White. *Id.* at 349.The contract contained an arbitration provision. *Id.* A contractual dispute developed between the parties, and Sauer sought preliminary and permanent injunctions in the district court, while the contractual rights of the parties were being determined in arbitration. *Id.* In reversing the district court's denial of the injunctions, the Court applied four factors justifying a preliminary injunction to the case. *Id.* at 351. The Court found that all the requirements for a preliminary injunction were met, and held that a grant of a preliminary injunction was proper, notwithstanding an agreement to arbitrate. *Id.* at 350.

*3 Unlike the instant case, Sauer did not make

attempts to delay or avoid adjudication of the dispute, nor did Sauer take inconsistent positions. *Id.* In this case, Tenneco has done both. When seeking equity, the plaintiff can not come into court with unclean hands. In this case, Tenneco's unreasonable delay and inconsistent positions do not merit the grant of a preliminary injunction.[FN1]

> FN1. Because Tenneco can not establish the irreparable harm requirement for a preliminary injunction, it is not necessary to consider the remaining three factors needed for a preliminary injunction. Similarly, since the parties are now engaged in the arbitration process, *see* Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 1, it is no longer necessary to address Hyrad's waiver argument.

Furthermore, Tenneco is not without an adequate remedy. An arbitrator, under the AAA rules, may grant injunctive relief. The AAA Rule 36 of the Commercial Dispute Resolution Procedures provides in relevant part:

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

The arbitrator is not bound by legal rules, and may grant any appropriate relief. Thus, Tenneco may seek injunctive relief from the arbitrator.

### Conclusion

Tenneco can not establish the requirement of irreparable harm in order to satisfy a grant of a preliminary injunction because of Tenneco's inconsistent representations to the different district courts, and because of its unreasonable delay in seeking relief. For the reasons stated above, Tenneco's request for a preliminary injunction is denied. Tenncco's complaint is dismissed without prejudice, with leave to reinstate after the arbitrator

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**


has issued his/her award.

    SO ORDERED

N.D.Ill.,2002.
Tenneco Automotive Operating Co. Inc. v. Hyrad
Corp.
Not Reported in F.Supp.2d, 2002 WL 1632499
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE NEIL H. ELLIS INSURANCE TRUST-2005, | Case No. 08 CH 5368 |
| Plaintiff, | |
| v. | |
| LASALLE BANK NATIONAL ASSOCIATION and COVENTRY CAPITAL I LLC, | |
| Defendants. | |

**AFFIDAVIT OF JOSH MAY IN SUPPORT OF MEMORANDUM OF
LASALLE BANK NATIONAL ASSOCIATION AND COVENTRY CAPITAL I LLC
IN OPPOSITION TO PLAINTIFF'S VERIFIED COMPLAINT FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION
AND PERMANENT INJUNCTION**

| | |
|---|---|
| State of Pennsylvania | ) |
| County of Montgomery | ) |

I, Josh May, being duly sworn, do hereby swear under penalty of perjury that the following is true and correct:

1.  I am currently employed by Coventry Capital I LLC ("Coventry") as Associate Counsel since December 2005.  I have reviewed the complaint in the above-entitled action.  As a result of my employment with Coventry, and my review of the loan file, I have personal knowledge of the facts set forth in this affidavit.

2.     Loans under the premium finance program for which Coventry serves as Servicing Agent are insured against certain losses by a premium finance insurance coverage policy (the "PFIC Policy").

3.     The terms of the PFIC Policy require that, within 20 days after a loss (i.e., a loan default), Coventry must be able to deliver the loan collateral (i.e., the life insurance policy) to the provider of the PFIC coverage free of any liens or impairments of title.

4.     If Coventry is unable to deliver the life insurance policy to the provider of the PFIC coverage within such time, Coventry could be liable for the amount covered under the premium finance insurance coverage.

Dated: February 13, 2008          JOSH MAY

2/13/08

NOTARIAL SEAL
ELIZABETH R HAUSER
Notary Public
FORT WASHINGTON, MONTGOMERY COUNTY
My Commission Expires Apr 23. 2011

2

Firm I.D. # 42297

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE )
H. ELLIS INSURANCE TRUST-2005, )
                         )
        Plaintiff,           )     Case No. 08 CH 5368
                         )
v.                           )
                         )
LASALLE BANK NATIONAL ASSOCIATION and )
COVENTRY CAPITAL I LLC, )
                         )
        Defendants.      )

### NOTICE OF MOTION

TO:     Stephen P. Eisenberg
         Mark L. LeFevour
         Leahy, Eisenberg & Frankel, Ltd.
         33 W. Monroe Street, Suite 1100
         Chicago, Illinois 60603

      PLEASE TAKE NOTICE that on **February 28, 2008** at **10:30 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable William Maki** or any judge sitting in his stead, in **Room 2302** of the Richard J. Daley Center, and then and there present the attached **Defendants' Motion to Dismiss**, a copy of which is enclosed herewith.

Name:      Terrence E. Kiwala            **Attorney for:** Defendants
             Michael C. Borders          Atty. No.:     42297
             Rosa M. Tumialán
             Dykema Gossett PLLC
Address:    10 South Wacker Drive
**Telephone:** (312) 876-1700

### PROOF OF SERVICE BY FACSIMILE

      The undersigned, a non-attorney, states on oath that a copy of the foregoing notice was served on the above counsel of record by facsimile on February 27, 2008.

(X) Under penalties as provided by law pursuant to
      ILL.REV.STAT. CHAP 735 ILCS 5/1-109, I certify that      _____
      the statements set forth date herein are true and correct.           Signature



EXHIBIT
6

CHICAGO\2426352.1
JD\MCB

Firm I.D. # 42297

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE )
H. ELLIS INSURANCE TRUST-2005,                          )
                                                                        )
      Plaintiff,                                    )
                                                                        )
v.                                                                     )
                                                                        )
LASALLE BANK NATIONAL ASSOCIATION and   )
COVENTRY CAPITAL I LLC,                                   )
                                                                        )
      Defendants.                                 )

*FILED B - 11*
*2008 FEB 27  PH 2: 58*
*DOROTHY BROWN*
*CLERK OF THE CIRCUIT COURT*
*Case No. 08 CH 05368*
*COOK COUNTY, IL*

## DEFENDANTS' MOTION TO DISMISS

NOW COME defendants, LASALLE BANK NATIONAL ASSOCIATION and COVENTRY CAPITAL I, LLC (collectively "Defendants"), by and through their attorneys, Dykema Gossett PLLC, move to dismiss Plaintiff ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE NEIL H. ELLIS INSURANCE TRUST-2005's ("Plaintiff") complaint under 735 ILCS 5/2-619.1. Defendants state as follows in support their combined motion:

1.     Plaintiff filed this action seeking a TRO, preliminary injunction and permanent injunction to prevent the Defendants from taking any action to foreclose on a life insurance policy that served as collateral for the Note and Security Agreement (the "Security Agreement") executed between the Neil H. Ellis Insurance Trust—2005, Premium Finance Sub-Trust (not a party to this action) and LaSalle.

2.     This Court denied plaintiff's emergency motion for a TRO On February 14, 2008. Plaintiff filed a notice of appeal from the February 14 order but later withdrew the appeal. The appeal was formally dismissed by the Appellate Court in an order entered on February 22, 2008.

Defendants now seek dismissal of Plaintiff's complaint alternatively under section 2-619(a)(9) and 2-615.

3.  Dismissal under 2-619(a)(1) is proper because the parties' dispute, if any, would be subject to arbitration pursuant to an arbitration provision in the Security Agreement. 735 ILCS 5/2-619(a)(1) (West 2006). Alternative dispute resolution is a favored way of settling disputes. *Jenkins v. Trinity Evangelical Lutheran Church*, 356 Ill.App.3d 504, 507 (3rd Dist. 2005). Parties are bound to arbitrate those issues they agreed to arbitrate. *Id.* at 511.

4.  Plaintiff's complaint and motion acknowledged that the Security Agreement contains an arbitration clause for all disputes arising under the Security Agreement. (Plaintiff's complaint, ¶15.) Plaintiff sought to restrain the defendants from exercising rights under the Security Agreement pending her making any demand for arbitration. That request is moot given that this Court denied Plaintiff's request for a TRO, and as a result of a default under the Security Agreement, Defendants exercised their rights to foreclose on the collateral.

5.  The agreement to arbitrate divests this Court of subject matter jurisdiction over this dispute and warrants dismissal under section 2-619(a)(1). *See* Exhibit 2 to Defendant's prior Memorandum, p. 5, for full text of the subject Arbitration Clause.

6.  Plaintiff's complaint is also subject to dismissal under section 2-615 for failure to state a claim on which relief can be granted. *Vernon v. Schuster*, 179 Ill. 2d 338, 344, 688 N.E.2d 1172, 1175 (Ill. 1997). Plaintiff's complaint alleges no facts that, if true, establish Defendants breached any legal or contractual duty owed to her. Dismissal is proper and should be granted for this additional reason.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Court grant their motion and enter an order dismissing Plaintiff's complaint without prejudice, and for such other relief as this Court deems proper.

Respectfully submitted,

LASALLE BANK NATIONAL ASSOCIATION AND COVENTRY CAPITAL I, LLC

By: _____

One of their Attorneys

Terrence E. Kiwala
Michael C. Borders
Rosa M. Tumialán
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700
Firm I.D. #42297

Brian P. Brooks
Kyra A. Grundeman
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)

3



DYKEMA GOSSETT PLLC
10 SOUTH WACKER DRIVE
SUITE 2300
CHICAGO, ILLINOIS 60606
WWW.DYKEMA.COM

| | | |
|---|---|---|
| **DATE:** | April 18, 2008 | **TOTAL PAGES INCLUDING COVER: 5** |
| **SENDER'S NAME:** | Rosa M. Tumialan | **LOCATION:** Chicago |
| **SENDER'S E-MAIL:** | rtumialan@dykema.com | |
| **SENDER'S PHONE:** | 312-627-2139 | **SENDER'S FAX:** |

| | NAME | | FAX NUMBER | CONFIRM NUMBER |
|---|---|---|---|---|
| **TO:** | Mark L. LeFevour | Leahy, Eisenberg & Frankel, Ltd. | 312-368-4562 | 312-368-4554 |

**ADDITIONAL INFORMATION:**

Re:  Elizabeth Ellis, et al. v. LaSalle Bank National Assn., et al.
     Case No.  08 CH 5368

**If you have problems receiving this message, please call: (312) 627-2139**

EMPLOYEE NO.  4665

CLIENT NO. 102381

MATTER NO. 0002

To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein.

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable laws. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return original message to us at the below address via the U.S. Postal Service. Thank you

California | Illinois | Michigan |Texas | Washington D.C.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| Elizabeth Ellis, as Co-Trustee of<br>The Neil H. Ellis Irrevocable<br>Insurance Trust-2005, No. 2<br><br>        Plaintiff,<br><br>        v.<br><br>LaSalle Bank National Association and<br>Coventry Capital I LLC<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No.   08 CH 5368<br>)<br>)<br>)<br>)<br>) |

## MOTION TO AMEND COMPLAINT IN LIEU OF
## RESPONSE TO DEFENDANTS' MOTION TO DISMISS

    **NOW COMES** Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust, No. 2, by and through her attorneys, LEAHY, EISENBERG, & FRAENKEL, LTD.,

and moves this Honorable Court for leave to amend her Complaint in lieu of a response brief to

Defendants' motion to dismiss.

    WHEREFORE, Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust, No. 2, requests that this Honorable Court grants her motion for leave to amend her

Complaint in lieu of a response brief to Defendants' motion to dismiss.

               Respectfully submitted,

               **LEAHY, EISENBERG & FRAENKEL, LTD.**

               By: _____
                      Attorneys for Plaintiff

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875



EXHIBIT
7

Firm I.D. # 42297

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE )
NEIL H. ELLIS IRREVOCABLE INSURANCE )
TRUST – 2005, NO. 2 )
                                       )       Case No. 08 CH 5368
          Plaintiff, )
                                        )
v.                                         )
                                        )
LASALLE BANK NATIONAL ASSOCIATION and )
COVENTRY CAPITAL I LLC, )
                                        )
          Defendants.

### NOTICE OF FILING

TO:   Stephen B. Eisenberg
       Mark L. LeFevour
       Leahy, Eisenberg & Frankel, Ltd.
       33 West Monroe Street
       Suite 1100
       Chicago, IL 60603

      PLEASE TAKE NOTICE that on May 2, 2008, we filed with the Clerk of the Circuit Court of Cook County, Illinois, **Defendants' Reply in Further Support of Their Motion to Dismiss**, a copy of which is herewith served upon you.

Terrence E. Kiwala
Michael C. Borders
Rosa M. Tumialán
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606-7407
(312) 876-1700

                 By: _____
                     One of the Attorneys for Defendant

Brian P. Brooks
Kyra A, Grundeman
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300



EXHIBIT
8

## PROOF OF SERVICE BY REGULAR MAIL

The undersigned, a non-attorney, state on oath that I served a copy of the foregoing notice of filing to the above counsel of record at the above mailing addresses by depositing a copy of same in the U.S. mail at 10 South Wacker Drive, Chicago, Illinois 60606 on May 2, 2008.

[X]     Under penalties as provided by law pursuant to
        ILL.REV.STAT. CHAP 110-SEC 1-109 I certify
        that the statements set forth herein are true and correct.

_____
Signature

Firm I.D. # 42297

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ELIZABETH ELLIS, AS THE CO-TRUSTEE OF THE )
NEIL H. ELLIS IRREVOCABLE INSURANCE )
TRUST – 2005, NO. 2 )
                                   )  Case No. 08 CH 5368
        Plaintiff, )
                    )
v. )
                    )
LASALLE BANK NATIONAL ASSOCIATION and )
COVENTRY CAPITAL I LLC, )
                    )
        Defendants.

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

Defendants moved to dismiss this moot controversy under section 2-619(a)(1) for lack of subject matter jurisdiction based on the arbitration clause in the Note and Security Agreement attached as Exhibit A to plaintiff's complaint. 735 ILCS 5/2-619(a)(1) (West 2006). Plaintiff candidly acknowledges that the arbitration clause requires her to dismiss LaSalle Bank National Association ("LaSalle") from this action. *See* Response, at 1. She nevertheless insists on pursuing Coventry Capital I LLC ("Coventry") in this Court despite the fact that the same arbitration clause applies to Coventry. Plaintiff relies on new claims in a proposed amended pleading to support her argument.

Plaintiff's reliance on a proposed amended pleading (which this Court denied her leave to file) to resist Coventry's motion necessarily concedes that the only complaint properly before the Court should be dismissed. This Court should enter an order granting Coventry's motion to dismiss for the reasons set out in that effectively unopposed motion, leaving only plaintiff's request for the Court to reconsider its earlier order denying plaintiff leave to amend. Coventry

submits that the proposed pleading remains subject to the same jurisdictional bar that plagues the current complaint. As a result, leave to amend should not be granted and this case should be dismissed with prejudice.

## I.     BACKGROUND

The transaction that gave rise to this dispute is a non-recourse premium finance transaction whereby, pursuant to the terms of a Note and Security Agreement dated as of 7/26/2005 (the "Note and Security Agreement"), LaSalle loaned money (the "Loan") to the Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust (the "Sub-Trust") to pay the premiums on a $30 million life insurance policy (the "Policy") issued to the Neil H. Ellis Insurance Trust – 2005 (the "Trust"). The Note and Security Agreement is attached hereto as Exhibit A.

The Trust was formed pursuant to a trust agreement dated June 30, 2005 (the "Trust Agreement"), a copy of which is attached hereto as Exhibit B, among Wilmington Trust Company, as trustee, the Neil H. Ellis Irrevocable Insurance Trust – 2005, No. 2 (the "Irrevocable Trust"), as settlor and beneficial owner, and Elizabeth Ellis, as co-trustee. The Sub-Trust was formed on July 1, 2005, pursuant to a supplement to the Trust Agreement (the "Sub-Trust Agreement"), a copy of which is attached hereto as Exhibit C. The Sub-Trust also has Wilmington Trust Company, as trustee, the Irrevocable Trust, as settlor and beneficial owner, and Elizabeth Ellis, as co-trustee.

In addition to serving as the co-trustee of the Trust and Sub-Trust, Elizabeth Ellis is also the trustee of the Irrevocable Trust that is the plaintiff in this action as well as the settlor and beneficial owner of the Trust and Sub-Trust. Importantly, Elizabeth Ellis' signature appears on numerous agreements that, among other things, authorize the Trust to enter into the Note and Security Agreement, acknowledge Coventry's role as LaSalle's servicing agent and provide that

any disputes relating to the transaction can be arbitrated. These transaction documents disprove the allegations in plaintiff's proposed amended complaint that she was unaware of the Loan transaction and of Coventry's role as servicer. For example, the Sub-Trust Agreement, which is signed by Elizabeth Ellis in three separate capacities (as settlor, co-trustee and beneficial owner of the Sub-Trust), states, in part, that:

> **The Settlor desires that the Trustee (i) cause the Sub-Trust to enter into the Note and Security Agreement (the "Note and Security Agreement")** dated as of the date hereof, between the Trust and LaSalle Bank, N.A. (the "Lender"), pursuant to which the Sub-Trust will borrow money from the **Lender in the amount specified therein (the "Loan"), the proceeds of which shall be used primarily to pay premiums on the Policy** in accordance with the terms of the Note and Security Agreement...

Ex. C, at Recital D (emphasis added). In addition, the Settlor and Co-Trustee Disclosure Statement and Acknowledgment (the "Disclosure Statement"), a copy of which is attached hereto as Exhibit D, provides that:

> **Settlor intends to cause the [Sub-Trust] to enter into that certain Note and Security Agreement (the "Note")** with the lender named therein (together, with its successors, assigns and agents, the "Lender"), **under which the Borrower shall be provided loans to procure certain life insurance policies** which have been identified to the Lender (the "Policies").

Ex. D, at 1 (emphasis added). Elizabeth Ellis signed and initialed the Disclosure Statement in her capacities as settlor and co-trustee of the Sub-Trust.

The transaction documents also make it clear that Coventry is LaSalle's agent. Elizabeth Ellis, as trustee of the Irrevocable Trust, consented to LaSalle's appointment of Coventry as its servicing agent in the Settlor Non-Recourse Security Agreement, a copy of which is attached hereto as Exhibit E:

3

## CONSENT TO APPOINTMENT OF AGENT

> You [Irrevocable Trust] acknowledge and agree that we [LaSalle]
> have appointed Coventry Capital I LLC as our servicing agent
> under this Agreement (in such capacity, the "Servicer"). You
> agree to follow the instructions and directions of the Servicer under
> this Agreement until we notify you in writing to the contrary.

Ex. E, at 2. The Note and Security Agreement contains a nearly identical provision relating to Coventry's role as LaSalle's agent. *See* Ex. A, at 4. Coventry is also identified as LaSalle's "program administrator" in the Disclosure Statement. *See* Ex. D, at 2. Coventry's role as LaSalle's agent for the Loan includes, but is not limited to, arranging for Loan documents to be signed, servicing the Loan and the Policy, monitoring the status of the insured under the Policy, sending out notices under the Loan documents and facilitating the satisfaction of the Loan at maturity.

## II.    PLAINTIFF'S PROPOSED AMENDED COMPLAINT DOES NOT CURE THE JURISDICTIONAL DEFECT[1]

Because plaintiff has not substantively responded to Coventry's motion to dismiss, the Court is left to consider whether to allow her to amend her complaint. Courts consider the following factors when deciding whether to grant leave to amend pleadings: (1) whether the proposed amendment would cure a defect in the pleadings, (2) whether other parties would sustain prejudice if the amendment is allowed, (3) whether the amendment is timely, and (4) whether the party had previous opportunities to amend the pleadings. *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273, 586 N.E.2d 1211 (Ill. 1992). The first factor is dispositive here because plaintiff's proposed amended complaint is likewise subject to arbitration.

---

[1] Coventry notes that although plaintiff admits in her Response that LaSalle should be dismissed from this suit, LaSalle is still included in the caption of the proposed amended complaint attached as Exhibit F to her Response.

Congress enacted the Federal Arbitration Act (the "FAA") (9 U.S.C. § 1 et seq. (1994)) in 1925 "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts[ ] and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26, 36 (1991). The FAA reflects a "liberal federal policy favoring arbitration agreements" (*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983); *Borowiec v. Gateway*, 2000, Inc., 209 Ill. 2d 376, 384, 808 N.E.2d 957, 962 (Ill. 2004)) and provides for orders compelling arbitration when one party failed, neglected, or refused to comply with an arbitration agreement (9 U.S.C. § 4 (1994)). Any doubts concerning the scope of arbirtable issues should be resolved in favor of arbitration. *Moses*, 460 US at 24-25.

Plaintiff's proposed pleading does not and cannot avoid the arbitration clauses in the Note and Security Agreement and the Settlor Non-Recourse Security Agreement. Plaintiff's argument that Coventry is not LaSalle's agent and is thus unable to enforce those arbitration provisions is a gross mischaracterization of the facts. Furthermore, plaintiff's position that Coventry cannot compel arbitration is belied by her own conduct in demanding arbitration with Coventry just days before filing this suit. Finally, notwithstanding the fact that Coventry is covered by the arbitration provisions in the Note and Security Agreement and the Settlor Non-Recourse Security Agreement, alternatively Coventry is entitled to arbitrate with the plaintiff under the Disclosure Statement.

A. **Plaintiff Expressly Agreed to Arbitrate Disputes with Coventry as LaSalle's Agent in the Note and Security Agreement and the Settlor Non-Recourse Security Agreement**

Plaintiff takes great measures to attempt to state a position that Coventry is not entitled to the benefit of the arbitration clause in the Note and Security Agreement (signed by Wilmington

5

Trust Company and LaSalle) that divests this Court of jurisdiction over this case because, according to plaintiff, Coventry is not LaSalle's agent. The irresponsibility of plaintiff's argument is laid bare by a review of the agreements executed in the course of the transaction at issue.

As set forth above in Section I, the documents make clear that LaSalle designated Coventry as its agent and that plaintiff consented to this appointment in the Note and Security Agreement (which the Trust entered into at the request of Elizabeth Ellis) and in the Settlor Non-Recourse Security Agreement (which is signed by Elizabeth Ellis). Pursuant to the terms of those agreements, LaSalle's appointment of Coventry as its agent required plaintiff to "agree to follow the instructions and directions of the Servicer [Coventry] under this Agreement until we notify you in writing to the contrary." Ex. C, at 4; Ex. D, at 2.

An "agent" is "[o]ne who is authorized to act for or in place of another; a representative." Black's Law Dictionary 68 (8th ed. 2004). *See also* Webster's Third New International Dictionary 40 (1993) (defining an "agent" as "one that acts for or in the place of another by authority from him: as * * * a representative, *198 emissary, or official of a government"). *Ultsch v. Illinois Mun. Retirement Fund,* 226 Ill. 2d 169, 197-98, 874 N.E.2d 1 (Ill. 2007).

Because Coventry is LaSalle's agent under Illinois law, Coventry may choose to have this dispute arbitrated pursuant to the terms of the Note and Security Agreement and the Settlor Non-Recourse Security Agreement. Those agreements contain identical arbitration clauses, the plain language of which expressly provide that "any claim or dispute . . . ***between you and us or our employees, agents,*** successor or assigns, which arises out of or relates to this Agreement or any related or resulting agreement . . . shall, at your or our election, ***be resolved by neutral, binding arbitration and not by a court action.***" (Emphasis added). Plaintiff's dispute with

6

Coventry "relates" to its execution of its duties as LaSalle's agent – plaintiff's admitted default prompted Coventry, *as LaSalle's agent*, to foreclose upon the collateral for the Loan (the Policy) and dispose of such collateral consistent with the terms of the Note and Security Agreement.

Plaintiff's contention that Coventry is a stranger to the arbitration clause is further belied by her own conduct just days before she filed her Verified Complaint for Injunctive Relief and Emergency Motion for Temporary Restraining Order.

**B.    Plaintiff's Attempt to Enforce the Very Same Clause Against Coventry Estops Her Non-Signatory Argument**

Plaintiff sought to enforce the exact same arbitration clause against Coventry that she now conveniently claims Coventry has no power to enforce.[2] *See* Exhibits B and D to Response. The first correspondence, dated February 5, 2008, is directed to Coventry. The correspondence acknowledges that Coventry acted as LaSalle's agent and demands arbitration of the default and impending foreclosure of the loan. *See* Exhibit B to Response. Notably, the arbitration demand advises that plaintiff will pursue conflict of interest, constructive trust and breach of fiduciary duty claims against Coventry—the very same claims plaintiff seeks to bring in the proposed amended complaint. The second correspondence, also directed to Coventry, reiterated the arbitration demand. *See* Ex. D to Response.

Plaintiff's arbitration demands, both of which were directed to Coventry, constitute her admission that she agreed via contract to arbitrate any disputes with Coventry relating to the Note and Security Agreement. The FAA is "at bottom a policy guaranteeing enforcement of

---

[2] These initial purported demands by counsel for Ellis for arbitration under the Note and Security Agreement failed because, contrary to her counsel's assertion that he represented the Sub-Trust, Ellis had no standing under the Sub-Trust Agreement to hire counsel for the Sub-Trust or direct the Sub-Trust to make a demand for arbitration. The Sub-Trust provides that "for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in writing delivered to the Trustee." *See* Ex. C to Response. The Loan has since been partially satisfied through the disposition of the Policy pursuant to the terms of the Note and Security Agreement.

private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chryslers-Plymouth, Inc.*, 473 US 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The scope of the agreement is determined by the parties contract. *Id.* The contract here is clear. Plaintiff's own conduct confirms as much. Plaintiff is estopped from arguing otherwise because it conveniently suits her present purposes.

### C.    Plaintiff's Argument is Otherwise Misplaced

The discussion above makes clear that plaintiff agreed to resolve any and all disputes with Coventry through arbitration. This conclusion is underscored by plaintiff's reliance on three inapposite cases, *Caligiuri v. First Colony Life Ins. Co.*, 318 Ill. App. 3d 793, 724 N.E.2d 750 (1st Dist. 2000); *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 812 N.E.2d 534 (5th Dist. 2004); and *Peach v. CIM Ins. Corp.*, 352 Ill. App. 3d 691, 816 N.E.2d 668 (5th Dist. 2004).

Each of these cases considered whether a non-signatory could enforce an arbitration clause. *Caligiuri*, 318 Ill. App. 3d at 800; *Ervin*, 349 Ill. App. 3d at 510-11; *Peach*, 352 Ill. App. 3d at 696. The non-signatory in *Caligiuri* failed to provide evidence of its agency status. *Caligiuri*, 318 Ill. App. 3d at 802-03. The non-signatory in *Ervin* was expressly excluded from the arbitration clause and so could not qualify either as an agent or as a third party beneficiary. *Ervin*, 349 Ill. App. 3d at 513-14. Finally, it was the non-signatory's refusal in *Peach* to take a position on its agency status that led the court in that case to find that the non-signatory could not enforce the arbitration clause. *Peach*, 352 Ill. App. 3d at 696.

These cases are distinguishable because, unlike *Caligiuri*, plaintiff here expressly consented to Coventry's appointment as LaSalle's agent. Unlike *Ervin*, Coventry is expressly referenced in the arbitration clause. Unlike *Peach*, Coventry is not using an ambiguous status to further its own strategy.

8

**D.   Plaintiff Has Separately Agreed to Expressly Arbitrate Disputes Between the Plaintiff and Coventry**

Even if this Court finds that Coventry is not entitled to arbitrate under the provisions contained in the Note and Security Agreement and the Settlor Non-Recourse Security Agreement (which it is), Coventry can arbitrate this dispute pursuant to the arbitration provision contained in the Disclosure Statement:

> **Except to the extent that any party shall seek equitable relief, all other disputes and controversies of every kind and nature between the Program Administrator and the Settlor, the Co-Trustee or the Borrower arising out of or in connection with any of the Transaction Documents**, including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof **shall be submitted and settled by arbitration** in accordance with the rules of the American Arbitration Association. The arbitration shall be held in Philadelphia, Pennsylvania before a panel of three (3) arbitrators, hereafter collectively referred to as "arbitrator", knowledgeable in the business of life insurance, one to be chosen by each party, and the third to be chosen by the two previously chosen arbitrators. The arbitrator's decision and award shall be final and binding and may be entered in any court having jurisdiction thereof. The arbitrator shall not have the power to award punitive, exemplary, or consequential damages.

*See* Ex. A, at 3 (emphasis added).

The Disclosure Statement is signed by Elizabeth Ellis as co-trustee and settlor of the Trust. *See* Ex. C, at 3. (The settlor of the Trust is also the plaintiff in this dispute). Coventry is specifically identified in the language cited above as one of the parties to which the arbitration provision applies (Coventry is referred to in the Disclosure Statement as the "Program Administrator"). *See id.*, at 1. Accordingly, this Court should grant Coventry's motion to dismiss and deny plaintiff leave to file her proposed amended complaint because the jurisdictional bar would remain.

III.    **PLAINTIFF'S PROPOSED NEW CLAIMS FALL EXPRESSLY WITHIN THE ARBITRATION CLAUSE**

Plaintiff offers the alternative argument that, even if Coventry can enforce the arbitration clause in the Note and Security Agreement, the proposed new claims "fall outside the substantive scope of the Note's arbitration clause." Response at 7. Plaintiff reasons that even though Coventry "may have acted as LaSalle's agent in the administration of the Note, the parties to the Note only agreed to arbitrate those claims related to the Note itself." Response at 7. Plaintiff concludes that arbitration is not triggered because the claims in her proposed amended complaint relate to actions that "pre-date the Note or were outside of [Coventry's] capacity as LaSalle's agent." Response at 7-8. Plaintiff's argument overlooks the plain language of the arbitration clause:

> "Any claim or dispute, whether in contract, tort, statute or otherwise (including the scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of *or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement)* shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action." (Emphasis added)

The clause contains no temporal distinction limiting arbitration to disputes that only post-date the Note and Security Agreement as plaintiff would have this Court believe. Instead, the plain language unequivocally provides that *all* disputes "related to" the Note and Security Agreement would be subject to arbitration. It cannot be reasonably disputed that alleged breaches of fiduciary duty by Coventry to plaintiff relate to the Note and Security Agreement. Indeed, plaintiff herself acknowledged as much in her February 5, 2008 correspondence. *See* Ex. B to Response.

Plaintiff's proposed claims fall squarely within the arbitration clause and confirm that no amendment of her complaint will cure the jurisdictional defect. Leave to amend was properly denied. Plaintiff has proffered no valid reason proffered for this Court to conclude otherwise.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Court grant their motion and enter an order dismissing Plaintiff's complaint with prejudice, and for such other relief as this Court deems proper.

Respectfully submitted,

LASALLE BANK NATIONAL ASSOCIATION AND COVENTRY CAPITAL L, LLC

By: _____
One of their Attorneys

Terrence E. Kiwala
Michael C. Borders
Rosa M. Tumialán
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700
Firm I.D. #42297

Brian P. Brooks
Kyra A, Grundeman
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
(202) 383-5414 (facsimile)

11

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on _7/26/05_, by and between THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

***Payments.*** You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

***Relinquishment.*** You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

***Covenants.*** You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

***Events of Default.*** Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

***Default Interest.*** You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). **All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).**

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

— The Policies; and

— All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

6

# SIGNATURES

—  Do not sign this Agreement before you read it.

—  This is a binding legal document and you should seek legal, financial and tax advice before signing it.

—  You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

—  If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,
Premium Finance Sub-Trust

By:  Wilmington Trust Company, Trustee

By: _____
Name:        Janel R. Havrilla
Title:        Financial Services Officer

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

LaSalle Bank National Association

By: _____
Name:    Krista Lake
Title:    Attorney-in-fact

7

# SCHEDULE   A

| | | |
|---|---|---|
| Origination Fee: | $ | 32,752.57 |
| Amount Financed: | $ | 2,405,182.20 |
| Interest Rate: | | 14.47% |

*Stated Rate of Interest:  The Stated Rate of Interest, meaning an amount calculated and disclosed solely for purposes of compliance with Chapter 815 of the Illinois Compiled Statutes, subsection 205/4.1a(f),  is 18.40%, which rate is calculated by including the Origination Fee and expenses incurred relating to the procurement of PFIC Coverage. You should refer to the Interest Rate shown above for the annual rate that will be applied to the Amount Financed.

| | | |
|---|---|---|
| *Scheduled Maturity Date Balance: | $ | 3,275,256.86 |
| Funding Date | No later than 07/21/2005 | |
| *Scheduled Maturity Date: | 30 months after the funding date | |
| Expenses Related to PFIC Coverage: | $ | 203,770.20 |
| Trust Administration Fees: | $ | 5,712.00 |
| *Total of Payments (Including Origination Fee): | $ | 3,308,009.43 |

Borrower Name:
Borrower Address:

The Neil H. Ellis Insurance Trust - 2005
149 Colonial Road
PO Box 1270
Manchester, CT 06045

### Life Insurance Policy Information

Unique Identifier
Life Insurance Company
Policy Number
Face Amount
Premiums Financed By Us
Premiums Financed By Client

31830
Security Life of Denver
TBD
30,000,000.00
2,195,700.00
0.00

Insured Name:
Insured Address:

Ellis, Neil
149 Colonial Road, PO Box 1270, Manchester, CT 06045

Insurance Carrier Rating:
Rating Agency:
Life Insurance Product:
Rating Class:
Riders:
Death Benefit Option:
Policy Type:
Current Crediting Rate:

AA
S&P
LifeDesign Guarantee UL
Male 77 Standard NonTobacco
None
Return of Premium with No Contractual Cap on the Death Benefit
UL
4.50%

Settlor Initials _____
Co-Trustee Initials _____

* Subject to adjustment where term of loan causes loan to mature on a Saturday, Sunday, or holiday
  and the Maturity Date is established as the next business day.

## THE NEIL H. ELLIS INSURANCE TRUST - 2005

### TRUST AGREEMENT

This TRUST AGREEMENT (as may be amended or supplemented from time to time, this "Trust Agreement"), is made as of ___June___ 30, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as Settlor (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee (in such capacity, the "Trustee") and Elizabeth Ellis, as Co-Trustee (the "Co-Trustee"). The Settlor, the Beneficial Owner, the Trustee and the Co-Trustee hereby agree as follows:

1.     The trust created hereby shall be known as "The Neil H. Ellis Insurance Trust - 2005" (sometimes referred to herein simply as the "Trust"), in which name the Trustee may conduct the business of the Trust and make, execute and enforce contracts, and in which name the Trustee, the Settlor or the Co-Trustee may execute on behalf of the Trust one or more applications and contracts for life insurance, which policies are to become part of the trust estate of the Trust, and in so doing, has the power to bind the Trust to such contracts as obligations of the Trust. Such policies need not be separately executed by the Trustee. The Trustee shall execute on behalf of the Trust such agreements, certificates, instruments, or other documents, and shall manage, control, use, sell and dispose of the assets of the trust estate of the Trust in such manner as the Settlor may instruct, and the Co-Trustee shall execute on behalf of the Trust any such application or contract for insurance; provided that, except for the insurance application, all forms, instructions or other documents related to or in any way affecting any life insurance policy that is a part of the trust estate must be signed by the Trustee to be effective.

2.     The Settlor hereby assigns, transfers, conveys and sets over to the Trustee the sum of $1.00 (the "Initial Trust Estate"). The Trustee hereby acknowledges receipt of such amount in the Trust from the Settlor, which shall constitute the initial trust estate. The Trustee hereby declares that it will hold the trust estate in trust for the Beneficial Owner.

3.     It is the intention of the parties that the Trust constitute a statutory trust under Sections 3801 et seq. of Title 12 of the Delaware Code (the "Act"), and that this document constitute the governing instrument of the Trust. The Trustee is hereby authorized and directed to execute and file a certificate of trust with the Delaware Secretary of State.

4.     The Trustee and Co-Trustee accept the trusts hereby created and agree to perform their duties hereunder with respect to such trusts but only upon the terms of this Trust Agreement. The Trustee also agrees to disburse all moneys actually received by it constituting part of the trust estate of the Trust upon the terms of this Trust Agreement, and the Co-Trustee acknowledges and agrees that it is not expected or entitled to receive any such moneys or any other property or proceeds of the property of the Trust, but that if it does in fact receive any such moneys, property or proceeds, the Co-Trustee promptly shall notify the Trustee thereof and deliver the same to or at the direction of the Trustee. The Trustee and Co-Trustee shall not be answerable or accountable hereunder under any circumstances, except (i) for its own willful misconduct, bad faith or gross negligence, or (ii) for actual damages incurred by the Trust as a result of the inaccuracy of any representation or warranty herein expressly made by the Trustee

or Co-Trustee, as the case may be, in its individual capacity. In particular, but not by way of limitation (and subject to the exceptions set forth in the preceding sentence):

a.    in accordance with Section 3313(b) of the Act, the Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of this Trust Agreement, and the Co-Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Trust Agreement and at the direction of the Settlor or Trustee in accordance with the provisions of this Trust Agreement;

b.    no provision of this Trust Agreement or any document to which the Trust is a party shall require the Trustee or Co-Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder or thereunder, if the Trustee or Co-Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

c.    under no circumstances shall the Trustee or Co-Trustee be liable for any indebtedness of the Trust;

d.    the Trustee and Co-Trustee shall not be responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Settlor or for the form, character, genuineness, sufficiency, value or validity of any of the trust estate, and in no event shall the Trustee or Co-Trustee assume or incur any liability, duty or obligation other than as expressly provided for herein;

e.    the right of the Trustee to perform any discretionary act enumerated in this Trust Agreement or in any agreement to which the Trust is a party shall not be construed as a duty, and the Trustee shall not be answerable for other than its gross negligence, bad faith or willful misconduct in the performance of any such act;

f.    the Trustee and Co-Trustee undertake to perform such duties and only such duties as are specifically set forth in this Trust Agreement, in particular, but not by way of limitation, the Trustee and Co-Trustee shall have no duty or obligation to monitor any collateral securing any borrowing of the Trust or any sub-trust of the Trust nor any ratings or attributes of any insurance policy or the issuer of any insurance policy held in trust hereunder or in any sub-trust of the Trust, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee or Co-Trustee;

g.    the Trustee shall not be liable for any error of judgment made in good faith unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

h.    the Trustee may conclusively rely and shall fully be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or

2

document in good faith believed by it to be genuine and to have been signed or presented by the proper party or parties;

i.    the Trustee shall be under no obligation to appear in, prosecute or defend any legal action that is not incidental to its duties as the Trustee in accordance with this Trust Agreement or any agreement to which the Trust is a party and that in its reasonable judgment may involve it in any expense or liability (i) in excess of funds then available in the trust estate to defray such expenses or liability and (ii) for which the repayment of such expenses or adequate indemnity against such liability is not reasonably assured or provided to it;

j.    in no event shall the Trustee be liable for special, punitive, indirect or consequential losses or damages of any kind whatsoever (including but not limited to lost profit), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

k.    the Trustee shall not be charged with any duty to determine compliance by the Trust with the provisions of this Trust Agreement unless (i) a responsible officer of the Trustee shall have actual knowledge of non-compliance or (ii) the matter was submitted for the approval of the Trustee in accordance with the provisions hereof;

l.    in the exercise or administration of the trusts hereunder the Trustee (i) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Trustee with reasonable care and (ii) may consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by them, and the Trustee shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other skilled persons;

m.    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instruction, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit; and

n.    the Trustee shall not be liable for any actions taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights conferred upon the Trustee by this Trust Agreement, or that are taken by the Co-Trustee.

5.    Except as expressly provided in this Trust Agreement, in accepting the trusts hereby created, Wilmington Trust Company acts solely as the Trustee hereunder and thereunder and not in its individual capacity and all persons or entities having any claim against the Trustee shall look only to the trust estate for payment or satisfaction thereof.

3

6.   The Trustee hereby represents and warrants that:

    a.   it is a Delaware corporation, duly organized and validly existing in good standing under the laws of the State of Delaware and having an office and its principal place of business within the State of Delaware. It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Trust Agreement;

    b.   it has taken all corporate action necessary to authorize the execution and delivery by it of this Trust Agreement, and this Trust Agreement will be executed and delivered by one of its officers who is duly authorized to execute and deliver this Trust Agreement on its behalf;

    c.   this Trust Agreement constitutes a legal, valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms, subject, as to enforceability, to applicable bankruptcy, insolvency, reorganization, conservatorship, receivership, liquidation and other similar laws affecting enforcement of the rights of creditors of banks generally and to equitable limitations on the availability of specific remedies; and

    d.   neither the execution nor the delivery by it of this Trust Agreement, nor the consummation by it of the transactions contemplated hereby nor compliance by it with any of the terms or provisions hereof will contravene any federal or applicable state law, governmental rule or regulation granting the banking or trust powers of the Trustee or any judgment or order binding on it, or constitute any default under its articles of association or by laws or any indenture, mortgage, contract, agreement or instrument to which it is a party or by which any of its properties may be bound.

7.   The Trustee may resign upon thirty days prior notice to the Settlor and the Beneficial Owner.

8.   Upon written instructions of the Settlor, the Trustee shall dissolve, wind-up and terminate the Trust and file a certificate of cancellation in accordance with Section 3810 of the Act. Unless earlier dissolved by the Settlor, the Trust shall dissolve upon the disposition of the entire trust estate of the Trust and the disposition to the Beneficial Owner of all net proceeds thereof.

9.   In connection with the dissolution and winding up of the Trust, the Trustee and Co-Trustee shall take such action as may be directed by the Settlor to transfer the related assets of the trust estate of the Trust to the Settlor or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets.

10.   The principal place of business of the Trust for purposes of Delaware law shall be in the care of the Trustee. The office of the Trust shall be in the care of the Trustee located at Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19890.

4

11.    At no time can more than 100 persons hold beneficial interests in the Trust or any sub-trust of the Trust, collectively.

12.    The Trustee is hereby authorized and directed to issue to the Beneficial Owner a certificate representing the non-assessable, fully paid, fractional undivided interest in the general assets of the Trust.

13.    The Settlor, the Beneficial Owner, Trustee and Co-Trustee agree, and any person accepting a beneficial interest in the Trust or any sub-trust of the Trust shall by accepting such beneficial interest be deemed to agree, not to elect to have any part of the Trust or any sub-trust of the Trust taxed as a corporation.

14.    This Trust Agreement may be amended or supplemented at any time as contemplated by Section 3806(b) of the Act by an instrument executed by the Trustee upon the instruction of the Settlor.

15.    THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS AGREEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS AGREEMENT. SECTIONS 3540 AND 3561 OF TITLE 12 OF THE ACT SHALL NOT APPLY TO THE TRUST.

16.    Notwithstanding any other provision of this Trust Agreement (other than any amendment hereto expressly to the contrary), the Trustee shall perform all of its duties

5

hereunder and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner) and the Trustee shall, in accordance with 12 Del. C. § 3313(b), have no liability hereunder for any action taken at direction or for failure to act in the absence of direction except for loss to the Trust resulting directly from the Trustee's own willful misconduct.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed as of the day and year first written above.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Settlor

_____
Elizabeth Ellis, Trustee

WILMINGTON TRUST COMPANY,
as Trustee

By: _____
Name:    Janel R. Havrilla
Title:    Financial Services Officer

ELIZABETH ELLIS, as Co-Trustee

_____
Elizabeth Ellis

6

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2, as
Beneficial Owner

_Elizabeth Ellis_

Elizabeth Ellis, Trustee

7

## SUPPLEMENT TO TRUST AGREEMENT

This SUPPLEMENT TO TRUST AGREEMENT (this "Supplement") is made as of ___July___ _1_, 2005, among The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Settlor of the Trust (the "Settlor"), and The Neil H. Ellis Irrevocable Insurance Trust - 2005 No. 2, as the Beneficial Owner of the Trust (the "Beneficial Owner"), Wilmington Trust Company, a Delaware corporation, as Trustee of the Trust (the "Trustee") and Elizabeth Ellis, as Co-Trustee of the Trust (the "Co-Trustee").

### RECITALS

A.    The Settlor, Trustee and Co-Trustee have entered into a Trust Agreement (the "Trust Agreement"), dated as of ___June___ _30_, 2005, pursuant to which the Settlor, Trustee and Co-Trustee formed The Neil H. Ellis Insurance Trust - 2005, a Delaware statutory trust.

B.    Pursuant to the authority granted to the Trustee, the Settlor and Co-Trustee under Section 1 of the Trust Agreement, the Trustee, Settlor and/or Co-Trustee executed on behalf of the Trust a life insurance policy (the "Policy") dated as of ___July___ _20_, 2005, which Policy is part of the trust estate of the Trust.

C.    The Settlor desires to instruct the Trustee in accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act to establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust" (the "Sub-Trust").

D.    The Settlor desires that the Trustee (i) cause the Sub-Trust to enter into the Note and Security Agreement (the "Note and Security Agreement"), dated as of the date hereof, between the Trust and La Salle Bank, N.A. (the "Lender"), pursuant to which the Sub-Trust will borrow money from the Lender in the amount specified therein (the "Loan"), the proceeds of which shall be used primarily to pay premiums on the Policy in accordance with the terms of the Note and Security Agreement, (ii) for so long as the Loan is outstanding, allocate the Policy and the other assets of the Sub-Trust Estate (as defined below) to the Sub-Trust and hold such assets as collateral for the Loan, and (iii) upon repayment of the Loan, terminate the Sub-Trust and allocate the Policy and the other assets of the Sub-Trust Estate to the general trust estate of the Trust or otherwise as directed by the Settlor, all as set forth in this Supplement.

E.    The Settlor desires and hereby directs the Sub-Trust not to engage in any activities other than those expressly required or permitted by the Trust Agreement and this Supplement, and the Settlor, Trustee and Co-Trustee acknowledge that the Sub-Trust is being established in connection with the Note and Security Agreement for the purpose of entering into the Note and Security Agreement and giving the Lender interests in the assets of the Sub-Trust as collateral security for the loan evidenced thereby.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Trust Agreement, the parties hereto agree to the following supplemental obligations and provisions with regard to the Sub-Trust created hereby:

## ARTICLE I.
### DEFINITIONS

Section 1.    Capitalized Terms.  Except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used and not otherwise defined in this Supplement shall have the meanings ascribed to them in the Trust Agreement.

Section 2.    Other Interpretive Provisions.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Supplement shall refer to this Supplement as a whole and not to any particular provision of this Supplement; section references contained in this Supplement are references to sections in or to this Supplement unless otherwise specified; with respect to all terms in this Supplement, the singular includes the plural and the plural the singular; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Supplement; references to persons include their permitted successors and assigns; references to laws include their amendments and supplements, the rules and regulations thereunder and any successors thereto; and the term "including" means "including without limitation."

## ARTICLE II.
### ORGANIZATION AND BENEFICIAL OWNERSHIP

Section 1.    Initial Creation of Sub-Trust.  In accordance with Section 14 of the Trust Agreement and Section 3806(b) of the Act, the Settlor hereby instructs the Trustee to, and the Trustee hereby does, establish a new series of the Trust entitled "The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust."

Section 2.    Execution of the Note and Security Agreement.  The Settlor hereby instructs the Trustee to execute on behalf of the Sub-Trust the Note and Security Agreement.

Section 3.    Declaration of Sub-Trust.  The Trustee hereby declares that it will hold all right, title and interest in and to the Policy, and all proceeds thereof, including, without limitation, the right to collect net death benefits thereon, the right to proceed against any state guarantee fund and other property and interests in property related thereto, including, without limitation, all monies due and to become due in respect to any of the foregoing (whether in respect of principal, interest, fees, expenses, indemnities, rescission payments or otherwise), and any proceeds of the foregoing (collectively, the "Sub-Trust Estate"), and does hereby accept and agree to hold in trust, for the benefit of the Lender as security for the Loan for so long as the Loan is outstanding, and thereafter for the benefit of the Beneficial Owner, all of the Sub-Trust Estate conveyed or to be conveyed to the Trustee and all monies and proceeds that may be received with respect thereto in accordance with the terms of this Supplement.  The Sub-Trust Estate shall be segregated and held separately from the general trust estate of the Trust.

Section 4.    Purposes and Powers.  The purpose of the Sub-Trust is, and the Trust shall have the power and authority, to engage in the following activities:

2

(a)    to enter into the Note and Security Agreement;

(b)    to borrow money from the Lender and to pledge the Policy as collateral therefor pursuant to the Note and Security Agreement;

(c)    to hold the Policy and other assets of the Sub-Trust Estate in trust, for the benefit of the Lender as security for the Loan until such time as all obligations in respect of the Loan are fully satisfied or waived by the Lender;

(d)    to administer, service and collect the Policy, and to exercise other rights of ownership in connection with the Policy;

(e)    to enter into and perform its obligations under any agreements to which it is or may become a party; and

(f)    to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 5.    Title to Trust Property; Sub-Trust Certificate. Legal title to all of the Sub-Trust Estate shall be vested at all times in the Sub-Trust. The Trustee is hereby authorized and directed to issue a certificate in substantially the form attached hereto as Exhibit A representing the non-assessable, fully paid, undivided beneficial interest in the assets of the Sub-Trust Estate, which shall be issued in the name of the Beneficial Owner and delivered to the possession of the Lender or its designee as collateral security for the loan evidenced by the Note and Security Agreement.

Section 6.    Limitations on Trust Property. The Trust shall not hold any property other than the Initial Trust Estate and the Sub-Trust shall not hold any property other than the Sub-Trust Estate; provided, that the Settlor, the Beneficial Owner, the Trustee and the Co-Trustee, if any, may enter into a supplement to the Trust Agreement or this Supplement that would permit the Trust or the Sub-Trust to hold only such additional assets as are necessary for the repayment or the refinancing of the Loan promptly after adding such assets. The Settlor and the Beneficial Owner hereby agree (i) not to assign, transfer or convey any property to the Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Trust, other than the Initial Trust Estate, (ii) not to assign, transfer or convey any property to the Sub-Trust, or to instruct the Trustee or Co-Trustee to hold any title to or interest in any property on behalf of the Sub-Trust, other than the Sub-Trust Estate, and (iii) for so long as the Loan is outstanding, not to establish or instruct the Trustee or the Co-Trustee to establish, any additional series of the Trust other than the Sub-Trust. The Settlor and the Co-Trustee hereby agree (i) not to instruct the insurance company, which insurance company is obligated to pay the death benefit in accordance with the terms of the Policy (the "Issuing Insurance Company"), to change the owner or beneficiary of the Policy without the consent of the Trustee acting at the direction of such person or entity then authorized to direct the Trustee in the performance of its duties hereunder, and (ii) to notify the Issuing Insurance Company that the Trustee's signature is required to change the owner or beneficiary of the Policy.

3

Section 7.    Additional Covenants of the Settlor and the Trustee.

(a)    The Settlor and the Trustee hereby agree (i) to maintain the Sub-Trust Estate as identifiable and not commingle the Sub-Trust Estate with the assets of any other entity, including the assets of the Settlor, the Trust or any other sub-trust of the Trust and (ii) to maintain bank accounts, if any, records and books of account of the Sub-Trust showing the Sub-Trust Estate as assets of the Sub-Trust and being separate assets from those of any other person or entity, including the Settlor, the Trust or any other sub-trust of the Trust, and (iii) that the affairs of the Sub-Trust shall be managed by or under the direction of the Trustee.

(b)    The Settlor and the Trustee hereby agree that they will not (i) indicate to any third party, including any creditors of the Trust, the Trustee or the Settlor, that the Sub-Trust Estate is available to satisfy any obligations other than the Loan and any other obligations under the Note and Security Agreement, (ii) indicate to any third party that the Sub-Trust Estate constitutes assets of the Settlor or that the Trust or the Sub-Trust is responsible for or guaranteeing any obligations of the Settlor, (iii) cause the Trust or the Sub-Trust to issue any securities or deposit assets into any entity that issues any securities, (iv) cause the Trust or the Sub-Trust to incur any indebtedness, or assume or guaranty any indebtedness of any other person or entity, other than the Loan, or (v) purport that the Trust or the Sub-Trust is a division or subsidiary of, or the same person as, the Settlor.

## ARTICLE III.
## AUTHORITY AND DUTIES OF THE TRUSTEE

Section 1.    General Authority of the Trustee.  It shall be the duty of the Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of the Trust Agreement, this Supplement, the Note and Security Agreement and any other agreements to which the Trust or Sub-Trust is a party, and to administer the Sub-Trust in the interest of the Lender and the Beneficial Owner in accordance with the provisions of this Supplement. The Trustee is hereby expressly authorized to create security over the Sub-Trust Estate for the benefit of the Lender in accordance with the terms of the Note and Security Agreement.

Section 2.    Trustee to Act at Direction.  Notwithstanding any other provision of the Trust Agreement or this Supplement, the Trustee shall perform all of its duties under this Supplement and exercise all of its powers hereunder solely at the direction of the Settlor or, following the Settlor's death or incapacity, at the direction of the Beneficial Owner (acting unanimously if there is more than one Beneficial Owner); provided, however, that, except as otherwise provided in Section 6 of this Article III, for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in a writing delivered to the Trustee, and the Trustee shall, in accordance with Section 3313(b) of the Act, have no liability hereunder for any action taken at the direction of such of the Settlor, the Beneficial Owner, Lender, or Lender's designee as is then authorized to direct the Trustee or for failure to act in the absence of direction except for loss to the Sub-Trust resulting directly from the Trustee's own willful misconduct.

Section 3.    Notice.  In the event that the Settlor or the Beneficial Owner takes or attempts to take any action, or instructs the Trustee or the Co-Trustee to take any action, that is

4

not required or permitted under the terms of the Trust Agreement, this Supplement or the Note and Security Agreement, and a responsible officer of the Trustee or the Co-Trustee, as the case may be, shall have actual knowledge thereof, the Trustee or the Co-Trustee, as the case may be, shall promptly inform the Lender or its agent of such actions or instructions. Any notice or other communication delivered to the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, by the Issuing Insurance Company shall be forwarded by the Settlor, the Beneficial Owner, the Trustee or the Co-Trustee, as the case may be, to Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, Attention: Alex Seldin, facsimile: 312-992-5111, electronic mail: aseldin@coventryfirst.com.

Section 4.    Direction of Trustee. Whenever the Trustee is unable to decide between alternative courses of action permitted or required by the terms of the Trust Agreement, this Supplement, the Note and Security Agreement or any other agreement to which the Trust or the Sub-Trust is a party, or is unsure as to the application of any provision thereof or any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that any provision thereof permits any determination by the Trustee or is silent or is incomplete as to the course of action that the Trustee is required to take with respect to a particular set of facts, the Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the person or entity then authorized to direct the Trustee in the performance of the Trustee's duties hereunder, requesting direction as to the course of action to be adopted or application of such provision, and to the extent the Trustee acts or refrains from acting in good faith in accordance with any direction from the person or entity then authorized to direct the Trustee, the Trustee shall not be liable on account of such action or inaction to any person or entity.

Section 5.    Relinquishment. Notwithstanding the provisions of Section 2 of this Article III, upon written instructions sent by the Settlor to the Trustee and Co-Trustee at any time on or before the maturity date of the Loan, the Trustee and Co-Trustee shall in accordance with the terms of the Note and Security Agreement fully relinquish to the Lender, or any other person or entity designated in writing by the Lender or its agent, all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise.

Section 6.    Liquidation of the Sub-Trust Estate; Foreclosure. In the event that the Sub-Trust fails to satisfy in full all obligations in respect of the Loan at maturity or otherwise defaults on the Loan, and either (i) the Settlor, Co-Trustee and Trustee acting at direction pursuant to Section 5 of this Article III (on behalf of the Sub-Trust) agree to fully relinquish to the Lender all right, title and interest in, to and under the Policy in satisfaction of the Loan, including by surrender of all or any ancillary or springing interests in or rights with respect to the beneficial interests in this Sub-Trust or the Sub-Trust Estate that do or may exist or later arise, or (ii) the Lender notifies the Trustee that it is foreclosing on the Policy and other assets of the Sub-Trust Estate in accordance with the terms of the Note and Security Agreement, the Trustee and Co-Trustee shall take such action as may be directed by the Lender to liquidate such assets and distribute the proceeds thereof, including, if necessary, the execution of all applicable assignment, transfer or sale forms and any other instruments of transfer, assignment or sale reasonably identified by the Lender as necessary to effect the valid transfer, assignment or sale of

such assets. If such liquidation is made as a result of the Lender's foreclosure on the assets of the Sub-Trust Estate, proceeds of such liquidation that exceed the aggregate of the obligations due to the Lender in respect of the Loan through the completion of such liquidation shall be retained by the Trustee and deemed to be assets of the Trust, and not of the Sub-Trust Estate, and shall be maintained or distributed in accordance with the Trust Agreement.

Section 7. <u>Sale or Transfer</u>. In the event the Settlor elects to satisfy the Trust's obligations under the Note and Security Agreement in connection with a sale or transfer of the Policy (which sale or transfer shall be reasonably acceptable to the Lender or its designee), the Trustee, acting at the Settlor's direction, Co-Trustee and Lender shall enter into and reasonably act in accordance with any payoff instruction supplied by the Settlor, pursuant to which:

(a)     the Trustee and Co-Trustee shall promptly execute and deliver such documentation (the "Transfer Documents") prepared by and at the expense of the Settlor (or a third party on behalf of the Settlor) that is reasonably necessary to transfer the Policy to a third party (subject to paragraphs (b) through (e) set forth below), other than change of ownership or change of beneficiary forms (it being understood that (i) the Trustee shall have no responsibility for the preparation, accuracy or effectiveness of any such Transfer Documents and (i) the transfer contemplated by the Transfer Documents will not be effective until receipt by the Lender of the Payoff Funds (as defined below));

(b)     promptly upon receipt of the fully executed Transfer Documents from the Trustee, the Settlor will, on behalf of the Trust, cause immediately available funds to be deposited into an account (the "Escrow Account") maintained and controlled by the Lender or by a nationally recognized financial institution reasonably acceptable to the Lender (such financial institution or the Trustee in such capacity, as applicable, the "Escrow Agent") in an amount sufficient to satisfy all of the Trust's obligations to the Lender under the Note and Security Agreement (the "Payoff Funds") for release of all of Lender's interest in the Sub-Trust Estate;

(c)     the Escrow Account shall be established pursuant to an escrow agreement in form and substance (and on terms including fees payable to the Escrow Agent) reasonably acceptable to the Lender and the Escrow Agent;

(d)     the Trustee and Co-Trustee will, immediately upon receipt of written acknowledgment from the Escrow Agent that funds in the amount of the Payoff Funds have been placed in the Escrow Account, execute and deliver to the Settlor change of ownership and beneficiary forms prepared by or at the expense of the Settlor (or a third party on behalf of the Settlor) to be recorded with the issuer of the Policy (the "Change Forms"); and

(e)     upon confirmation that such Change Forms have been recorded by the issuer of the Policy (written notice of which is delivered to the Trustee and the Escrow Agent) as contemplated by the Transfer Documents, the Escrow Agent will release the Payoff Funds to the Lender.

Notwithstanding the foregoing to the contrary, in the event that the applicable Payoff Funds are not placed into such Escrow Account within 30 days of delivery of a related payoff instruction, neither the Lender nor the Trustee shall have any further obligation to execute and deliver any

6

ownership transfer documents or otherwise take any action as described in this Section, the Settlor shall be deemed to have revoked the applicable payoff instruction, the Settlor shall pay all costs, fees and expenses incurred by the Lender, the Trustee and the Escrow Agent in connection therewith, and the Transfer Documents shall be deemed void.

## ARTICLE IV.
### TERMINATION

Section 1.    Termination of the Sub-Trust. Promptly upon satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement, the Lender shall give written notice to the Trustee that all obligations of the Sub-Trust under the Note and Security Agreement have been fully performed or satisfied (the "Satisfaction Notice"). The parties hereto acknowledge and agree that either the Settlor or the Trustee may, following the delivery of the Satisfaction Notice, deliver written notification to the other that it wishes to terminate the Sub-Trust (the "Termination Notice"). Following the receipt by the non-terminating party of the Termination Notice, each of the Settlor, the Trustee and the Co-Trustee shall take all commercially reasonable actions that are necessary to effectuate and evidence the termination of the Sub-Trust. Prior to such satisfaction of or release by the Lender of all the Sub-Trust's obligations to the Lender under the Note and Security Agreement and the Lender's delivery of the Satisfaction Notice:

(a)    (i) the Trustee will not resign pursuant to Section 8 of the Trust Agreement except upon thirty days prior notice to the Lender and the appointment of a successor Trustee or, if no successor Trustee is appointed prior to the expiration of such thirty day notice period, upon the interpleader of the Sub-Trust Estate pursuant to an action filed by the Trustee, at the expense of the Sub-Trust Estate, in the Court of Chancery in and for New Castle County, Delaware, (ii) neither the Trustee nor the Co-Trustee will take any action to dissolve, wind-up or terminate the Trust or file a certificate of cancellation pursuant to Section 9 of the Trust Agreement, and (iii) none of the Trustee, the Co-Trustee, the Settlor or the Beneficial Owner will take any action to terminate the Sub-Trust, and

(b)    the assets of the Sub-Trust Estate will not be modified or reduced by the Settlor, the Trustee, the Co-Trustee or the Lender other than as expressly contemplated in this Supplement as this Supplement or the Trust Agreement may be supplemented as described in Article II, Section 6 or otherwise.

Section 2.    Trustee Actions Upon Termination. In connection with the termination of the Sub-Trust, upon full performance or satisfaction of all obligations of the Sub-Trust under the Note and Security Agreement and following Lender's delivery of the Satisfaction Notice, any remaining assets of the Sub-Trust Estate shall be allocated to the general trust estate of the Trust, or the Trustee and Co-Trustee shall take such action as may be directed by the Settlor Settlor to transfer such assets to the Beneficial Owner or such other person or entity as the Settlor may designate, including, if necessary, the execution of all applicable assignment, transfer forms and any other instruments of transfer and assignment reasonably identified by the Settlor as necessary to effect the valid transfer and assignment thereto of such assets. Upon completion of the transfer of the remaining assets of the Sub-Trust Estate pursuant to the first sentence hereof, the Settlor may designate another person or entity as the Trustee or Co-Trustee of the Trust.

7

# ARTICLE V.
## MISCELLANEOUS

Section 1.    _Amendments_. This Supplement may be amended by a writing signed by the Settlor, Trustee and Co-Trustee; provided that this Supplement may not be amended without the prior written consent of the Lender during the term of the Loan or prior to the satisfaction of all obligations in connection with the Loan and the Lender's delivery of the Satisfaction Notice.

Section 2.    _Governing Law_. THIS SUPPLEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION THAT WOULD CALL FOR THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT THERE SHALL NOT BE APPLICABLE TO THE PARTIES HEREUNDER OR THIS SUPPLEMENT ANY PROVISION OF THE LAWS (STATUTORY OR COMMON) OF THE STATE OF DELAWARE PERTAINING TO TRUSTS THAT RELATE TO OR REGULATE, IN A MANNER INCONSISTENT WITH THE TERMS HEREOF (A) THE FILING WITH ANY COURT OR GOVERNMENTAL BODY OR AGENCY OF TRUSTEE ACCOUNTS OR SCHEDULES OF TRUSTEE FEES AND CHARGES, (B) AFFIRMATIVE REQUIREMENTS TO POST BONDS FOR TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (C) THE NECESSITY FOR OBTAINING COURT OR OTHER GOVERNMENTAL APPROVAL CONCERNING THE ACQUISITION, HOLDING OR DISPOSITION OF REAL OR PERSONAL PROPERTY, (D) FEES OR OTHER SUMS PAYABLE TO TRUSTEES, OFFICERS, AGENTS OR EMPLOYEES OF A TRUST, (E) THE ALLOCATION OF RECEIPTS AND EXPENDITURES TO INCOME OR PRINCIPAL, (F) RESTRICTIONS OR LIMITATIONS ON THE PERMISSIBLE NATURE, AMOUNT OR CONCENTRATION OF TRUST INVESTMENTS OR REQUIREMENTS RELATING TO THE TITLING, STORAGE OR OTHER MANNER OF HOLDING OR INVESTING TRUST ASSETS OR (G) THE ESTABLISHMENT OF FIDUCIARY OR OTHER STANDARDS OF RESPONSIBILITY OR LIMITATIONS ON THE ACTS OR POWERS OF TRUSTEES THAT ARE INCONSISTENT WITH THE LIMITATIONS OR LIABILITIES OR AUTHORITIES AND POWERS OF THE TRUSTEES HEREUNDER AS SET FORTH OR REFERENCED IN THIS SUPPLEMENT. SECTIONS 3540 AND 3561 OF TITLE 12 OF THE DELAWARE CODE SHALL NOT APPLY TO THE TRUST.

Section 3.    _Indemnification_. The Trustee and Co-Trustee shall be liable hereunder and under the Trust Agreement only for gross negligence, willful misconduct, or actions taken in bad faith. The Trustee and Co-Trustee shall not be liable in a fiduciary or personal capacity for making any delegation that is authorized hereunder or under the Trust Agreement, nor for any action taken at direction or without their consent, nor for any failure to act absent bad faith. The Trustee shall be indemnified and held harmless by the Settlor and the Beneficial Owner (but only to the extent of such Beneficial Owner's interest hereunder or under the Trust Agreement), the Lender, and each assignee at any time holding an interest in the Loan

8

(but only to the extent of the value of such assignee's interest in the Loan) from and against any threatened, pending or completed action, claim, demand, suit or proceeding (whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section 3 or to which the Trustee is made a party, or threatened to be made a party, by reason of serving as Trustee, if the Trustee, as the case may be, acted in good faith) brought by any Person claiming through the Settlor, the Beneficial Owner, the Lender or such assignee, as the case may be. Such indemnification shall include reimbursements for expenses (including attorneys' fees, judgments, fines and amounts paid in settlement) actually incurred, together with advancements for such expenses reasonably expected by the Trustee to be incurred in connection with such action, claim, demand, suit, or proceeding. Each indemnitor hereunder shall be liable, jointly and severally, for the full amount of the indemnity payments due hereunder and for such portion thereof as any indemnified person shall demand of them, subject to the limitations described above with respect to Beneficial Owner and Loan assignees. The Trustee shall not have any recourse to, right of offset against, or other claim against the assets of the Trust Estate or of the Sub-Trust Estate for any expense or liability of any kind (whether falling within the exculpatory provisions of this Section 3 or otherwise) of the Trustee incurred in connection with its duties under the Trust Agreement or this Supplement or for fees, if any, payable to the Trustee by any Fund (as defined in Section 6 of this Article V) as a result of the Trustee's management activity in connection with such Fund. The provisions of this Section 3 shall survive termination of the Trust Agreement or this Supplement or, with respect to any Trustee, the resignation or removal of such Trustee.

Section 4.    Taxation of Sub-Trust. The Settlor is intended to be the owner of the Sub-Trust Estate for purpose of, and pursuant to, Sections 671 through 677 of the Internal Revenue Code of 1986 (the "Code") and, except as otherwise directed by the person or entity then authorized to direct the Trustee hereunder, the Trustee shall so treat the Sub-Trust and Sub-Trust Estate in connection with all federal, state and local income tax filings, reports, returns, records and other documents prepared or filed by the Trustee or any agent of the Trustee with any tax authority.

Section 5.    Reports to the Settlor, the Beneficial Owner, the Internal Revenue Service and Others. The Trustee shall, on behalf of the Trust, (a) only upon the direction of the Settlor, which direction shall be delivered to the Trustee within 30 days of the end of a fiscal year, cause to be prepared and delivered to the Settlor and the Beneficial Owner, within 90 days of the end of such fiscal year, or more often, as may be required by the Code and the regulations thereunder, a copy of an unaudited annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as is necessary and appropriate to enable the Settlor and the Beneficial Owner to prepare its federal and state income tax returns, (b) annually determine if criteria are met requiring the Trust to file an IRS Form 1041, (c) if required by law, annually cause to be prepared IRS Form 1041 on behalf of the Trust as a grantor trust, (d) if required by law, annually cause to be prepared grantor letters for the Beneficial Owner that (i) set forth income, deductions, and credits allocated to such Beneficial Owner, (ii) set forth suggested classification of such income, deductions, and credits on such Beneficial Owner's own tax return and (iii) inform such Beneficial Owner of income and credits should be included on its tax return, (e) annually determine validity of income and expenses incurred by the Trust and (f) annually allocate income, deductions, and credits to each

9

of the Owners based on its percentage ownership interest in the Trust and the number of days it has held such percentage ownership interest. The Trustee shall sign on behalf of the Trust the tax filings of, or on behalf of, the Trust, unless the Beneficial Owner determines that applicable law requires the Beneficial Owner to sign such documents, in which case, the Beneficial Owner shall sign such documents.

Section 6.    Investment of the Trust Assets. The Trustee shall not, and shall have no duty to, invest and reinvest the assets of the Trust unless the Trustee has received a written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement to invest such assets. Promptly following receipt of such direction, the Trustee shall invest the directed assets only in the following: (a) negotiable instruments or securities represented by instruments in bearer or registered or in book-entry form which evidence investments that are short-term debt obligations rated A-1 by S&P and P-1 by Moody's; (b) commercial paper having, at the time of investment or contractual commitment to invest therein, a credit rating from Moody's and S&P of at least P-1 and A-1, respectively; or (c) any other similar highly rated investment approved in writing by the Lender ("Permitted Investments"), until such directed assets are required (1) to satisfy other obligations of the Trust, if any, or (2) to be distributed pursuant to the written direction of the Settlor or any other person or entity authorized to so direct the Trustee in accordance with the provisions of the Trust Agreement and this Supplement. The parties acknowledge that, subject to the foregoing limitations, the Trustee may make Permitted Investments in one or more mutual funds managed by affiliates of the Trustee (each, a "Fund"), and that (i) shares in a Fund are not obligations of the Trustee, are not deposits and are not insured by the FDIC, (ii) the Trustee or its affiliates may be compensated by a Fund for services rendered in its capacity as investment advisor, custodian and/or transfer agent; (iii) the Trustee, or its affiliates, also may be compensated by a Fund for providing shareholder services; and (iv) such compensation will be both described in detail in the prospectus for a Fund, and is in addition to the compensation, if any, paid to Trustee in its capacity as the Trustee hereunder.

*[Remainder of page intentionally left blank.]*

10

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be duly executed as of the date first written above.

THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2, as Settlor

_____
Elizabeth Ellis, Trustee

WILMINGTON TRUST COMPANY, as Trustee

By: _____
Name:
Title:    Janel R. Havrilla
          Financial Services Officer

Acknowledged and Agreed:

LA SALLE BANK, N.A.,
as Lender

By: _____
Name: Krista Lake
Title: Attorney-in-fact

ELIZABETH ELLIS , as Co-Trustee

_____
Elizabeth Ellis

THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2, as Beneficial Owner

_____
Elizabeth Ellis, Trustee

## SETTLOR AND CO-TRUSTEE DISCLOSURE STATEMENT AND ACKNOWLEDGMENT

## IMPORTANT: PLEASE READ THIS DISCLOSURE STATEMENT BEFORE SIGNING THE TRANSACTION DOCUMENTS

| | |
|---|---|
| BORROWER: | The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust |

Settlor intends to cause The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust to enter into that certain Note and Security Agreement (the "Note") with the lender named therein (together, with its successors, assigns and agents, the "Lender"), under which Borrower shall be provided loans to procure certain life insurance policies which have been identified to the Lender (the "Policies"). The Note, the Trust Agreement, Supplement to Trust Agreement and each of the documents contemplated thereby or delivered in connection therewith are sometimes referred to collectively as the "Transaction Documents." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Transaction Documents.

Each of the undersigned, as Settlor and Co-Trustee of the Borrower, do hereby acknowledge that such Settlor or Co-Trustee has read each of the Transaction Documents and further acknowledges, represents and warrants the following:

1. Each undersigned understands that pursuant to the Note, Borrower has agreed to take out a loan (the "Loan") from the Lender for the sole purpose of allowing it to procure the Policies, which Loan shall be strictly non-recourse unless Borrower defaults under the Note.

2. Each undersigned understands that pursuant to the Transaction Documents, Borrower has granted to the Lender a security interest in all of the assets contained in The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust (the "Sub-Trust"), including the Policies and all proceeds from the Policies, and in the event of a default under the Note, the Lender shall have the right to (i) take the Sub-Trust assets, including the Policies, from Borrower by means of foreclosure and (ii) surrender, sell or otherwise exercise rights under the Policies. Settlor also understands that in the event the Insured dies prior to the maturity of the Loan, the death benefit proceeds paid pursuant to the Policies shall first be used to repay the obligations of the Borrower due under the Note with the remainder of such death benefit proceeds being paid to the Borrower.

3. Each undersigned understands that, upon the maturity of the Loan, Borrower may satisfy all of its payment and other obligations under the Note by either (i) paying the Lender the Scheduled Maturity Date Balance (as defined in the Note) or (ii) relinquishing to the Lender all of Borrower's right, title and interest in, to and under the Policies.

4. Each undersigned understands that in the event Borrower relinquishes its rights to any of the Policies in accordance with the terms and conditions of the Note, Settlor, Co-Trustee and Borrower will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

5. Each undersigned understands that there will be tax effects to Borrower in connection with the transactions contemplated by the Transaction Documents, and Borrower has not relied upon any advice from the Lender, Coventry Capital I LLC, the administrator for the Lender (together with any successor, the "Program Administrator"), any affiliate of the Program Administrator, or any insurance producer regarding any such tax effects. Settlor and Co-Trustee each hereby confirms that the Program Administrator has recommended that both the Settlor and Co-Trustee consult with such person's own legal, tax, accounting and financial advisors regarding such potential effects.

6. Settlor hereby acknowledges and understands that the Trust Agreement and the Supplement to Trust Agreement are not intended to satisfy Settlor's estate planning needs and have not been designed as an

Settlor Initials _____

Co-Trustee Initials _____

estate planning tool. Settlor hereby confirms that the Program Administrator has recommended to Settlor that Settlor consult with Settlor's own legal, tax, accounting and financial advisors regarding individual estate planning needs.

7.  Settlor hereby confirms that each of the beneficial owners named in the Trust Agreement and in the Supplement to Trust Agreement is either related to or otherwise has an insurable interest in the insured.

8.  Each undersigned hereby acknowledges and confirms that such undersigned has had an opportunity to review each of the Transaction Documents, including the Note, with his, her or its attorneys, accountants and/or advisors and has a complete understanding of each of the Transaction Documents. Each undersigned understands and agrees that any such attorneys, accountants and or advisors (including any insurance producer) who is advising, or assisting such undersigned in connection with the transactions contemplated by the Transaction Documents is not acting as an agent of either the Program Administrator or the Lender. Neither undersigned has relied upon any advice from the Lender, the Program Administrator, or any affiliate of the Program Administrator, regarding its involvement in this transaction, and has not received and is not relying on any oral or written representations from any person that are inconsistent with or contrary to the information contained in the Note or this Disclosure Statement and Acknowledgement or any other Transaction Documents. Each undersigned is signing, or causing the Borrower to sign, as appropriate, the Transaction Documents freely and voluntarily and is of sound mind and not subject to any constraint or undue influence, and has never been the subject of any mental health or mental competency proceeding or other proceeding or hearing with respect to which such undersigned's competency or capacity to contract is or was an issue.

9.  The Loan and the issuance of the Policies are on terms that are fair and reasonable to the Borrower.

10. The Program Administrator has no obligation to cause any of the Policies to be issued and/or the Loan to be made.

11. Upon the reasonable request of the Program Administrator, Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, releases and authorizations from time to time, permitting or authorizing the Program Administrator to obtain current information regarding the Policies.

12. Settlor and Co-Trustee shall inform the Program Administrator within thirty (30) days of any and all changes in personal information of the Insured, including address, telephone number, or attending physician information. Settlor acknowledges that the Program Administrator may, from time to time and at its own discretion, contact Insured for confirmation of such information.

13. Each undersigned acknowledges that the Lender, the Program Administrator, and any insurance company providing insurance coverage relating to the value of the Policies, as well as third parties, will be acting in reliance upon the undertakings of such undersigned set forth in this document.

14. Settlor and/or Co-Trustee shall execute, or cause the Borrower to execute, all documents as may be required by the Lender, or any life insurer in connection with any of the Policies or the Loan and shall cooperate in any way reasonably requested (and at no cost to Settlor, Co-Trustee or Borrower) in connection with the transactions contemplated by the Transaction Documents, including, but not limited to, assisting in keeping any of the Policies in force or liquidating any of the Policies upon a default under the Note or at the request of the Borrower.

15. Each undersigned shall hold each of the Lender, the Program Administrator, any affiliate of the Program Administrator and any insurance company providing insurance coverage relating to the value of the Policies,

Settlor Initials _____
Co-Trustee Initials _____

2

harmless, and indemnify each of them from and against any loss, liability, expense, claim, or demand arising out of or in connection with (i) the failure of the Settlor, the Co-Trustee, the Borrower or the Insured to perform any of their respective obligations contained herein (or in any Transaction Document), except for those Losses resulting directly from the gross negligence or willful misconduct of either the Lender or the Program Administrator and/or (ii) any representation, and/or information provided, by the Settlor, the Co-Trustee, the Borrower or the Insured, or any of their respective agents, to the Lender or the Program Administrator being found to be false or materially misleading (collectively, "Losses"). The foregoing indemnity shall survive the termination of the Transaction Documents.

16. Except to the extent that any party shall seek equitable relief, all other disputes and controversies of every kind and nature between the Program Administrator and the Settlor, the Co-Trustee or the Borrower arising out of or in connection with any of the Transaction Documents, including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof shall be submitted and settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall be held in Philadelphia, Pennsylvania before a panel of three (3) arbitrators, hereafter collectively referred to as "arbitrator", knowledgeable in the business of life insurance, one to be chosen by each party, and the third to be chosen by the two previously chosen arbitrators. The arbitrator's decision and award shall be final and binding and may be entered in any court having jurisdiction thereof. The arbitrator shall not have the power to award punitive, exemplary, or consequential damages.

**SETTLOR**

X _____
(Signature of Settlor)

The Neil H. Ellis Irrevocable Insurance
Trust - 2005 No. 2
Elizabeth Ellis, Trustee
(Printed name of Settlor)

**CO-TRUSTEE**

X _____
(Signature of Co-Trustee)

Elizabeth Ellis
(Printed name of Co-Trustee)

**NOTARY**

State of _Connecticut_ )
                              ) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_ , _2005_

(Seal) _____
(Signature of Notary Public)

My commission expires: _____

My Commission Exp. Sep. 30, 2007

**NOTARY**

State of _Connecticut_ )
                              ) SS:
County of _Hartford_ )

Subscribed and affirmed to before me this
_23_ day of _June_ , _2005_

(Seal) _____
(Signature of Notary Public)

My commission My Commission Exp. Sep. 30, 2007

Settlor Initials _____
Co-Trustee Initials _____

3

## SETTLOR NON-RECOURSE SECURITY AGREEMENT

This **SETTLOR NON-RECOURSE SECURITY AGREEMENT** (this "Agreement") is entered into on ___July 1___, 20_05_ by and between THE NEIL H. ELLIS IRREVOCABLE INSURANCE TRUST - 2005 NO. 2 (sometimes "you" in this Agreement) and LA SALLE BANK, N.A. (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this grant of security from you to us of all of your right, title and interest in and to (i) any and all beneficial ownership interests in THE NEIL H. ELLIS INSURANCE TRUST - 2005 (the "Trust") and THE NEIL H. ELLIS INSURANCE TRUST - 2005, PREMIUM FINANCE SUB-TRUST(the "Sub-Trust") and (ii) all the assets held by the Trust and the Sub-Trust. Please read this Agreement together with the Note Agreement (as defined below) carefully and if you agree with the terms, please sign your name below.

*Background.* We and the Sub-Trust have entered into that certain Note and Security Agreement (the "Note Agreement"), dated ___July 16___, 20_05_, pursuant to which we have lent money to the Sub-Trust (the "Loan"). You acknowledge that it is a condition to our making the Loan to the Sub-Trust that you execute and deliver this Agreement to us and that you are entering into this Agreement in order to induce us to make the Loan to the Sub-Trust.

*Definitions.* Unless otherwise stated herein, capitalized terms used herein shall have the meanings ascribed thereto in the Note Agreement.

*Limited Non-Recourse Guaranty.* You hereby pledge and assign to us, and hereby grant to us a security interest in, all of your right, title and interest in and to all beneficial ownership interests in the Trust and the Sub-Trust and all assets now or hereafter held in the Trust or the Sub-Trust and all proceeds of the foregoing (collectively, the "Collateral"). The Collateral secures your guaranty below of the payment of the Loan. It also secures the Sub-Trusts' other obligations under the Note Agreement to the extent allowed by the law. You hereby, unconditionally and irrevocably, guarantee to us, for the benefit of the Sub-Trust and the Trust, and their respective successors and assigns, the prompt payment by the Sub-Trust of the Loan when due and all other obligations under the Note Agreement. This Agreement is non-recourse, meaning that nothing other than the Collateral secures your obligation to us and that we will not seek to collect the amounts due in respect of the Loan or pursuant to the Note Agreement other than from proceeds of the Collateral except as provided below in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date. In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request (the "Security Interest Perfection Documents"). You hereby authorize us, upon an Event of Default, to file one or more financing or continuation statements relative to all or any part of the Collateral without your signature. If the Sub-Trust does not satisfy all of its obligations to us under the Note Agreement on or before the Maturity Date and an Event of Default results, this Agreement, the Note Agreement and the documents pursuant to which the Trust and the Sub-Trust are formed give us the right and ability to foreclose upon the Collateral in an effort to receive proceeds sufficient to satisfy such obligations.

*Covenants.* You hereby agree that so long as the Note Agreement and this Agreement shall remain in effect, you will not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Collateral

*Events of Default.* Upon any Event of Default by the Sub-Trust, as described in the Note Agreement that is not remedied by the Sub-Trust within fifteen (15) days, we may take any and all lawful actions as described in paragraph "Events of Default" in the Note Agreement, including accelerating the Loan, and otherwise permitted by applicable law. In addition, upon any Event of Default, we may exercise any of the rights and remedies described below under the heading "If the Sub-Trust Fails to Perform Its Obligations."

*Default Interest.* You agree that if any amounts due under the Note Agreement are not paid on the Maturity Date and the Sub-Trust has not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Collateral).

## CONSENT TO APPOINTMENT OF AGENT

*Servicer.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicer"). You agree to follow the instructions and directions of the Servicer under this Agreement until we notify you in writing to the contrary.

You agree to send copies of all notices and correspondence hereunder to the Servicer at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless us and the Servicer and any of their respective affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF THE SUB-TRUST FAILS TO PERFORM ITS OBLIGATIONS

*We will take the Collateral from you.* If the Sub-Trust fails to pay the amounts due under the Note Agreement by the Scheduled Maturity Date (as defined in the Note Agreement), we may take the Collateral from you (i.e., foreclose) by whatever methods are contemplated by this Agreement or the Security Interest Perfection Documents and applicable law, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies and take any other actions that are legal and that we find appropriate with regard to the Collateral. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that the Sub-Trust fails to pay the amounts due under the Note Agreement on or before the Scheduled Maturity Date and fails to

2

relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Collateral.* We may surrender, sell or otherwise exercise rights under the Collateral as the owner thereof if the Sub-Trust defaults and we foreclose upon the Collateral as provided for in this Agreement. You hereby agree that we may exercise in respect of the Collateral, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Collateral) or other applicable law and also may, without notice except as specified below, sell or otherwise dispose of the Collateral or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You hereby confirm, acknowledge and agree that you have given to us, the Servicer and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge of any facts that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request. You further represent and warrant that your principal residence is located at 149 Colonial Road, PO Box 1270, Manchester, CT 06045 and that you will not change your principal residence without giving us at least 30 days prior written notice.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) the Sub-Trust defaults under the Note Agreement and we take the Collateral from you, or (ii) the Policies are relinquished to us in satisfaction of the Sub-Trust's obligations under the Note Agreement, we or certain third parties may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of the Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by us or such third party and its agents and employees, and you agree to reasonably cooperate with us or such third person in this matter.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under the Note Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

3

*Counterparts.* This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

*Delay in Enforcement.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US RELATING TO THIS AGREEMENT DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

### HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the Note Agreement and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

4

## SIGNATURES

- Do not sign this Agreement before you have read both this Agreement and the Note Agreement.

- This is a binding legal document and you should seek legal, financial and tax advice before signing it.

- If the Sub-Trust defaults in the performance of its obligations under the Note Agreement, we may foreclose on the Collateral.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THE NOTE AGREEMENT IN ITS ENTIRETY AND THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION.

THE NEIL H. ELLIS IRREVOCABLE
INSURANCE TRUST - 2005 NO. 2

Elizabeth Ellis, Trustee

Address:
149 Colonial Road
PO Box 1270
Manchester, CT 06045

LASALLE BANK NATIONAL
ASSOCIATION

By:

Name: Krista Lake
Title: Attorney-in-fact

Order                                    CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Elizabeth Ellis, As Co-Trustee
of The Neil H. Ellis Insurance
Trust - 2005

                    v.                          }          No.    08 CH 5368

LaSalle Bank National
Association et al.

### ORDER

This cause coming to be heard on plaintiff's Emergency MOTION FOR TEMPORARY RESTRAINING ORDER, DUE NOTICE HAVING BEEN GIVEN AND THE COURT BEING DULY ADVISED IN THE PREMISES

IT IS HEREBY ORDERED

(1) Plaintiff's motion for a temporary restraining order is denied for the reasons stated on the record; any previous TRO order is dissolved;

(2) This matter is set for status on Feb, 28, 2008 at 10:30 a.m without further notice.

Atty. No.: 42297

Name: M.C. Borders, Dykema          **ENTERED:**

Atty. for: Defendants

Address: 10 S Wacker Dr          Dated: 2-14 , 2008
Suite 2300

City/State/Zip: Chicago 60606          ENTERED
                                        JUDGE WILLIAM O. MAKI-1604

Telephone: 312-627-2154          Judge | FEB 14 2008 | Judge's No.
                                        DOROTHY BROWN
                                        CLERK OF THE CIRCUIT
                                        OF COOK COUNTY
                                        DEPUTY CLERK

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

EXHIBIT
9

Scheduling Order                                                    (11/08/04)  CCCH 0057

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - CHANCERY DIVISION

*# 12849-2*

Ellis

_v._

LaSalle Bank, etal

No. _08 CH 5368_

Judge _____

## SCHEDULING ORDER

**IT IS HEREBY ORDERED:**

The Motion of _Defendants_ _____ (NAME OF MOVANT)

for/to _Dismiss plaintiffs complaint_ (NAME OF MOTION)

is set for hearing on:

_April 30, 2008_ (date) at _11:00_ (a.m./**p.m.**).

MOVANT shall file a brief in support of the MOTION on or before

_____

RESPONDENT shall file a brief in response to the MOTION on before

_March 27, 2008_

MOVANT is granted leave to file a brief in reply to the MOTION on or before

_April 10, 2008_

*Hearing dates shall not be amended by agreement of the parties without prior leave of Court.*

*Movant shall furnish to the Court __NO LATER THAN TEN (10) DAYS BEFORE THE HEARING DATE**__ Courtesy Copies of:*
    The Motion
    The Brief in Support of the Motion
    The Brief in Response
    The Brief in Reply
    Any other Relevant Pleadings
    Any Federal or Sister State Cases and Statutes cited in Briefs.

***Motions are subject to being stricken from the call upon Movant's failure to provide Courtesy Copies on time. Please expect that the Hearing Date will be continued if Courtesy Copies are not received on a timely basis.*

Atty. No.: _____

Name: _____

Atty. for: _____

Address: _____

City/State/Zip: _____

Telephone: _____

ENTERED
JUDGE WILLIAM O. MAKI-1604

ENTERED:

Dated: FEB 28 2008

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge _____ Judge's No. _____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# 15 PAGE  LIMIT  ON  BRIEFS - NO  EXCEPTIONS

Scheduling Order                                                                 (11/08/04)  CCCH 0057

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT - CHANCERY DIVISION

*Elizabeth Ellis*

No. _08 CH 5368_

v.

*LaSalle Bank Natl Assn. and*

Judge _William O. Maki_

*Coventry Capital I LLC*

### SCHEDULING ORDER

IT IS HEREBY ORDERED:

The Motion of _Defendants LaSalle & Coventry_ ~~Plaintiff~~ _____ (NAME OF MOVANT)

for/to _Dismiss_ _____ (NAME OF MOTION)

is set for hearing on:

_the May 12, 2008_ (date) at _7:00_ a.m./p.m.). _And the previously scheduled hearing date of April 30, 2008 is stricken._

MOVANT shall file a brief in support of the MOTION on or before _____

_____

RESPONDENT shall file a brief in response to the MOTION on before

_April 21, 2008_ _____

MOVANT is granted leave to file a brief in reply to the MOTION on or before

_May 2, 2008_ _____

*Hearing dates shall not be amended by agreement of the parties without prior leave of Court.*

*Movant shall furnish to the Court **NO LATER THAN TEN (10) DAYS BEFORE THE HEARING DATE**\*\* Courtesy Copies of:*

    The Motion
    The Brief in Support of the Motion
    The Brief in Response
    The Brief in Reply
    Any other Relevant Pleadings
    Any Federal or Sister State Cases and Statutes cited in Briefs.

*\*\*Motions are subject to being stricken from the call upon Movant's failure to provide Courtesy Copies on time.  Please expect that the Hearing Date will be continued if Courtesy Copies are not received on a timely basis.*

Atty. No.: _0925358_

Name: _STEPHEN  EISENBERG_

Atty. for: _PLAINTIFF_

Address: _33 N. Monroe St. #1100_

City/State/Zip: _Chicago, IL 60603_

Telephone: _312-388-4554_

ENTERED
JUDGE WILLIAM O. MAKI - 1604

ENTERED

Dated:

APR - 7 2008

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge                                      Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                                          CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Eliz. Ith Ellis as Co-Trustee,
etal

v.                                      No.   08 CH 5368

LaSalle National Bank etal

### ORDER

This matter having come before the Court
on Plaintiff's _____ chez _____ To Amend
the Complaint in lieu of Response T)
_____ dants _____ To _____; due notice
_____ and the Court advised in the premises;

_____ it is hereby Ordered:

That Plaintiff's Motion for leave to
_____ Complaint is hereby
_____

Atty. No.: 45375

Name: _____ Frankling & Frankel   ENTERED:

Atty. for: Plaintiff

Address: 33 N. _____ 1100              Dated: _____ 2008

City/State/Zip: Chicago Illinois                ENTERED
                                60603         JUDGE WILLIAM O. MAKI-1604

Telephone: 312 365-4574                          APR 18 2008

                                        Judge    DOROTHY BROWN     Judge's No.
                                        CLERK OF THE CIRCUIT COURT
                                        OF COOK COUNTY, IL
                                        DEPUTY CLERK

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                              CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Elizabeth Ellis as co.
trustee et al.

_____

v.

La Salle Bank National
et al.

_____

} No. _08 CH 5368_

### ORDER

This cause coming to be heard on defendants'
motion to dismiss and the court being duly
advised in premises.

It Is Hereby Ordered

(1) Defendants 2-615 motion is granted and
plantiff's complaint is stricken with
leave to amend within 7 days on or before
May 19, 2008

(2) Defendants 2-619 motion is denied without
prejudice

(3) This matter is continued for status
on the pleadings on June 12, 2008
at 10:30 a.m.

Atty. No.: 42297

Name: M C Badges

Atty. for: Coventry

Address: Suite 2300
10 S Wacker Dr.

City/State/Zip: Chicago IL 60606

Telephone: 312-627-2154

ENTERED:

Dated: _5-12_, _2008_

ENTERED
JUDGE WILLIAM O. MAKI-1604
MAY 12 2008

Judge _____

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**