## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Elizabeth Ellis, as Co-Trustee of | ) | |
| The Neil H. Ellis Irrevocable | ) | |
| Insurance Trust-2005, No. 2 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 3083 |
| | ) | |
| | ) | |
| Coventry Capital I LLC | ) | Judge John W. Darrah |
| | ) | |
| | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS AND COMPEL ARBITRATION

NOW COMES Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 ("Ellis") by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and for her Response to Defendant's Motion to Dismiss and Compel Arbitration, states as follows:

### INTRODUCTION

Contemporaneously with the filing of this Response to Coventry's Motion to Dismiss, Ellis has filed a Motion for Remand to the Circuit Court of Cook County, Illinois. Assuming, *arguendo*, that this Court does not remand this case to the Circuit Court of Cook County, then Coventry's Motion to Dismiss should be denied because the Arbitration clauses relied upon by Coventry do not apply to the allegations and theories in the Amended Complaint against Coventry, the Federal Arbitration Act does not apply to the allegations in the Amended

Complaint, in the absence of remand, the discretionary arbitration clauses do not negate the Court's subject matter jurisdiction over Plaintiff's claims and the Amended Complaint states sufficient facts to withstand Coventry's 12 (b) (6) Motion to Dismiss.

Here, Coventry through its Notice of Removal has in one breath stated that Ellis' state court claims should be decided in federal court and now through its Motion to Dismiss is telling this Court that even though Coventry wanted its day in federal court, this Court lacks subject matter jurisdiction over the claims that Coventry has removed to this Court. (Coventry's Motion to Dismiss, Doc. No. 15 p. 11) As noted above regarding Ellis' Motion for Remand, the entire removal process that Coventry has undertaken and then the filing of this Motion to Dismiss does not appear to comply with the spirit of Rule 11. When a party has lost the identical issue in state court and now moves to dismiss citing lack of subject matter jurisdiction, after removal, while in the same motion seeking a different ruling than the state court ruling, that party should be found to have also waived dismissal of the removed federal court proceeding. Otherwise, litigant abuse of the removal process as an alternative to the state appellate courts occurs. It is for this very reason that remand and not dismissal is the appropriate order in the instant case.

### A. Summary of Facts in the Amended Complaint

In summary, this case arises out of LaSalle and Coventry's foreclosure on and liquidation of a $30,000,000.00 life insurance policy ("Policy") issued on the life of Plaintiff's husband, Neil Ellis. The policy premiums were financed by LaSalle pursuant to a Note and Security Agreement ("Note") executed on July 26, 2005. The Note appointed Coventry as the "Servicing Agent" for the Note.

The Plaintiff's Verified First Amended Complaint ("Amended Complaint") alleges five Counts against Coventry: Count I alleges a breach of fiduciary duty, Count II alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Count III alleges Fraudulent Concealment; Count IV alleges Unjust Enrichment/ Disgorgement and Count V alleges Constructive Trust. *See* Plaintiff's Verified First Amended Complaint.

Generally, the Amended Complaint alleges that prior to January 29, 2008 Coventry had acted as the Plaintiff's agent in securing and financing the purchase of the Policy. Coventry through its agents had chosen the lender, the broker and the attorney to represent Plaintiff and to draft all necessary documents for Plaintiff's signature. Coventry also acted in a dual capacity as LaSalle Bank's "Servicing Agent".

On January 29, 2008, Ellis received notice from Coventry that the Note was in default and that Coventry would be foreclosing on and liquidating the Policy. By correspondence to Coventry dated February 5, 2008, Ellis demanded arbitration to resolve the claim of default and any claim for foreclosure, sale or any other liquidation of the Policy. (See Exhibit B attached to Exhibit 2). By correspondence to Ellis dated February 6, 2008, Coventry refused Ellis' demand for arbitration. (See Exhibit C attached to Exhibit 2). By correspondence to Coventry dated February 6, 2008, Ellis again demanded arbitration. (See Exhibit D attached to Exhibit 2). Coventry did not respond to the subsequent demand for arbitration.

On February 12, 2008 Plaintiff secured a one-day temporary restraining order prohibiting Coventry and LaSalle from foreclosing on the Policy. On February 13, 2008, Plaintiff filed a Complaint against LaSalle and Coventry. Before the Plaintiff could appear in Court to request a renewal of the TRO, on February 13, 2008, Coventry notified Ellis that it had foreclosed on and would be liquidating the Policy. The Complaint sought a temporary

restraining order and preliminary and permanent injunctive relief to protect Plaintiff from the harm resulting from LaSalle and Coventry's potential liquidation of the Policy.

Despite Coventry's prior refusal to arbitrate, on February 27, 2008, Coventry filed its motion to dismiss the Complaint asserting that all disputes between Plaintiff, LaSalle and Coventry arising from the purchasing and financing of the Policy must be resolved through arbitration and, alternatively, asserting that the Complaint does not allege sufficient facts on which relief can be granted.

On February 28, 2008, the state court entered an order setting the briefing schedule for the motion to dismiss. On March 19, 2008, Plaintiff filed a motion to extend the time for filing a response to the motion to dismiss or an amended complaint in lieu of a response. On April 7, 2008, Plaintiff's motion was granted. On April 16, 2008, Plaintiff filed an emergency motion to file an amended complaint in lieu of a response to the motion to dismiss. The Amended Complaint included substantive theories of liability against Coventry to reflect recently discovered facts regarding Coventry's involvement in the purchasing and financing of the Policy. On April 18, 2008, the state court denied Plaintiff's motion to file an Amended Complaint. (See copies of all of the pleadings filed as Exhibits to Plaintiff's *Motion for Remand,* filed contemporaneously with this *Response*).

On May 12, 2008, after a hearing on Coventry's Motion to Dismiss, the Court granted Plaintiff leave to file and Amended Complaint which was filed in state court on May 16, 2008.


**B.  The Claims Against Coventry Are Not Subject To The Note's Arbitration Provision**

None of the Counts or theories in the Amended Complaint is dependent upon the Note and Security Agreement between Plaintiff and LaSalle. The allegations in the Amended

4

Complaint involve the interrelationship between Coventry and Plaintiff that existed prior to and after the execution of the note and security agreements. Generally, the five Counts of the Complaint focus on the fraud and breach of fiduciary duty that Coventry committed against the Plaintiff. These allegations are separate and distinct from the provisions of the Note and Security Agreement and do not directly involve the interpretation of the Transaction Documents but do involve the circumstances under which the Transaction Documents came into being and how Coventry abused its fiduciary relationship with the Plaintiff and profited from those breaches of duty.

While the Note and Security Agreement contain arbitration provisions, the law is clear that those provisions must actually apply to the case and controversy pled in the Amended Complaint. Clearly, a review of the allegations of the Amended Complaint demonstrates that the allegations and Counts in the Amended complaint do not fall within the Arbitration Clauses of the Note and Security Agreement. The arbitration clause does not apply to those claims against Coventry which fall outside the scope of the arbitration clause.  Plaintiff and Coventry are bound to submit to arbitration "only those issues that they have agreed clearly to resolve through the arbitration mechanism, and a court should not extend to an agreement by construction or implication." *Travis v. American Mfrs. Mut. Ins. Co.*, 335 Ill.App.3d 1171, 1176, 782 N.E.2d 322 (5th Dist. 2002).

Coventry's involvement in the transaction that is the subject matter of this case extends beyond its administration of the Note as the appointed Servicing Agent.  As evidenced by correspondence dated June 21, 2005 from Coventry to Neil Ellis, Coventry's involvement pre-dates the Note's execution on July 26, 2005.  (See Exhibit G attached to Exhibit 2). That correspondence evidences that Coventry procured the financing for the Policy's premium.  As

alleged in the proposed amended complaint, this and other pre-Note conduct by Coventry resulted in a fiduciary relationship between Coventry and the Trust. Plaintiff's claims against Coventry for breach of a duty which arose prior to the execution of the Note which contained the subject arbitration clause are beyond the scope of the arbitration clause.

To the extent that Coventry may have acted as LaSalle's agent in the administration of the Note, the parties to the Note agreed only to arbitrate those claims related to the Note itself or any resulting or related agreement. The parties did not agree to arbitrate those claims, such as those enumerated in Plaintiff's Amended Complaint, arising from Coventry's actions that pre-date the Note or were outside the scope of its capacity as LaSalle's agent.

**C.     The Claims Against Coventry Are Not Subject To The Note's Arbitration Provision Because Coventry Was A Non-Signatory To The Agreement**

Coventry's primary argument for dismissal is that an arbitration clause contained in the Note and Security Agreement divests this Court of subject matter jurisdiction over Coventry. The Note contained the following clause:

> ***Arbitration Clause.***  EITHER YOU OR WE ***MAY*** CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.  DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.
>
> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, ***at your or our election***, be resolved by neutral, binding arbitration and not by a court action.  [Emphasis added] (See p. 5 of Doc. No. 15-2).

6

The signatories to the note were Janet Havrilla of Wilimington Trust Company and Kristin Lake as attorney-in-fact for LaSalle. (See p. 7 of Doc. No. 15-2). Pursuant to the Note's arbitration clause, Coventry, as a non-signatory, may only compel arbitration if it qualifies as LaSalle's "agent, employee, successor, or assign." Coventry has asserted that it is LaSalle's "Servicing Agent", but would not commit that Coventry was LaSalle's agent for all purposes. (Exhibit 1, pp. 14-15).

Illinois courts have held that "an arbitration clause cannot generally be invoked by a non signatory to the contract." *Peach v. CIM Ins. Corp.*, 352 Ill.App.3d 691, 696, 816 N.E.2d 668 (5th Dist. 2004). Coventry has not admitted or asserted in the Motion to Dismiss that Coventry was LaSalle's agent, employee, successor, or assign for all purposes to legally bind LaSalle to any agreements with Plaintiff. Thus, Coventry may only successfully invoke the Note's arbitration clause to support dismissal of Plaintiff's claims against it if it proves that it was acting as LaSalle's legal agent in its administration of the Note. Coventry, through its attorney, who also represented LaSalle at the state court hearing, would not admit that Coventry was LaSalle's agent for all purposes to legally bind LaSalle. (Exhibit 1, pp.14-15)

Although Coventry was designated in the Note as LaSalle's "Servicing Agent," to invoke the arbitration clause, Coventry must prove that it was LaSalle's agent as that term is defined by Illinois law. In *Caligiuri v. First Colony Life Ins. Co.,* 318 Ill.App.3d 793, 801, 742 N.E.2d 750 (1st Dist. 2000), an Illinois appellate court considered the applicability of an arbitration clause to claims against a non-signatory. In *Caligiuri*, the subsidiary of a signatory to a contract containing an arbitration clause attempted to compel arbitration on the basis that it was an agent of the signatory. *Id.* at 800. After the trial court denied the motion on the grounds that the subsidiary was not an agent of the signatory, the subsidiary appealed. *Id.*

The Appellate Court initially commented that to invoke the arbitration clause, the subsidiary must prove that it was the signatory's agent as that term is defined under Illinois law: "Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal." *Id.* at 801 (citing *Illinois State Toll Highway Authority v. DiBenedetto*, 275 Ill.App.3d 400, 410, 655 N.E. 2d 1085 (1st Dist. 1995)).   Although the subsidiary pointed to some evidence that it was controlled by the signatory, the Appellate Court upheld the trial court's ruling on the grounds that the subsidiary failed to introduce evidence that it had the ability to conduct legal transactions in the name of the signatory. *Id.* at 803.  In this case, Coventry has not alleged that it was LaSalle's agent as that term has been defined by Illinois Courts.

Under the reasoning of *Caliguiri*, Coventry was not LaSalle's agent in its administration of the Note because it did not have the power to conduct legal transactions on LaSalle's behalf.   Coventry's duties as the Servicing Agent were defined by the Note's "Consent to Appointment of Agent" provision.  (See p. 4 of Doc. No. 15-2).  That provision states that Coventry, as the servicing agent, was to handle certain paperwork and notices on LaSalle's behalf.  The Consent to Appointment provision indicates that Coventry's involvement was of a clerical nature and does not suggest that Coventry was vested with the authority to conduct legal transactions on LaSalle's behalf.   Coventry has failed to allege or provide any proof to the contrary.

Additionally, Coventry cannot compel arbitration by declining to take a position with respect to whether it was LaSalle's legal agent under Illinois Law.  In *Ervin v. Nokia, Inc.,* 349 Ill.App.3d 508, 812 N.E.2d 534 (5th Dist. 2004), Nokia, a non-signatory to a phone

service contract between the plaintiff and a service provider, sought to compel arbitration based on an arbitration clause contained in the contract. *Id.* at 509. Nokia refused to take any position on whether it was the service provider's agent and argued that it could invoke the arbitration clause because the plaintiff's complaint implied an agency theory of liability. *Id.* at 513. The Court rejected Nokia's argument and held that, based on its denial and failure to allege or request a judicial determination that it was the service provider's agent, it could not invoke the arbitration clause. *Id.*

Similarly, in *Peach*, cited above, the appellant, a non-signatory to the contract containing the subject arbitration clause, attempted to compel arbitration while refusing to take a position regarding its relationship with the signatory or request a judicial ruling that it was the signatory's agent. 352 Ill.App.3d at 696. The *Peach* court's reasoning for upholding the trial court's denial of the non-signatory's motion to compel is instructive:

> In this case, [the defendant] did not request the trial court to find that Enterprise was its agent. CIM has actually refused to take any position in the trial court or in this court regarding its relationship to Enterprise. We can only assume that this is a tactical decision that will allow CIM, once it reaches arbitration, to deny that Enterprise was its agent, thereby refuting the exact allegation that allowed it to go to arbitration in the first place. Considering that an arbitration clause cannot generally be invoked by a nonsignatory to the contract, we see no reason to extend this option to CIM when it refuses to take a position on whether it has any legal relationship with enterprise.

*Id.* The "tactical decision" noted by the *Peach* court is precisely the tactic Coventry attempted to employ during the hearing on the motion to dismiss. To allow Coventry to invoke the arbitration clause without admitting that it was LaSalle's legal agent would facilitate the inequitable result that the *Peach* and *Nokia* courts expressly sought to prevent.

No legal or factual analysis is offered to support the contention that Coventry, as a non-signatory, may invoke the Note's arbitration clause. Coventry cannot, for the purposes of

protecting LaSalle or for any other reason, refuse to take a position on whether it was LaSalle's legal agent and still successfully invoke the arbitration clause as grounds for its dismissal. Since Coventry failed to allege that it was LaSalle's agent as the term is defined by Illinois Courts and refused to take such a position at the hearing, its motion to dismiss should be denied.

Lastly, Plaintiff, in her Amended Complaint, has clearly alleged sufficient facts upon which relief can be granted to satisfy the pleading requirements in opposition to Coventry's 12 (b) (6) Motion to Dismiss.

### D. The Federal Arbitration Act Does Not Apply To This Case Since The Arbitration Clause Does Not Apply To Plaintiff's Claims Against Coventry

Contrary to the broad sweeping assertions of Coventry that the Federal Arbitration Act applies to this case because of the existence of the arbitration clause in the Note and Security Agreement, the Plaintiff maintains, as argued above, that the Arbitration Clause in the Note and Security Agreement do not apply to Plaintiff's allegations against Coventry and even if they did, pursuant to the terms of the arbitration clause, Plaintiff has made her election to proceed in Court and not through arbitration. Regardless, Plaintiff has not agreed to arbitrate with Coventry in any Agreement between Plaintiff and Coventry. Moreover, to state that "Ellis refuses to arbitrate", misstates the issue. It is not whether there is a refusal to arbitrate. The issue is whether Plaintiff entered into a valid binding agreement to arbitrate. As detailed above, Plaintiff contests that the arbitration clause applies to the fiduciary relationship between Coventry and her. The Plaintiff cannot be forced or compelled into arbitrating her claims when these claims are either not governed by any arbitration agreement or are beyond the scope of

the arbitration agreement. For these additional reasons, Coventry's Motion to Dismiss should be denied.

## CONCLUSION

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005 No 2., respectfully requests that this Honorable Court deny Defendant, Coventry Capital I LLC's Motion to Dismiss and Compel Arbitration, and for such further relief as this Court deems just and appropriate.

Respectfully Submitted,

Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2

/s/ *Mark L. LeFevour*
One of the Attorneys for Plaintiff

Stephen P. Eisenberg (ARDC #0725358)
Mark L. LeFevour (ARDC #6204957)
James J. Sanders (ARDC #6204957)
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554

F:\CASE\059808\12849\RESPONSE TO MTD—FED CT -- FINAL.DOC

## CERTIFICATE OF SERVICE

I hereby certify that on **July 16, 2008**, I caused to be filed, electronically, the foregoing document with the Clerk of the United States District Court, Northern District of Illinois for the Eastern Division, using the CM/ECF system, which sent a Notice of Electronic Filing to all CM/ECF Registered Participants on **July 16, 2008**.

| | |
|---|---|
| Terrence E. Kiwala<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 1476548<br>Email: tikiwala@dykema.com<br>*Attorney for Coventry Capital I LLC*<br><br>Michael Borders<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 61800620<br>Email: mborders@dykema.com<br>*Attorney for Coventry Capital I LLC*<br><br>Rosa M. Tumialan<br>Dykema Gossett, PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>(312) 876-1700<br>ID Number: 6226267<br>Email: rtumialan@dykema.com<br>*Attorney for Coventry Capital I LLC* | **A copy was also served on the below counsel by U.S. mail:**<br><br>Brian P. Brooks<br>Kyra A. Grundeman<br>O'Melveny & Myers LLP<br>1625 Eye Street, N.W.<br>Washington, D.C. 20006 |

/s/ Mark L. LeFevour
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 West Monroe Street, Suite 1100
Chicago, IL 60603
Phone: (312) 368-4554
Fax: (312) 368-4562
E-mail: mll@lefltd.com
IL ARDC # 6204957

STATE OF ILLINOIS  )
                   ) SS:
COUNTY OF C O O K  )
    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         COUNTY DEPARTMENT - CHANCERY DIVISION
ELIZABETH ELLIS, as the        )
Co-Trustee of the Neil         )
H. Ellis Insurance Trust       )
- 2005                         )
              Plaintiff,       )
                               )
    vs.                        )  Case No. 08 CH 5368
                               )
LaSALLE NATIONAL BANK          )
ASSOCIATION and COVENTRY       )
CAPITAL LLC,                   )
              Defendants.      )

    REPORT OF PROCEEDINGS at the hearing of
the above-entitled cause before the Honorable
WILLIAM O. MAKI, Judge of said Court, on the 12th
day of May, 2008, at the hour of 1:45 o'clock p.m.

Reported by:  Deborah E. DeSanto, CSR
License No. 084-1384

1

---

1    APPEARANCES:
2        LEAHY, EISENBERG & FRAENKEL, LTD.
3        BY:  MR. STEPHEN P. EISENBERG
4              and
5            MR. MARK L. LeFEVOUR
6        33 West Monroe Street
7        Suite 1100
8        Chicago, Illinois  60603
9        (312) 368-4554
10           Representing the Plaintiff;
11
12       DYKEMA GOSSETT LLC, by
13       BY:  MR. MICHAEL C. BORDERS
14       10 South Wacker Drive
15       Suite 2300
16       Chicago, Illinois 60606
17       (312) 876-1700
18           Representing the Defendants.
19
20
21
22
23
24

2

---

1        MR. LeFEVOUR:  Good afternoon, your Honor.
2    Mark LeFevour and Stephen Eisenberg on behalf of
3    the plaintiff, Elizabeth Ellis as Co-Trustee of the
4    the Neil H. Ellis Insurance Trust - 2005.
5        THE COURT:  Okay.
6        MR. BORDERS:  Michael Borders on behalf of
7    the defendants, LaSalle National Bank Association
8    and Coventry Capital LLC.
9        THE COURT:  I think this comes to be heard
10   on your 619/615 motion to dismiss.
11       MR. BORDERS:  Yes, your Honor, it does.
12       THE COURT:  You wish to be heard?
13       MR. BORDERS:  Briefly, because I think the
14   parties' positions are fairly well stated in the
15   briefs submitted to your Honor.
16       I think the critical issue is, for the
17   purposes of enforcement of the arbitration clauses
18   in the various agreements that have been made part
19   of this record, is Coventry Capital an "agent" of
20   LaSalle as contemplated by the arbitration clauses.
21   And there's simply no question about that fact.  In
22   the -- we have, well, three trusts.  We have the
23   irrevocable trust, which is the beneficiary of the
24   insurance policies.  We have the -- what we

3

---

1    generally refer to as the trust, and then the
2    sub-trust.  And the sub-trust is the trust that
3    actually took out the note and security agreement
4    from LaSalle.
5        In the insurance trust, the irrevocable
6    trust, which is the named plaintiff in this action,
7    it, the plaintiff consents to Coventry being named
8    as servicing agent of LaSalle.  There's
9    unquestionably an arbitration clause in the
10   agreement that encompasses the types of claims
11   attempted to be asserted here.  And, in fact, the
12   document itself, which is attached to the motion,
13   as the document says consent to agent, which
14   clearly makes -- consent to appointment of agent,
15   it's part of the Tab A to the note and security
16   agreement, lists Coventry as the servicing agent
17   for LaSalle.
18       So there can be no ambiguity, there is no
19   ambiguity as to whether or not for purposes of the
20   matters that are asserted here, that Coventry
21   Capital is an agent of LaSalle subject to the
22   arbitration provision.  The plaintiffs have
23   conceded that any disputes they have with LaSalle
24   are subject to the arbitration provision.

---

EXHIBIT

1

1 (Pages

1    In addition, under the sub-trust's note
2    and security agreement, there is also a consent to
3    Coventry as being a sub-agent, and that provision
4    includes the same essential arbitration clauses as
5    included in the non-recourse security agreement
6    with LaSalle.
7    And then if that weren't enough as it
8    were, there is the separate disclosure statement
9    wherein Coventry is designated as the program
10    administrator. And there is a specific provision
11    in the disclosure statement that all these
12    agreements involving the program administrator are
13    also subject to arbitration under the same basic
14    terms. And that relates to any disputes relative
15    to the transaction documents. And the transaction
16    documents are defined to include the various trusts
17    that are the subject matter of this controversy.
18    So, there's essentially no dispute that
19    there's an arbitration provision here that under
20    the provisions of the Federal statute and the
21    public policy, that this Court essentially is
22    divested of subject matter jurisdiction for the
23    claims that plaintiff wishes to plead in what
24    essentially amounts to a motion to reconsider this

5

1    Court's denial of their prior motion to file an
2    amended complaint. They have essentially conceded
3    that the complaint currently on file is subject to
4    dismissal, and since the amended complaint does not
5    cure the defect, that the Court should deny what
6    needs to be filed.
7    The second argument raised is that the
8    plaintiffs are essentially estopped from contending
9    that this dispute's not subject to arbitration
10    since their Connecticut counsel has demanded
11    arbitration and in their demand letters asserted
12    essentially the same claims, breach of fiduciary
13    duty and -- that are encompassed within both
14    amendments.
15    And their final argument is, issue is
16    whether or not the arbitration clauses themselves
17    encompass what's alleged in the amended complaint.
18    And they clearly do in that the arbitration
19    provisions are quite broad, including the disputes
20    that arise out of or are related to the documents
21    which are the subject of this dispute, and that is
22    the essence of the plaintiff's claims of breach of
23    fiduciary duty.
24    So it's the defendants' position that this

6

1    case should be dismissed with prejudice, and any
2    claims that the plaintiff has against either
3    LaSalle or Coventry will have to be submitted by
4    the arbitration.
5    THE COURT: Okay.
6    MR. LeFEVOUR: Your Honor, primarily, you
7    know, there's two different provisions that are
8    seeking dismissal, 2 619 and 2 615.
9    Under 2 619, their theory is that the
10    Court does not have subject matter jurisdiction
11    because of this arbitration clause.
12    As to Coventry, in the case law that we've
13    cited in our brief, more particularly, Urban vs.
14    Nokia, 349 Ill. App. 3d 508, and then the -- I
15    don't want to mispronounce it, the, Caligiure case,
16    is C-a-l-i-g-i-u-r-e, vs. First Colony Life
17    Insurance Company, 318 Ill. App. 3d 793, it really
18    goes to the heart of the issue here. And the issue
19    is not whether or not Coventry is designated an
20    agent in the documents, but as a non-signatory to
21    the agreements, whether Coventry can be deemed a
22    legal agent under Illinois law.
23    A mere servicing agent does not bring them
24    within the arbitration clause. They would have to

7

1    have the right to conduct legal transactions on
2    behalf of LaSalle.
3    And even in the arguments today, that
4    position has not been taken here. Basically what
5    they're saying is, well, they have the right to be
6    the agent to do what's under the documents, which
7    is basically a servicing agent, which is basically
8    send out notices, send out other things that we're
9    claiming they did wrong.
10    And so, therefore, under the case law, as
11    we have read it, and that's one of the reasons we
12    sought to amend the complaint before the Court a
13    few weeks ago, was we did not believe that they
14    were covered by the agreement, because they're a
15    non-signatory, and there's been no showing in
16    either the documents or anywhere that they're
17    anything but a servicing agent and not a legal
18    agent of LaSalle Bank.
19    And I certainly would suggest to the Court
20    that I don't think LaSalle Bank would have made
21    them a legal agent for all purposes in case
22    Coventry is doing something wrong, as we have
23    alleged here.
24    The other issue is, there's a relationship

8

1 that exists prior to the secured -- I'm sorry, the
2 note and security agreement.
3      If I'm listening to LaSalle at this point,
4 they're saying, "Okay. Well, those transactions
5 would come within this because they're our agent."
6 And if that's their position, that's fine. But our
7 position is, those are things that took place even
8 before the financing here, the note and security
9 agreement was signed.
10      The critical issue is whether or not
11 they're a signatory to the agreement, and they are
12 not. And that's, that is where we divide here.
13      And LaSalle, there's no question, if
14 they're a signatory to the agreement, they can go
15 to arbitration.
16      Coventry's not a signatory to the
17 agreement and not right at this point, as far as I
18 know, designated as a legal agent under Illinois
19 law to act on behalf of LaSalle for all purposes in
20 this transaction. And that goes to -- you know, to
21 act as an agent for all purposes goes to signing
22 legal documents and things like that. And they
23 certainly did not do that in this case.
24      As to --

9

1 relevant, of course, to this transaction? And if
2 so, then their principal is responsible for what
3 they do if they can't hold for the indemnity, and
4 they acted with that full force of agency power for
5 its principal.
6      And I can't get an answer to that
7 question. I see the distinctions between servicing
8 agent and program administrator. But when I look
9 at the case law and I look at the language of the
10 arbitration provision, it says, "My agent,"
11      LaSalle's agents are subject to
12 arbitration, I can understand that. And I think if
13 we ask the question are they willing to stand,
14 LaSalle and Coventry, with actually the same
15 counsel today, for all the actions that Coventry
16 did relative to this transaction -- we're not
17 looking to make them into an agent for things that
18 are not relevant -- and if they answer yes, then
19 they are an unnamed and they might be there by
20 admitting to being an Illinois authorized legal
21 agent.
22      But if they corner and equivocate with the
23 word servicing agent and program administrator,
24 what is to say that later, during an arbitration,

11

1      THE COURT: What is the distinction in
2 terms of the facts here of Coventry Capital's role?
3 I mean, they are designated in the security
4 agreement, the note and security agreement as being
5 the servicing agent. And it's acknowledged by the
6 parties that they are the servicing agent. I mean,
7 what distinction is there in terms of any other
8 activities that may or may not have been alleged
9 here?
10      MR. LeFEVOUR: Well, in a case by case --
11      MR. EISENBERG: Well, if Coventry -- if I
12 may, as to the facts, your Honor, which you've
13 asked, we look at the fact that it is alleged that
14 the notices sent by Coventry were sent to the wrong
15 address.
16      Now, in the documents, we look at the
17 distinction because the documents say the
18 arbitration clause applies to us and our agents.
19      The documents also refer to Coventry as a
20 servicing agent and as a program administrator.
21      The question is a simple one, and I think
22 it can be answered, and, that is, do they stand
23 before the Court today and say that they are the
24 Illinois legal agent for LaSalle to do things only

10

1 they will say, not say, "Wait a minute. We're not
2 the agent for LaSalle on that. We're agent --" or
3 LaSalle might say, "No, they're not our agent on
4 that, that bad address thing. They're on their own
5 for that."
6      And then we would find ourself wondering
7 why we didn't litigate with them here, because now
8 it's not the arbitration provision against
9 Coventry, for Coventry, it's LaSalle saying, "Wait
10 a minute. They're not."
11      So will LaSalle say "Illinois law, our
12 agent, they bind us. All that they did is all that
13 we do." Or if they're going to hedge behind
14 language of servicing and program administrator,
15 then they're not under the arbitration benefit.
16      So I say to them, well, I wish they could
17 answer that question, and I asked it before court.
18 I don't have an answer yet. It might resolve the
19 whole matter.
20      The fact is that they sent it to the wrong
21 address. So the question is -- that and other
22 facts -- do they apply as the agent acting for the
23 principal?
24      THE COURT: So for the point of argument

12

1 if Coventry Capital performed a misdeed, whatever
2 it is, sent it to the wrong address, the issue in
3 your mind is were they acting as an agent of
4 LaSalle or are they acting independently?
5     MR. EISENBERG: I'm sure that they might,
6 that LaSalle might later say that they were acting
7 as an independent.
8     Now, they might correct that here by
9 saying for LaSalle, because LaSalle is here, too.
10 I don't -- that seems to have an inherent conflict
11 for me, but given this context, we can -- it's not
12 my job. I've got to go right by that.
13     But will LaSalle say, "They were acting
14 for us in all that they did"?
15     MR. LeFEVOUR: And that's what the Nokia
16 case basically says, Judge, is that -- they
17 attempted that in that case, when they got to
18 arbitration and they were going to switch their
19 position that they weren't an agent. And that's
20 the concern.
21     The only other points to touch on is the
22 estoppel argument on these letters. Judge, they
23 were letters asking to arbitrate about the
24 foreclosures and said that, "If we get to

13

1 arbitration, we'll raise these other issues." That
2 was early on in this, before anyone had really
3 looked at the documents.
4     Our position is, as Mr. Eisenberg stated,
5 Judge, is that if they're willing to take that
6 position, that for all purposes that they're the
7 legal agent, well, then that would control.
8     But if not, then we have to look at the
9 Nokia case and say that doesn't control and they're
10 not entitled to -- they're not entitled to
11 arbitration.
12     MR. EISENBERG: And counsel for both is
13 here. He could speak to that. That way we don't
14 have to be haunted by it later.
15     THE COURT: Can you speak to that?
16     MR. BORDERS: I can speak to it to this
17 extent. LaSalle and Coventry have no conflict as I
18 stand here representing both of them in this matter
19 in that they have the joint position that both
20 Coventry and LaSalle and any dispute they have with
21 the plaintiff relative to these documents and
22 transactions are subject to the arbitration
23 agreement. It will be up to the arbitrator to
24 decide and resolve if there is any claim against,

14

1 for purposes of example, Coventry that may or may
2 not go beyond the scope of the agency delegated to
3 them by LaSalle. That's arbitrable. This doesn't
4 divest the arbitrator of jurisdiction over that
5 dispute.
6     They need not have identical interest in
7 all matters, just as in any principal/agency
8 dispute. The agent, the principal could argue that
9 the agent acted outside the scope of their
10 delegated agency.
11     The question here before this Court is
12 what is contemplated by these documents and is
13 Coventry as well as LaSalle, if you will,
14 beneficiary of the arbitration clause. And I think
15 it's -- it can be -- there really is no legitimate
16 dispute that -- in my view, there is no legitimate
17 dispute that the agreements executed by the parties
18 contemplate that any and all controversies arising
19 out of these various documents are subject to
20 arbitration. And it can be no clearer than in the
21 disclosure statement, which is attached to our
22 motion as Exhibit D that specifically references
23 Coventry as well as LaSalle. In that document they
24 use the term program administrator.

15

1     THE COURT: Okay.
2     MR. BORDERS: So I think that, you know,
3 what plaintiffs are trying to do is, you know,
4 manipulate the issue as it were to try to create a
5 controversy between LaSalle and Coventry when in
6 fact there is no dispute over the -- between the
7 two parties as it relates to the ability in
8 assessing these claims be subject to arbitration.
9     MR. EISENBERG: Judge, what I just heard
10 is what I heard earlier, and that is that Coventry
11 and LaSalle agree with what this Court is charged
12 to order, the question, but Coventry and LaSalle
13 agree this is arbitrable. I heard him say that.
14 And then he said that which would be the context of
15 a third-party arbitration complaint, whether you
16 did act inside or outside the scope of authority.
17     It is not -- it is for me to deal with the
18 question about Coventry's actions with respect to
19 the plaintiff. Not to simply leave it later for an
20 arbitration of third-party liability between
21 principal and agent and actions inside or outside
22 of the scope of the authority.
23     A signatory to arbitration is LaSalle, and
24 it's clear that everything about their case with

16

1 the plaintiff goes to arbitration.

2     But when we have this hedging about

3 whether or not it's a third-party matter or

4 servicing agent or plan administrator, it's not

5 clear, and it shouldn't be left for it later to be

6 decided in arbitration that wrongs committed

7 against the plaintiff disavowed by LaSalle are the

8 duty of Coventry in arbitration for a decision

9 rather than this Court. It should be this Court,

10 because they're not named, they're not signed. And

11 I just heard third-party arbitration complaint, and

12 I can't believe that that would be the subject

13 matter, let alone they're arguing before the Court

14 by the same lawyer. So, they would have to do

15 that, they would have to get different lawyers in

16 arbitration.

17     THE COURT: All right. But the issue here

18 in their motion is whether or not they can choose

19 to void this Court of any jurisdiction and settle

20 these issues in arbitration. I mean, isn't that

21 the question? And it seems by the very nature of a

22 619 motion, they're saying, they're opting for

23 arbitration.

24     MR. EISENBERG: Absolutely, Judge. This

17

---

1 is a question that on behalf of LaSalle is by the

2 documents and by the clear language arbitrable. We

3 have said that in our papers.

4     THE COURT: Okay.

5     MR. EISENBERG: The next step is, is it

6 the arbitration form for Coventry and plaintiff?

7 And we look at the documents, and the first

8 arguments that have been made -- well, I won't

9 repeat them -- are that they are non-signatories.

10     The second is that the defendant,

11 Coventry, says, "We're a servicing agent, so we're

12 the agent." "We're the program administer, so

13 we're the agent." And I say to them, "Are you,

14 therefore, the agent for LaSalle in all matters of

15 this transaction?" And he says, "That will be the

16 subject of a dispute, if at all, between my

17 principal and my agent," between the principal and

18 the agent.

19     And you can't read that into this

20 arbitration clause. If I've got a dispute with

21 Coventry, it should be brought to this Court. And

22 these documents and the references to a servicing

23 agent and a program administrator don't make them

24 the legal agent, and if they do, they should say

18

---

1 so.

2     THE COURT: Do you have to establish that

3 distinction in order to see whether Coventry is

4 entitled to arbitration? I mean, just because

5 they're not a signatory to this agreement doesn't

6 mean that it's -- that they don't have rights under

7 the agreement where all parties acknowledge that

8 they are a servicing agent.

9     MR. LeFEVOUR: Right. And that's -- I

10 think the case law in this area is very specific on

11 those issues, that non-signatories to agreements,

12 you have to establish, it's actually their burden

13 to establish that they are an agent before they'll

14 be able to enforce any arbitration provisions.

15     Because we have -- under the agreement,

16 either party has the right to arbitrate, okay, to

17 choose arbitration. We have the right to choose

18 arbitration against LaSalle. We have the right to

19 choose arbitration -- to not arbitrate against

20 Coventry because we don't believe that they're

21 covered by the agreement. They don't have the

22 right to choose arbitration against Coventry

23 because they're saying they don't have any claims

24 against them. So we --

19

---

1     THE COURT: Now, wait a minute. I believe

2 he's representing them, he's saying on, "behalf of

3 Coventry I'm electing to arbitrate."

4     MR. LeFEVOUR: Of course. But that puts

5 the answer before the question, because to get to

6 where he wants, to be saying, "I want to arbitrate

7 on behalf Coventry," you'd have to establish that

8 they have rights under the agreement and the rights

9 under the agreement --

10     THE COURT: Correct.

11     MR. LeFEVOUR: Yes. And the rights under

12 the agreement, the case law says that when they're

13 non-signatory, the only way that they can get that

14 bundle of rights under the agreement is if they say

15 that they're their agent, they're legal agent for

16 all purposes.

17     And what we're trying to say here is, if

18 that's their position here, then your decision's

19 easy. But they're not stating that that's their

20 position.

21     And I hate to keep referring to the Nokia

22 case, but that's exactly what they said. They

23 didn't want gamesmanship, where they come in here

24 and say, "Judge, they're the agent." Then they go

20

---

1 over there and say, "Well, they're really not the
2 agent." So then we have to come all the way back
3 -- and then what do we have to do? We have to come
4 back here, because now they're not subject to the
5 arbitration.
6     And that's the issue that we're dealing
7 with. If they want to admit that these are -- that
8 it was our legal agent for purposes of this
9 transaction, and, you know, we accept his
10 representation, obviously then the Court's decision
11 is easy.
12     But here it's not that simple, because
13 they're not signatories to this agreement. And
14 that does make a difference, because they don't get
15 the rights that he's trying to assert as a
16 non-signatory. You only get them, those rights, if
17 they're agent, a legal agent of LaSalle.
18     And that's really -- I think we've been
19 trying to show the Court that, you know, here and
20 earlier in our -- when we sought to amend the
21 pleading, because we didn't think -- we don't
22 believe that under the current state of pleadings,
23 that Coventry is, you know, subject to any rights
24 arbitration clause or can invoke any rights under

21

1 the arbitration clause unless LaSalle says,
2 "They're our agent."
3     MR. EISENBERG: That could be an easy
4 answer. If under Illinois law, Coventry is the
5 agent of LaSalle, it seems that that's what limited
6 discovery, if we were allowed, would show here.
7 But they could solve it by that admission, and you
8 could order us to arbitration, and we would go do
9 so.
10     But I loathe the thought of getting to
11 arbitration when two parties against us are
12 starting to say, "Well, no, no, no, that's not me.
13 No, no, no, that's not me," when the burden of the
14 benefit of the arbitration opportunity is on
15 Coventry to show that they're the agent, not the
16 servicing agent, not the program administrator.
17     MR. BORDERS: Whenever it's my turn, you
18 know --
19     MR. EISENBERG: It's easier to just
20 interrupt. Then you'll get a turn for sure.
21     THE COURT: Here's what I'm doing, is I'm
22 reviewing his brief in reference to this Urban vs.
23 Nokia. I'm just looking at it, his arguments here
24 in reference to this case.

22

1     Go ahead. What did you want to add?
2     MR. BORDERS: I think the non-signatory,
3 Urban, if I remember, was expressly excluded from
4 the arbitration clause.
5     I mean, I think that it's not uncommon at
6 all for various parties who potentially may not
7 have completely uniform positions to agree to
8 submit disputes to arbitration.
9     So the issue before this Court is not
10 whether or not there could be a claim asserted in
11 arbitration against Coventry where they would not
12 be deemed to be the agent of LaSalle since LaSalle
13 was responsible financially for that breach, as
14 opposed to did the parties agree that any
15 controversies between the plaintiff or the other
16 trust and LaSalle and Coventry arising out of these
17 transactions and execution of these documents would
18 be submitted for resolution to arbitration.
19     And on that issue, I do not think there is
20 any dispute. Plaintiffs are trying to essentially
21 get, if you will, the cart before the horse. To
22 argue, you know, what if, what if, what if, those
23 what if claims could be submitted to arbitration.
24     If the arbitrator determines that Coventry

23

1 has liability to the plaintiff for some reason or
2 LaSalle does not, so be it, that would be the
3 result of the arbitration. If they deem that both
4 Coventry and LaSalle jointly have liability or
5 LaSalle as the principal for Coventry, so be it.
6     But the question before the Court is, do
7 these agreements give Coventry, since it's not a
8 dispute as to LaSalle, the right to assert the
9 arbitration clause.
10     THE COURT: That is the question.
11     MR. BORDERS: That is the question.
12     THE COURT: Right.
13     MR. BORDERS: And we say, and I say the
14 answer is undisputedly yes. If one goes no further
15 than looking at the disclosure statement, which is
16 at our Tab D, it talks about "arising out of or in
17 connection with any of the transaction documents,
18 including but not limited to its existence,
19 instruction, validity, interpretation or meaning,
20 performance, nonperformance, enforcement,
21 operation, breach, continuous, or termination
22 thereof shall be submitted and settled by
23 arbitration," et cetera.
24     So their arguments that Coventry breached

24

6 (Pages 21 to 24)

1  and their purported complaint that Coventry
2  breached a fiduciary duty to provide proper notice
3  of the maturity date clearly is a claim which falls
4  within the scope of responsibilities delegated to
5  Coventry as a servicing agent for LaSalle, for
6  example.
7       MR. LeFEVOUR: May I just make one brief
8  point on it, your Honor?
9       THE COURT: Sure.
10      MR. LeFEVOUR: The agreements they're
11  referring to, none of them are signed by Coventry.
12  That's No. 1.
13      And No. 2 is that Mr. Borders focuses on,
14  "Well, we can just go arbitrate this with
15  Coventry." But, you know, our client, the
16  plaintiff, has the right to choose where the trust
17  wants to litigate these issues. And what we lose
18  in arbitration is the potential of going before a
19  jury on these claims in the Law Division, which are
20  the legal claims.
21      And that's what the dispute is here, is
22  that, you know, we believe that based on the
23  amended complaint, that there is some significant
24  issues against Coventry that we want to litigate,

25

1  and we don't want to forego that right to litigate
2  it before a jury when we don't have to.
3       And quite frankly, again, under the case
4  law as we see it and without some establishment of
5  legal agency under Illinois law, we don't have to
6  under the agreement take Coventry to arbitration.
7  And that's our position. And --
8       THE COURT: And your position is that
9  Coventry doesn't have the right to take you to
10  arbitration?
11      MR. LeFEVOUR: Correct, correct, under the
12  agreement because they're non-signatory.
13      MR. BORDERS: But then what the plaintiff
14  would purport to put this Court in a predicament to
15  do, assuming hypothetically their argument would be
16  accepted, is then this Court would be left to slice
17  and dice, "Well, what relates to these agreements
18  and transactions and what's separate? So what's
19  before the arbitrator and what's before me?"
20      All right. So, you know, this is exactly
21  why arbitration clauses are enforced. I mean, I
22  don't even know what would be left before this
23  Court and would be left before the arbitrator,
24  because they're -- unless you just buy that as a

26

1  non-signatory, they cannot enforce the arbitration
2  clause, which I think that argument just has no
3  basis in law. Then you are to, well, what, you
4  know, what claims did they have that could possibly
5  -- legal claims that could fall outside of the
6  arbitration agreement? And the answer is that they
7  don't have any if they don't -- if their
8  independent claim's unrelated or arising out of the
9  execution of these documents, and that's not what
10  they've pled. Every claim they've pled arises out
11  of this transaction, the execution of these
12  documents and the legal relationship between the
13  parties as a result of the execution of these
14  documents.
15      THE COURT: But does it really matter,
16  because once LaSalle exercises their right to take
17  it to arbitration, then the issues are taken to
18  arbitration. Whether it's LaSalle, whether it's
19  Elizabeth Ellis, what difference does it make?
20  Whoever elects to take it to arbitration, the
21  issues go to arbitration.
22      MR. LeFEVOUR: As between LaSalle and the
23  trust.
24      THE COURT: If there's any disputes.

27

1       MR. LeFEVOUR: Between LaSalle and the
2  trust I would agree with you. I don't know -- I'm
3  not sure I agree with Mr. Borders that the -- our
4  claims against Coventry necessarily go to
5  arbitration. It wouldn't necessarily have to go to
6  arbitration even if they chose --
7       THE COURT: I believe, and, you know, I'm
8  going to have to go and read it, but I believe that
9  in the case that you're citing, the Nokia case, I
10  mean, Nokia was attempting to take it to
11  arbitration, and the issue became whether they had
12  that right or not, they were a non-signatory.
13      But whoever had the right in the agreement
14  if they chose to take arbitration, well, you
15  wouldn't have that same issue.
16      MR. LeFEVOUR: Well, you know, I --
17      MR. EISENBERG: I think you're looking at
18  the invocation, the right to elect that as a venue.
19      THE COURT: I'm saying the plain reading
20  of the agreement is that there's no ambiguity that
21  one or two parties could take this dispute to
22  arbitration.
23      MR. EISENBERG: I agree, Coventry or
24  plaintiff Ellis or LaSalle.

28

1    THE COURT: Correct.

2    MR. EISENBERG: Now, I ask you to

3 fast-forward, Judge.

4    If in fact all of this were handled in

5 arbitration, and at that point the Coventry party

6 attempts to -- is found responsible for failing to

7 send proper notices of a default --

8    THE COURT: But they don't have to waive

9 their defenses just because they're taking it to

10 arbitration.

11    MR. EISENBERG: No, sir. But if they

12 didn't -- if LaSalle disavows its agency, the

13 agents, that Coventry was its agent, it's not

14 collectible against LaSalle. And if Coventry's not

15 there, then we win nothing. And that's the reason

16 we know who's going do be arbitrating the case, and

17 that's the signatories.

18    Now, as to the non-signatories, the

19 question is, is there full-pledged agency, because

20 when we go now to arbitration, if Ellis wins and

21 there's this conflict between Coventry and LaSalle

22 and Coventry's committed all -- a bunch of wrongs

23 in mailing notices and default action on faulty

24 mailings, and LaSalle says, "Wait a minute. They

29

1 weren't our agents for that. It's not collectible

2 against us," and then all of a sudden we've got

3 this dispute between Coventry and LaSalle.

4    And all I'm suggesting is --

5    THE COURT: That would be the argument

6 whether they're in this forum or --

7    MR. BORDERS: Right.

8    THE COURT: -- in arbitration. I mean,

9 it's --

10    MR. EISENBERG: But under Illinois law, to

11 get to arbitration, they have to be the agent of

12 LaSalle. That's our position.

13    THE COURT: If they're insisting on the

14 arbitration, basically what it is is they're

15 acquiescing to arbitration. I.e., they're

16 submitting themselves to the jurisdiction of the

17 arbitrator or the arbitration.

18    MR. LeFEVOUR: But when you say them,

19 Judge, who are you saying specifically?

20    THE COURT: Coventry by the appearance of

21 their counsel. Their counsel is saying, "We're

22 willing to submit to arbitration."

23    MR. LeFEVOUR: And I don't think there's

24 -- there's no dispute as to that.

30

1    What I'm saying is, what the dispute is is

2 whether or not he has the right without declaring

3 them to be an agent.

4    THE COURT: But even assuming that

5 Coventry doesn't have the right, he has the right

6 to bring it to arbitration as the attorney for

7 LaSalle. And Coventry is submitting themselves to

8 the jurisdiction of that arbitration. So it's --

9    MR. EISENBERG: But isn't it the

10 plaintiffs may? The plaintiff Ellis may take this

11 case to arbitration against LaSalle. How does --

12    THE COURT: No. I believe the way it

13 reads is either party.

14    MR. EISENBERG: Either party may.

15    MR. BORDERS: The defense, some of them --

16 the disclosure statement actually uses the word

17 shall, but I think the note/security agreement may

18 use the language may.

19    THE COURT: Let's see.

20    MR. EISENBERG: "Either you or we may."

21 It's on Page 3 of defendants' brief, your Honor.

22    MR. BORDERS: This says LaSalle, but it's

23 LaSalle on behalf of LaSalle and all of their

24 "agents."

31

1    THE COURT: But we have Page 5 here,

2 arbitration clause, "Either you or we may choose to

3 have any dispute between us decided by an

4 arbitration and not in court or by a jury trial.

5 Discovery and rights to appeal in arbitration are

6 generally noted under the intended lawsuit and

7 other rights that you and we would have in court

8 may not be available in arbitration." This is --

9    MR. EISENBERG: That's the contract

10 between LaSalle and plaintiff.

11    THE COURT: Correct. Any -- and then it

12 goes on to the next paragraph, "Any claim or

13 dispute, whether in contract, tort, statute, or

14 otherwise, including the interpretation and the

15 scope of this clause and the arbitrability

16 (phonetic) of the claim or dispute between you and

17 us or our employees, agents, successors, or assigns

18 which arise out of the -- out of or relates to this

19 agreement or any related or resulting agreement,

20 transaction, or relationship, including any such

21 relationship of third parties which did not sign this

22 agreement, shall and at your own election be

23 resolved by a neutral binding arbitration and not

24 by court action."

32

1    It seems unambiguous to me.
2    MR. EISENBERG: Well, your Honor, I guess
3  I want to say that LaSalle has not elected
4  arbitration. LaSalle doesn't even acknowledge
5  there's a dispute. So I don't think we're talking
6  about LaSalle's election. Ellis has elected --
7    THE COURT: Well, wait a minute. My
8  understanding is that this is --
9    MR. BORDERS: We are counsel for LaSalle.
10  We moved --
11    THE COURT: No, no, no. Beyond that.
12  There is an arbitration pending, is there not?
13    MR. LeFEVOUR: No.
14    MR. EISENBERG: No, sir.
15    THE COURT: No, there is not?
16    MR. BORDERS: They made the demand, and
17  then they filed this lawsuit. And so until this
18  lawsuit is dismissed and we go through the process,
19  the arbitration is --
20    THE COURT: I'm sorry. They made a demand
21  for arbitration?
22    MR. BORDERS: Under the sub-trust
23  initially. That's all the letters --
24    MR. EISENBERG: And there was no response.

33

1    MR. LeFEVOUR: No, no, there was a
2  response.
3    MR. EISENBERG: There was?
4    MR. LeFEVOUR: They rejected it. They
5  rejected it. They said, "You can't ask for
6  arbitration." That's in the letter we attached
7  from Coventry. They said, "You can't demand
8  arbitration because we represent you. You can't
9  have an outside lawyer representing the trust. We
10  represent you. Therefore, you cannot go to
11  arbitration." That's what they said. And that's
12  one of the reasons we filed here, because they
13  said, "No, we're not going to arbitrate with you"
14  even though we demanded it. I mean, that's in the
15  letter. That's in the letter we attached to our
16  pleading.
17    You know, Judge, I agree with you, the
18  clause is not ambiguous, but you have to read it in
19  the context of who are you and us. You is LaSalle
20  or --
21    THE COURT: All right.
22    MR. LeFEVOUR: -- you is us.
23    And the other thing was is that --
24    THE COURT: Wait a minute.

34

1    MR. LeFEVOUR: Oh, sorry.
2    THE COURT: No, no. Really, what I think
3  I have to do is, I have to review it in the factual
4  context, and the factual context is that their
5  argument is I don't have jurisdiction because it's
6  subject to arbitration. But yet they haven't
7  elected to arbitrate. So how have I lost
8  jurisdiction?
9    MR. BORDERS: Well, we demand that it be
10  submitted to arbitration.
11    THE COURT: And how have you done that?
12    MR. BORDERS: By filing our pleadings
13  here.
14    MR. EISENBERG: Where is the letter?
15    MR. BORDERS: And, you know, what they're
16  asking you to do is, you know, decide, as you say,
17  the arbitrability of the claim here when LaSalle
18  and Ellis have undisputedly, you know, in this
19  court acknowledged that they agreed to be bound by
20  this clause. And asking this Court to leave
21  pending before it a claim against Coventry as a
22  servicing agent for LaSalle albeit while the
23  parties move on to arbitrate all other disputes I
24  guess between the two of them, which leaves --

35

1  which, you know, his comments are just forget the
2  arbitration clause, its purpose and intent.
3  Because you'd have pending before you claims
4  against Coventry as agent for LaSalle while that's
5  the very same issues being arbitrated, even if they
6  attempted to append claims in arbitration that
7  somehow said Coventry went beyond, above and beyond
8  the scope of their agency.
9    THE COURT: All right. I believe that
10  it's proper for me to deny my 619 motion as being
11  premature. I just don't see a sufficient demand
12  for arbitration to establish that this Court
13  doesn't have jurisdiction over this claim. So I'm
14  going to deny the 619 without prejudice. I'm going
15  to -- you're asking leave to file an amended
16  complaint?
17    MR. LeFEVOUR: Correct.
18    THE COURT: I suppose I could grant his
19  615, strike your complaint, and give you leave to
20  file an amended complaint, and then we'll go from
21  there.
22    MR. BORDERS: Here's the point of our
23  argument, your Honor. We have not -- they made a
24  claim against LaSalle and Coventry, and they made

36

1  it by filing this action. We responded by
2  demanding that that be dismissed pursuant to the
3  arbitration clause and submitted to arbitration.
4  To me that is a demand for arbitration. So I just
5  don't see how -- I mean, we could write the letter,
6  but, I mean, essentially we have demanded that
7  their dispute with us, that they have pled in this
8  action, be submitted to arbitration, and upon
9  dismissal --
10      THE COURT: But whose --
11      MR. BORDERS: But it's their claim to
12  pursue.
13      THE COURT: All right. Hold on. I mean,
14  are you shifting the burden on them? Are you
15  saying to them, "We're filing responsive pleadings
16  here saying we want to arbitrate," and then you're
17  going to sit back and wait for them to initiate
18  arbitration? I mean --
19      MR. BORDERS: Well, they're the ones
20  making the claim. It's their burden to submit the
21  claim to arbitration. They're the ones that have
22  the claim. We're defending the claim. We demand
23  -- when they say, "We're coming to the Law Division
24  of the Circuit Court of Cook County to make this

37

1  Honor. I think your position on this is obviously
2  correct. We have the right to either go to
3  arbitration or not go to arbitration. We chose not
4  to. We chose to file this claim here. They have
5  the right then to file for arbitration if they
6  want. They haven't done it.
7      So I believe actually you're right on
8  point, is that they're -- we're in -- we're doing
9  what we're allowed to do under the agreement.
10      THE COURT: That's going to be my ruling.
11  I'm going to deny the motion.
12      MR. LeFEVOUR: Thank you, Judge.
13      THE COURT: I should say I'm going to deny
14  his 619 without prejudice.
15      MR. LeFEVOUR: Correct.
16      THE COURT: I'm going to grant his 615,
17  give you leave to file an amended complaint. Now,
18  you had an amended complaint ready?
19      MR. LeFEVOUR: Right.
20      THE COURT: So, should I say give you
21  leave to file an amended complaint instanter, or
22  how do you --
23      MR. EISENBERG: Seven days, five days,
24  Judge.

39

1  claim --"
2      THE COURT: So you're saying, "If you want
3  to address this dispute, we're electing that we do
4  it in arbitration. You've got to take it to
5  arbitration"?
6      MR. BORDERS: Absolutely.
7      THE COURT: Okay. And their dilemma is
8  exactly what they said before, is that this
9  contradicts previous correspondence or --
10      MR. BORDERS: Now, that was just a
11  question of their ability to -- when they said they
12  represented the sub-trust and were seeking to stop
13  execution of the collateral under the terms -- it's
14  referenced in the responses under the terms of the
15  sub-trust, the trustee, all those rights when
16  delegated to Coventry at that point in time.
17      But that doesn't encompass the legal
18  claims that they made here. There's never been a
19  dispute that if they have these legal claims, that
20  those would be subject to arbitration.
21      I mean, you know, procedurally we're just
22  coming back here, you know, in two weeks arguing
23  the same motion again.
24      MR. LeFEVOUR: I don't think so, your

38

1      THE COURT: And we'll handle it that way.
2      MR. LeFEVOUR: Okay. Off the record for
3  one second.
4          (Whereupon, a discussion was had
5          off the record.)
6          (Whereupon, those were all the
7          proceedings had in the
8          above-entitled case on the
9          aforesaid date.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

40

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

Elizabeth Ellis, as Co-Trustee of    )
The Neil H. Ellis Irrevocable        )
Insurance Trust – 2005, No. 2,       )
          Plaintiff,               )
    vs.                          )    No.   08 CH 5368
                     )
LaSalle Bank National Association and )
Coventry Capital I LLC.,             )
          Defendants.              )

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

NOW COMES Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005 No 2. ("Plaintiff"), by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and for her Response to Defendants' Motion to Dismiss, states as follows:

### PRELIMINARY STATEMENT

Plaintiff agrees that arbitration is the appropriate forum for resolving all disputes between Plaintiff and Defendant, LaSalle Bank National Association ("LaSalle"), and requests leave to file an amended complaint which dismisses LaSalle from this case. Accordingly, this Response is limited in scope to the Motion to Dismiss by Coventry Capital I LLC ("Coventry").

### BACKGROUND

In summary, this case arises out of LaSalle and Coventry's foreclosure on and liquidation of a life insurance policy ("Policy") issued on the life of Plaintiff's husband, Neal Ellis. The policy premiums were financed by LaSalle pursuant to a Note and Security Agreement ("Note") executed on July 26, 2005. A copy of the Note is attached hereto as

EXHIBIT
2

Exhibit A.  The Note appointed Coventry as the "Servicing Agent" for the Note.  On January 29, 2008, Ellis received notice from Coventry that the Note was in default and that Coventry would be foreclosing on and liquidating the Policy.  By correspondence to Coventry dated February 5, 2008, (Exhibit B), Ellis demanded arbitration with Coventry and LaSalle to resolve the claim of default and any claim for foreclosure, sale or any other liquidation of the Policy.  By correspondence to Ellis dated February 6, 2008, (Exhibit C), Coventry refused Ellis' demand for arbitration.  By correspondence to Coventry dated February 6, 2008, (Exhibit D), Ellis again demanded arbitration.  Coventry did not respond to the subsequent demand for arbitration and, on February 13, 2008, notified Ellis that it had foreclosed on and would be liquidating the Policy.

On February 13, 2008, Plaintiff filed a Complaint against LaSalle and Coventry.  A copy of the Complaint is attached hereto as Exhibit E.  The Complaint sought a temporary restraining order and preliminary and permanent injunctive relief to protect Plaintiff from the harm resulting from LaSalle and Coventry's potential liquidation of the Policy.  Despite Coventry's prior refusal to arbitrate, on February 27, 2008, LaSalle and Coventry filed their motion to dismiss the Complaint on the basis that all disputes between Plaintiff and LaSalle and Coventry arising from the purchasing and financing of the Policy must be resolved through arbitration and, alternatively, on the basis that the Complaint does not allege sufficient facts on which relief can be granted.

On February 28, 2008, this Court entered an order setting the briefing schedule for the motion to dismiss.  On March 19, 2008, Plaintiff filed a motion to extend the time for filing a response to the motion to dismiss or an amended complaint in lieu of a response.  On April 7, 2008, Plaintiff's motion was granted.  On April 16, 2008, Plaintiff filed an emergency motion

to file an amended complaint in lieu of its response to the motion to dismiss. The proposed amended complaint, as drafted, excludes LaSalle from this case and includes substantive theories of liability against Coventry to reflect recently discovered facts regarding Coventry's involvement in the purchasing and financing of the Policy. A copy of the proposed amended complaint is attached hereto as Exhibit F. On April 18, 2008, Plaintiff's motion to file an amended complaint was denied.

## ARGUMENT

**A.    The claims against Coventry are not subject to the Note's arbitration provision because Coventry has not alleged that it was LaSalle's agent under Illinois law**

Coventry's primary argument for dismissal is that an arbitration clause contained in the Note and Security Agreement divests this Court of subject matter jurisdiction over Coventry. The Note contained the following clause:

> *Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.
>
> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. (Ex. A, p. 5).

The signatories to the note were Janet Havrilla of Wilimington Trust Company and Kristin Lake as attorney-in-fact for LaSalle. (Ex. A, p. 7). Pursuant to the Note's arbitration clause,

Coventry, as a non-signatory, may only compel arbitration if it qualifies as LaSalle's "agent, employee, successor, or assign."

Illinois courts have held that "an arbitration clause cannot generally be invoked by a non signatory to the contract." *Peach v. CIM Ins. Corp.*, 352 Ill.App.3d 691, 696, 816 N.E.2d 668 (5th Dist. 2004). Neither Coventry nor LaSalle alleged in the Motion to Dismiss that Coventry was LaSalle's agent, employee, successor, or assign. Upon information and belief, there is no factual issue as to whether Coventry may have been LaSalle's employee, successor, or assign. Thus, Coventry may only successfully invoke the Note's arbitration clause to support dismissal of Plaintiff's claims against it if it proves that it was acting as LaSalle's legal agent in its administration of the Note.

Although Coventry was designated in the Note as LaSalle's "Servicing Agent," to invoke the arbitration clause, Coventry must prove that it was LaSalle's agent as that term is defined by Illinois law. In *Caligiuri v. First Colony Life Ins. Co.*, 318 Ill.App.3d 793, 801, 742 N.E.2d 750 (1st Dist. 2000), an Illinois appellate court considered the applicability of an arbitration clause to claims against a non-signatory. In *Caligiuri*, the subsidiary of a signatory to a contract containing an arbitration clause attempted to compel arbitration on the basis that it was an agent of the signatory. *Id.* at 800. After the trial court denied the motion on the grounds that the subsidiary was not an agent of the signatory, the subsidiary appealed. *Id.* The Appellate Court initially commented that to invoke the arbitration clause, the subsidiary must prove that it was the signatory's agent as that term is defined under Illinois law: "Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal." *Id.* at 801 (citing *Illinois State Toll*

*Highway Authority v. DiBenedetto*, 275 Ill.App.3d 400, 410, 655 N.E. 2d 1085 (1st Dist. 1995)). Although the subsidiary pointed to some evidence that it was controlled by the signatory, the Appellate Court upheld the trial court's ruling on the grounds that the subsidiary failed to introduce evidence that it had the ability to conduct legal transactions in the name of the signatory. *Id.* at 803. In this case, Coventry has not alleged that it was LaSalle's agent as that term has been defined by Illinois Courts.

Under the reasoning of *Caliguiri*, Coventry was not LaSalle's agent in its administration of the Note because it did not have the power to conduct legal transactions on LaSalle's behalf. Coventry's duties as the Servicing Agent were defined by the Note's "Consent to Appointment of Agent" provision. (Ex. A., p 4). That provision states that Coventry, as the servicing agent, was to handle certain paperwork and notices on LaSalle's behalf. The Consent to Appointment provision indicates that Coventry's involvement was of a clerical nature and does not suggest that Coventry was vested with the authority to conduct legal transactions on LaSalle's behalf. Coventry has failed to allege or provide any proof to the contrary.

Additionally, Coventry cannot compel arbitration by declining to take a position with respect to whether it was LaSalle's legal agent under Illinois Law. In *Ervin v. Nokia, Inc.*, 349 Ill.App.3d 508, 812 N.E.2d 534 (5th Dist. 2004), Nokia, a non-signatory to a phone service contract between the plaintiff and a service provider, sought to compel arbitration based on an arbitration clause contained in the contract. *Id.* at 509. Nokia refused to take any position on whether it was the service provider's agent and argued that it could invoke the arbitration clause because the plaintiff's complaint implied an agency theory of liability. *Id.* at 513. The Court rejected Nokia's argument and held that, based on its denial and failure to

allege or request a judicial determination that it was the service provider's agent, it could not invoke the arbitration clause. *Id.*

Similarly, in *Peach*, cited above, the appellant, a non-signatory to the contract containing the subject arbitration clause, attempted to compel arbitration while refusing to take a position regarding its relationship with the signatory or request a judicial ruling that it was the signatory's agent. 352 Ill.App.3d at 696. The *Peach* court's reasoning for upholding the trial court's denial of the non-signatory's motion to compel is instructive:

> In this case, [the defendant] did not request the trial court to find that Enterprise was its agent. CIM has actually refused to take any position in the trial court or in this court regarding its relationship to Enterprise. We can only assume that this is a tactical decision that will allow CIM, once it reaches arbitration, to deny that Enteprise was its agent, thereby refuting the exact allegation that allowed it to go to arbitration in the first place. Considering that an arbitration clause cannot generally be invoked by a nonsignatory to the contract, we see no reason to extend this option to CIM when it refuses to take a position on whether it has any legal relationship with enterprise.

*Id.*

Coventry's motion to dismiss is notably brief and vague when referring to the arbitration clause, stating only that "[d]ismissal under 2-619(a)(1) is proper because the parties' dispute, if any, would be subject to arbitration pursuant to an arbitration in the Security Agreement." (Defendants' motion to dismiss, ¶ 3). No legal or factual analysis is offered to support the contention that Coventry, as a non-signatory, may invoke the Note's arbitration clause. Coventry cannot, for the purposes of protecting LaSalle or for any other reason, refuse to take a position on whether it was LaSalle's legal agent and still successfully invoke the arbitration clause as grounds for its dismissal. Since Coventry failed to allege that it was LaSalle's agent as the term is defined by Illinois Courts, its motion to dismiss should be denied.

**B.** **Plaintiff's claims against Coventry fall outside the substantive scope of the Note's arbitration clause**

Assuming *arguendo* that Coventry can prove that it was acting as LaSalle's legal agent in its capacity as Servicing Agent for the Note, the arbitration clause does not apply to those claims against Coventry which fall outside the scope of the arbitration clause. Plaintiff and Coventry are bound to submit to arbitration "only those issues that they have agreed clearly to resolve through the arbitration mechanism, and a court should not extend to an agreement by construction or implication." *Travis v. American Mfrs. Mut. Ins. Co.*, 335 Ill.App.3d 1171, 1176, 782 N.E.2d 322 (5th Dist. 2002).

Coventry's involvement in the transaction that is the subject matter of this case extends beyond its administration of the Note as the appointed Servicing Agent. As evidenced by correspondence dated June 21, 2005 from Coventry to Neal Ellis, Coventry's involvement pre-dates the Note's execution on July 26, 2005. A copy of the June 21, 2005 correspondence is attached hereto as Exhibit G. The attached correspondence evidences that Coventry procured the financing for the Policy's premium. As alleged in the proposed amended complaint, this and other pre-Note conduct by Coventry resulted in a fiduciary relationship between Coventry and the Trust. Plaintiff's claims against Coventry for breach of a duty which arose prior to the execution of the Note which contained the subject arbitration clause are beyond the scope of the arbitration clause.

To the extent that Coventry may have acted as LaSalle's agent in the administration of the Note, the parties to the Note agreed only to arbitrate those claims related to the Note itself or any resulting or related agreement. The parties did not agree to arbitrate those claims, such as those enumerated in Plaintiff's proposed amended complaint, arising from Coventry's

actions that pre-date the Note or were outside the scope of its capacity as LaSalle's agent.

**C.    Plaintiff's Complaint alleges facts which establish that Coventry breached legal or contractual duties owed to her**

Coventry has alternatively argued that the Complaint should be dismissed pursuant to 735 ILCS 2-615 for failure to state a claim on which relief can be granted. Coventry's motion only generally states that "Plaintiff's complaint alleges no facts that, if true, establish Defendants breached any legal or contractual duty owed to her." (Defendants' motion to dismiss, ¶ 6). Plaintiff, in her complaint, has alleged numerous facts upon which relief can be granted, including, but not limited to, those facts which concern Coventry's failure to provide the Trust with notice of the loan's maturity date.

Additionally, Plaintiff's proposed amended complaint includes additional factual allegations and substantive theories of liability against Coventry. The proposed amended complaint alleges that Coventry breached its fiduciary duty to Plaintiff and engaged in fraudulent and deceptive acts giving rise to certain common law and statutory causes of action. Thus, in the event that this Court finds that Plaintiff's Complaint does not allege facts giving rise to a cause of action against Coventry, Plaintiff requests that the Court reconsider its April 18, 2008 order denying Plaintiff leave to file an amended complaint against Coventry.

## CONCLUSION

Since Coventry was a non-signatory to the Note and has not alleged that it was LaSalle's agent under Illinois Law, the Note's arbitration clause does not divest this Court of subject matter jurisdiction with respect to Plaintiff's claims against Coventry. Many of Coventry's actions giving rise to potential liability occurred prior to the Note's execution and were, to the extent that Coventry may have acted as LaSalle's agent, outside the scope of its

capacity as LaSalle's agent. Additionally, Plaintiff's Complaint alleges facts that, if true, establish that Coventry breached a legal or contractual duty owed to her. Thus, Coventry's motion to dismiss should be denied. Plaintiff requests this Court to reconsider its April 18, 2008 order denying Plaintiff leave to file an amended complaint and grant Plaintiff leave to file an amended complaint against Coventry, *instanter*.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005 No 2., respectfully requests that this Honorable Court deny Defendant, Coventry Capital I LLC's Motion to Dismiss under 735 ILCS 5/2-619.1 and 2-615, grant Plaintiff leave to file an amended complaint, *instanter*, and for such further relief as this Court deems just and appropriate.

> Respectfully Submitted,
>
> LEAHY, EISENBERG & FRAENKEL, LTD.
>
> By: _____
> One of Its Attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
LEAHY, EISENBERG & FRAENKEL, LTD.
33 W. Monroe Street, Suite 1100
Chicago, Illinois 60603-5317
(312) 368-4554
Firm I.D. 45875
F:\Case\059808\12849\RESPONSE BRIEF.doc

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on 7/26/05, by and between THE NEIL H. ELLIS INSURANCE TRUST – 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.



*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital 1 LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to make the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

- The Policies; and

- All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

### IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

### YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

### MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

## SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,          LaSalle Bank National Association
Premium Finance Sub-Trust

By:  Wilmington Trust Company, Trustee

By: _____          By: _____
Name:      Janel R. Havrilla               Name:  Krista Lake
Title:     Financial Services Officer        Title:  Attorney-in-fact

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

7

LAW OFFICES

# WEINSTEIN & WISSER, P.C.

A PROFESSIONAL CORPORATION

29 SOUTH MAIN STREET

SUITE 207

WEST HARTFORD, CONNECTICUT 06107

(860) 561-2628

RICHARD P. WEINSTEIN
KERRY MARC WISSER*†
NATHAN A. SCHATZ

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
†ALSO ADMITTED IN PA

TELECOPIER
(860) 521-6150

February 5, 2008

*SENT VIA FACSIMILE: (215) 402-8369
AND BY WAY OF FIRST CLASS MAIL*

Richard Cooper
Coventry Capital
7111 Valley Green Road
Fort Washington, PA 19034-2209

**Re:**  *The Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust*
        *PFP Loan – ID # 12070*

## DEMAND FOR ARBITRATION

Dear Mr. Cooper:

The undersigned represents the two trusts referenced above, as well as Neil Ellis as the Settlor of said trusts and Elizabeth Ellis as the Co-Trustee. On behalf of my clients, a demand is hereby made for arbitration pursuant to the "Arbitration Clause" set forth in the Note and Security Agreement dated both July 22, 2005 and July 26, 2005, between the Trusts and LaSalle Bank National Association ("Lender"). Pursuant to the Note and Security Agreement, Coventry Capital I ("Coventry") is the "Servicing Agent" for the Lender and the entity that is to receive all notices and correspondence relating to the Note and Security Agreement. For protection, however, a notice of this Demand for Arbitration has also been sent to the Lender directly, as well as the Wilmington Trust Company ("Wilmington") as the other Co-Trustee of the Trusts.

I have reviewed a variety of documents surrounding this transaction and it appears that on or about June 21, 2005, Coventry solicited Mr. Ellis to participate in the PFP Program offered by Coventry to obtain non-recourse financing in order to procure certain life insurance policies. In furtherance of this solicitation, Coventry procured and/or provided Mr. and Mrs. Ellis with the following documents:

1.    PFP Summary of Terms and Conditions.    That document indicated that Coventry would attempt to procure a life insurance policy in the amount of $30,000,000



Page Two
Richard Cooper
February 5, 2008

on the life of Mr. Ellis from Security Life of Denver. The premium for said policy for the term of the loan that was to be secured to pay for the same was $2,195,700. The Lender for said loan was represented to be LaSalle Bank, N.A., as referenced above.

    2.      Proposed Note and Security Agreement.

    3.      Consent to Appointment of Agent. This document appointed Coventry as the Lender's servicing agent.

    4.      Settlor and Co-Trustee Disclosure Statement and Acknowledgement.

    5.      Insured's Disclosure Statement, Acknowledgement and Consent and Agreement. This document also provides an arbitration provision, but said provision specifically excludes arbitration for claims seeking equitable relief.

    6.      Borrower's Special Irrevocable Durable Power of Attorney. (This document provides a choice of law provision for Pennsylvania.)

    7.      Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney. (This document also has a choice of law provision for Pennsylvania.)

    8.      PFP Loan Application.

    9.      Settlor's Acknowledgement.

    10.      Settlor Non-Recourse Security Agreement. (This document has a choice of law provision applying Illinois law.) This document also contains an "Arbitration Clause" that mirrors said clause in the Note and Security Agreement referenced in the first paragraph of this letter. However, there is no exclusion for equitable claims in said clause.

    11.      Trust Agreement, executed between Wilmington and the Trust. (This document has a choice of law provision for Delaware.)

    12.      Supplement to Trust Agreement. This document supplements the above-referenced Trust with Wilmington.

The Note and Security Agreement that was either drafted by the Lender or drafted

Page Three
Richard Cooper
February 5, 2008

by Coventry, as servicer for the Lender, clearly identifies that my clients have the unfettered right to choose to have *any dispute* decided by arbitration and not in a court of law. The document specifically states that: "Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement, or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who did not sign this Agreement) *shall*, at your or our election, be resolved by neutral, binding arbitration and not by a court action." While the arbitration clause in document number 5 listed above had an arbitration provision that excludes equitable claims, the arbitration clause in the Note and Security Agreement has no such exclusion.

My clients have received notice that Coventry, as servicer for the Lender, and/or the Lender directly, intends to foreclose on the insurance policies to satisfy the purported obligation of my clients to make payment under the Note and Security Agreement. Said notice indicates that said foreclosure and/or sale or other liquidation of the life insurance policies will occur sometime after February 12, 2008, if my clients don't satisfy the purported default. Since it is clear and unequivocal that my clients have the unfettered right to elect arbitration for any and all claims asserted under the terms of the Note and Security Agreement, whether asserted by them or asserted against them, they hereby elect the arbitration process to resolve the claim of purported default and any claim for foreclosure, sale or any other liquidation of the policies. Now that Coventry and the Lender are on notice of this election and demand for arbitration, no court action shall properly be initiated by the Lender for foreclosure and no sale or other liquidation of the policies shall occur prior to any decision rendered by the arbitrator(s). Any such attempt to commence a foreclosure action in court, or to otherwise sell or liquidate the policies will represent a breach of the contract and my clients will seek a stay of any court action as well as all consequential damages relating to said breach.

During the arbitration proceeding, my clients intend to raise claims of conflict of interest, constructive trust, and breach of fiduciary duty against Coventry. It is clear that Coventry initially solicited my clients as set forth above. Additionally, the appointment of Coventry as an agent for the Lender, while also acting as attorney-in-fact for the borrower, creates a clear conflict that cannot be waived, nor otherwise reconciled. Other claims may be developed during the arbitration proceeding, but I wanted to make clear that the demand for arbitration goes beyond the claim of the alleged default and notice of foreclosure.

Page Four
Richard Cooper
February 5, 2008


     Pursuant to the Arbitration Clause contained in the Note and Security Agreement, my clients choose the American Arbitration Association ("AAA") for arbitration of this matter. While AAA maintains its main business office in New York, it also has offices in Connecticut and my clients intend to arbitrate this claim in Hartford County, which is where the Ellises reside and the insurance Trusts maintain business offices.

     I look forward to your immediate response.



                              Very truly yours,


                              Kerry M. Wisser


KMW/cmg
Enclosure
cc:    Coventry Capital I, LLC
        LaSalle Bank National Association
        Wilmington Trust Company
        Neil H. Ellis
        Elizabeth Ellis



COVENTRY CAPITAL

7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 6, 2008

SENT VIA FACSIMILE (860) 521-6150 AND FEDERAL EXPRESS

Weinstein & Wisser
29 South Main Street
Suite 207
West Hartford, CT 06107
Attn: Kerry Wisser

Re:    The Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
       and PFP Loan ID #12070

Dear Mr. Wisser:

I am in receipt of your letter dated February 5, 2008 wherein you purport to make a demand for arbitration on behalf of the Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust (the "Sub Trust"), pursuant to the terms of the Note and Security Agreement (the "Note and Security Agreement") dated July 26, 2005 between the Sub-Trust and LaSalle Bank, N.A.  Coventry Capital I LLC is the Servicing Agent for LaSalle Bank under the Note and Security Agreement.[1]

The assertion in your letter that you represent the Sub-Trust is incorrect.  Article II, Section 3 of the Sub-Trust Agreement (the "Sub-Trust Agreement") dated July 1, 2005 states that Wilmington Trust Company, as Trustee, holds the property of the Sub-Trust "for the benefit of the Lender as security for the Loan for so long as the Loan is outstanding."  Article II, Section 2 of the Sub-Trust Agreement further provides that *"for so long as the Loan is outstanding, the Trustee shall perform all of its duties hereunder solely at the direction of the Lender or such person or entity as the Lender designates in writing delivered to the Trustee."*  Given that the Loan is currently outstanding and the Lender has not directed Wilmington Trust Company, as Trustee of the Sub-Trust, to retain you as its counsel, you do not represent the Sub-Trust.

As a result, your purported demand for arbitration on behalf of the Sub-Trust is invalid.

I would also like to point out that the Sub-Trust has already received the full benefit of the PFP transaction.  Pursuant to instructions provided by The Neil H. Ellis Irrevocable Insurance Trust – 2005 No. 2, as settlor of the Sub-Trust, the Sub-Trust entered into the Note and Security Agreement to borrow money primarily to pay premiums on the life insurance policy (the "Policy") identified in Schedule A of the Note and Security

---

[1] Capitalized terms not herein defined shall have the meanings given to them in the Note and Security Agreement.

EXHIBIT
C



Agreement. For the duration of the Loan term, The Neil H. Ellis Irrevocable Insurance Trust – 2005 No. 2, as beneficial owner of the Sub-Trust, stood to receive the proceeds of the Policy that was financed by the amounts borrowed under the Note and Security Agreement (net of any amounts due to LaSalle Bank under the Note and Security Agreement).

As a result of the Sub-Trust's failure to pay the amounts due under the Note and Security Agreement or relinquish the Policy to LaSalle Bank, N.A. in satisfaction of the Loan by the Maturity Date, the Loan is currently in default. In the event that the Sub-Trust fails to satisfy in full all of its obligations in respect of the Loan by February 12, which date is fifteen (15) days after the Maturity Date, the Lender will foreclose on the Policy.

Coventry Capital I LLC reserves all of its rights to respond more fully to your letter if and when it becomes appropriate.

Sincerely,

Coventry Capital I LLC

Cc:    Wilmington Trust Company (via electronic mail)

LAW OFFICES

# WEINSTEIN & WISSER, P.C.

A PROFESSIONAL CORPORATION

29 SOUTH MAIN STREET

SUITE 207

WEST HARTFORD, CONNECTICUT 06107

(860) 561-2628

RICHARD P. WEINSTEIN
KERRY MARC WISSER*†
NATHAN A. SCHATZ

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
†ALSO ADMITTED IN PA

TELECOPIER
(860) 521-6150

February 6, 2008

***SENT VIA FACSIMILE: (215) 402-8369***
***AND BY WAY OF FIRST CLASS MAIL***

Josh May
Coventry Capital
7111 Valley Green Road
Fort Washington, PA 19034-2209

***Re:*** ***The Neil H. Ellis Insurance Trust – 2005, Premium Finance Sub-Trust***
***PFP Loan – ID # 12070***

Dear Mr. May:

   This letter is in response to your letter dated February 6, 2008.   The contents of the letter are inaccurate and the fallacy of the arguments set forth therein is self-evident. First of all, Coventry is breaching its fiduciary duty to my clients, created by the execution of the Power of Attorney, by continuing to prosecute this claim on behalf of the Lender. Further, the claim that the undersigned does not represent the sub-trust lacks merit. Most importantly, however, the determination that the demand for arbitration on behalf of the sub-trust is "invalid" is not one that can be determined by Coventry, the Lender, or anyone else, other than the arbitrator.   I will direct your attention, once again, to the plain language of the Note and Security Agreement, which was drafted by the Lender or one of its agents, which undisputedly states as follows:   "Any claim or dispute, whether in contract, tort, statute or otherwise (***including the interpretation and scope of this clause and the arbitrability of the claim or dispute***)...shall at [ ] our election, be resolved by neutral, binding arbitration, and not by a court action."

   Any literate individual, even if untrained in the law, must understand that the issue as to whether or not a matter is subject to arbitration can ***only*** be decided by an arbitrator once we elect arbitration.   Therefore, notwithstanding your interpretation otherwise, which can certainly be preserved and argued in front of the arbitrator, arbitration ***must*** occur.


EXHIBIT
D

Page Two
Josh May
Coventry Capital
February 6, 2008

     Once again, a copy of this document is being sent to Wilmington Trust. Your company, the Lender and Wilmington are all on notice of the fact that arbitration must occur and all three companies will be held fully financially responsible if there is a breach of that arbitration provision. More importantly, any action brought in court to foreclose on the policies will be met with a Motion to Stay, which under all circumstances will be granted by the court. If your company or the Lender seeks to avoid a court action and tries to liquidate the policies in any other fashion, with full notice that this demand for arbitration has been made, that will represent an intentional tort which will expose Coventry and anyone else who aids and abets Coventry, to claims of conversion, civil theft and unfair trade practices. Under such claims, the entities involved will be responsible for punitive damages and potentially, treble damages for civil theft, as well as attorney's fees. Your company is treading on very thin ice, and since there is absolutely no prejudice to your company, the Lender or Wilmington in fulfilling the terms that are clear and unequivocal in the Agreement, I strongly suggest that you put the arbitration process in place forthwith. By virtue of receipt of this document, Wilmington is on full notice that it shall not release those policies to Coventry or the Lender unless and until ordered by a court, enforcing the decision of the arbitrator.

     I do not intend to exchange any further letters with you, as the obligations of your company, the Lender and Wilmington are clear. You act at your own peril.

Very truly yours,

Kerry M. Wisser

KMW/cmg
Enclosure
cc:   Richard Cooper, Coventry Capital
      Coventry Capital I, LLC
      LaSalle Bank National Association
      Wilmington Trust Company
      Neil H. Ellis
      Elizabeth Ellis

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

Elizabeth Ellis, as Co-Trustee of          )
The Neil H. Ellis Irrevocable              )
Insurance Trust-2005, No. 2                )
                                           )
            Plaintiff,                     )
                                           )          No.        08CH05368
    v.                                     )
                                           )
                                           )
LaSalle Bank National Association and      )
Coventry Capital I LLC                     )
                Defendants.                )

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis

Irrevocable Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg &

Fraenkel, Ltd., pursuant to 735 ILCS 5/11-101 and 102 and for her Complaint for the entry of a

Temporary Restraining Order, Preliminary Injunction and Permanent Injunction, states as

follows:

### COUNT I

#### Temporary Restraining Order

1.    Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable

Insurance Trust-2005, No. 2, ("Trust").  The Trust is the beneficiary of a $30,000,000.00 life

insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2.    Defendant, LaSalle Bank National Association ("LaSalle") is, on information and

belief, a bank chartered and licensed under the laws of the United States and the laws of the State

of Illinois with its principal place of business in Chicago, Cook County, Illinois.


EXHIBIT
E

3.     Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, the Servicing Agent for LaSalle in the subject Note and Security Agreement ("Agreement") and is in the business of being a servicing agent and agent-in-fact for financing and purchasing life insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.

4.     At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high benefit insurance policies with financing provided by third parties.

5.     In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy on Ellis' life and acted as Ellis' agent in said purchase.

6.     Passananti advised Ellis that he would arrange all of the legal work to be done and the financing for the payment of premium.

7.     Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life.

8.     On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was the beneficiary of the Policy.

9.     The Policy premium was financed by LaSalle Bank.  A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

10.     The Note and Security Agreement was signed only by the Corporate Co-Trustee.

11.     Neither Ellis nor Elizabeth Ellis, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis did not even know that Coventry was involved as the Servicing Agent in the transaction until 2008.

2

12.     Upon information and belief, as a result of the financing provided by the Agreement, the premium on the Policy has been paid through December 31, 2008.

13.     On or about January 29, 2008, Coventry first notified Plaintiff that the Agreement's maturity date was the previous day on January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy. At no time did Plaintiff or Ellis receive a Notice of Premium Due on the policy.

14.     On February 1, 2008, Coventry notified the Plaintiff that Plaintiff had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/ or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of Coventry's February 1, 2008 letter is attached as Exhibit 2.

15.     The Agreement contains an Arbitration clause for all disputes arising under the Agreement. See Exhibit 1 attached hereto.

16.     The Plaintiff has disputed the default that was declared by Coventry on behalf of itself and LaSalle and, on February 5, 2008, pursuant to the Agreement, Plaintiff has demanded arbitration to resolve all disputes.

17.     Coventry's late notice of a purported default, and issues of conflict of interest, constructive trust and breach of fiduciary duty are issues for which the Plaintiff has demanded arbitration pursuant to the Agreement.

18.    Pursuant to the Agreement, Coventry has asserted that it has the right to liquidate the assets and to affect Plaintiff's interests in the assets prior to any foreclosure or other legal proceedings.

19.    If Coventry and LaSalle are allowed to change or otherwise alter the beneficiary of the Policy or to liquidate the Policy before the proper parties arbitrate their disputes, the Plaintiff will sustain irreparable injury in that the Plaintiff will lose its interest in the $30,000,000.00 policy of life insurance and the beneficiaries of the Trust will lose their rights and interest in the Policy.

20.    Plaintiff does not have an adequate remedy at law since the transfer or liquidation of the Policy will destroy Plaintiff's right and interest in the Policy. In contrast, the Defendants have adequate remedies at law.

21.    Plaintiff has filed this motion on an emergency basis because Coventry and LaSalle take the position that if the purported default is not cured by February 12, 2008, it will take action that will detrimentally affect Plaintiff's rights and interest in the Policy.

22.    With regard to the merits of the request for a restraining order, the issue is one of the arbitribility of "ANY DISPUTE" under the Agreement.    As there is no issue that the Agreement requires that ANY DISPUTE be arbitrated, and further that the issues of arbitribility are arbitrable, there is clearly the highest likelihood of success on the merits.    The issue for purposes of this temporary restraining order is *not* the propriety of the purported default.    That issue, and others, will be the subjects of the arbitration.

23.    Since the premium on the Policy, the collateral for the Note and Security Agreement, upon information and belief, are paid through December 31, 2008. and since the Plaintiff is potentially liable for "Default Interest", the absence of a narrowly drawn temporary

4

restraining order will cause more harm to the Plaintiff than if it is entered against LaSalle and Coventry.

24.    There will be no prejudice to either party if the status quo is maintained until the arbitrator has had an opportunity to rule on the Arbitration Complaint. See *All Seasons Excavating Company v. Bluthardt*, 229 Ill App 3d 22, 593 N. E. 2d 679 (1st Dist. 1992)

WHEREFORE, Plaintiff requests that this Court issue a Temporary Restraining Order that prohibits Defendants, LaSalle and Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title, right or interest in the Policy and for such other relief as the Court deems just and equitable, including a Preliminary and/or Permanent Injunction at the earliest opportunity.

## COUNT II

### Preliminary and Permanent Injunction

1-24    Plaintiff hereby restates and realleges paragraphs 1 through 24 of Count I as and for Paragraphs 1 through 24 of Count II as though fully set forth herein.

25.    Plaintiff has demanded arbitration pursuant to the Agreement to resolve the propriety of the alleged default, the conflict of interest between the Defendants and the Plaintiff and the issues of constructive trust and breach of fiduciary duty.

26.    The Plaintiff's remedy, upon arbitration of these issues will be prejudiced if the Court does not enter a preliminary and/or permanent injunction prohibiting the Defendants from taking any action that would impair or affect the Plaintiff's right and title to the Policy.

WHEREFORE, Plaintiff requests that this Court order a hearing on the Plaintiff's request for a Preliminary Injunction and to issue an Order that prohibits Defendants, LaSalle and

Coventry from taking any action to change the beneficiary of the Policy, seek surrender of the

Policy, liquidate the Policy or take any action whatsoever that could affect the Plaintiff's title,

right or interest in the Policy and for such other relief as the Court deems just and equitable,

including a Preliminary and/or Permanent Injunction.


By: _____
One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street   Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875

## NOTE AND SECURITY AGREEMENT

This Note and Security Agreement (this "Agreement") is entered into on ___7/26/05___, by and between THE NEIL H. ELLIS INSURANCE TRUST – 2005, PREMIUM FINANCE SUB-TRUST (sometimes "you" or the "Trust" in this Agreement) and LASALLE BANK NATIONAL ASSOCIATION (sometimes "we" or "us" in this Agreement). This Agreement states the terms of this loan (the "Loan") from us to you to finance certain insurance premiums. Please read this Agreement carefully and if you agree with the terms, please sign your name below.

*Promise to Pay and Payment Terms.* You promise to pay to the order of LaSalle Bank National Association at the address set forth below, or at such other address as LaSalle Bank National Association may designate, the principal amount of the Loan ("Amount Financed") as set forth on Schedule A, plus interest accruing on the Amount Financed at the interest rate (the "Interest Rate") set forth on Schedule A from the Funding Date (as set forth on Schedule A) until the Maturity Date (as hereinafter defined) and other charges or fees, calculated as set forth below, in lawful money of the United States in immediately available funds on the Maturity Date. "Maturity Date" shall mean the date that is the earliest to occur of (i) the date set forth on Schedule A as the scheduled maturity date (the "Scheduled Maturity Date"), (ii) the acceleration of the maturity of the amounts due hereunder upon an Event of Default (as defined herein) in accordance with the provisions of this Agreement, (iii) the date on which the Loan is prepaid in full or (iv) the date on which an amount of death benefits under the Policies sufficient to repay the Loan in full is paid by one or more of the life insurance companies that issued the Policies. Until the Maturity Date, interest pursuant to this Agreement is computed on a 30/360 simple basis. This means that we apply the ratio of the annual interest rate over the number of days in a year assumed to consist of 360 days and twelve months of thirty (30) days, multiplied by the outstanding principal balance from the Funding Date through the Maturity Date. After the Maturity Date, we will earn interest on the unpaid balance of the Loan as of the Maturity Date at the Default Interest Rate (as defined below).

*Loan Proceeds.* The Amount Financed will be disbursed to (i) the life insurance companies listed on Schedule A to pay certain premiums on the life insurance policies listed on Schedule A (the "Policies") and (ii) satisfy certain expenses incurred by us relating to our procurement of insurance coverage maintained by us relating to the value of the Policies on and following the Maturity Date ("PFIC Coverage") as set forth on Schedule A.

*Origination Fee.* As of the date of this Agreement, we have received from you an Origination Fee (in the amount set forth on Schedule A). You agree that the Origination Fee is non-refundable.

*Total of Payments.* If you elect to pay to us the Amount Financed plus accrued interest as of the Scheduled Maturity Date (the "Scheduled Maturity Date Balance"), you will have paid to us an aggregate amount equal to the Total of Payments (including the Origination Fee), as set forth on Schedule A. Your cost of credit at an annual rate ("Stated Rate of Interest") will be the rate set forth on Schedule A.

*How we will apply payments.* We may apply your payment(s) in any order we choose, consistent with applicable law.

*Prepayment.* You may prepay the Amount Financed plus accrued interest in full or in part at any time prior to the Scheduled Maturity Date, provided that you shall pay to us a prepayment fee in an amount equal to the lesser of (i) six (6) months of interest on the amount of the prepayment which exceeds 20% of the Amount Financed, calculated at the Interest Rate, or (ii) the interest that would have accrued between the date of such prepayment and the Scheduled Maturity Date, calculated at the Interest Rate. Such prepayment fee shall not apply if the Amount Financed plus accrued interest is paid prior to the Scheduled Maturity Date as a result of (a) an amount of death benefits sufficient to repay the Loan in full becoming due and payable under the Policies or (b) the insurance company increasing the cost of insurance rates for one or more of the Policies (beyond the scheduled annual increase in rates) which increases the amount required to keep the Policies in full force and effect through the Scheduled Maturity Date.

EXHIBIT

1

*Payments.* You agree not to send to us payments marked "paid in full", "without recourse", or similar language purporting to limit our rights or to indicate our acceptance of a partial payment as full satisfaction of the amounts owed to us by you. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts that include any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to LaSalle Bank National Association, c/o Coventry Capital I LLC, 7111 Valley Green Road, Fort Washington, PA 19034, attention: Legal Department, facsimile: (215) 402-8369, electronic mail: pfpcorrespondence@coventrycap.com.

*Relinquishment.* You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title and interest in, to and under all Policies in writing on or before the Scheduled Maturity Date. In the event you relinquish your rights under the Policies in accordance with the foregoing sentence, you will not be entitled to recover any death benefits or other monetary benefits under or relating to such Policies.

*Covenants.* You hereby agree that so long as this Agreement shall remain in effect, the undersigned shall not create or suffer to exist voluntarily or involuntarily any lien, security interest, pledge, charge or encumbrance, or similar right or claim on or with respect to any of the Policies. If you are not a natural person, you hereby agree that so long as this Agreement shall remain in effect, unless we otherwise consent in writing: (i) you shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate or other existence and the undersigned will not be revoked or divided, or distribute, sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions), all or substantially all of its assets (in each case whether now owned or hereafter acquired), or terminate, liquidate or dissolve and (ii) you shall not, directly or indirectly, by operation of law or otherwise, merge with, consolidate with, or otherwise combine with any entity, unless this Agreement is assumed by such entity pursuant to such merger, consolidation or other combination.

*Events of Default.* Upon your failure to make any payment when due, or your breach of any of your obligations under this Agreement, or your breach of any covenant, representation, or warranty in this Agreement, or your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due (each an "Event of Default") we may, if such Event of Default has not been remedied by you within fifteen (15) days after the occurrence of such Event of Default, at our option to the maximum extent permitted by law, (i) accelerate the maturity of this Loan, declare the Amount Financed, accrued interest and other amounts payable hereunder immediately due and payable and seek any and all other remedies available for the enforcement of this Agreement, at law, in equity or otherwise and (ii) in our sole discretion, (a) terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner thereof, (b) request a loan or other distribution on the Policies and (c) take any other action with respect to the Policies, including foreclosure and sale or change of beneficiaries, to realize the value therefrom. Notwithstanding the foregoing, the Amount Financed plus accrued interest and other amounts payable hereunder shall be automatically and immediately due and payable upon your bankruptcy, general assignment for the benefit of creditors or failure to pay debts as they become due. We may exercise the option to accelerate upon the occurrence of an Event of Default by you regardless of any prior forbearance. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

*Default Interest.* You agree that if any amounts due hereunder are not paid on the Maturity Date and you have not relinquished the Policies (in addition to any other interest, fees or expenses which may accrue as a result of such Event of Default), such unpaid amounts of the Loan will continue to bear interest at an interest rate equal to the lesser of (i) the Interest Rate plus 2% or (ii) the maximum amount permitted by law ("Default Interest Rate"). All interest that accrues on such unpaid amounts of the Loan at the Default Interest Rate shall be recourse to you and may be recovered from any of your assets (in addition to the Policies).

2

*Funding Date.* We will notify you of the Funding Date of this Agreement when we return a copy hereof to you (the Funding Date will be included in Schedule A), and you authorize us to complete Schedule A by filling in the Funding Date after the date you sign this Agreement. If you do not receive a completed copy of Schedule A with the Funding Date filled in within fifteen (15) days of the date of this Agreement, you agree to contact us. Otherwise, we will assume that you have received a completed copy of Schedule A.

## SECURITY INTEREST

To secure your payment and performance under the terms of this Agreement, you hereby give us a security interest in the following collateral (the "Collateral"):

- The Policies; and

- All other proceeds (if any and from any source) on the Policies.

This Collateral secures payment of all you owe on the Loan. It also secures your other obligations under this Agreement as the law allows. This loan is non-recourse, meaning that nothing else secures your obligations to us and that we will not seek to collect the amounts due hereunder other than from proceeds of such Collateral, except as provided above in the paragraph entitled "Default Interest" with respect to amounts owed due to the application of the Default Interest Rate to the Loan after the Maturity Date.

In connection with your grant to us of a security interest in the Collateral, you hereby authorize us to take, and agree that upon our request you will take or cause to be taken, all action necessary and/or reasonably requested by us to protect and perfect the security interest granted by you to us hereunder under all applicable law (whether pursuant to the Uniform Commercial Code or otherwise), which may include without limitation, your execution and delivery to us of such documents, agreements and forms as we may reasonably request, possibly including a policy account control agreement and related instructions pursuant to which an account will be created in your name to which the Policies will be credited and control of which will be granted to us that lasts until you satisfy all of your obligations to us hereunder on or before the Maturity Date (the "Security Interest Perfection Documents"). If you do not satisfy all of your obligations to us hereunder on or before the Maturity Date, these documents will give us the right and ability to foreclose upon the Policies in an effort to receive proceeds sufficient to satisfy such obligations.

3

## CONSENT TO APPOINTMENT OF AGENT

*Servicing Agent.* You acknowledge and agree that we have appointed Coventry Capital I LLC as our servicing agent under this Agreement (in such capacity, the "Servicing Agent"). You agree to follow the instructions and directions of the Servicing Agent under this Agreement until we notify you in writing to the contrary.

You agree to send all payments to us at:

LaSalle Bank National Association
Consumer Loan Servicing
4747 West Irving Park Road
Chicago, Illinois 60641

You agree to send copies of all notices and correspondence hereunder, other than any payments, to the Servicing Agent at:

Coventry Capital I LLC
7111 Valley Green Road
Fort Washington, PA 19034
Attention: Legal Department
Facsimile: (215) 402-8369
Electronic Mail: pfpcorrespondence@coventrycap.com

*Notification of Maturity.* You understand and acknowledge that the Servicing Agent may send written notice in advance of the Scheduled Maturity Date reminding you of your payment obligations under this Agreement (the "Servicing Agent Notice"). Any such Servicing Agent Notice will be sent to the address listed below your signature. To the extent that such address changes between the date you sign this Agreement and the Scheduled Maturity Date, you agree to provide us with notice of any such change within thirty (30) days. In connection with the delivery of the Servicing Agent Notice, the Servicing Agent may request that you provide advance written notice regarding whether you intend to repay the Amount Financed plus accrued interest and any other charges on the Scheduled Maturity Date or to relinquish the Policies.

*Hold Harmless.* To the fullest extent permitted by law, you agree to hold harmless the Servicing Agent and any of its affiliates, directors, officers, employees, shareholders, assigns, representative or agents (each such person being an "Indemnitee") for any loss, liability, damages or expenses (including reasonable attorneys' fees) (collectively, "Liabilities") suffered by virtue of acts or omissions or alleged acts or omissions arising out of such Indemnitee's activities, except to the extent any such Liability arises as a result of the gross negligence or willful misconduct of such Indemnitee.

## IF YOU FAIL TO PERFORM YOUR OBLIGATIONS

*We will take the Policies from you.* If you fail to pay the amounts due hereunder by the Scheduled Maturity Date, we will take the Policies from you (i.e., foreclose) by whatever methods are contemplated by the Security Interest Perfection Documents, and will send notices or instructions to the issuing insurance companies as to the change of beneficial ownership and designation of other beneficiaries of the Policies. We will send you a written notice of our activities in this regard.

*You will have to pay foreclosure and collection costs.* In the event that you fail to pay the amounts due hereunder on or before the Maturity Date and fail to relinquish the Policies, you will pay our costs, including attorneys' fees, court costs and collection costs paid in connection with our foreclosure on the Policies.

*We may liquidate the Policies.* We may surrender, sell or otherwise exercise rights under the Policies as the owner thereof if (i) you relinquish the Policies or (ii) you default and we foreclose upon the Policies. You

4

hereby agree that we may exercise in respect of the Policies, in addition to any other rights and remedies provided in this Agreement or the Security Interest Perfection Documents, all of the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in any applicable jurisdiction (whether or not the Uniform Commercial Code applies to the affected Policies) and also may, without notice except as specified below, sell or otherwise dispose of the Policies or any part thereof in one or more transactions for cash, on credit or for future delivery, and upon such terms as we may determine. You agree that, to the extent notice of disposition shall be required by applicable law (including the Uniform Commercial Code as in effect in any applicable jurisdiction), ten (10) days' prior written notice to you at the address set forth herein of the time and place of any sale is to be made shall constitute reasonable notification.

## YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS

You promise that you have given to us, the Servicing Agent and the insurance companies issuing the Policies true and correct information in connection with this Agreement and the related transaction documents, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this Agreement. Upon request, you will provide us with documents and other information necessary to verify any item contained in this Agreement or that we may otherwise reasonably request.

## MISCELLANEOUS

*Use of Medical Information of Underlying Life.* In the event that (i) you default under this Agreement and we take the Policies from you, or (ii) you relinquish the Policies to us in satisfaction of your obligations hereunder, the Servicing Agent may, in order to facilitate liquidation of the Policies, provide third parties certain of the information you supplied to us or that we have otherwise obtained in connection with the funding of this Loan with regards to each person whose life is insured under the Policies (each an "Underlying Life"). You hereby agree that so long as there is no expense to you, you shall cause each Underlying Life to consent to the sharing of such information by the Servicing Agent and its agents and employees, and you agree to reasonably cooperate with the Servicing Agent.

*Applicable Law.* Federal law and Illinois law govern the terms of this Agreement whether or not you live in Illinois. This Agreement has been accepted by us in the State of Illinois and all credit under this Agreement is extended from Illinois. If any part of this Agreement is not valid, all other parts stay valid (except as noted in the Arbitration Clause). We do not intend to charge or collect, and you do not agree to pay, any charge or fee, that is more than the maximum amount permitted by applicable law. If you pay a charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal balance has been paid in full, any excess will be refunded to you.

*General Provisions.* We may delay or forego enforcing any of our rights or remedies under this Agreement without losing them. You waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, you shall not be released from liability.

*Arbitration Clause.* EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY AN ARBITRATION AND NOT IN COURT OR BY JURY TRIAL. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to this Agreement or any related or resulting agreement, transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. Any claim

or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. If you or we elect arbitration, you may choose any one of the following arbitration organizations and its applicable rules: the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www. arb-forum.com), or JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com). You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration shall be conducted in the federal district in which you reside. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. The arbitrator's award shall be final and binding on all parties, except that the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. Any arbitration under this arbitration clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

Any court having jurisdiction may enter judgment on the arbitrator's award. This clause shall survive any termination, payoff or transfer of this Agreement. If any part of this arbitration clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

*Execution by the Trust.* It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it as trustee, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other document.

## HOW THIS AGREEMENT CAN BE CHANGED

This Agreement, the loan application and the Security Interest Perfection Documents contain the entire agreement between you and us relating to the transactions contemplated herein. Any change to this Agreement must be in writing and both you and we must sign it. No oral changes are binding.

# SIGNATURES

— Do not sign this Agreement before you read it.

— This is a binding legal document and you should seek legal, financial and tax advice before signing it.

— You are entitled to a completely filled-in copy of this Agreement (including the Funding Date) shortly after this Loan is funded.

— If you default in the performance of your obligations under this Agreement, we may foreclose on the Policies.

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY, INCLUDING THE ARBITRATION CLAUSE ABOVE, AND AGREE TO THE TERMS OF THIS AGREEMENT. EXCEPT FOR THE COMPLETION OF THE FUNDING DATE ON SCHEDULE A OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN COPY OF EVERY DOCUMENT THAT YOU SIGNED IN CONNECTION WITH THIS TRANSACTION. YOU AUTHORIZE US TO COMPLETE THE FUNDING DATE ON SCHEDULE A HEREOF FOLLOWING YOUR EXECUTION OF THIS AGREEMENT.

The Neil H. Ellis Insurance Trust – 2005,
Premium Finance Sub-Trust

By: Wilmington Trust Company, Trustee

By: _____
Name:        Janel R. Havrilla
Title:        Financial Services Officer

Address:
1100 North Market Street
Wilmington, DE 19890

Dated: 7/22/05

LaSalle Bank National Association

By: _____
Name:   Krista Lake
Title:   Attorney-in-fact



COVENTRY
CAPITAL                7111 Valley Green Road    Fort Washington, PA 19034-2209    877-836-8300    coventry.com

February 1, 2008

Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust
149 Colonial Road
Manchester, CT 06045

Re:    <u>Notice of Foreclosure of Collateral of PFP Loan—Loan ID #12070</u>

Dear Borrower:

Reference is made to that certain Note and Security Agreement (the "Agreement") dated as of July 26, 2005 between Neil H. Ellis Insurance Trust - 2005, Premium Finance Sub-Trust and LaSalle Bank National Association (the "Secured Party"). The outstanding balance of $3,921,112.16 was due on or before January 28, 2008 (the "Maturity Date").

As a result of your failure to pay the required amount prior to the Maturity Date, your loan is now in default and unpaid amounts will continue to bear interest at an interest rate equal to the lesser of (i) the interest rate stated in the Note plus 2% or (ii) the maximum amount permitted by law.

You are hereby notified that in the event that you fail to pay the amounts due under the Agreement by FEBRUARY 12, 2008, we will foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral.

Please contact us immediately at (877) 296-1700 to arrange for repayment of the outstanding obligations under the Note.

Sincerely,

*Richard Cooper*

Coventry Capital
Servicing Agent

EXHIBIT
2

## VERIFICATION

I, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, being first duly sworn on oath, deposes and states that she has read the above and foregoing Verified Complaint and under penalties of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge.

_Elizabeth Ellis_
Elizabeth Ellis

LEAHY, EISENBERG & FRAENKEL, LTD.
Attorneys for Plaintiff
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 346-4554
Firm I.D. 45875

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Elizabeth Ellis, as Co-Trustee of | ) | |
| The Neil H. Ellis Irrevocable | ) | |
| Insurance Trust-2005, No. 2 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2008 CH 05368 |
| | ) | |
| LaSalle Bank National Association and | ) | |
| Coventry Capital I LLC | ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2 by and through her attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and for her First Amended Complaint against the Defendants, LaSalle Bank National Association and Coventry Capital I LLC, states as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

1.    Plaintiff, Elizabeth Ellis, is a Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, ("Trust").  The Wilmington Trust Company as Settlor, Trustee, and, on information and belief, Beneficial Owner of the Trust, is the beneficiary of a $30,000,000.00 life insurance policy ("the Policy") on the life of Neil H. Ellis ("Ellis").

2.    Defendant, Coventry Capital I LLC ("Coventry") is, on information and belief, in the business of being a servicing agent and agent-in-fact for financing and purchasing life insurance policies to be issued on the lives of others. Coventry is, on information and belief, a foreign corporation with its principal place of business in Fort Washington, Pennsylvania.



3.      Defendant, LaSalle Bank National Association ("LaSalle") is, on information and belief, a bank chartered and licensed under the laws of the United States and the laws of the State of Illinois with its principal place of business in Chicago, Cook County, Illinois.

4.      At all relevant times, Vincent Passananti was an insurance broker and agent who would solicit persons like Ellis to purchase high-benefit insurance policies with financing of the premiums provided by third parties.

5.      Prior to the transaction which is the subject matter of this case, Passananti solicited Ellis to arrange for the purchase of a $10,000,000.00 life insurance policy on Ellis's life.    Coventry administered and acted as the servicing agent for the purchase of the $10,000,000.00 policy and the financing of its premium through LaSalle Bank.    Upon the recommendation of Passananti, Ellis elected to sell the $10,000,000.00 policy to a third-party. Ellis had little involvement with the purchasing and selling of the Policy and the financing of its premium.    Due to Passananti and Coventry's experience in the industry, Ellis relied on Passananti and Coventry to handle the details and complete the purchasing, financing, and selling of the policy.

6.      In 2005, Passananti solicited Ellis to arrange for the purchase of a $30,000,000.00 life insurance policy ("Policy") on Ellis' life and acted as Ellis' agent in said purchase.

7.      Passananti advised Ellis that he would arrange all of the legal work and the financing of the premium.    On information and belief, Coventry administered and acted as the servicing agent for purchase and financing of the Policy.

8.      Based on Passananti's representations, Ellis agreed to participate in the purchase of a $30,000,000.00 policy of life insurance on his life and, as he had done with the

$10,000,000.00 policy, relied on the expertise and experience of Passananti and Coventry in securing and financing the policy.

9.      On or about July 26, 2005, the Policy was purchased by the Trust, of which Elizabeth Ellis was a Co-Trustee and the Trust was designated as the beneficiary of the Policy.

10.     The Policy premium was financed by LaSalle Bank. A copy of the Note and Security Agreement is attached hereto as Exhibit 1.

11.     The Note and Security Agreement was signed only by the Corporate Co-Trustee.

12.     Neither Ellis nor Plaintiff, as Co-Trustee, agreed to or executed the financing agreement. In fact, Ellis and Plaintiff did not know that the Policy had been purchased on July 26, 2005 and were otherwise of the belief that the Policy had been financed and purchased on or about August 18, 2005. As the Note provided that the Loan would become due 30 months from the Financing Date, Ellis and Plaintiff were of the belief that the Maturity Date was February 18, 2005.

13.     Upon information and belief, as a result of the financing provided by the Agreement, the premium for the Policy has been paid through December 31, 2008.

14.     Ellis and the Trust first became aware of the Note's actual maturity on or about January 29, 2008, when Coventry sent notification via Federal Express that the Agreement's maturity date was the previous day, January 28, 2008, that the loan was in default and that by February 12, 2008, Plaintiff was required to pay the outstanding balance of $3,921,112.16 or lose its rights in the Policy and be subject to an action for foreclosure of the policy. At no time prior to that date did Plaintiff or Ellis receive a notice of premium due on the Policy. A copy of the January 29, 2008 correspondence is attached hereto as Exhibit 2.

15.     On or about February 1, 2008, via Federal Express, Coventry sent notification that the Trust had until February 12, 2008 to cure the alleged default on the loan or Coventry would "foreclose upon and sell or otherwise liquidate the life insurance policy(ies) set forth on Schedule A of the Agreement and proceeds thereof (the "Collateral") and/or use other legal remedies in order to satisfy your payment obligations under the Agreement, and you will be responsible for our costs, including attorney's fees, court costs and collection costs paid in connection with our foreclosure on the Collateral." A copy of the February 1, 2008 correspondence is attached as Exhibit 3.

16.     Due to Coventry's failure to provide proper notice of the Loan's Maturity Date, Ellis was unable to appropriate the funds necessary to satisfy the maturity date balance prior to February 12, 2008.

17.     On information and believe, Coventry initiated foreclosure of the Policy on or about February 13, 2008.

18.     By correspondence dated March 20, 2008, Coventry notified Plaintiff that the Policy was foreclosed upon and subsequently liquidated in order to satisfy the Trust's obligations under the Note. A copy of the March 20, 2008 correspondence is attached hereto as Exhibit 4.

## COUNT I
### (Breach of Fiduciary Duty)

1-18.     Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count I, as if fully set forth herein.

19.     Upon information and belief, Coventry received fees and commissions from both LaSalle, and Plaintiff, whereby Coventry received a portion or percentage of fees and

commissions that Plaintiff paid to Passananti in connection with the initial purchase of the Policy.

20.     Additionally, due to Coventry's experience in securing and financing life insurance policies, Ellis and the Trust relied on Coventry's skill and judgment in securing the Policy and administering the Loan, which included providing the Trust with proper notice of the loan's maturity date.

21.     Coventry owed Plaintiff a fiduciary duty to provide proper notice of the impending maturity date.

22.     By failing to provide the Trust with proper notice of the loan's maturity date, Coventry breached its fiduciary duty to Plaintiff.

23.     As a proximate and direct result of said breach, Plaintiff has suffered and will continue to suffer substantial damages in that Plaintiff has lost her $30,000,000.00 interest in the Policy and/or the cash surrender value of the Policy in an amount in excess of $50,000.00

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.


## COUNT II
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)

1-18.     Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count II, as if fully set forth herein.

19.    On information and belief, Coventry secured the lender for the policy premium and counsel to draft the Note.

20.    The Note's default provision provided that in the event the Trust failed to pay the loan's balance by the scheduled maturity date, LaSalle would have the right to foreclose, surrender, sell, or otherwise exercise rights under the Policy as the owner thereof.

21.    By allowing LaSalle to assume ownership of a policy on the life of an individual in which it had no insurable interest, the default provision created a "wager" policy on Ellis's life.  Wager policies on the life of another are forbidden by Illinois law as contrary to public policy.

22.    Despite its knowledge that the Note contained a provision which created an illegal wager policy on Ellis's life, Coventry secured the Note to finance the Policy's premiums and intentionally deceived Ellis and the Trust into believing that the Note was a legal instrument.

23.    Additionally, after Ellis rejected the initial offer to sell the Policy, Coventry, despite knowing that Ellis and the Trust were relying on Coventry to provide proper notice of the Note's maturity date, intentionally and deceptively failed to provide the Trust with proper notice of the maturity date.

24.    In failing to provide proper notice to the Trust, Coventry knew and intended that the maturity date would pass without the Trust's knowledge, thereby causing the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy and disperse the proceeds of the liquidation between itself and Coventry.

25.    As Coventry is in the business of securing and financing life insurance policies and was receiving commissions to act as the servicing agent for the subject transaction, its

deception of the Trust by intentionally securing a note with an illegal default provision and failing to provide proper notice of the maturity date was in the course of trade or commerce.

26.    As a result of the foregoing, Coventry violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*

27.    As a direct and proximate result of Coventry's violation of the Illinois Consumer Fraud and Deceptive Practices Act, Plaintiff has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00, plus statutory attorney's fees, penalties and costs.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred for statutory attorneys fees and penalties, and for any other and further relief this Court deems just and proper.

## COUNT III
### (Fraudulent Concealment)

1-18.    Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count III, as if fully set forth herein.

19.    By knowingly and intentionally failing to provide the Trust with proper notice of the impending maturity date pursuant to the terms of the Note, Coventry knowingly concealed a material fact – the Note's maturity date.

20.    In concealing the maturity date, Coventry knew that the Trust was relying on Coventry to provide proper notice of the maturity date and intended to induce the Trust into failing to pay the maturity date balance by the maturity date.

21.      Coventry's knowing concealment of the maturity date caused the Trust to default on the Loan, which allowed LaSalle to foreclose on and liquidate the Policy.

22.      Upon information and belief, Coventry profited from said transaction by receiving commission and fees in connection with the foreclosure and liquidation of the Policy.

23.      Had Coventry provided the Trust with proper notice of the maturity date, Ellis would have paid the maturity date balance to ensure that the Note was not defaulted upon and that the Policy would not be foreclosed and liquidated.

24.      As a direct and proximate result of the Trust's reliance and Coventry's intentional concealment, which caused the subsequent default, foreclosure, and liquidation, the Trust has suffered and will continue to suffer substantial damages in an amount in excess of $50,000.00.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess of $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.  Plaintiff also seeks punitive damages to the fullest extent permitted by law.

## COUNT IV
### (Unjust Enrichment/Disgorgement)

1-18.  Plaintiff repeats and realleges paragraphs 1-18 as paragraphs 1-18 of Count IV, as if fully set forth herein.

19.      Upon information and belief, Coventry, at the direction of LaSalle, effectuated the foreclosure and liquidation of the Policy, and profited from said transaction in receiving commission and fees in connection with the foreclosure and sale of the Policy.

20.     As a consequence of the acts set forth above, and to the extent that the sale of the Policy caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy, Coventry was unjustly enriched at the expense and detriment of Plaintiff.

21.     The Plaintiff requests that Coventry be dispossessed of all funds received by Coventry related to the foreclosure and sale of the Policy.

WHEREFORE Plaintiff, Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2, prays that judgment be entered in its favor and against Defendant, Coventry Capital I LLC, for an amount in excess $50,000.00, to the fullest extent permitted by law, together with any costs incurred, and for any other and further relief this Court deems just and proper.

## COUNT V
### (Constructive Trust)

1-23.     Plaintiff repeats and realleges paragraphs 1-18 and paragraphs 19-23 of Count I as paragraphs 1-26 of Count V, as if fully set forth herein.

24.     Coventry breached its fiduciary duty to Plaintiff by failing to provide the Trust with advance notice of the Note's maturity date.

25.     As a proximate result of Coventry's breach of its fiduciary duty, in acting as a dual agent and failing to act on Plaintiff's behalf, Coventry has caused Plaintiff to lose its interest in the Policy and the beneficiaries of the Trust to lose their rights and interests in the Policy.

26.    Coventry's abuse of confidence and/or violation of its fiduciary relationship allows for the imposition of a constructive trust.

27.    Plaintiff requests that this Court impose a constructive trust on the proceeds of the liquidated Policy, $3,993,000.00, against Coventry as LaSalle's agent until the disposition of this case as the proper and necessary means to protect Plaintiff from suffering future undue harm and damages.

WHEREFORE, Plaintiff requests that this Court enter an order imposing a constructive trust on said proceeds from the sale of the Policy, totaling $3,993,000.00, and for a declaration that Defendant, COVENTRY CAPITAL, LLC, hold the proceeds of the sale of the Policy as a constructive trustee, and for such other relief as the Court deems just and equitable.

Respectfully Submitted,

Elizabeth Ellis, as Co-Trustee of The Neil H. Ellis Irrevocable Insurance Trust-2005, No. 2

By:_____
          One of its attorneys

Stephen P. Eisenberg
Howard B. Randell
Mark L. LeFevour
James J. Sanders
Leahy, Eisenberg & Fraenkel, Ltd.
33 W. Monroe Street  Suite 1100
Chicago, Illinois 60603
(312) 368-4554
Attorney No. 45875
F:CASE\059808\12849\FIRST AMENDED COMPLAINT.doc

# COVENTRY
## CAPITAL

21 June 2005

Neil Ellis
149 Colonial Road
Manchester, CT 06045

Dear Mr. Ellis:

We have been advised that you are interested in participating in the PFP Program offered by
Coventry Capital and obtaining non-recourse financing in order to procure certain life insurance
policies. The attached Summary of Principal Terms and Conditions (the *"Loan Proposal"*) contains
the indicative terms and conditions upon which we may be able to arrange such financing for you.
Please note that the Loan Proposal is merely an indication of the terms and conditions of such a
financing, and remains subject to final underwriting approval.

The Loan Proposal is delivered to you on the understanding that none of its terms or substance shall
be disclosed, directly or indirectly, to any other person except to (a) your advisors who are directly
involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative
proceeding or as otherwise required by law (in which case you agree to inform us promptly).

If the Loan Proposal correctly sets forth our agreement, please indicate your acceptance of its terms
by executing, and returning it to us by no later than 07/04/2005. The Loan Proposal will expire at
such time in the event that we have not received a fully executed Loan Proposal from you.

In order to be able to issue the financing documents to you, we will need you to furnish us
with each of the respective items identified in the Checklist of Required Documents
attached to the Loan Proposal.

If you have any questions please feel free to contact our Contract Services Department at
(877) 836-8300. Coventry Capital is pleased to have the opportunity to assist you in connection with
this important transaction.

Very truly yours,

Krista Lake / KR

Krista Lake



# COVENTRY
## CAPITAL

## PFP℠ Summary of Terms and Conditions

### Borrower(s)

| Neil Ellis | | 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 | |
|---|---|---|---|
| Borrower | | Social Security Number or Tax ID Number | |

| | | | |
|---|---|---|---|
| Borrower | | Social Security Number or Tax ID Number | |

| 149 Colonial Rd | Manchester | CT | 06045 |
|---|---|---|---|
| Address | City | State | Zip |

### Insured(s)

| Neil Ellis | | 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 | |
|---|---|---|---|
| First Insured's Name | | Social Security Number | |

| 149 Colonial Rd | Manchester | CT | 06045 |
|---|---|---|---|
| Address | City | State | Zip |

| ☒ Male ☐ Female | 2/10/1928 | 77 | 77 |
|---|---|---|---|
| Insured's Sex | Insured's DOB | Proposed Issue Age | Actual Age |

| | | | |
|---|---|---|---|
| Second Insured's Name | | Social Security Number | |

| | | | |
|---|---|---|---|
| Address | City | State | Zip |

| ☐ Male ☐ Female | | | |
|---|---|---|---|
| Insured's Sex | Insured's DOB | Proposed Issue Age | Actual Age |

### The Policy(ies)

| 1. Security Life of Denver | AA | S&P | $30,000,000 |
|---|---|---|---|
| Insurance Carrier | Insurance Carrier Rating | Rating Agency | Net Death Benefit |

| LifeDesign Guarantee UL | Standard Non Smoker | | UL |
|---|---|---|---|
| Life Insurance Product | Rating Class Offered | | Policy Type |

| None | $2,195,700 | | 4.50% |
|---|---|---|---|
| Rider | Premium Per Loan Term | | Current Crediting Rate |

| Return of Premium with No Contractual Cap on the Death Benefit |
|---|
| Death Benefit Option |

# COVENTRY
## CAPITAL

### The Loan

| | |
|---|---|
| Lender: | LaSalle Bank N.A. |
| Program Administrator: | Coventry Capital I LLC |
| Total Loan Amount: | (x) + (y) + (z) |
| Life Insurance Premium(x): | $2,195,700 |
| Expenses related to Lender insurance coverage (y): | Not to exceed 10% of the Total Loan Amount |
| Interest (z): | The Loans shall bear simple interest at an approximate rate per annum equal to no less than 14.43%. |
| Term: | 30 Months |
| Purpose: | The proceeds of the Loans shall be used solely to finance the acquisition and maintenance of the Policies |
| Origination Fee: | A one-time origination fee which is an amount equal to the greater of: (i) $5,000 and (ii) 1% of the Total Loan Amount, payable by the Borrower(s) in cash upon issuance of the Loans. |
| Prepayments: | The Loans may be prepaid by the Borrower(s) at any time prior to maturity subject to the terms of the loan documents. |
| Collateral: | The obligations of the Borrower(s) in respect of the Loans shall be secured by a perfected first priority security interest in (i) each of the Policies and (ii) insurance coverage maintained by the Lender. |
| Default: | The failure of the Borrower(s) to pay when due the outstanding principal and interest of the Loans. |
| 30 Day Rate Commitment: | Upon receiving your executed acceptance of this proposal, we will compute each of the amounts above, (x), (y), and (z). These amounts will be communicated to you as part of your loan closing package and will not change provided that your loan is financed within 30 days from the issuance of the loan package. After 30 days from the issuance of the loan package, the terms of the loan will be reevaluated and are subject to change. |

### Example

If the proposed transaction was completed today, the following represents the loan information:

| $3,265,079 | $2,195,700 | |
|---|---|---|
| Total Loan Amount | Life Insurance Premium (x) | |

| $203,770 | $865,609 | 14.43% |
|---|---|---|
| Expenses related to Lender insurance coverage (y) | Interest (z) | Interest Rate |

# COVENTRY
## CAPITAL

### Approval

This proposal, and the availability of the Loans, shall be conditioned upon receipt by the Program Administrator of each of the following items, each in form and substance satisfactory to the Program Administrator:

1. Final underwriting approvals.
2. Execution and delivery of definitive financing documentation with respect to the Loans.
3. Each of the respective items in the Checklist of Required Documents attached hereto as Exhibit A.

### Modifications of this Proposal

This is only a non-binding proposal and is not a firm agreement or commitment by the Lender to enter into a transaction or provide the Loans. The Program Administrator may withdraw this proposal at any time prior to a definitive written commitment to enter into the transaction.

### Proposal Accepted and Agreed

By: _____    / /
Neil Ellis                                                       Date

By: _____    / /
Neil Ellis                                                       Date

Closing Documents should be sent to:

_____
Name

_____
Address                              City          State        Zip